**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | | |
|---|---|---|
| **TOM KONDASH,** on behalf of himself and all others similarly situated, | ) ) | Case No. 1:15-cv-506 |
| | ) | Judge Susan J. Dlott |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **KIA MOTORS AMERICA, INC.,** and | ) | |
| **KIA MOTORS CORPORATION,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................... 2

     A.    The Defective Panoramic Sunroofs in Class Vehicles ............................ 2

     B.    Kia Discovered the Defect Years Ago but Continued Manufacturing
          and Selling the Defective Vehicles ........................................................ 5

     C.    Kia Falsely Claims That Only Rocks Are to Blame ............................... 6

     D.    The Dangerous Failings of Class Vehicles' Panoramic Sunroofs ........ 10

     E.    Kia Has and Will Continue to Profit from Its Misconduct. ................... 13

III.   ARGUMENT ..................................................................................................... 14

     A.    The Proposed Class ................................................................................ 14

     B.    Numerosity Is Satisfied. ........................................................................ 15

     C.    Common Questions Both Exist and Predominate. ................................. 15

     D.    Plaintiff's Claims Are Typical of Other Class Members. ...................... 18

     E.    The Adequacy Requirement Is Satisfied. .............................................. 19

     F.    The Superiority of the Class Action Device .......................................... 20

IV.   CONCLUSION ................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Briseno v. ConAgra Foods, Inc.*,

    844 F.3d 1121 (9th Cir. 2017) ................................................................ 15

*Brown v. City of Detroit*,

    No. 10-CV-12162, 2014 WL 7074259 (E.D. Mich. Dec. 12, 2014) ....................................... 17

*Chapman v. Tristar Prod., Inc.*,

    No. 1:16-CV-1114, 2017 WL 1433259 (N.D. Ohio Apr. 24, 2017) ....................................... 14

*Daffin v. Ford Motor Co.*,

    458 F.3d 549 (6th Cir. 2006) ................................................................ 14, 15, 20

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,

    722 F.3d 838 (6th Cir. 2013) ................................................................ passim

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,

    45 F.Supp.3d 724 (N.D. Ohio 2014) ................................................................ 18

*In re: Lenovo Adware Litig.*,

    No. 15-md-02624, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ........................................... 18

*Mullins v. Direct Digital, LLC*,

    795 F.3d 654 (7th Cir. 2015) ................................................................ 15

*Palombaro v. Emery Fed. Credit Union*,

    No. 1:15-CV-792, 2017 WL 3437559 (S.D. Ohio Aug. 10, 2017) ....................... 14, 15, 19, 20

*Sanchez-Knutson v. Ford Motor Co.*,

    310 F.R.D. 529 (S.D. Fla. 2015) ................................................................ 18

*Sandusky Wellness Ctr. v. ASD Specialty Healthcare*,

    863 F.3d 460 (6th Cir. 2017) ................................................................................. 15

*Sprague v. Gen. Motors Corp.*,

    133 F.3d 388 (6th Cir. 1998) ................................................................................. 18

*Tyson Foods, Inc. v. Bouaphakeo*,

    136 S. Ct. 1036 (2016) ........................................................................................... 16

*Wal-Mart Stores v. Dukes*,

    564 U.S. 338 (2011) ................................................................................................ 18

*Young v. Nationwide Mut. Ins. Co.*,

    693 F.3d 532 (6th Cir. 2012) ................................................................................. 14

## Rules

Fed. R. Civ. P. 23(a)(4) ................................................................................................ 19

Federal Rule of Civil Procedure 23(a)(1) ................................................................... 15

Rule 23(a)(2) and (b)(3) .............................................................................................. 15

Rule 23(a)(3) ................................................................................................................ 18

Rule 23(b)(3) ................................................................................................................ 20

I.       **INTRODUCTION**

This proposed class action stems from Kia's decision to manufacture and sell vehicles equipped with panoramic sunroofs even though the sunroofs are prone to shattering without warning. Drivers compare the sound of the shattering to that of a gunshot and report being cut by the falling glass and being so startled they veer out of their lanes. One driver reported suffering a laceration to an artery, requiring five stitches. Others have reported crashing into a stop sign or guard rail.

Kia learned of this danger years ago, receiving a steady stream of complaints from drivers beginning when the vehicles first went on sale. By 2012, Kia had opened several formal inquiries, recognizing the severity of the problem and seeking some sort of countermeasure. No countermeasure followed, however. Kia chose not to fix the problem, and instead continued concealing it from drivers and prospective buyers. At the same time, Kia has warded off regulatory inquiries, telling regulators the only reason the sunroofs shatter is bad luck; flying rocks and road debris are smashing into the glass. Internally, however, Kia has long recognized that road debris is—at most—a "contributing factor." The regulators are likewise skeptical. Even in the face of severe budgetary constraints, the regulators have rejected Kia's invitation to blame road debris and close their investigation.

The widespread nature of Kia's conduct—manufacturing and selling defective vehicles and concealing the danger—makes class certification appropriate. Classwide proof can speak to the main issues in this case: that there's a defect, that it's dangerous, and that Kia continued to manufacture and sell the vehicles while concealing the danger from drivers. A certified class action will not only allow these points to be established for all class members at once, but will also provide a method for compensating consumers (who overpaid for defective vehicles).

