**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| TOM KONDASH, On Behalf of Himself and All Others Similarly Situated, <br>                           Plaintiff, <br>    v. <br><br> KIA MOTORS AMERICA, INC., and KIA MOTORS CORPORATION, <br>                          Defendants. | Civil Action No. 1:15-CV-00506-SJD <br><br> CLASS ACTION <br><br> JUDGE SUSAN J. DLOTT |

---

**DEFENDANTS KIA MOTORS AMERICA, INC., AND KIA MOTORS**
**CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS**
**CERTIFICATION**

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

I. FACTUAL BACKGROUND........................................................................... 2

    A. Panoramic Sunroofs Undergo Rigorous Design and Testing ................................ 2

    B. Informed of Sunroof Fractures, Kia Initiated a Thorough, Cooperative Investigation that Uncovered No Evidence of a Defect......................................... 4

    C. Kondash's Sunroof Breaks and Kia Replaces It for Free ..................................... 7

II. LEGAL STANDARD...................................................................................... 7

III. INDIVIDUAL ISSUES PREDOMINATE ON EACH OF KONDASH'S CLAIMS.......... 8

    A. Kondash Has Insufficient Evidence of a Common Defect ................................... 8

    B. Kondash's Class of 22 Different Model-Years Defeats Predominance.............. 11

    C. Individual Issues Predominate on Kondash's Express Warranty Claim ............ 13

    D. Issues of Individual Reliance Predominate........................................................ 14

    E. Individualized Issues Predominate Kondash's Theory of Injury........................ 15

IV. KONDASH IS AN ATYPICAL AND INADEQUATE CLASS REPRESENTATIVE ................................................................................... 18

V. A CLASS ACTION IS NOT A SUPERIOR MEANS TO RESOLVE THE CLAIMS ....................................................................................................... 20

VI. CONCLUSION............................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allamong v. Falkenhof*,
   39 Ohio App. 515 (1930) ................................................................... 18

*Am. Honda Motor Co. v. Allen*,
   600 F.3d 813 (7th Cir. 2010) ........................................................ 8, 9

*Baba v. Hewlett Packard Co.*,
   2012 WL 5336971 (N.D. Cal. Oct. 26, 2012) ............................... 14

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   198 F.3d 415 (6th Cir. 1999) ...................................................... 18, 19

*Belfiore v. P&G*,
   311 F.R.D. 29 (E.D.N.Y. 2015) ....................................................... 20

*Bojorquez v. Abercrombie & Fitch, Co.*,
   193 F. Supp. 3d 1117 (C.D. Cal. 2016) .......................................... 19

*Butler v. Porsche Cars N. Am., Inc.*,
   2017 WL 1398316 (N.D. Cal., Apr. 19, 2017) .............................. 8, 9

*Cancino v. Yamaha Motor Corp., U.S.A.*,
   2010 WL 2607251 (S.D. Ohio June 24, 2010) ........................... 14, 15

*Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enters., Inc.*,
   50 N.E.3d 955 (Ohio Ct. App. 2015) .............................................. 14

*Cates v. Whirlpool Corp.*,
   2017 WL 1862640 (N.D. Ill. May 9, 2017) ................................ 8, 9, 13

*Clark v. Experian Info. Sols, Inc.*,
   2001 WL 1946329 (D.S.C. Mar. 19, 2001) .................................... 20

*Daffin v. Ford Motor Co.*,
   458 F.3d 549 (6th Cir. 2006) .......................................................... 11

*Darne v. Ford Motor Co.*,
   2015 WL 9259455 (N.D. Ill. Dec. 18, 2015) .................................. 14

*Deary v. Vital Pharms.*,
   2012 U.S. Dist. LEXIS 190941 (C.D. Cal. Nov. 14, 2012) .............. 20

*Doyle v. Chrysler Grp. LLC*,
   2015 WL 353993 (C.D. Cal. Jan. 21, 2015) ................................... 10

*Faralli v. Hair Today, Gone Tomorrow*,
   2007 WL 120664 (N.D. Ohio Jan. 10, 2007) ................................. 15

*Feinstein v. Firestone Tire and Rubber Co.*,
   535 F. Supp. 595 (S.D.N.Y. 1982) ................................................. 19

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Germain v. Teva Pharms., USA, Inc.*,
　756 F.3d 917 (6th Cir. 2014) ................................................................. 12

*Gilmore v. Gen. Motors Corp.*,
　35 Ohio Misc. 36 (Ohio Ct. Com. Pl. 1973) ............................... 11, 12, 13

*Glasstech, Inc. v. Chicago Blower Corp.*,
　675 F. Supp. 2d 752 (N.D. Ohio 2009) .................................................. 14

*Glazer v. Whirlpool Corp.*,
　722 F.3d 838 (6th Cir. 2013) ................................................................... 7

*Gooch v. Life Inv'rs Ins. Co. of Am.*,
　672 F.3d 402 (6th Cir. 2012) ................................................................. 19

*Harnish v. Widener Univ. Sch. of Law*,
　833 F.3d 298 (3d Cir. 2016) ................................................................... 17

*Huffman v. Electrolux Home Prods.*,
　129 F. Supp. 3d 529 (N.D. Ohio 2015) ................................................. 10

*In re Bank of Am. Wage & Hour Emp't Litig.*,
　286 F.R.D. 572 (D. Kan. 2012) ............................................................. 13

*In re Bridgestone/Firestone, Inc.*,
　288 F.3d 1012 (7th Cir. 2002) ............................................................... 13

*In re Fluidmaster*,
　2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ........................................ 17

*In re GMC Dex-Cool Prods. Liab. Litig.*,
　241 F.R.D. 305 (S.D. Ill. 2007) ...................................................... 11, 13

*In re Polyurethane Foam Antitrust Litig.*,
　314 F.R.D. 226 (N.D. Ohio 2014) ........................................................... 8

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
　302 F.R.D. 448 (N.D. Ohio 2014) ......................................................... 11

*Kaczmarek v. IBM*,
　186 F.R.D. 307 (S.D.N.Y. 1999) .......................................................... 19

*Kramer v. Toyota Motor Corp.*,
　668 F. App'x 765 (9th Cir. 2016) ........................................................ 8, 9

*Marcus v. BMW of N. Am., LLC*,
　687 F.3d 583 (3d Cir. 2012) ...................................................... 13, 15, 19

*Meta v. Target Corp.*,
　2016 WL 5076089 (N.D. Ohio Sept. 19, 2016) .................................... 15

*Opperman v. Path, Inc.*,
　2016 WL 3844326 (N.D. Cal. July 15, 2016) ....................................... 17

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Painter v. Graley*,
106 Ohio App. 3d 770 (1930) ................................................. 18

*Parkinson v. Hyundai Motor Am.*,
258 F.R.D. 580 (C.D. Cal. 2008) ............................................. 20

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) .................................................. 17

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*,
863 F.3d 460 (6th Cir. 2017) ............................................. 8, 11

*Stout v. J.D. Byrider*,
228 F.3d 709 (6th Cir. 2000) ................................................ 15

*Thompson v. Am. Tobacco Co.*,
189 F.R.D. 544 (D. Minn. 1999) ........................................ 18, 19

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......................................................... 17

*Walsh v. Ford Motor Co.*,
130 F.R.D. 260 (D.D.C. 1990) ............................................... 13

**Statutes**

Ohio Rev. Code § 1345.77(B) ................................................. 14

**Rules**

Fed. R. Civ. P. 23(a) ...................................................... 8, 18

Fed. R. Civ. P. 23(b)(3) ...................................................... 8