1

Plaintiff therefore asks that the Court certify the proposed class, appoint class counsel, and direct that notice be sent to class members.

## II.     FACTUAL BACKGROUND

### A.     The Defective Panoramic Sunroofs in Class Vehicles

Panoramic sunroofs are larger than traditional sunroofs, allowing more light to enter the vehicle cabin. (Stein Decl., Ex. 2[1] at 78, Ex. 3 at 94, Ex. 4 at 113, Ex. 5 at 126.) In the late 2000s, Kia began selling the sunroofs as part of a luxury upgrade package, which costs thousands more than non-upgrade models. (Ex. 1 at 1-2, Exs. 6-10.)

The "Class Vehicles" in this case are the following models equipped with panoramic sunroofs: 2011-2015 Sorento, Sportage, and Optima (including hybrid) and the 2014-2015 Cadenza. (Ex. 1 at 8-10.) The panoramic sunroofs in Class Vehicles share a common design concept that makes them prone to abrupt shattering. (Hannemann Decl. at ¶ 20-23; Read Decl. at ¶¶ 2-3, 23-32.) They feature large, thin, curved panels of weakened glass fastened onto vehicle frames in a manner that causes the stresses of vehicle movement to be absorbed into the glass, so even minor scratches can grow and eventually cause the sunroofs to shatter without warning. (Read Decl. ¶¶ 2-3, 23-32, 48-51; *see also* Ex. 11 (ODI Letter) at 9.) When the sunroofs shatter, all or most of the sunroof fragments, with pieces of glass raining down into the passenger cabin and also blowing out onto the exterior of the vehicle and onto the roadway. Thus, the sunroof glass differs, for example, from windshield glass, which can develop major cracks without shattering completely. (Read Decl. ¶¶ 16-17.) An example of a photograph taken after the fact, available on the NHTSA's website, appears below:

---

[1] Citations to "Ex. __" refer to exhibits to the Declaration of David Stein, filed concurrently with this brief.



(Ex. 136 at 1627.)

Sunroofs are not like tires, brake pads, or other "wear parts"—they should last the life of a vehicle and should withstand the ordinary and foreseeable conditions to which vehicles are exposed. (Hannemann Decl. ¶¶ 24-25.) This includes exposure to a wide variety of temperatures, vehicle movement, and sudden shocks such as a car wash on a hot day and small stones kicked up off the road. (*Id*. ¶ 25; Ex. 12 at 175 ¶ 30; Ex. 13 at 243; Ex. 14 at 256 ¶ 3.2.1, 269 ¶ 5.6.) But the sunroofs in Class Vehicles do not reliably withstand the stresses to which vehicles are commonly exposed.

Understanding the defect begins with the nature of the tempered glass used in the Class Vehicles' sunroofs. (*See* Hannemann Decl. ¶ 20; Read Decl. ¶¶ 14, 16, 18-21, 25-26, 32, 40-42; Doc. 75, Kim Depo., PAGEID 1019, 30:6-8.) Tempered glass is rapidly cooled when it is made so that its outer surface contracts around its center core. (*See* Read Decl. ¶¶ 16, 18-19, 40, Exs.

15-16 at 302, 324.) This process typically strengthens the glass, but it has a downside: when a scratch grows from the glass's surface into the core, the entire panel of glass abruptly shatters into hundreds of smaller pieces.

Next, it is important to understand that although scratches do not grow in tempered glass unless stresses are applied to the glass, (Read Decl. ¶¶ 14, 40-42), the design of Class Vehicles exposes the sunroof glass to substantial stress. The glass panels used in Class Vehicles are curved, (Doc. 75, Kim Depo., PAGEID 1019, 30:3-5), and are fitted in a stiff sunroof frame attached to the vehicle body.) (Read Decl. ¶¶ 2-3, 23-24, 26, 29, 31; Hannemann Decl. ¶ 21; Exs. 17-20 at 336-37, 339, 341; Doc. 75, Kim Depo., PAGEID 1017-19, 27:17-29:3.) Also, Class Vehicles employ a "unibody" construction, meaning that the vehicle body is a single molded unit, and road stresses are transmitted throughout the vehicle, including the roof. (Hannemann Decl. ¶ 23; Read Decl. ¶¶ 3, 24, 31.) With the panoramic sunroofs spanning virtually the entire roof, instead of metal bearing road stresses, it is the tempered glass via the attached edges of glass that must absorb these stresses. (Hannemann Decl. ¶ 23; Read Decl. ¶¶ 24, 29; Exs. 19, 21-23 at 338, 342-44.) So when the vehicles are driven, their sunroofs' glass is stressed by the environment—be it pot holes, speed bumps, cornering, or driving on rough roads. (Hannemann Decl. ¶¶ 23, 25; Read Decl. ¶ 29.)