**Regulations**

49 C.F.R. § 571.205.S5.1 ...................................................... 3

77 Fed. Reg. 37,481 ........................................................... 3

Plaintiff Tom Kondash brought this putative class action against these Kia entities[1] because he contends the panoramic sunroof in his 2012 Kia Optima broke as the result of a design defect. To be clear, Kondash does not actually have any evidence of a defect. He has not tested ***any*** sunroof glass to determine if Kia's panoramic sunroofs are weakened—the central premise of his claims. He has no tests to show Kia's sunroofs are too large, too thin, too curved, or too heavily coated in ceramic paint to perform adequately—as his experts contend. And he has no data whatsoever to show that Kia panoramic sunroofs break at a higher rate than "non-defective" sunroofs—without which, there is simply no reason to believe they are defective. In fact, NHTSA actually *closed* its investigations of panoramic sunroofs in other vehicles that failed at *higher* rates than the Class Vehicles, finding no evidence of a defect. And after investigating Kia panoramic sunroofs for over five years, NHTSA has found no basis to conclude any Kia sunroofs are defective either. Plaintiff's burden at class certification was to demonstrate with evidence, not mere assertions or speculation, the existence of a common defect tying his class together. With no facts and no data, Plaintiff simply has not met that burden.

Class certification is inappropriate for the additional reason that the class's claims, involving 22 different model-year vehicles, cannot be proved or disproved based on *common* evidence. In fact, all the factors that Kondash claims are relevant to proving the alleged defect—the design of the vehicles, the amount of ceramic paint applied to the sunroof glass, the rate of sunroof breakage—vary from model to model and year to year. Kondash does not even attempt to show how a single jury can evaluate the evidence going to 22 different Kia models and feasibly determine Kia's liability as to each one.

The proposed class fails to meet the requirements of Rule 23 for a host of other reasons. *First*, Plaintiff's breach of express warranty claim cannot be certified because proof of Kia's breach will turn entirely on individualized issues, including (i) whether Kia repaired a given class member's broken sunroof (as it did in many cases), (ii) whether a given breakage was covered

---

[1] Although Kia Motors America, Inc., and Kia Motors Corporation are separate entities with different decision-makers, they are referred to collectively as "Kia" for purposes of this brief.

under the warranty (many were not), and (iii) whether the class member participated in the dispute resolution procedure prescribed in Kia's warranty (as required to bring an express warranty claim under Ohio law). *Second*, all of Plaintiff's claims require him to prove that Kia *caused* class members' claimed injury—that "they spent more money than they otherwise would have" had the defect been disclosed. But determining whether any class member spent more than he otherwise would have requires individualized inquiries into each class member's preferences and knowledge about the risk of shattering—class members who would have paid the same for their sunroofs, even if informed, have not been caused any injury. *And third*, Plaintiff proposes no way to determine injury as to most of his proposed class, including those who leased Class Vehicles, those who bought used Class Vehicles, and those who resold their Class Vehicles. Injury is an element of each of Kondash's claims, and under controlling Supreme Court precedents, Plaintiff's experts' conceded inability to determine injury across the class precludes certification.

Finally, Kondash cannot meet the adequacy and typicality requirements because his decision to forgo any recovery for class members' personal injuries, sunroof repair costs, and any other injury besides the alleged overpayment will foreclose future actions by class members to recover such damages under established *res judicata* and claim-splitting principles. The decision of Plaintiff and his lawyers to forgo recovery for such injuries, in a bid to facilitate certification of the broadest possible class, renders Plaintiff and his counsel inadequate to represent the class.

## I.     FACTUAL BACKGROUND

### A.     Panoramic Sunroofs Undergo Rigorous Design and Testing

Panoramic sunroofs are a safe and popular feature offered by virtually every automaker today. (Ewing Rep. at 7.[2]) Kia introduced its first panoramic sunroof in the 2011 Sorento, which featured a two-panel design with metal cross-pieces to secure the glass to the frame. (Ex. 1, Doc. 80-8 at 3050[3]; Ex. 138, Doc. 105 at 6637.) The sunroof systems in the Class Vehicles were

---

[2] The reports of Kia's expert witnesses are concurrently filed as Ex. 1 to each witness's respective declaration in support of this opposition.

[3] Unless otherwise noted, all numbered exhibits refer to the exhibits attached to the Declaration of David Stein in Support of Plaintiff's Motion for Class Certification (Exs. 1–137) and the Declaration of Jason A. Orr in Opposition

designed and manufactured by Webasto Roof Systems, Inc, and Webasto Donghee. (Ex. 1, Doc. 80-8 at 3058.) Webasto adapted its sunroof design to each Class Vehicle: the sunroofs are different shapes and sizes, they fit into the vehicle at different angles, they are fastened to the bodies in different ways, and they are manufactured on different production lines at different facilities, using glass from three different suppliers. (*Id.*; Ewing Rep. at 9.) As industry design standards moved toward a three-panel design, Kia incorporated that design into its vehicles, including the redesigned 2014 Sorento. (Ex. 1, Doc. 80-8 at 3050–51, Ex. 88, Doc. 80-95 at 4310–11.)

Kia's panoramic sunroofs use tempered safety glass, which is the material of choice for about 90% of sunroofs industry-wide. (Ex. 139, Doc. 105 at 6652.) Tempered glass is favored for its strength, low weight, and reduced risk of injury. (Ewing Rep. at 6–7.) Tempered glass has a strong outer compression layer that is resistant to impacts, abrasion, or other external forces that could break the glass. (Ewing Rep. at 6; Verghese Rep. at 4.) When a severe impact does break the glass, tempered glass is designed to fragment immediately into small nuggets that are unlikely to cause serious injury. (Ewing Rep. at 7; Verghese Rep. at 4–5.)

The panoramic sunroof glass in Kia vehicles undergoes rigorous evaluation, testing, and certification to ensure it is safe and reasonably resistant to impacts. Federal Motor Vehicle Safety Standard ("FMVSS") 205 requires that all auto glass conform to global engineering standards. *See* 49 C.F.R. § 571.205.S5.1 (all glass must conform to ANSI/SAE Z26.1-1996). These standards require manufacturers to certify that their tempered glass passes stringent testing, including (1) a ball drop test, (2) a fragmentation test, and (3) a shot bag test.[4] *See id.*; 77 Fed. Reg. 37,481

---

to Plaintiff's Motion for Class Certification (Exs. 138–178). Each pin citation to those exhibits refers to the CM/ECF PageID number, per this Court's standing order.

[4] Kondash contends that FMVSS testing ensures that "non-defective sunroof glass should *not* break due to road debris alone." (Mem. at 8–9.) While FMVSS standards are high, it is not true, as Kondash asserts, that "the force generated during testing is actually far greater than that generated by even worst-case road debris." As explained in research performed by KATRI, a number of factors affect whether an impact will break a piece of tempered glass, including the mass of the impacting object, the relative velocity of that object to the glass, and the angularity and hardness of the impacting object. A hard and sharp object may break tempered automotive glass by piercing the tempered layer, while a heavier but rounded object can bounce off the tempered glass. (Ex. 148, Doc. 106 at 6731.)

Kondash also misconstrues Global Technical Regulation No. 6; in fact, auto regulators globally acknowledge that the shape, mass, and velocity of an object determine whether it will break a given piece of tempered glass. (*Id.*

(describing testing required by FMVSS 205). All Kia panoramic sunroof glass passes these tests.