Finally, even though the Class Vehicles' design requires the tempered glass to bear these stresses, the glass is too thin and weak to do so. The glass in Class Vehicle sunroofs is only four millimeters thick, (Ex. 1 at 9-10; Doc. 75, Kim Depo., PAGEID 1017, 28:10-14), so scratches need to expand less than one millimeter before they reach the core and cause the sunroof to shatter. (*See* Read Decl. ¶¶ 27, 40.) Every glass panel is also coated with ceramic paint around its border, a known adulterant that substantially reduces the strength of glass. (Read Decl. ¶¶ 3, 28,

4

31; Doc. 79, Chung Depo., PAGEID 2611, 85:5-9; Exs. 24-25 at 347-48, 351-52.) Kia vehicles

use considerably more ceramic paint than the industry average, making the glass particularly

weak. (*Id.*, Ex. 26 at 354-55; Ex. 27 at 356; Ex. 28 at 365; *see also* Ex. 93 at 1297.)

B.      **Kia Discovered the Defect Years Ago but Continued Manufacturing and
         Selling the Defective Vehicles**

Kia has told the National Highway Traffic Safety Administration (NHTSA) that it first

began evaluating the problem of shattering panoramic sunroofs in May 2012. (Ex. 11 at 163.) As

the driver complaints discussed below show, however, Kia was well aware it had a problem over

a year earlier. In fact, by July 2011, Kia had already opened a formal inquiry. (Ex. 29 at 375.)

The inquiry-opening report states Kia had received reports of sunroof glass shattering for "no

apparent reason," and marks the problem "Priority A." (*Id.*) In subsequent months, Kia would

open at least five similar inquiries. (Exs. 30-35 at 376, 404, 409, 457, 482, 485.) The inquiry-

opening reports recognized the sunroofs shatter in two scenarios—"while driving" and also while

parked, particularly "while opening/closing" the doors and sunroofs themselves. (*See* Ex. 30 at

376; Ex. 32 at 409; Ex. 33 at 457.) The reports also note Kia was "[u]nable to determine [the]

root cause" of the shattering. (Ex. 30 at 376; Ex. 31 at 404; Ex. 32 at 409.) And they request that

Kia's Korean parent company (Kia Motor Company) issue a countermeasure to solve the

problem. (Ex. 30 at 376 ("KMC Action Requested C/M Part YES"); Ex. 32 at 409 (same); Ex.

33 at 357 (same).)

Kia began listing the shattering panoramic sunroofs in its weekly "Top Issues" report

beginning in January 2013.  (Ex. 36 at 537.)  By the end of 2013, the shattering was listed as a

"Top Issue" for all four Class Vehicle models. (Ex. 37 at 577; Ex. 38 at 597.)  Each remained

listed in the report until mid-2015, when Kia removed the issue from the list despite failing to

resolve it. (Ex. 39 at 620.) In early 2015, the shattering sunroofs—again in all four Class Vehicle models—were separately listed in Kia's list of "Potential Safety Issues." (Exs. 40-41 at 622, 628-31, 636-39; Exs. 42-43 at 652, 656-58; Exs. 44-45 at 662, 667, 687.)

Despite recognizing that it was receiving a steady flow of complaints from drivers and that the number of shattered sunroofs was high enough to pique the interest of federal regulators, Kia made no changes to protect drivers. (Doc. 75, Kim Depo., PAGEID 1040, 51:6-9.) It did not stop selling the vehicles while it investigated potential design changes. And Kia did not warn its customers—providing no notice to those buying new vehicles and no warning to those already on the roads about the risk of the shattering. Kia failed to do so even though all new Kia vehicles are sold at Kia's authorized dealerships, meaning Kia has great capacity for warning potential customers. (*See* Ex. 46 at 692 (Volkswagen conducted a recall when its vehicles' sunroofs posed a similar risk); Ex. 47 at 694 (as did Hyundai).)

C.     **Kia Falsely Claims That Only Rocks Are to Blame**

The NHTSA began investigating shattering Kia sunroofs in October 2013, (Ex. 48 at 696), noting that the "[g]lass shattering while driving could distract the driver and the resulting glass particles could injure occupants." (*Id.*) In response, Kia took the position that the sole reason for the shattering was flying rocks and other road debris smashing into the glass. Kia told the NHTSA, for example, that "Kia has only identified one meaningful cause for the breakage, which is external impact from rocks or other foreign objects." (Ex. 11 at 162.) Kia went on to say that its "investigation has at all times shown an absence of any manufacturing process, design or quality control defect." (*Id.*)

In reality, the flying rock theory has never been able to serve as a complete explanation. This is reflected in Kia's own documents. For example, Kia concluded internally that "External

6

Influences / Rock Impact has been identified … as a ***contributing factor***" only. (Ex. 49 at 698 (emphasis added); *see also* Ex. 50 at 824 ("No definite root cause determined at this time."); Exs. 37-38 at 577, 597 (Kia request for "Assistance for Further Investigation to 'Root Cause' as Issue is Complex").) And only about a month before telling the NHTSA that rocks, and only rocks, were to blame, another internal Kia document said that, many months into Kia's investigative efforts, Kia and its glass supplier were still at the initial "Solving of issue started" phase, with no "Clean Point" yet demarcating the vehicles free of the defect. (Ex. 51 at 827.) Following its rock-blaming letter to the NHTSA, Kia was still holding meetings at which the shattering sunroofs were listed among the "open critical issues/Help needed." (Ex. 52 at 852.) Most recently, in January 2017, Kia continued to list the shattering panoramic sunroofs among its "Significant Field Issues." (Ex. 53-54 at 853, 856-58.)