In addition to safety testing required by law, Kia subjects its vehicles to extensive Failure Mode Effects Analysis ("FMEA"), reliability and durability testing, and lot inspections. (Exs. 140–41, Doc. 105 at 6673–77; Kim Decl. ¶ 4, Mack Decl. ¶ 9.) Kia's durability testing involves driving vehicles through punishing conditions in extreme environments for thousands of miles—no Kia sunroof glass has ever broken in such testing. (Kim Decl. ¶ 5–6.) Kia also requires its suppliers to conform each sunroof component to exacting standards for thermal shock, impact resistance, and fragmentation (Ex. 60, Doc. 80-67), and to quality check sunroof glass before delivery and during installation and production (Ex. 144, Doc. 105 at 6710–11).

### B. Informed of Sunroof Fractures, Kia Initiated a Thorough, Cooperative Investigation that Uncovered No Evidence of a Defect

Kia closely monitors field data for potential quality and safety issues. It began tracking panoramic sunroof fractures in July 2011 after a Kia employee's panoramic sunroof on his 2011 Kia Sorento shattered while he was passing two large trucks at 80 mph on a rural highway. (Doc. 97 at 5147–48.) The employee saw debris "flying out" of one of the trucks just before the sunroof broke. (*Id.*) A Quality Information Report ("QIR") was created. (Ex. 145, Doc. 105 at 6714.) Kia had received 11 reports of sunroof fractures from a vehicle population of 172,010 (0.006%). (*Id.*)

By May 2012, Kia had received 50 reports of sunroof fracture for the 2011–2013 Sorento. (Ex. 146, Doc. 105 at 6716.) Although the incident rate was very low (0.02%), Kia monitored these incidents and investigated potential causes, as was the company's routine practice. (*Id.*) Kia began tracking sunroof fractures in Executive Summary Reports and conducted field inspections. (Ex. 147, Doc. 105 at 6718.) Kia worked with its sunroof and glass suppliers in the investigation and root cause analysis. (Ex. 88, Doc. 80-95 at 4304–05.) Where sufficient glass was recoverable, Kia sent broken sunroofs to its supplier for an analysis of potential root causes of the fractures. (Ewing Rep. at 19; Ex. 49, Doc. 80-56 (evaluating fractured glass from incident vehicles).) Kia

---

(certain rocks can easily break sunroof glass "because of their small, light and sharp [shape.]"); Ex. 157, Doc. 106 at 6771 (breakage "appears to be due to random impacts with . . . sharp objects."); Ex. 88, Doc. 80-95 at 4334 (same).)

evaluated the sunroof installation process at both its Georgia and Korea plants for possible installation errors. (Exs. 152–54, Doc. 106 at 6751–63.) And Kia requested that Hyundai-Kia America Technical Center, Inc. ("HATCI") conduct additional durability and impact tests at its California Proving Grounds to further evaluate the panoramic sunroofs. (Ex. 155, Doc. 106 at 6765.) *None of these tests or analyses revealed any evidence of a defect within the glass or the sunroof assembly of any of the Class Vehicles.* (Ex. 86, Doc. 80-93 at 4272.) *The <u>only</u> consistently identified cause of sunroof fracture was external impact from road debris.* (*Id.*)

Kia then contacted NHTSA, on its own, voluntarily shared the results of its investigation, and requested guidance on further investigatory steps. (Ex. 87, Doc. 80-94.) NHTSA opened an investigation into reports of broken panoramic sunroofs in 2011–2013 Kia Sorentos "to analyze the scope, frequency and consequence of the alleged incidents." (Ex. 48, Doc. 80-55 at 3792.) After more than five years of investigation, NHTSA has found no basis to conclude that the panoramic sunroofs in any Kia vehicle are defective. Past NHTSA investigations into similar reports of panoramic sunroof fractures had concluded that the fractures were caused by ordinary impacts from road debris. In 2005, NHTSA investigated reports of sunroof shattering in the "Ultraview" sunroofs of Cadillac SRX vehicles. (Ex. 156, Doc. 106 at 6767.) NHTSA "did not identify any defective manufacturing, process, design, or quality control issue with the . . . glass roof system," and noted that "the rate of incident for the subject vehicle [0.07% per exposure-year] is within the range of peer vehicles for glass roof breakage." (Ex. 157, Doc. 106 at 6769.) NHTSA concluded the fractures were "due to random impacts with stones or sharp objects" and closed the investigation. (*Id.* at 6771.) In 2006, NHTSA investigated reports of moonroof shattering in Toyota Scion tC vehicles and concluded those vehicles "sustain[ed] . . . shattering and/or damage at rates comparable to those for most other similarly equipped vehicles [*i.e.*, 0.09% per unit sold]." (Ex. 158, Doc. 107 at 6780.) The agency noted that "while tempered glass panels . . . are shatter-resistant, some catastrophic failures do in fact occur," and "[i]mpact with small stones or road debris may result in immediate or delayed shatter incidents" in rare instances. (*Id.*)

While NHTSA was still investigating, the Korean auto regulator KATRI released a study

that suggested the ceramic paint area ("CPA")—a border of opaque, black ceramic applied to the fringes of the underside of most automotive glass panels—may reduce the impact resistance of panoramic sunroof glass at the application area. (Ex. 159, Doc. 107 at 6783.) At KATRI's behest, the United Nations convened an Informal Working Group ("IWG") to evaluate and potentially revise international glazing standards for panoramic sunroofs. (*Id.*; Ex. 160, Doc. 107 at 6786.) At several IWG meetings, regulators and auto industry groups provided input, and the IWG reached a consensus on "key findings": (1) "the risk of damage through glass breakage is rather small compared to delivered volumes of sunroofs," (2) sunroof breakage resulted in "a low number of minor injuries," and (3) the cause of sunroof breakage was likely "due to impact" from external road debris. (Ex. 149, Doc. 106 at 6743.) The IWG "agreed . . . that no further data research for glass breakage is necessary." (*Id.*) It concluded that the "thicknesses of glass don't seem to affect exhibiting sudden breakage," and "impacts from small objects were likely the cause" of reported incidents. (Ex. 161, Doc. 107 at 6793–94.)

The data collected to date shows that the fracture rates of panoramic sunroofs in the Class Vehicles are remarkably low. Indeed, the panoramic sunroof in 99.4% of Class Vehicles will never shatter. (Padmanaban Rep. at 7 (survival analysis shows fracture rate of 0.6% over 120 months in service).) A combined analysis of warranty, goodwill, consumer affairs, technical assistance center, and field reports yields an overall fracture rate of 0.06% per exposure-year for all Class Vehicles. (*Id.* Fig. 1.) Depending on the model, the rate ranges between 0.00% and 0.13% per exposure-year. (*Id.* Fig. 1a.) These rates are low in absolute terms, and they do not meaningfully diverge from the fracture rates for *conventional* sunroofs that were offered in previous model-years of the same vehicles—sunroofs that Plaintiff does not allege to be defective. (Padmanaban Rep. at 6 & Fig. 1b.) *In fact, the fracture rates for the Kia Class Vehicles are similar to—and in some instances, are far lower than—the 0.07% fracture rate that led NHTSA <u>to close</u> its investigation into the Cadillac SRX for lack of evidence of a defect.* (*See* App. A; Padmanaban Rep. Fig. 1a.)