Despite Kia's assurances that flying rocks are to blame, the NHTSA was not persuaded. Rather than closing its investigation, the NHTSA upgraded it to the "Engineering Analysis" phase. (Exs. 55-56 at 871, 873.) In doing so, the NHTSA acknowledged that Kia had "identified only one potential cause for the sunroof breakage—external impacts from rocks or other foreign objects encountered while the vehicle was in motion." (Exs. 55-56.) The NHTSA concluded, however, that "the rate of … reported incidents is concerning," so "the investigation has been upgraded." (*Id.*)

Since the time the NHTSA upgraded its investigation, in May 2014, the NHTSA also expanded the investigation's scope, asking for additional information from not only Kia, but also Kia's sister company in Korea, Hyundai, and other automotive manufacturers. (Exs. 57-58 at 875, 882-83.) Three and a half years later, the investigation remains open. (Doc. 77, Park Depo., PAGEID 1405, 152:1-2.) As described below, much of that time appears to have been spent

studying the root cause of sunroof shattering in cooperation with the international community. As of early 2017, however, the NHTSA has begun to face "budgetary issues" and "various changes" that hampered its sunroof-related efforts. (Ex. 59 at 889.) It is unclear how that will affect future NHTSA efforts or the open investigation.

The international efforts, which include cooperation from the NHTSA and other governmental bodies, have made important findings about the sunroof shattering. In particular, the United Nations working group studied the amount of force generated by "worst-case" road debris and compared that force to the force inflicted on sunroof glass during standard preproduction testing. (Ex. 12 at 175 ¶ 30.) The group found that the force generated during testing is actually far greater than that generated by even worst-case road debris. Put another way, non-defective sunroof glass should *not* break due to road debris alone.

To be more specific, the applicable standard requires that the tempered glass used in sunroofs be able to withstand the dropping of a half-pound steel ball from a height of ten feet. (*Id.*; Ex. 60 at 916-17.) By contrast, a "typically encountered stone was determined to have a mass of 2-3 g[rams]," (Ex. 12 at 175 ¶ 30), and the "worst-case impact velocity" for the typical stone was determined to be 150 km/h (or roughly 93 mph). (*Id.*) This "worst-case" stone, traveling 93 mph, generates far less force than the steel ball dropped from 3 meters; instead, it is comparable to the same ball being dropped from far lower—only 1.17 meters. (*Id.*)

This means the "worst-case" road debris should not come close to breaking sunroof glass—assuming the sunroof is not defective. Only by incorporating the defect can this discrepancy be explained. And that is where it is important to understand how the testing is conducted. When Kia performs the testing it does *not* use actual Class Vehicle sunroof glass. (Ex. 60 at 757.) Instead, it uses a "tempered glass sample." (*Id.*; Doc. 75, Kim Depo., PAGEID

1069-70, 80:10-81:7.) That means when the steel ball is dropped, it falls onto glass that is not subject to bending stresses. Likewise, the ball is dropped onto glass that has not been weakened with ceramic paint. (Doc. 75, Kim Depo., PAGEID 1073-74, 84:21-85:11.) But more recently, Kia's sunroof glass supplier experimented with ball drops on sunroof glass that *did have* ceramic paint already applied, and it confirmed the UN group's findings: with the ceramic paint applied, the glass shattered at far lower heights (between 1 and 1.5 meters) than the 3 meters contemplated by the standard. (Ex. 61 at 925.)  Testing in Korea confirmed the same in the sunroofs for each Class Vehicle model. (Exs. 62-63 at 929, 932.)

These differences are key. Whereas tempered glass like that used in Class Vehicle sunroofs is toughened to withstand impacts, the glass coated with ceramic paint is 43% weaker than typical tempered glass.  (Ex. 28 at 372.) And it is even weaker than ordinary glass (*i.e.*, glass that that never underwent toughening process in the first place). (*Id.*; *see also* Ex. 64 at 952.) Thus, while the international efforts continue, they have already recognized that "CPA [ceramic paint area] induced strength reduction, in conjunction with stone impact, [is] a potential source of sudden breakage." (Ex. 65 at 955.)

Finally, the flying rock theory is also incomplete because—in many instances—the sunroofs are shattering in circumstances that rule out high speed road debris impacts. Sunroofs are shattering while parked, while stopped at intersections, while exiting car washes, and when car doors are slammed shut. (Read Decl. ¶ 36.) As Kia itself has acknowledged, to the extent any of these sunroofs were ever struck by an external impact, "the full fracture [is] occurring later, say while being driven on a rough road, or even while the vehicle is parked in a hot location." (Ex. 66 at 956.) Or, as Kia told the NHTSA, scratches or other "latent damage" can lead to "breakage when later events occur, any one or more of which may stress the glass to the point of

9

breakage." (Ex. 11 at 163.) Those "later events" include "vibration caused by driving at high speeds, vibration from driving on rough roads or road disruptions such as railroad tracks, aerodynamic lift, changes in temperature, operation of the sunroof, track obstructions, and weather conditions such as hail or high winds." (*Id.*) This too is consistent with the NHTSA and international efforts, which found that "bending loads may increase the propensity for failures to occur, specifically when vibratory loads are introduced during vehicle movement or flexion from traversing road hazards such as speed bumps." (Ex. 67 at 956.)