Few, if any, serious injuries have resulted from shattering panoramic sunroofs. (Ex. 162, Doc. 107 at 6801.) Kondash cites a handful of reports that show a tenuous connection between the

fracture and the alleged injury. (Mem. at 11–13.) For instance, Kondash refers to a deep cut to a driver's hand, but that cut occurred only *after* the shattering, when the driver mishandled the fractured glass. (*See* Ex. 83, Doc. 80-90 at 4243 (driver grabbed piece of glass with bare hand).) He also cites an incident in which the driver reported arterial bleeding. (Ex. 51, Doc. 80-58 at 3929.) While Kia was aware of this incident, it established that the driver's wound was not caused by the shattered sunroof glass, but by the same large object that pierced the sunroof and caused it to shatter. (*See* Ex. 88, Doc. 80-95 at 4335.) Kondash also cites two reports of "vehicle control" issues (*see* Mem. at 13), but it is not clear whether these incidents were the direct result of a sunroof shattering. (*Compare* Ex. 76, Doc. 80-83 at 4171 (driver reports hitting stop sign), Ex. 77, Doc. 80-84 at 4189 (driver reports hitting guardrail), *with* Ex. 76 at 4171 (insurer treated sunroof breakage as separate incident from driver's collision with stop sign), Ex. 77 at 4189 (driver "almost got into an accident").) Kia has evaluated sunroof fractures since 2011 and is unaware of any instance of a fracture that led to loss of control. (Doc. 77 at 1324.)

### C. Kondash's Sunroof Breaks and Kia Replaces It for Free

Kondash bought a 2012 Kia Optima from Kings Kia in Cincinnati in March 2012. (Ex. 142, Doc. 105 at 6691.) In July 2015, as he was driving approximately 70 mph on an interstate through West Virginia, the panoramic sunroof on his Optima shattered. (Doc. 98 at 5352–53.) Kondash safely pulled the car over to the side of the road, then drove a few more exits to a store parking lot where he inspected the broken sunroof. (*Id.* at 5253–55.) There, he removed the small "cubes" and "fine pieces" of fragmented glass from the car seats and taped a tarp over the broken sunroof. (*Id.* at 5355, 5370–72.) He then drove the car home to Mason, Ohio, and took it to Kings Kia the next day. (*Id.* at 5407.) Although Kondash's Optima was outside the scope of the 60,000-mile warranty, Kia replaced Kondash's sunroof at no cost to him. (*Id.* at 5481, 5652.)

## II. LEGAL STANDARD

In ruling on class certification, this Court must "probe behind the pleadings" and engage in a "rigorous analysis" of the evidence. *Glazer v. Whirlpool Corp.*, 722 F.3d 838, 851 (6th Cir. 2013). "[P]laintiffs carry the burden to prove that the class certification prerequisites are met." *Id.*;

*Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (plaintiff must "affirmatively demonstrate" with "evidentiary proof" that all requisites are met). To meet his burden, Kondash must show his claims are typical of those of the putative class, that he will fairly and adequately represent the class, and that common questions of law or fact exist. Fed. R. Civ. P. 23(a).

He must further show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3). The Court must consider Kia's evidence, as well as Kondash's, in making this determination. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 469 (6th Cir. 2017). The Court must also determine the admissibility and weight of conflicting expert evidence, which may require the Court to resolve methodological disputes. *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 236 (N.D. Ohio 2014).

## III. INDIVIDUAL ISSUES PREDOMINATE ON EACH OF KONDASH'S CLAIMS

### A. Kondash Has Insufficient Evidence of a Common Defect

All of Kondash's claims are premised on the alleged existence of a common, classwide defect. Kondash therefore has the burden to "affirmatively demonstrate," *at class certification*, that such a common defect exists. *Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, *6–9 (N.D. Cal. Apr. 19, 2017) (no predominance where evidence showed alleged defect not common throughout class). To do so, he must do more than raise "a superficial common question of whether the [Class Vehicles] are defective"—his burden is to present evidence of "a specific design defect" that "tie[s] a broad swath of consumer products together in a class proceeding." *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *19–22 (N.D. Ill. May 9, 2017). If he fails to meet this burden, class certification must be denied. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 819 (7th Cir. 2010) (predominance not satisfied where no competent evidence of a common defect); *Kramer v. Toyota Motor Corp.*, 668 F. App'x 765, 766 (9th Cir. 2016) ("Without any evidence of a common defect, there are no 'common questions of law or fact' binding the proposed class together.").

Kondash fails to meet that burden. He has not articulated any coherent theory of a defect.

His expert has not conducted *any* tests of the sunroof glass in the Class Vehicles to determine if it is "weakened"—Plaintiff's core allegation—though he admits he could have done so. (Doc. 131 at 8166.) He claims the sunroofs are defective because of their "size, thinness, curvature, ceramic print, and attachment to the unibody frame." (Read Decl. ¶ 31.)[5] But he has not even measured these features, much less tied them to any breakages or weakened glass, and there does not appear to be any relationship between them and the measured fracture rates. (*See* Suppl. Padmanaban Decl., Doc. 153-2 at 10173 (Class Vehicles with *least* ceramic print had *highest rate* of breakage); Ewing Rep. at 11–19 (noting these features are not unique to Kia vehicles).) All glass breaks—but to show a defect, Plaintiff must show the rate of breakage here exceeds the industry standard. (*Id.* at 20.) His expert does not even contend it does. (Doc. 129 at 7627–29.)

This dearth of evidence supporting Plaintiff's theory of a common defect alone warrants denial of certification. *See Am. Honda*, 600 F.3d at 817–19 (reversing district court's order granting certification where plaintiffs' expert had only tested one vehicle, using an unreliable methodology); *Kramer*, 668 F. App'x at 766 (affirming denial of class certification where plaintiffs' expert conducted tests of vehicle braking, but failed to provide rationale for benchmarks used in tests); *Butler*, 2017 WL 1398316 at *7 (denying certification where plaintiffs' expert "identified three factors as probable or possible contributors to the wiring harness defect" but did not "explain the extent to which these factors contribute to the defect"); *Cates*, 2017 WL 1862640 at *10, 13–14 (denying certification where expert tested plaintiffs' two ovens, but he "did not test what caused the [plaintiffs'] two ovens to fail," did "not test[] ovens from other brands," and "admitted . . . that he did not test any of his theories of causation").[6] In fact, Kondash has *far less*

---

[5] Kondash asserts that "Kia vehicles use considerably more ceramic paint than the industry average." (Mem. at 5) That is demonstrably false. IWG documents indicate that the ceramic paint area in Class Vehicles' sunroofs is well within the range of other vehicles' panoramic sunroofs. (Ewing Rep. at 15–16; Ex. 26, Doc. 80-33.)

[6] The only testing Kondash cites is in a report by KATRI that concluded CPA could potentially weaken glass. (Mem. at 9 & Ex. 28, Doc. 80-35.) But KATRI did not test Kia sunroofs, and the samples they used were unlike the glass in Class Vehicles because the *entire surface* of the test samples was coated with CPA. (Ex. 28, Doc. 80-35 at 3447–48.) The CPA on the subject sunroofs, by contrast, is only around the edges; if the whole surface were coated, the glass would be opaque and could not function as a sunroof. (Ewing Rep. at 14.) And even if CPA could theoretically weaken a portion of the glass (that is, the surface that is coated with CPA), Kondash has not shown that CPA is implicated in any reported sunroof fractures in Class Vehicles. Indeed, Verghese's inspection of over 30

evidence of a defect here than the plaintiffs in each of these cases—whose evidence of a defect was insufficient to support class certification.

With no testing or data to prove Kia's sunroof glass is weakened, Kondash's primary evidence of a defect is the *ipse dixit* of his expert Hannemann that the replacement rates for Kia sunroof parts are "higher than [he] would expect." (Hannemann Decl. ¶ 30.) Hannemann has no data to support that opinion. He does not explain what kind of rate he "would expect"—or what purchasers should expect—in a non-defective vehicle, nor does he compare the rates he purports to observe in the Class Vehicles to any industry benchmark. *Cf. Doyle v. Chrysler Grp. LLC*, 2015 WL 353993, at *5, *7 (C.D. Cal. Jan. 21, 2015) (excluding expert testimony that a product "should have a failure rate approaching zero" because it was "based more on [the expert's] personal experience and/or speculation than . . . on data and analysis"). Even if he wanted to substantiate his hunch that Kia fracture rates are "higher," he has no relevant experience on which to base that opinion because he has never worked on a sunroof. (Hannemann Decl. ¶¶ 10–13 (auto glass experience is limited to low-volume "supercars").) *See Huffman v. Electrolux Home Prods., Inc.*, 129 F. Supp. 3d 529, 537–38 (N.D. Ohio 2015) (expert, though "a well-qualified mechanical engineer," had "no foundation to opine" on design defect).