This all explains why, even in Kia's view, road debris is merely a "contributing factor." And it explains why the NHTSA did not accept Kia's statements to the contrary.

### D. The Dangerous Failings of Class Vehicles' Panoramic Sunroofs

Although many Class Vehicles are just a few years old, hundreds of panoramic sunroofs have already shattered, (Ex. 1 at 71), and every model and model year of Class Vehicle has experienced spontaneous shattering. (*Id.*) The shattering endangers drivers, passengers, and anyone else on the road. (Hannemann Decl. ¶¶ 33-41; *see also* Ex. 51 at 830; Ex. 81 at 1098-99; Exs. 82-84 at 1108; Ex. 83 at 1111-12; Ex. 84 at 1122.)

It is well known that driver distraction leads to many crashes, injuries, and deaths each year. (Hannemann Decl. ¶¶ 34-35; *see* Ex. 48 at 696 ("Glass shattering while driving could distract the driver and the resulting glass particles could injure occupants."); *see also* Ex. 68 at 978 (Hyundai reports that "[i]f the panoramic sunroof glass panel were to break while the vehicle is in motion, it could cause driver distraction.") When panoramic sunroofs shatter in Class Vehicles, the abrupt shattering of a large glass panel directly over a driver's head is so loud many drivers believe they have been in an accident or that a gun was fired, as the following driver reports reflect:

10

- 2012 Sportage, March 6, 2015 — "It was a loud popping and **thought it was a gun shot**. Then I thought it was a tire popped, noticed the sunroof had broken."

- 2012 Optima, July 24, 2014 — "They were driving and she and my son said it sounded **like a shot gun blast**, the sunroof breaks… It scared them both and part of the glass fell in, most of it hit my son on his face and his chest"

- 2012, Sorento, March 18, 2014 — "I know people over here fire guns in the air . . . . **All of a sudden this explosion went off** 2. The next thing I knew [REDACTED] had blood on his face on my arm 3. We were totally submerged in glass. 4. Everything was covered in glass, it took me 2 days to get the glass out of my hair"

- 2013 Optima, March 14, 2013 — "My husband is in military… He was in Afghanistan 2 years ago and hit by **bomb**… When sunroof glass exploded, he opened the door even though car was still driving on the highway"

- 2014 Cadenza, Sept. 13, 2013 —"The vehicle was in the left hand turn bay and we heard a **loud explosion** like a blow out"

(Ex. 69 at 986; Ex. 70 at 989; Ex. 71 at 1006; Ex. 72 at 1019; Ex. 73 at 1025 (emphasis added);

*accord* Ex. 74 at 1036 (Kia employee reporting: "I was driving, loud pop and glass fell all over

me. . . . . Now, get this, I was driving the same car today and the exact thing happened . . . yep,

explosion #2.").)

Even momentary distractions are dangerous, as drivers may leave their lanes when

distracted or fail to notice other vehicles, pedestrians, or objects entering their paths.

(Hannemann Decl. ¶¶ 34-35.) Kia's manager of Product Quality experienced a sunroof

shattering in 2011: "Cruising down freeway my sunroof glass blew-out… **scared the heck out of

me** glass flying everywhere." (Stein Decl., Ex. 75 at 1041 (emphasis added).) Other startled

drivers report they reacted by swerving or braking:

- 2013 Sorento, October 16, 2014 — "We were just driving [when] the sunroof exploded and it scared me and I **started veering** to the sign and **hit a street sign**"

- 2011 Optima, April 15, 2015 — "Next thing I heard was a boom… I pulled off and **veered off to the side…** I **scraped** the side of the car **on the guardrail**, it wasn't crushed"

- 2014 Cadenza, December 26, 2014 — "I heard a loud boom … I thought there was a small explosion… Some glass hit me on my head, I don't remember the size… I *swerved* a little right when this happened, I was shocked; *fortunately no one was next to me*"

- 2013 Optima, May 7, 2015 — "I heard a loud bang what sounded like a gunshot and I was peppered with glass... It shocked me so back that *I swerved into the next lane*… Luckily there were no cars around or I would've hit someone"

- 2014 Optima, March 24, 2015 — "There was glass everywhere… All over my face and my mouth… *I swerved*… I panicked"

(Ex. 76 at 1047; Ex. 77 at 1064; Ex. 78 at 1071; Ex. 79 at 1079; Ex. 80 at 1094 (emphasis added).)

Although tempered glass is considered safer than some types of glass, it still has sharp edges that can cut skin and eyes. A number of people have raised concerns about the added danger caused by the falling glass. A Kia affiliate, for example, raised the following warning:

> Please be informed that *several cases have been involving infants whom lying on their back in special designated child seats has been more or less covered with glass fragments*. Since the infants are facing the panoramic sunroof directly there is just luck that no infant so far has been traumatized with severe eye injuries.

(Ex. 81 at 1099 (emphasis added).) In other instances, drivers have reported suffering abrasions from the falling glass, including one driver who was taken to the hospital by ambulance after the falling glass sliced open an artery:

- 2013 Sorento, April 11, 2014 — "Just had a sun roof failure … it *went off like a bomb*, unfortunately I had the curtain open, I was injured by the glass and taken to *hospital by ambulance*, 1 stitch to repair an *arterial bleed* and *5 stitches to close the wound*."