Lastly, Kondash relies on individual consumer accounts of sunroof fractures (Mem. at 9 (citing Read Decl. ¶ 36)), but these isolated incidents are not evidence of a defect. All glass can shatter when struck with a sharp, fast-moving object, and when glass shatters it shatters abruptly. (Ewing Rep. at 7–8; Verghese Rep. at 5.) The fracture rates of sunroofs in the Class Vehicles are extremely low—on average, 0.06% per exposure-year. (Padmanaban Rep. at 6.) ***NHTSA has closed defect investigations on the basis of higher fracture rates than those observed in the Class Vehicles.*** **(***See*** App. A; Exs. 157–58, Doc. 106 at 6768–77, Doc. 107 at 6780.) To the extent Kondash relies on individual accounts of sunroof fractures, Kia will introduce individualized evidence to show that external impacts were responsible for each breakage. (*Cf.* Verghese Rep. at

---

sunroofs revealed *only one* sunroof where the fracture originated at the CPA. (Verghese Rep. at 14–15; *see also* Ex. 162, Doc. 107 at 6804 (noting that "the fracture pattern after breakage . . . is not impacted by the ceramic" paint area).)

14–15 (external impact was cause of shattering in 11 of 12 samples for which cause was apparent).)

Common issues will not predominate that analysis. *See Sandusky Wellness Ctr.*, 863 F.3d at 469.

      **B.**      **Kondash's Class of 22 Different Model-Years Defeats Predominance**

      Plaintiff seeks certification of a class that includes the 2011–2015 Sorento, the 2011–2015 Sportage, the 2011–2015 Optima, the 2011–2015 Optima Hybrid, and the 2014–2015 Cadenza—all together, some 22 different model years. (Mot. at 2, 14.) What Plaintiff fails to explain in his motion, however, is how this sprawling class of 22 different vehicle model years can be tried before a single jury, when those models vary in nearly every aspect he claims is relevant to proving the alleged defect and Kia's purported liability—different designs, different fracture rates, and different evidence of Kia's supposed knowledge. (Hannemann Decl. ¶¶ 19–23.) "How could a jury, or a court, separate the evidence applying to each year? It would be impossible." *Gilmore v. Gen. Motors Corp.*, 35 Ohio Misc. 36, 42 (Ohio Ct. Com. Pl. 1973) (denying certification of negligence class because "[d]ifferent cars were produced at different plants at different times," making classwide determination of negligence impossible). Where "there is no practicable way to adjudicate claims pertaining to all of the [] models in the proposed class," certification "must be denied." *In re GMC Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 327 (S.D. Ill. 2007).

      Here, Kondash contends that the defect in the Class Vehicles is tied to the size of the sunroof glass, its curvature, its ceramic print area, and the manner in which the sunroof is fastened to the vehicle. (Hannemann Decl. ¶¶ 19–23.) Yet the Class Vehicles are materially different in each of these respects[7]—and these differences are directly tied to Kondash's theory of the defect. (Read Decl. ¶ 32 (opining these factors "weaken[]" the glass).) For example, the percentage area of a sunroof glass pane coated in ceramic paint ranges from 37–92%. (Padmanaban Suppl. Decl. Ex. 1, Doc. 153-1 at 10168–69.) The sunroofs in Class Vehicles also widely differ in maximum

---

      [7] For this reason, Kondash's case is unlike the cases on which he relies, where courts found (or assumed) that the differences between products were immaterial. *E.g.*, *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 302 F.R.D. 448, 465 (N.D. Ohio 2014) (narrowing class definition to include only models that share "the essential alleged common defect of crevices in the tub and/or bracket that promote mold growth"); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006) ("This is a case in which, *assuming the throttle body is the same in every car*, class members all have the same . . . claim." (emphasis added)).

curvature. (Verghese Suppl. Decl., Doc. 154 at 10178.) The different sizes, shapes, and curvatures, and the different ways in which the sunroofs are fastened to the vehicle bodies, all translate into different forces applied to the glass. (*See* Verghese Rep. at 10.) If there were any merit to Kondash's theory of a defect (there is not) a jury would have to consider these differences in determining whether any Class Vehicle is defective.

Kondash also contends that the rates of breakage of Kia's panoramic sunroofs indicate a defect. (Hannemann Decl. ¶ 30.) But here again, there are significant differences in fracture rates between Class Vehicles. (Hannemann Decl. ¶ 28; Padmanaban Rep. Fig. 1a.) Defendants' expert Padmanaban demonstrates those rates vary from 0.00% to 0.13%. (*See* Padmanaban Decl. Ex. 4.) Plaintiff's expert Hannemann uses a meaningless "replacement parts" calculation to estimate fracture rates, but even by that measure, the rate of "glass part sales per vehicles sold" ranges from 1.54% for the 2014–2015 Cadenza to nearly double that rate, 3.02%, for the 2011–2013 Sorento.

Moreover, to prevail on his negligent design claim, Plaintiff must prove Kia's knowledge of the defect. *See Germain v. Teva Pharm., USA, Inc.*, 756 F.3d 917, 927 (6th Cir. 2014). He says he intends to do so by identifying consumer complaints to NHTSA, reports of sunroof breakages, and investigations by KATRI, NHTSA, and Kia. *Gilmore*, 35 Ohio Misc. at 42 ("Negligence in manufacture and design involves technology and knowledge available *at the time*.") (emphasis added). But by Kondash's own account, all these supposed indicia of Kia's knowledge varied by model and over time. For example, the KATRI study Kondash cites as putting Kia on notice of a defect in the Class Vehicles did not come out until 2015. (Ex. 28, Doc. 80-35 at 3433.) The NHTSA investigation he cites as putting Kia on notice of a defect in the 2011–2013 Sorento was initiated in late 2013. (Ex. 48, Doc. 80-55.) And as far back as 2011, Kia had received consumer complaints about the 2011 Sorento. (Ex. 145, Doc. 105 at 6714.) *A jury could decide that Kia had knowledge of a defect in some of the Class Vehicles by 2015—but not in 2013 or 2011. Or that Kia had knowledge of a defect in the Sorento as of 2013—but not any other model at that time.* The question whether a "defendant had actual or constructive knowledge of defects" will "depend upon what was known or could have been known at the time," which will vary widely when several "different

12

[model] years are involved." *Gilmore*, 35 Ohio Misc. at 42 (denying certification).

Kondash himself implicitly acknowledges that the evidence supporting his claims varies from model to model because he has now decided to exclude the Kia Soul from his proposed class. He originally included the 2014 and 2015 Soul among the Class Vehicles (FAC ¶ 22), but now no longer appears to claim those models are defective (Mot. at 2). As it turns out, the Soul exhibits the *lowest* fracture rate among the Class Vehicles, 0.03%. (Padmanaban Rep. Fig. 1b.) Thus, as Plaintiff now implicitly concedes, these differences in proof matter.