- 2013 Optima, March 25, 2015 — "Big huge explosion and glass started raining down . . . My *fingers were starting to bleed* at that point in time, the glass shattered in tiny little pieces. The glass was all in my hair and all over."

- 2012 Sportage "My *grandson was covered in glass*, no injury just *scared to death*… There was a big shard of glass hanging, 12 to 14 inches long, he had to remove it … [my son] left the car there and took one of his car and went to the hospital and got a *couple of stitches*… I'm not sure which hand, they took a piece of glass out of his eye… It was in his eye, it wasn't stuck in his eye."

12

- 2012 Sorento, August 28, 2014 — "callers daughter had *cuts, scratches on arms, legs, feet* from the shattered glass"

(Ex. 51 at 830; Ex. 82 at 1108; Ex. 83 at 1111-12; Ex. 84 at 1122 (emphasis added).)

The same falling glass can also damage the vehicles. (*See* Ex. 85 at 1130 ("The *paint was also scratched* from the glass when the sunroof exploded… The noise caused me to *swerve* on the interstate and *also caused the car next to me to swerve*" (emphasis added)).)

Notwithstanding the above complaints, Kia has told the NHTSA that "there have been "[n]o crashes nor serious or moderate injuries" tied to the shattering. (Ex. 86 at 1138.) Kia has told the NHTSA that "only scratches" have resulted from the shattering and that any "nicks are less significant than a typical shaving razor cut." (Ex. 87 at 1150; Ex. 90 at 1166.) And despite the above reports of drivers hitting stop signs, contacting guard rails, and swerving as a result, Kia has told the NHTSA that there have been "[n]o vehicle control incidents." (Ex. 87 at 1150.)

### E. Kia Has and Will Continue to Profit from Its Misconduct

Plaintiff Tom Kondash purchased a Class Vehicle from Kings Kia, an authorized Kia dealership in Cincinnati. (Ex. 91 at 1214.) Hundreds of thousands of other individuals have bought the vehicles as well, including over eleven thousand in Ohio. (*See e.g.*, Ex. 90; Ex. 91.)

By failing to manufacture and design Class Vehicles in a non-defective manner, Kia sold Plaintiff and other class members defective vehicles, but at prices normally charged for non-defective vehicles. Kia thus profited at the expense of Plaintiff and its other customers, who all received dangerous vehicles worth less than the non-defective vehicles for which they paid.

To assess the financial harm Kia caused consumers at the point of sale, Plaintiff has retained two expert witnesses—Colin Weir and Steven Gaskin—to measure damages based on conjoint analysis, which uses a combination of economic theory, statistics, and survey data to estimate the decrease in market value corresponding to the defect in Class Vehicles. (Gaskin

13

Decl., ¶¶ 4-5, 10-13, 55-59; Weir Decl., ¶¶ 4, 7-9, 11, 15-16, 20.) This methodology is legally sound and is discussed in further detail below.

## III.  **ARGUMENT**

Class certification is appropriate when the four factors of Rule 23(a)—numerosity, commonality, typicality, and adequacy—are satisfied and when at least one prong of Rule 23(b) is satisfied. As several courts in the Sixth Circuit have held, cases involving defects in vehicles and other mass-produced products are well-suited for class certification. *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 844 (6th Cir. 2013); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 550 (6th Cir. 2006); *Chapman v. Tristar Prod., Inc.*, No. 1:16-CV-1114, 2017 WL 1433259, at *11 (N.D. Ohio Apr. 24, 2017).

### A.      **The Proposed Class**

Plaintiff seek to certify the following statewide class: <u>*All persons and entities who purchased or leased a Class Vehicle in Ohio*</u>.[2] This definition suffices because "the court [will] be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Palombaro v. Emery Fed. Credit Union*, No. 1:15-CV-792, 2017 WL 3437559, at *3 (S.D. Ohio Aug. 10, 2017) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)). Class membership will turn on two objective criteria: whether someone bought a particular vehicle and whether they did so in Ohio.

Some courts have scrutinized proposed class definitions still further to determine whether class membership will be "ascertainable"; but since ascertainability is not an express requirement

---

[2] Excluded from the proposed class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which a Defendant has a controlling interest; any officer, director, or employee of a Defendant; any successor or assign of a Defendant; anyone employed by counsel for Plaintiff; any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; and anyone who purchased a Class Vehicle for the purpose of resale.

under Rule 23, courts have recently begun expressing doubt as to whether such a requirement applies. *Sandusky Wellness Ctr. v. ASD Specialty Healthcare*, 863 F.3d 460, 472 (6th Cir. 2017) (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017)). In any event, identifying class members here will pose no undue difficulties. Kia maintains records of its vehicle sales, and vehicle purchases and leases generate transaction records, finance agreements, vehicle registration documents, and a host of other records that will allow for ready identification of those who bought and leased Class Vehicles in Ohio. (*See e.g.*, Ex. 89.)

### B.    Numerosity Is Satisfied

Under Federal Rule of Civil Procedure 23(a)(1), the proposed class must be "so numerous that joinder of all members is impracticable." While there is not an exact numerical cutoff for numerosity, "substantial" numbers satisfy this requirement. *Palombaro*, 2017 WL 3437559, at *4 (citing *Daffin*, 458 F.3d at 552). Here, Kia sold and leased hundreds of thousands of Class Vehicles, including over eleven thousand Class Vehicles in Ohio. (*See e.g.*, Exs. 90-91.) Thus, joining all class members into one action would be impracticable, satisfying the numerosity requirement.