Where a plaintiff seeks to represent purchasers of a variety of different products, he must show his evidence will "apply uniformly across the different product types." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012). The record demonstrates that is not the case here, and Plaintiff effectively acknowledges as much. Given the absence of common evidence on issues Plaintiff claims are key to proving a defect, common questions will not predominate. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019–20 (7th Cir. 2002) (reversing class certification order where 67 materially different products at issue); *Cates*, 2017 WL 1862640, at *19 (denying certification where the products "have different designs—including design aspects that [plaintiffs' expert] admitted are material"); *In re GMC*, 241 F.R.D. at 326–27 (denying certification where material differences among products); *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 277 (D.D.C. 1990) ("Factual disputes over the four engine systems consisting of twenty-three or more component configurations employed in at least seventeen different models . . . over five model years threaten to overwhelm the Court.").

### C.     Individual Issues Predominate Kondash's Express Warranty Claim

Kondash does not even mention his express warranty claim in his motion. He therefore has not met his burden to show that Rule 23's requirements are met for this claim, and the Court should deny certification of this claim for that reason alone. *See In re Bank of Am. Wage & Hour Emp't Litig.*, 286 F.R.D. 572, 587 n.5 (D. Kan. 2012) (where plaintiffs did not argue an issue in their class certification brief, they "failed to put forward this issue for independent certification").

The need for individual inquiries to determine whether Kia breached its warranty will

predominate over any common issues. Kia clearly did not breach its repair-and-replace warranty as to the vast majority of class members whose sunroofs never broke or were repaired for free. *See Baba v. Hewlett Packard Co.*, 2012 WL 5336971, at *7 (N.D. Cal. Oct. 26, 2012) ("As a matter of law, HP cannot have breached the warranty if it upheld its obligation to repair or replace the defective product."). Kia provided free repairs of fractured panoramic sunroofs under its goodwill policy. (Doc. 118 at 7072–73; Padmanaban Rep. at 2.) And Kia also did not breach its warranty if the damage was caused by something other than the alleged defect, or if it occurred outside the warranty period. *See Cancino v. Yamaha Motor Corp., U.S.A.*, 2010 WL 2607251, at *11–12 (S.D. Ohio June 24, 2010); *Darne v. Ford Motor Co.*, 2015 WL 9259455, at *7 (N.D. Ill. Dec. 18, 2015). Sunroof fractures occurred at varying times in and out of warranty coverage, and for causes unrelated to any alleged defect, including problems with the automated roller track. (Ex. 121, Doc. 80-128 at 4619, 4621, 4623.) Finally, class members vary as to whether they participated in the informal dispute resolution procedure prescribed under Kia's warranty. (Ex. 164, Doc. 107 at 6846–47.) If they did not, they have no warranty claim under Ohio law. *See* Ohio Rev. Code § 1345.77(B) (plaintiff cannot sue for breach of warranty "until after the consumer has initially resorted to the informal dispute resolution mechanism"). These are all individualized questions.

### D.   Issues of Individual Reliance Predominate

To prevail on his negligent design and warranty claims, Plaintiff and class members must prove that Kia caused their injury. *Glasstech, Inc. v. Chicago Blower Corp.*, 675 F. Supp. 2d 752, 760 (N.D. Ohio 2009) (negligent design); *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enters., Inc.*, 50 N.E.3d 955, 960, 963 (Ohio Ct. App. 2015) (express and implied warranty). Here, where the claimed injury is economic, the allegation of causation is that class members "*spent more money than they otherwise would have*" had the defect been disclosed. (FAC ¶ 187 ("As a . . . result of Kia's failure to exercise reasonable care to inform Plaintiff[] and the class about the defect . . . Plaintiff[] and class members have suffered damages in that they spent more money than they otherwise would have.")), ¶ 195 ("Plaintiffs and the other Class members bought or leased Class Vehicles they otherwise would not have" and "overpaid for their vehicles").)

Kondash cannot prove this with common evidence because determining whether class members "spent more money than they otherwise would have" raises individual questions of reliance. *See Stout v. J.D. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000) (a "fraud class action cannot be certified when individual reliance will be an issue"); *see also Cancino*, 2010 WL 2607251, at *12; *Faralli v. Hair Today, Gone Tomorrow*, 2007 WL 120664, at *14 (N.D. Ohio Jan. 10, 2007). Class members had varying degrees of knowledge about the alleged defect when they bought their cars. (Strombom Rep. at 17–19; Reibstein Rep. at 34–35; Ex. 163, Doc. 107 at 6814–23 (notes from exploratory interviews show differences in knowledge of alleged defect).) Those who knew about the alleged defect but bought anyway did not rely on Kia's alleged omissions, and were not injured. *See Meta v. Target Corp.*, 2016 WL 5076089, at *3 (N.D. Ohio Sept. 19, 2016) (denying certification because consumers purchased for different reasons, creating individual questions of reliance); *Marcus*, 687 F.3d at 599 (purchase with knowledge of defect breaks chain of causation).

### E.   Individualized Issues Predominate Kondash's Theory of Injury

Plaintiff's sprawling class of "[a]ll persons and entities who purchased or leased a Class Vehicle in Ohio" includes at least three groups: (1) those who ***purchased*** a new Class Vehicle in Ohio, (2) those who ***leased*** a new Class Vehicle in Ohio, and (3) those who ***purchased a used*** Class Vehicle in Ohio. Plaintiff's damages experts admit that they do not propose any methodology to measure the alleged injury suffered by the second and third groups: lessees and used car buyers. (Doc. 100 at 6132; *see* Strombom Rep. at 15–16.) Given that the vast majority of Class Vehicles are eventually resold, and given that 31% of Class Vehicles were leased rather than sold (*see* Exs. 90, Doc. 80-97 & 91, Doc. 80-98), these two groups likely make up the majority of the proposed class. Under Supreme Court precedent, Plaintiff's failure to offer any method of measuring their damages alone warrants denial of certification. *See Comcast*, 569 U.S. at 34 (reversing certification where plaintiff failed to offer an appropriate method to calculate class members' damages).

Moreover, even as to the first group, Plaintiff incorrectly assumes ***all*** original purchasers are entitled to overpayment damages, when his own expert makes clear that cannot be the case. Most original owners of the Class Vehicles will sell them at some point during their useful life.

(Ex. 143, Doc. 105 at 6701.) An original owner who resells his car *only* suffers a diminution-of-value injury if he sells the car to a second buyer for *less* than the value of a "non-defective" car—that is, if he has to discount the price of the car because the second buyer knows about the "defect." (Strombom Rep. at 15.) But determining in each case (i) what the second buyer paid, (ii) what the second buyer knew about the "defect," and (iii) whether the second buyer negotiated a lower price to account for the defect, *are all individualized questions that Plaintiff's expert admits his damages methodology does not and cannot resolve.* (Doc. 100 at 6138–44 (Gaskin admits he cannot determine whether any given car buyer "overpaid" for a Class Vehicle or was able to negotiate a lower price to account for the defect).) In short, Plaintiff's expert says he cannot determine whether any given class member has even suffered a diminution-in-value injury. (*Id.* at 6139–41.) That admission, too, precludes class certification under *Comcast.* 569 U.S. at 34.