### C.    Common Questions Both Exist and Predominate

The provisions of Rule 23(a)(2) and (b)(3) pose closely related requirements. To avoid repetition, Plaintiff analyzes both (a)(2) commonality and (b)(3) predominance together here.

Under (a)(2), there must be "questions of law or fact common to the class," and under (b)(3) those common questions must "predominate over any questions affecting only individual members." Whereas an individual question is one where class members would need to present evidence that "varies from member to member," a "common question is one where the same

15

evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks and brackets omitted). But in showing that common questions predominate, Plaintiff "need not prove that each element of a claim can be established by classwide proof." *In re Whirlpool*, 722 F.3d at 858. Courts thus "start from the premise that there need be only one common question to certify a class." *In re Whirlpool*, 722 F.3d at 853.

Here, both of Plaintiff's claims can largely be dispatched by answering the same question. Per the Sixth Circuit, both claims hinge—in large part—on the overlapping question: whether the Class Vehicles are defective such that their panoramic sunroofs are prone to shattering. *See In re Whirlpool*, 722 F.3d at 853. This is because Plaintiff's negligent design claim requires proof that Kia breached its duty to design against reasonably foreseeable hazards. *Id.* at 853. And Plaintiff's implied warranty claim, similarly, requires proof that Kia manufactured and sold Class Vehicles with a defect. *Id.*

Plaintiff can and will address this predominating factual issue using common evidence. As summarized in the Factual Background section, Plaintiff intends to prove the existence of the sunroof defect, as well as Kia's discovery and concealment of it, mostly from Kia's own documents, including formal inquiry-opening reports, submissions to the NHTSA, and warranty and other corporate records. Those documents show Kia began receiving reports of shattered sunroofs quickly after releasing vehicles with panoramic sunroofs to the market; that Kia opened formal inquiries into the shattering repeatedly; and that while Kia has told the NHTSA that flying rocks are the "one meaningful cause" of the shattering, it has acknowledged internally that road debris is only a "contributing factor." Other publicly available documents, including those relating to NHTSA and international efforts further help to explain the existence and nature of

16

the defect, as do the expert opinions of highly qualified glass and automotive experts retained by Plaintiff. (*See generally* Read Decl. ¶¶ 2-3, 31, 51; Hannemann Decl. ¶¶ 20, 30, 33.)

Although demonstrating that the defect is dangerous is not necessary to establish Kia's liability, (Doc. 49 at 32-33), Plaintiff also has common proof of the severity of the defect. Kia records show that many drivers have reported how frightened and distracted they were from the abrupt shattering, with several reporting collisions, another reporting his artery was sliced open and required stitches, and still others reporting veering out of their lanes or suffering cuts from the falling glass. (*See e.g.*, Ex. 51 at 830; Ex. 76 at 1047; Ex. 77 at 1064; Ex. 78 at 1071; Ex. 79 at 1079; Ex. 83 at 1111-12; Ex. 85 at 1130; Section II.D infra.) The severity can also be gleaned from the fact that other manufacturers decided to initiate safety recalls when their vehicles were experiencing sunroof shattering. (Exs. 46-47.) Finally, internal Kia documents also identify the safety risk posed by shattered sunroof glass. (Exs. 40-41 at 622, 628-31, 636-39; Exs. 42-43 at 652, 656-58; Exs. 44-45 at 662, 667, 687; Ex. 81 at 1099.)

Turning to damages, class certification does not require that damages be established using common proof. *In re Whirlpool*, 722 F.3d at 854; *accord Brown v. City of Detroit*, No. 10-CV-12162, 2014 WL 7074259, at *3 (E.D. Mich. Dec. 12, 2014) ("[t]he Sixth Circuit held that the presence of individualized damages cannot, by itself, defeat class certification"). Using common proof for damages can be simpler for both class members and the Court, however, and Plaintiff intends to proffer expert testimony to help quantify the class's damages. Class members' harm may be measured by calculating the difference in market value between the defective vehicles received and the non-defective vehicles they were entitled to receive. *In re Whirlpool*, 722 F.3d at 856 ("If defective design is ultimately proved, all class members have experienced injury as a result of the decreased value of the product purchased.").

17

To measure that difference, Plaintiff will offer testimony from Steven Gaskin and Colin Weir. Mr. Gaskin has developed a survey study that he is prepared to execute as part of a conjoint analysis to measure the effect the defect had on the market value of Class Vehicles. (Gaskin Decl., ¶¶ 4-5, 10-13, 55-59; *see also* Weir Decl. ¶¶ 4, 7-9, 11, 15-16, 20.) And Mr. Weir, an economist, is prepared to help explain why that analysis is appropriate economically in these circumstances. (Weir Decl. ¶¶ 4, 7-9, 11, 15-16, 20.)