Even the one type of injury Plaintiff's experts do claim to measure is not subject to common proof. Determining whether any given class member *"spent more money than [he] otherwise would have"* (FAC ¶ 187) depends entirely on individual preferences. Plaintiff's expert Gaskin admits consumers have different preferences and different valuations of the Class Vehicles. (Doc. 100 at 6107.) His proposed survey itself measures *individual* consumer preferences that he acknowledges will vary—"[t]hat's why we survey them." (*Id.*; Gaskin Decl. ¶¶ 47–48.) In fact, he assumes some class members are willing to pay more than the "diminished value" of the Class Vehicles even when the defect is disclosed. (Doc. 100 at 6098–103 (discussing differing valuations of conjoint respondents).) Gaskin's exploratory interviews, declarations from Kia owners, and a consumer survey conducted in parallel litigation against another automaker all show that many consumers would not change their purchase decisions even upon learning of the alleged defect. (Strombom Rep. at 10–11 (survey showed disclosure of sunroof defect did not impact likelihood of purchase); Holm Decl. ¶ 4 (Kia owner would have purchased even with disclosure); Jass Decl. ¶ 4 (same); Kelly Decl. ¶ 5 (same); Ross Decl. ¶ 4 (same); Shovlin Decl. ¶ 5 (same); Tenenbaum Decl. ¶ 4 (same); Ex. 163, Doc. 107 at 6817 (Kia buyer interviewed by Gaskin knew about alleged defect in Kia Optima but did not say it would affect his decision to buy a Kia).) Class members

16

who would have made the same purchase regardless of a disclosure have suffered no injury. *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *14 (N.D. Cal. July 15, 2016). Yet Plaintiff's expert, who acknowledges those class members exist, offers no way of identifying them. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("[A] model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury.").

It is not surprising that many class members would be willing to pay full price for the Class Vehicles, even if informed of the risk of shattering. After all, these are car buyers who chose to pay *more money* for an optional panoramic sunroof that *has some risk of shattering*, while forgoing a standard steel roof, available *at no extra cost*, that *will not shatter.* A small additional risk of shattering may simply not matter to them. And because panoramic sunroofs are almost always sold as part of a package (Reibstein Rep. at 53–54), many likely would have paid for the same package regardless—because they were after heated seats, navigation, or other features in the package.

Lastly, Kondash's damages expert Weir never proposes a method to measure individual class members' injuries. *See Opperman*, 2016 WL 3844326, at *14 ("Defendants '[are] entitled to individualized determinations of each [class member]'s eligibility for [damages].'" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366 (2011))). Instead, in his report, he proposes a formula to calculate the class's *combined, aggregate* "Overpayment Damages"—not any individual's alleged overpayment. (Weir Decl. ¶¶ 16–17.) Although he also suggested at his deposition that individual damages might be calculated using an "estimate" or a "proxy," he never explains what that means, what figures he would use, or where he would even get them. (Doc. 99 at 5878–80.)

Because Plaintiff fails to offer any method to determine the very fact of injury as to each class member—an element of each of his claims—common issues will not predominate. *See Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 305 (3d Cir. 2016) (lack of common proof of the fact of injury precluded a finding of predominance); *Opperman*, 2016 WL 3844326, at *14 (denying certification where model was likely to overcompensate some, while undercompensating others); *In re Fluidmaster*, 2017 WL 1196990, at *58–59 (N.D. Ill. Mar. 31, 2017) (same).

## IV.    KONDASH IS AN ATYPICAL AND INADEQUATE CLASS REPRESENTATIVE

Rule 23(a) requires the class representative's claims to be "typical of the claims . . . of the class" such that he will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Kondash fails to meet the adequacy requirement because, although he brings a negligence claim and describes multiple class members he says have been injured, he has disclaimed any recovery for class members' physical injuries. (Doc. 98 at 5666.) To be clear, there is no credible evidence of any serious injuries caused by fractured sunroof glass. *See supra* Section I.B. But even if there were, *injured class members would likely be barred from recovering for their personal injuries in a subsequent action*. That is, under Ohio law, Kondash's decision to forgo damages for personal injuries likely forecloses class members' future claims for personal injuries. *Painter v. Graley*, 106 Ohio App. 3d 770, 773 (1995) (*res judicata* requires plaintiff to present every ground for relief in the first action); *e.g.*, *Allamong v. Falkenhof*, 39 Ohio App. 515, 522 (1930) (suit to recover damages to car precluded later suit to recover personal injury). That risk alone supports denial of certification and renders Plaintiff an inadequate representative. *See Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 551 (D. Minn. 1999) (denying certification where there was a *possibility* that a court would find class members' personal injury claims barred by *res judicata*).

The apparent strategic decision of Kondash and his lawyers to "sell out" the class's recovery in a bid to facilitate class certification does not end there. Kondash claims that his sunroof shattered and that he incurred costs related to its repair. (Doc. 98 at 5654.) But he does not seek those damages either. Instead, he only seeks alleged overpayment damages tied to the risk the sunroofs could break, regardless of whether they ever do break.[8] (Mem. at 17–18.) Should Plaintiff's class be certified, those class members, too, would be barred from recovering repair and related costs in any future action—costs that often run into the thousands of dollars. *See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 418, 428–29 (6th Cir. 1999) (*res*

---

[8] Assuming there are 11,000 class members as alleged by Kondash (Mem. at 15), there are only about 66 individuals in Ohio who own Class Vehicles and whose sunroofs have shattered or will shatter at some point in their vehicle's usable life. (*See* Padmanaban Rep. at 7 (0.6% survival rate).) And many of those individuals will never experience a sunroof fracture for the duration of their ownership. (Ex. 143, Doc. 105 at 6701.)

*judicata* bars class members from recovering on certified claims in other action). In fact, even under his overpayment theory, Kondash does not seek the full damages to which he claims to be entitled. Kondash testified his car is worth "zero" to him (Doc. 98, at 5669–70), but the damages he seeks are far less than the full purchase price of the vehicle. (FAC ¶ 187.) Other class members who believe their cars are worthless would be barred from seeking a full recovery because Kondash has chosen to forgo those damages too. *Becherer*, 193 F.3d at 428–29; *see also Bojorquez v. Abercrombie & Fitch, Co.*, 193 F. Supp. 3d 1117, 1127 (C.D. Cal. 2016) (dismissing as improper claim-splitting a claim brought by plaintiff who was class member in separate class action).

Normally, "[a] class action. . . is one of the recognized exceptions to the rule against claim-splitting," because for absent class members, "individual actions remain available to pursue any *other questions* that were *expressly excluded* from the class action." *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 428 n.16 (6th Cir. 2012) (emphasis added). But here, Kondash is not seeking to certify a claim now that is distinct from a personal injury claim that might be brought later. His negligent design claim is *identical* to the claim other class members might later bring to recover for personal injuries. Where plaintiffs "tailor[] the class claims in an effort to improve the possibility of demonstrating commonality. . . [they] present[] putative class members with significant risks of being told later that they had impermissibly split a single cause of action." *See Thompson*, 189 F.R.D. at 551 (citing *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595, 606–07 (S.D.N.Y. 1982)). To certify Plaintiff's negligence claim now is to potentially bar future negligence claims by class members. That risk alone should preclude certification. *Id.*

Kondash's claims are also not typical of other class members' claims because his vehicle and his purchase were materially different from theirs. *See supra* Section III.B; *see Marcus*, 687 F.3d at 599. Kondash owns a 2012 Kia Optima but his class includes 21 other model year vehicles, with varying characteristics and fracture rates. A jury could find no defect in the 2012 Optima (Kondash's vehicle), with a fracture rate of 0.05% (Padmanaban Decl. Ex. 4), even if it would have found a defect in the 2013 Sorento, with a higher rate of 0.13% (*id.*). *See Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 313 (S.D.N.Y. 1999) (plaintiffs who bought materially different computer

models were inadequate class representatives for purchasers of those models). Likewise, Kondash cannot represent class members who are lessees or used vehicle purchasers because, as discussed *supra*, he does not propose ***any*** method to measure their damages. (*See* Strombom Rep. at 15–16.)