Similar analyses have been accepted as classwide proof in a variety of other automotive and consumer class actions. *E.g.*, *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015) (certifying class in automotive defect action due in part to Gaskin and Weir's conjoint-based damages model); *In re Whirlpool*, 45 F.Supp.3d 724, 750–53 (N.D. Ohio 2014) (approving conjoint analysis); *In re: Lenovo Adware Litig.*, No. 15-md-02624, 2016 WL 6277245 at *21 (N.D. Cal. Oct. 27, 2016) (certifying class based on Gaskin conjoint model).

### D.     Plaintiff's Claims Are Typical of Other Class Members

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Typicality is met if the class members' claims are "fairly encompassed by the named plaintiffs' claims." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc), *quoted in In re Whirlpool*, 722 F.3d at 852. The concepts of commonality and typicality "tend to merge" in practice because both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349 n.5 (2011), *quoted in In re Whirlpool*, 722 F.3d at 853.

Here, Plaintiff's claims are interrelated with the claims of everyone else who bought or leased a Class Vehicle: Kia sold and leased them defective vehicles prone to abrupt sunroof shattering. This course of conduct gives rise to the same claims for all class members, causing them the same injury: they overpaid for vehicles. *See In re Whirlpool*, 722 F.3d at 857-58.

### E. The Adequacy Requirement Is Satisfied

The final Rule 23(a) requirement demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement tends to be intertwined with the commonality and typicality considerations already discussed. *In re Whirlpool*, 722 F.3d at 853. The adequacy requirement "also brings into play any concerns about the competency of class counsel and any conflicts of interest that may exist." *Id.* And courts consider whether it appears that the class representative will "vigorously prosecute the interests of the class." *Palombaro*, 2017 WL 3437559, at *7 (citing cases).

Here, there are no intra-class conflicts. To the contrary, Plaintiff and the members of the class share the same interest in holding Kia accountable for manufacturing and selling defective Class Vehicles. In addition, Plaintiff's testimony and effort throughout this litigation demonstrates that he understands his role and obligations as a class representative and will continue to press for classwide relief. (Stein Decl., ¶ 8.) Plaintiff's counsel, for their part, are experienced attorneys with a history successfully litigating complex class actions, including against Kia and other manufacturers. (*Id*. ¶¶ 6-7-; Coleman Decl. ¶¶ 7-16.) Counsel have successfully opposed a motion to dismiss, uncovered key documents in discovery, and engaged four experts to study and help explain technical issues for the factfinders in this litigation. (Stein Decl., ¶ 3.) There is no reason to doubt the adequacy of this representation.

F.      **The Superiority of the Class Action Device**

Having already discussed how the common questions predominate over any individual ones, the only remaining consideration for certifying a Rule 23(b)(3) class for monetary relief is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Among the factors to be considered are: (A) class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by class members; (C) the desirability of concentrating the litigation of the claims in this forum; and (D) anticipated difficulties in managing a class action. *Id.*

Here, as in *Whirlpool*, *Daffin*, and other cases decided in this district, "class certification is the superior method to adjudicate this case fairly and efficiently." *In re Whirlpool*, 722 F.3d at 861. "Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *Id.* Even by recovering the entire amount spent buying a Class Vehicle, an individual class member's recovery would be dwarfed by the costs of litigating this action. "Additionally, the difference in value between conforming and non-conforming goods is better litigated in a class-wide context." *Daffin*, 458 F.3d at 554. With the key common question well-suited to classwide adjudication, class treatment is the superior method of resolving all class members' claims against Kia.

IV.   **CONCLUSION**

For the above reasons, Plaintiff asks that the Court certify the proposed class, appoint class counsel, and direct the dissemination of class notice.

DATED: October 4, 2017                                Respectfully submitted,

**GIBBS LAW GROUP LLP**

*/s/ David Stein*

Eric H. Gibbs (*pro hac vice*)
David Stein (*pro hac vice*)
Steve Lopez (*pro hac vice*)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: 510-350-9700
Facsimile: 510-350-9701
ehg@classlawgroup.com
ds@classlawgroup.com
sal@classlawgroup.com

Gregory F. Coleman (*pro hac vice*)
Lisa A. White (*pro hac vice*)
Mark E. Silvey (*pro hac vice*)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: 865-247-0080
Facsimile: 865-533-0049
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
mark@gregcolemanlaw.com

Jason T. Dennett (*pro hac vice*)
**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
Telephone:    (206) 682-5600
Facsimile:    (206) 682-2992
kstephens@tousley.com
jdennett@tousley.com

Shanon J. Carson (*pro hac vice*)
Eric Lechtzin (*pro hac vice*)
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000
Facsimile: 215-875-4604

scarson@bm.net
elechtzin@bm.net

Paul C. Peel (*pro hac vice*)
**FARRIS BOBANGO BRANAN PLC**
999 S. Shady Grove Road, Suite 500
Memphis, Tennessee 38120
(901) 259-7100 Telephone
(901) 259-7150 Facsimile
ppeel@farris-law.com

Jack Landskroner (0059227)
Drew Legando (0084209)
**LANDSKRONER GRIECO**
**MERRIMAN, LLC**
1360 West 9th Street, Ste. 200
Cleveland, OH 44113-1254
Telephone: 216-522-9000
Facsimile: 216-522-9007
jack@lgmlegal.com
drew@lgmlegal.com

*Attorneys for Plaintiff*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record on October 4, 2017.


*/s/ David Stein*

23