Lastly, "[t]he ability to opt out of the class is insufficient to protect the rights of putative class members who would want to seek remedies other than those chosen by the [class] representatives." *Clark v. Experian Info. Sols., Inc.*, 2001 WL 1946329, at *4 (D.S.C. Mar. 19, 2001). Kondash and his lawyers appear intent on pursuing the largest class, rather than the fullest recovery for individual class members. Given his willingness to prejudice the claims of absent class members, Kondash is not the appropriate person to represent them.

## V.    A CLASS ACTION IS NOT A SUPERIOR MEANS TO RESOLVE THE CLAIMS

First, all class members have access to a fair and efficient means of adjudicating their warranty claims at no cost to them, through the BBB Auto Line arbitration service provided in Kia's New Vehicle Limited Warranty. (Ex. 164, Doc. 107 at 6846–47.) The availability of this free alternative dispute resolution mechanism weighs against a finding that a class action is a superior means of resolving consumers' disputes. *See Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 595 (C.D. Cal. 2008) (finding lack of superiority in part because "plaintiffs have an alternative, free forum for determination of warranty claims through the BBB Auto Line").

Second, while Kia and NHTSA have found no basis to conclude that there is a defect in the panoramic sunroofs in Kia vehicles, NHTSA is currently investigating that issue and is best positioned to make that determination. (Ex. 56, Doc. 80-63.) Under the primary jurisdiction doctrine, this Court should deny or continue its consideration of Kondash's motion in deference to NHTSA, which has special competence to resolve this issue. *See Belfiore v. P&G*, 311 F.R.D. 29, 78 (E.D.N.Y. 2015) (citing primary jurisdiction, staying class certification motion pending agency action); *Deary v. Vital Pharms.*, 2012 U.S. Dist. LEXIS 190941, at *2–3 (C.D. Cal. Nov. 14, 2012) (denying certification and dismissing case on primary jurisdiction grounds).

## VI.    CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's class certification motion.

Respectfully submitted,

/s/ Carlos M. Lazatin

Jeffrey P. Hinebaugh (0059888)
H. Toby Schisler (0068306)
**DINSMORE & SHOHL LLP**
1900 Chemed Center
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Phone: (513) 977-8200
Fax: (513) 977-8141
jeff.hinebaugh@dinsmore.com

Carlos M. Lazatin (admitted *pro hac vice*)
Adam G. Levine (admitted *pro hac vice*)
Jason A. Orr (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
400 South Hope Street
Los Angeles, CA 90017
Phone: (213) 430-6000
Fax: (213) 430-6407
clazatin@omm.com
alevine@omm.com

**Counsel for Defendants Kia Motors America, Inc., and Kia Motors Corporation**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this **<u>23rd day of August,</u>** **2019**, the foregoing document was

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the following counsel of record:

> ***<u>Counsel for Plaintiff Tom Kondash</u>***
> - Gregory F. Coleman [greg@gregcolemanlaw.com]
> - Lisa A. White [lisa@gregcolemanlaw.com]
> - Mark E. Silvey [mark@gregcolemanlaw.com]
> - Drew T. Legando [drew@merrimanlegal.com]
> - Eric Lechtzin [elechtzin@bm.net]
> - Shanon J. Carson [scarson@bm.net]
> - Eric H. Gibbs [ehg@classlawgroup.com]
> - Steven Augustine Lopez [stevelopez@classlawgroup.com]

/s/ H. Toby Schisler

,

# Appendix A

# Claims for Sunroof Breakage in Class Vehicles
## *(by model and year)*



Source: Kia warranty, goodwill, CA, TAC, FPQR, and production data. Duplicate VINs are removed. Excludes records not related to glass breakage. Sold Vehicle years calculated through the end of 2016.



# Appendix B

ⓘ Cited
As of: August 22, 2019 7:17 PM Z

## *Deary v. Vital Pharms.*

United States District Court for the Central District of California

November 14, 2012, Decided; November 14, 2012, Filed

CV 12-04314 RGK (MAN)

**Reporter**
2012 U.S. Dist. LEXIS 190941 *

Deary v. Vital Pharmaceuticals et al.

# Core Terms

allegations, expertise, contends, requires, issues, administrative body, dietary supplement, new drug, the Primary Jurisdiction Doctrine, advertising, misleading, asserting, citations, courts, moot

**Counsel:** **[*1]** Attorneys Present for Plaintiffs: Not Present.

Attorneys Present for Defendants: Not Present.

**Judges:** The Honorable R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE.

# Opinion

**CIVIL MINUTES - GENERAL**

**Proceedings: (IN CHAMBERS) Order Re: Defendant Vital Pharmaceuticals' Motion to Dismiss under *Rule 12(b)(6)* (DE 18) and Plaintiff's Motion for Class Certification (DE 17)**

On May 18, 2012, Charles Deary ("Plaintiff") filed a class-action complaint against Vital Pharmaceuticals, Inc. ("Vital") and Does 1-10 (collectively "Defendants") for violation of the *California Business and Professions Code 17200* and *17500 et seq.* and California's Consumer Legal Remedies Act (*Cal. Civil Code § 1750 et seq.*). Specifically, Plaintiff alleges that Defendants violated these laws by engaging in false, deceptive, or misleading advertising related to Defendants' product VPX Friction, a pre-workout dietary supplement.

Presently before the Court is Defendant Vital's Motion to Dismiss under *Federal Rule of Civil Procedure 12(b)(6).*

(DE 18.) Vital contends that Plaintiff's claims should be dismissed under the Primary Jurisdiction Doctrine. The Court agrees and **GRANTS WITHOUT PREJUDICE** Vital's Motion to Dismiss. In light of this decision, the Court also **DENIES as moot** Plaintiff's Motion for Class Certification. (DE 17.)

The Primary Jurisdiction Doctrine "applies where **[*2]** a claim is originally cognizable in the courts," but where "enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within special competence of an administrative body, in which case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Aaronson v. Vital Pharmaceuticals, Inc., 2010 U.S. Dist. LEXIS 14160, 2010 WL 625337, at *1 (S.D. Cal. Feb. 17, 2010)* (citing *United States v. Western Pac. R.R. Co., 352 U.S. 59, 64, 77 S. Ct. 161, 1 L. Ed. 2d 126, 135 Ct. Cl. 997 (1956)* (citations omitted)). The Doctrine is applied at the court's discretion, and courts typically look to factors including whether adjudication of the issue requires the administrative body's expertise and whether there is a need for uniformity within the area of regulation." *Id.* (citing *Syntek Semiconductor Co., Ltd. v. Microchip Technology, Inc., 307 F.3d 775, 781 (9th Cir.2002)* (citations omitted)).

Plaintiff makes two primary allegations. First, Plaintiff alleges that Defendants' advertising statements failed to mention that VPX Friction contains a substance known as Isopropyloctopamine—a substance which Plaintiff contends the Food and Drug Administration ("FDA") has classified as a new drug. Second, Plaintiff contends that Defendants' statements asserting the product is "university tested" is misleading because it asserts a message that VPX Friction is safe and legal when it is not the case.

The Court finds Plaintiff's allegations **[*3]** to fall outside the traditional expertise of judges and requires the expertise of an administrative authority, in this case the

2012 U.S. Dist. LEXIS 190941, *3

FDA. Plaintiff's allegations involve the identification of a "new drug," contents of labels for dietary supplements, and product safety. These type of issues are best resolved through the expertise of the FDA pursuant to the Primary Jurisdiction Doctrine. Thus, the Court **GRANTS WITHOUT PREJUDICE** Defendant Vital's Motion to Dismiss (DE 18) and **DENIES as moot** Plaintiff's Motion for Class Certification. (DE 17.)

**IT IS SO ORDERED**.

**End of Document**