Page 1

1          IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF OHIO
3                   WESTERN DIVISION
4
5
6   _____
                             )
7   TOM KONDASH, On Behalf   )
    of Himself, and All      )
8   Others Similarly         )
    Situated,                )
9                            )
            Plaintiff,       )
10                           )
       vs.                   ) Case No.
11                           ) 1:15-cv-00506-SJD
    KIA MOTORS AMERICA,      )
12  INC., and KIA MOTORS     )
    CORPORATION,             )
13                           )
            Defendants.      )
14  _____ )
15
16
17      VIDEOTAPED DEPOSITION OF BRUCE STROMBOM
18             Los Angeles, California
19            Tuesday, February 27, 2018
20                    Volume I
21
22  Reported by:
    LORI M. BARKLEY
23  CSR No. 6426
24  Job No. 2828457
25  PAGES 1 - 142

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                      WESTERN DIVISION

4

_____

5                                )
TOM KONDASH, On Behalf           )
6   of Himself, and All          )
Others Similarly                 )
7   Situated,                    )
                                 )
8            Plaintiff,           )
                                 )
9     vs.                        ) Case No.
                                 ) 1:15-cv-00506-SJD
10  KIA MOTORS AMERICA,          )
INC., and KIA MOTORS             )
11  CORPORATION,                 )
                                 )
12           Defendants.         )
_____)

13

14

15          Videotaped deposition of BRUCE STROMBOM,

16  Volume I, taken on behalf of Plaintiff, at 400 South

17  Hope Street, 18th Floor, Los Angeles, California,

18  beginning at 9:04 a.m., and ending at 2:55 p.m., on

19  Tuesday, February 27, 2018, before LORI M. BARKLEY,

20  Certified Shorthand Reporter No. 6426.

21

22

23

24

25

1   APPEARANCES:

2

3   For Plaintiff:

4       GREG COLEMAN LAW

5       BY:  ADAM A. EDWARDS

6       Attorney at Law

7       800 South Gay Street, Suite 1100

8       Knoxville, Tennessee 37929

9       865.247.0080

10      adam@gregcolemanlaw.com

11

12  For Defendant:

13      O'MELVENY & MYERS

14      BY:  CARLOS M. LAZATIN

15            - AND -

16          MARIO L. CUTTONE

17      Attorneys at Law

18      400 South Hope Street, 18th Floor

19      Los Angeles, California 90071

20      3213.430.6000

21      clazatin@omm.com

22      mcuttone@omm.com

23

24  Videographer:

25      Wesley Mack

Page 4

1                          INDEX

2    WITNESS                              EXAMINATION

3    BRUCE STROMBOM

4    Volume I

5

6                  BY MR. EDWARDS                    8

7                  BY MR. LAZATIN                   134

8                  BY MR. EDWARDS                   138

9

10

11                        EXHIBITS

12   NUMBER              DESCRIPTION              PAGE

13   Exhibit 1   Notice of Deposition              14

14

15   Exhibit 2   Letter, dated April 2, 2017, with   16

16               Bruce Strombom's Curriculum Vitae

17               attached

18

19   Exhibit 3   Invoice for period ending          19

20               July 31, 2017 for Total

21               Professional Services totalling

22               $14,847.50

23

24

25

Page 5

1    INDEX (Continued):

2                        EXHIBITS

3    NUMBER                DESCRIPTION              PAGE

4    Exhibit 4  Invoice for period ending        20

5               August 31, 2017 for Total

6               Professional Services totalling

7               $122,198.25

8

9    Exhibit 5  Invoice for period ending        20

10              September 30, 2017 for Total

11              Professional Services totalling

12              $99,709.50

13

14   Exhibit 6  Export Report of Bruce Strombom,  49

15              dated September 8, 2017

16

17   Exhibit 7  Screenshot of Panoramic Sunroof   75

18

19

20

21                   INSTRUCTION NOT TO ANSWER

22                       Page       Line

23                        10          8

24

25

Page 6

1    Los Angeles, California, Tuesday, February 27, 2018

2                        9:04 a.m.

3

4         VIDEO OPERATOR:  Good morning.  We are on

5    record at 9:34 a.m., February 27th, 2018.

6              Please note that microphones are sensitive,

7    may pick up whispering, private conversation, and

8    cellular interference.

9              Please turn off all cell phones, or place

10   them away from the microphones as they can interfere

11   with the deposition audio.

12             Audio and video recording will continue to

13   take place unless all parties agree to go off the

14   record.

15             This is Media Unit Number 1 of the video

16   recorded deposition of Bruce Strombom taken by the

17   counsel of the plaintiff in the matter of Tom Kondash

18   versus Kia Motors Incorporated, et al., filed in the

19   United States District Court of the Southern District

20   of Ohio, Western Division.

21             This deposition is being held at O'Melveny

22   located at 400 South Hope Street in the City of

23   Los Angeles, California.

24             My name is Wesley Mack from the firm of

25   Veritext.  I am the videographer.  Today's court

1    reporter is Lori Barkley from the firm of Veritext.

2           I'm not authorized to administer an oath.

3    I'm not related to any party in this action, nor am I

4    financially interested in the outcome.

5           Counsel and all present in the room

6    attending remotely, will now state their appearances

7    and affiliations for the record.

8           If there are any objections to the

9    proceeding, please state them at the time of your

10   appearance, beginning with the noticing attorney.

11          MR. EDWARDS:  Adam Edwards, Greg Coleman Law

12   for the plaintiff and the proposed class.

13          MR. LAZATIN:  Carlos Lazatin, O'Melveny &

14   Myers, for Defendants.

15          MR. CUTTONE:  Mario Cuttone, O'Melveny &

16   Myers for Defendants.

17          VIDEO OPERATOR:  Thank you.

18          The witness will be sworn in and we may

19   begin the examination.

20

21                   BRUCE STROMBOM,

22   having been administered an oath, was examined and

23   testified as follows:

24

25

1                    EXAMINATION

2    BY MR. EDWARDS:

3        Q.   Dr. Strombom, good to see you again.

4        A.   Good to see you.

5        Q.   I took your deposition a few weeks ago on

6    the Hyundai case; you recall that?

7        A.   I do.

8        Q.   Okay.  So I'm going to be going over a few

9    of the introductory things, and I apologize in

10   advance that some of it is going to overlap, but I

11   need to ask you the same questions in this case to

12   make sure that we're all on the same page, okay?

13       A.   Sure.

14       Q.   How many depositions have you given,

15   approximately?

16       A.   On the order of 70 or 80 depositions.

17       Q.   Okay.  So you understand that I'm going to

18   be asking you a number of questions today and we need

19   verbal responses as opposed to head shakes, correct?

20       A.   Yes.

21       Q.   Okay.  And you understand that it's best to

22   avoid answers like "uh-huh" and "huh-uh" so we can

23   make a clear record.

24       A.   Yes.

25       Q.   If you would, please let me finish my entire

```
 1   question.  I do tend to ask questions more slowly
 2   than you might be used to and I will tend to pause,
 3   but I will try to let you get out your entire answer
 4   if you'll also allow me to get out my entire
 5   question, we can avoid talking over each other, okay?
 6        A.   Okay.
 7        Q.   All right.  What did you do to prepare for
 8   your deposition here today?
 9        A.   I reviewed documents from the case and I met
10   with counsel yesterday.
11        Q.   Okay.  Let's talk about meeting with counsel
12   first.
13             Who did you meet with?
14        A.   Carlos Lazatin and Mario Cuttone.
15        Q.   And where was that meeting?
16        A.   In O'Melveny's office here in L.A.
17        Q.   Okay.  How long did that meeting last?
18        A.   Maybe six hours, including lunch.
19        Q.   Okay.  Was anyone else present other than
20   yourself, Mr. Lazatin, and Mr. -- is it Cuttone?
21             MR. CUTTONE:  Cuttone.
22             MR. EDWARDS:  Cuttone, I'm sorry.
23        Q.   Anyone else present?
24        A.   No.
25        Q.   Okay.  You talked about, let me first ask
```

1    you:  Did you do -- did you have any other meetings,

2    whether in person or on the telephone in preparation

3    for this deposition here today?

4        A.   No.

5        Q.   You told me that you reviewed documents in

6    preparation for your deposition here today, correct?

7        A.   Yes.

8        Q.   Okay.  Which documents did you review?

9            MR. LAZATIN:  Objection, privilege,

10   work-product.

11           Instruct you not to answer.

12   BY MR. EDWARDS:

13       Q.   Just so I'm clear, I'm not asking you to

14   reveal what counsel instructed far as what documents

15   you should review.  I'm asking you aside from

16   conversations with counsel, what documents you did

17   review in preparation for your deposition here today?

18           MR. LAZATIN:  Let me just be clear.  You're

19   asking about documents, any documents he reviewed

20   other than ones I asked him to review?

21           MR. EDWARDS:  No.  I'm -- I'm not trying to

22   get into the substance of conversations that you had

23   with him.  I'm asking him a pretty simple and

24   straightforward question, I think:  What documents

25   did he review in preparation for his deposition here

```
                                              Page 11
 1   today?
 2            MR. LAZATIN:  Okay.  The documents he
 3   reviewed, you can inquire about this, but the
 4   documents he reviewed were provided to him by
 5   counsel, and therefore are covered by work-product,
 6   so I'm going to instruct him not to answer on that
 7   basis.
 8            MR. EDWARDS:  So your -- your position is
 9   with regard to experts in this case, if you or I
10   provide our experts with certain documents, then you
11   or I would not be able to inquire as to what
12   documents were reviewed in preparation for the
13   deposition today.
14            Is that the position you're taking?
15            MR. LAZATIN:  If he reviewed them at the
16   instruction of counsel, yes.
17            MR. EDWARDS:  Okay.
18            MR. LAZATIN:  Which is the case here, but
19   you may inquire about that in case there are others.
20            MR. EDWARDS:  Right.
21      Q.   So all of the documents that you reviewed in
22   preparation for your deposition were documents
23   provided to you by counsel?
24      A.   Well, they were provided to me by counsel.
25   I guess there were some that -- that weren't, some of
```

1    the documents referenced in my report --

2        Q.    Okay.

3        A.    -- which I reviewed independently.

4        Q.    Okay.  And what were those documents?

5        A.    I think there were articles that appeared in

6    various publications and news broadcasts related to

7    sunroof shattering.  I reviewed the deposition

8    transcript of Mr. Gaskin and Mr. Weir.

9        Q.    In the Kia case?

10       A.    In the Kia case.

11       Q.    And what articles specifically did you

12   review?

13       A.    There were ten articles that are listed in a

14   footnote in my report including articles from the

15   "New York Times," transcript of Good Morning America,

16   and various others in a specific footnote that relate

17   to news reports about sun -- sunroof shattering.

18       Q.    Okay.  All ten of those articles had to do

19   with news reports about sunroofs shattering?

20       A.    Yes.

21       Q.    Okay.  All with regard to Kia vehicles?

22       A.    No.  There was some Kia vehicles, some more

23   general articles.

24       Q.    Okay.  And is there a reason why you thought

25   those articles in particular were important to review

Page 13

1   for your deposition here today?

2      A.   They were just articles that I relied on in

3   forming my opinions in my report, so I thought it

4   would be advisable to refresh myself on those.

5      Q.   Okay.  And so you also reviewed other

6   documents in preparation for your deposition here

7   today, correct?

8      A.   Yes.

9      Q.   Other than the ones you just mentioned?

10     A.   Yes.

11     Q.   Okay.  You're going to listen to admonition

12  of counsel to not reveal what those documents were

13  because those were documents that counsel provided to

14  you; is that correct?

15     A.   Yes.  I'm going to take the instruction of

16  counsel on that respect.

17     Q.   Okay.  Were those also documents that you

18  relied upon in your report?

19     A.   Yes.

20          MR. EDWARDS:  So, Carlos, even though

21  they're documents he relied upon in his report,

22  you're not going to allow him to answer which

23  documents he reviewed in preparation for his

24  deposition?

25          MR. LAZATIN:  Those documents are listed in

1   his reports, which of those he did provide to us and

2   not our instruction, that's correct.

3           MR. EDWARDS:  Okay.  There are a number of

4   documents you relied upon in your report that you

5   specifically reviewed in preparation for your

6   deposition other than the news articles and the

7   deposition transcript of Mr. Gaskin and Mr. Weir,

8   correct?

9       A.   Yes, that's correct.

10      Q.   All right.  And you reviewed those in

11  preparation for your deposition here today?

12      A.   Yes.

13      Q.   Did you receive a deposition notice in this

14  case?

15      A.   Yes.

16      Q.   Okay.  When did you review it for the first

17  time?

18      A.   Last week sometime.

19          MR. EDWARDS:  Go ahead and mark this as the

20  first exhibit, please.

21          (Exhibit 1 was marked for identification by

22      the court reporter and is attached hereto.)

23  BY MR. EDWARDS:

24      Q.   If you would review that document that we've

25  marked as Exhibit 1.

Page 15

1          Did you bring any documents with you to the

2     deposition today?

3          A.    No.

4          Q.    Okay.  Did you review the documents

5     requested from Bruce Strombom, which is attached to

6     the notice of deposition that we've marked as

7     Exhibit 1?

8          A.    Yes.  I -- I reviewed this sheet.

9          Q.    Okay.  Do you see there under number 1, we

10    asked you to (as read):

11              Produce any and all documents

12          which you considered in the

13          development of your opinions in this

14          matter including legal research,

15          materials from other cases, or any

16          other materials generated from any

17          other source including all backup

18          data, notes, or other documents

19          containing facts, data, or

20          assumptions that you relied upon in

21          forming your opinions in this

22          matter.

23          Did you review that before today?

24    A.    Yes.

25    Q.    Okay.  Did you make a search to determine if

1    you had documents responsive to Request Number 1?

2         A.   Yes.  I basically looked at my list of

3    documents relied upon, which is a complete list of

4    the documents that I considered in forming my

5    opinions.

6         Q.   Okay.  So every document that you considered

7    in the development of your opinions in this matter is

8    already set forth in your report?

9         A.   Yes.

10        Q.   Okay.  And all of those documents have been

11   provided to counsel?

12        A.   Yes.

13        Q.   Okay.  Number 2 (as read):

14             All agreements between you and

15             defendants regarding your retention

16             as an expert in this matter.

17             Do you -- did you review that request?

18        A.   Yes.

19        Q.   And did you provide the retainer agreement

20   you had in this case to counsel?

21        A.   Yes.

22             MR. EDWARDS:  Go ahead and mark this as the

23   next exhibit, please.  Sorry.

24             (Exhibit 2 was marked for identification by

25        the court reporter and is attached hereto.)

1          MR. EDWARDS:  You have to share on that one,

2     Carlos.

3          MR. LAZATIN:  What's this?  Which one is

4     this?

5          MR. EDWARDS:  This is a letter that you

6     provided to us, dated April 2nd, 2017, and it also

7     has a C.V. attached.

8          MR. LAZATIN:  Okay.

9     BY MR. EDWARDS:

10    Q.   Is this April 2nd, 2017 letter, the first

11    two pages or three pages of which are attached to

12    what we've now marked as Exhibit 2, is that what you

13    would consider to be the retainer agreement that you

14    provided to O'Melveny in this case?

15    A.   Yes.

16    Q.   Okay.  Did you seek to provide a separate

17    retainer agreement for the Hyundai case?

18    A.   I believe so, yes.

19    Q.   On page 3, I see there's an accepted and

20    agreed page for signature by Kia Motor Americas and

21    Kia Motors Corporation.

22         Do you see that?

23    A.   Yes.

24    Q.   Okay.  Is there a reason why that's not

25    signed?

1      A.   I imagine there's a reason.  I don't know

2   what it is.

3      Q.   Okay.

4      A.   The only copy I have is the copy that I

5   signed and sent out.

6      Q.   Okay.  And then there's a signature below

7   that also for O'Melveny to sign?

8      A.   Correct.

9      Q.   And do you have a signed copy of the

10  agreement with the signature from either a

11  representative from Kia or O'Melveny on it?

12     A.   I don't.

13     Q.   Okay.  And then the next pages of what we've

14  marked as Exhibit 2, I think, appear to be a C.V.

15  that you provided us.

16          Do you see that?

17     A.   Yes.

18     Q.   Okay.  Is that your most current C.V.?

19     A.   Yes, it is.

20     Q.   Okay.

21          MR. LAZATIN:  Wait.  Did this, the agreement

22  have the C.V. attached or you've just stapled them

23  together?

24          MR. EDWARDS:  I think -- I don't know

25  whether they were produced that way or whether they

1    were just stapled together now.  I thought it best

2    for three of them stapled to this so we didn't have

3    pages flying around.

4              MR. LAZATIN:  Okay.

5              MR. EDWARDS:  I know they were produced

6    together.

7              MR. LAZATIN:  Okay.

8              MR. EDWARDS:  I'm going to hand you what was

9    produced as KMA(Strombom)_00002 -- 2 and 3.  It's

10   kind of written, written in there in pen, it appears.

11   I don't know if it was cut off, but we'll mark that

12   as Exhibit 3, please.

13             (Exhibit 3 was marked for identification by

14       the court reporter and is attached hereto.)

15   BY MR. EDWARDS:

16       Q.   Is that your bills in this case?

17       A.   It appears to be, yes.

18       Q.   Okay.  From what time period?

19       A.   It's dated as of August 31st, 2017.  It's

20   for the period ended July 31st, 2017.

21       Q.   Okay.  And what is the total for the work

22   done from that invoice?

23       A.   Professional -- Total Professional Services

24   of $14,847.50.

25             MR. EDWARDS:  Go ahead and mark as the next

1   numbered exhibit, which I think will be Exhibit 4; is

2   that correct?

3           THE REPORTER:  Yes.

4           MR. EDWARDS:  This was produced as

5   KMA(Strombom)_00004 and 00005.

6           (Exhibit 4 was marked for identification by

7       the court reporter and is attached hereto.)

8   BY MR. EDWARDS:

9       Q.   And can you identify that document for me,

10  please.

11      A.   This is a copy of our invoice for the period

12  ending August 31st, 2017.

13      Q.   Okay.  And what was the total there for the

14  billing from your company to Kia?

15      A.   Total professional services of $122,198.25.

16      Q.   And does that accurately reflect your

17  billing for the time period indicated on Exhibit 4?

18      A.   I believe it does.

19          MR. EDWARDS:  Okay.  Let's go ahead and mark

20  as Exhibit 5 what was produced to us as

21  KMA(Strombom)_00006 and 00007.

22          (Exhibit 5 was marked for identification by

23      the court reporter and is attached hereto.)

24  BY MR. EDWARDS:

25      Q.   And what is the relevant time period for

1   that billing for your professional services?

2       A.   For the period ended September 30th, 2017.

3       Q.   Okay.  And what was the total amount of the

4   bills to Kia for that time period?

5       A.   Total professional services of $99,709.50.

6       Q.   Do Exhibits 3, 4, and 5 represent the total

7   billing to date that you have incurred for

8   professional services rendered for your work in the

9   Kia case?

10      A.   If those are all that I sent you, then that

11  would be our total billings to date.

12      Q.   Okay.  So far in this case you have billed,

13  I'm just doing the math in my head, a little over

14  $235,000 to Kia in this case?

15      A.   That sounds close, yes.

16      Q.   Okay.  And you haven't been asked to design

17  a damages model in this case, have you?

18      A.   No.  Not an affirmative damage model, no.

19      Q.   Okay.  You haven't been asked to design any

20  sort of survey to calculate consumers demand, have

21  you?

22      A.   No, I haven't been asked to affirmatively

23  design any surveys.

24      Q.   Okay.  You haven't been asked to conduct any

25  survey for any reason in this case, correct?

Page 22

1    A.    That's correct.

2    Q.    Primarily your assignment in this case is to

3    review the damages model proposed by, or excuse me,

4    the survey proposed by Mr. Gaskin and provide your

5    opinions about that; is that fair?

6    A.    I think my assignment also includes

7    commenting upon how the analysis going -- is going to

8    be used by Mr. Weir to calculate damages, so I

9    reviewed and commented both on Mr. Gaskin's and

10   Mr. Weir's reports.

11   Q.    Okay.  What is your hourly rate in this

12   case?

13   A.    $720 an hour.

14   Q.    How many conjoint analysis surveys have you

15   designed?

16   A.    I have not designed a conjoint analysis

17   survey affirmatively.

18   Q.    Okay.  You are currently employed as the

19   managing principal for analysis group in Los Angeles,

20   California?

21   A.    Yes, I am a managing principal.

22   Q.    Okay.  Does your work primarily involve

23   litigation?

24   A.    Approximately 75 percent of what I do is

25   related to litigation or potential litigation, and

1   about 25 percent is related to public policy or

2   consulting assignments with companies.

3        Q.   Approximately how many cases have you worked

4   on as an expert witness?

5        A.   Where I was the designated expert?

6        Q.   Correct.

7        A.   Something over a hundred.

8        Q.   Have you ever been asked to develop a

9   damages model for a class action case?

10       A.   I -- I think in one case I was asked to

11  perform some calculations based upon wage an hour

12  data.  I guess that could be considered a damages

13  model.  So I think the answer is yes.

14       Q.   What case was that?

15       A.   It was a case involving employees at LAX.

16  It was a wage an hour case that involved employees at

17  LAX, a case that I ended up never issuing an expert

18  report or testifying on, but I was retained and did

19  some amount of work in that respect.

20       Q.   Do you remember the name of the case?

21       A.   I don't.

22       Q.   Were you retained in that case by counsel

23  for the plaintiffs or the defendant?

24       A.   The plaintiffs.

25       Q.   Okay.  Was the plaintiff in that case a

Page 24

1   company?  A business?

2       A.    No.  It was a class of employees.

3       Q.    Okay.  And you told me it was in a wage an

4   hour case?

5       A.    That's right.

6       Q.    Is there a reason why you didn't issue a

7   report in that case?

8       A.    Yes.

9       Q.    What was the reason?

10      A.    The case settled.

11      Q.    Okay.  How did you intend to calculate class

12  damages in that case?

13      A.    I looked at the time records that the

14  company maintained, electronic database of time

15  records, and performed various calculations to

16  identify those hours in compensation that met the

17  plaintiff's decision rule about what damages were in

18  the case, so I basically crunched some data to try

19  and calculate under compensation for individual

20  members of the class.

21      Q.    Okay.  Have you ever been retained to design

22  a damages model in a class action product defect

23  case?

24      A.    I've calculated diminution of value of

25  vehicles on sort of a class-wide basis.  I don't know

Page 25

1    if that qualifies as a yes to your -- to your

2    question, but I have looked at used car prices to

3    assess whether there's any evidence of diminution in

4    value associated with an alleged defect on several

5    occasions.

6        Q.   Well, in those cases, did you design a model

7    for measuring class-wide damages or were you

8    attempting to rebut a damages model set forth by

9    plaintiffs?

10       A.   Well --

11            MR. LAZATIN:  Objection, form.

12            THE WITNESS:  In the context of those cases,

13   I think one of the claims was that there was a

14   diminution of value of the vehicles.  My recollection

15   is that plaintiffs did not put forward a methodology

16   that I thought measured what they said they were

17   planning to measure, which is the diminution in

18   value.

19            And so I looked at the available data to see

20   if there was any evidence that these vehicles had a

21   diminution in value associated with the defect.  So

22   that -- that's essentially what I did.  You can

23   characterize that however you want, but that's

24   basically what I did.

25

Page 26

1    BY MR. EDWARDS:

2         Q.    Okay.  And what was your conclusion?

3         A.    In those four cases, the at-issue vehicles

4    did not show any statistically significant diminution

5    in value.

6         Q.    Okay.

7         A.    Four, there may have been five actually, now

8    that I think about it.

9         Q.    So we're talking about four or five total

10   class cases involving automobiles that you've worked

11   on; is that correct?

12        A.    That I -- for which I've calculated

13   diminution in value, that's right.

14        Q.    All right.

15        A.    There are other, other automobile class

16   defect cases that I've worked on, but ...

17        Q.    Okay.  And in every case where you've

18   attempted to, or every automobile case where you've

19   attempted to calculate diminution in value, is it

20   fair to say that you found that there was no

21   significant diminution in value?

22        A.    That's correct.  For every case that I've --

23   that I've attempted that, yes --

24        Q.    Okay.

25        A.    -- for the class vehicles.  I found

Page 27

1   diminution in value from other vehicles in the

2   control group, but not for the vehicles at issue.

3        Q.   Okay.  I know you've told me you've never

4   designed a conjoint analysis survey.

5        A.   That's correct.

6        Q.   Do you feel sitting here today that you have

7   the proper training and qualifications to design a

8   conjoint analysis survey?

9        A.   I think there are many aspects to the

10  conjoint analysis.  There -- it's based upon economic

11  principles, about willingness to pay, so there are

12  aspects of a conjoint analysis that I feel qualified

13  to comment about, and there are aspects that I'm

14  really not the expert in, specifically in terms of

15  the survey design and execution, I wouldn't hold

16  myself out as a conjoint survey expert.

17       Q.   Okay.  So you hold yourself out as an expert

18  in economics; is that fair?

19       A.   That's true, yes.

20       Q.   Okay.  So as far as the survey design

21  itself, that's kind of outside the scope of your

22  expertise?

23       A.   Well, there are aspects of survey design and

24  execution that are -- that I feel qualified to

25  comment upon based upon just basic scientific method

1    and appropriate research techniques based upon my

2    academic training and also my experience in business.

3              But I wouldn't say I'm a -- a -- I wouldn't

4    hold myself out as a, say, a full-service survey

5    expert.  For example, in this case, Professor

6    Reepstein is somebody who I took to or think of as a

7    conjoint expert in all dimensions, and he's really

8    the expert in this -- in the survey aspect.

9        Q.   What about Mr. Gaskin, do you consider him

10   to be an expert in surveys?

11       A.   I -- I really -- I don't have an opinion

12   about Mr. Gaskin.  I frankly don't know exactly what

13   his qualifications are.

14       Q.   Okay.  I believe I asked you this question

15   specifically in the Hyundai case, and you indicated

16   to me that you don't hold yourself out as a conjoint

17   survey design expert; is that -- is that the same

18   today?

19       A.   Yeah.  No.  That's the same today and that's

20   what I think I tried to communicate here.

21       Q.   Okay.  Okay.  If -- in a law firm comes to

22   you in the context of litigation and asks you if you

23   would serve as an expert to design and implement a

24   conjoint analysis survey for the purposes of

25   providing data for a class-wide damages model, would

1   you undertake that, yourself, or refer them to

2   someone else?

3      A.   Well, if it's affirmatively designing a

4   conjoint study, I would probably refer them to

5   someone else.  There's certainly aspects of conjoint

6   studies that I feel qualified to comment upon, and

7   make observations about, but I don't think I've held

8   myself out as an expert to design -- affirmatively

9   design a conjoint analysis, nor would I at this

10   point.

11      Q.   Okay.  Just going back to the documents

12   requested as part of the notice, and feel free to go

13   back to the notice there, so number 3 asks for your

14   complete billing record related to your retention by

15   Defendants in this matter.

16        We previously marked as Exhibits 3, 4, and

17   5, I think, the bills that you provided.

18        Do you believe that you have provided us

19   with the complete billing records related to your

20   retention by Defendants in this matter?

21      A.   Yes, I think so.

22      Q.   Okay.  Please take a look at number 4.  That

23   asks for (as read):

24          Any and all correspondence,

25          documents, written materials,

Page 30

```
1           e-mails, or other physical evidence
2           exchanged by you and anyone other
3           than attorneys for Defendants
4           relating to your retention in this
5           action by the defendants.
6           Do you see that?
7      A.   Yes.
8      Q.   Okay.  And you reviewed that before today?
9      A.   Yes.
10     Q.   Okay.  Did you make a search to see if you
11  had correspondence, documents, written materials,
12  e-mails, or other physical evidence that you
13  exchanged between another individual, not counsel, in
14  this matter?
15     A.   Yes.
16     Q.   Okay.  And did you find anything?
17     A.   No.
18     Q.   So if I may look at Exhibit 5 here, in
19  addition --
20          You okay?
21          I'm looking at Exhibit 5 under Professional
22  Hours, and it lists the number of professionals other
23  than -- other than yourself.  It lists a
24  Mr. Gustafson?
25     A.   Yes.
```

1    Q.   Vice president.  He's also worked on -- on

2   this Kia case if I'm reading these bills correctly?

3    A.   That's right.

4    Q.   A Mr. -- well, I don't know if it's Mr.,

5   it's a J. Wiles?

6    A.   Yes.

7    Q.   What's the "J" stand for?

8    A.   Joel.

9    Q.   Joel, okay.

10        Mr. Wiles has also worked on the case, the

11   Kia case?

12    A.   Yes.

13    Q.   Okay.  In fact, according to this invoice

14   for the period ending September 30th, 2017, he had

15   billed 54.7 hours.

16        Does that sound about right?

17    A.   I don't know.  I don't have the bill in

18   front of me.

19        Yes.

20    Q.   Okay.  His bill for this time period set

21   forth in Exhibit 5 was $23,794.50, correct?

22        MR. LAZATIN:  Who?

23        MR. EDWARDS:  Mr. Wiles.

24        THE WITNESS:  $23,794.50, that's correct.

25

Page 32

1  BY MR. EDWARDS:

2      Q.   Okay.  And then there's a K. Williams?

3      A.   Yes.

4      Q.   What's the "K" stand for?

5      A.   Katie.

6      Q.   Okay.  She also had significant work on this

7  Kia case, correct?

8      A.   She billed time to this case, that's right.

9      Q.   I mean, for this time period set forth in

10  Exhibit 5 you had 15.7 hours, Mr. Wiles had 54 hours,

11  K. Williams had 45.5, correct?

12     A.   I don't know.  I can't see that.

13     Q.   Okay.

14     A.   Yes.

15     Q.   Why don't you read for me the next -- the

16  next person that worked on the case and the hours

17  that they billed.

18     A.   A. Farrukh, that's F-A-R-R-U-K-H, is an

19  analyst who spent 41.4 hours.

20     Q.   What's the "A" stand for?

21     A.   I'm not sure.

22     Q.   Okay.

23     A.   You want me to read the whole list here.

24     Q.   Yeah.  The next one, please.

25     A.   C. Morley is an analyst in this time period,

1  47.35 hours.

2          H. Holland is an analyst in this time

3  period, incurred 12.9 hours.

4           I. Staeheli, S-T-A-E-H-E-L-I, incurred

5  7.2 hours.

6          And Jay Breslow incurred 21.2 hours in this

7  time period.

8     Q.   Okay.  And I realize I'm using the term

9  "significant," but which is subject to

10  interpretation, but it -- it appears that everyone on

11  this list on Exhibit 5 with the exception of Staeheli

12  actually put more hours in -- and Mr. Gustafson put

13  more hours into the case, at least for this time

14  period than you had, correct?

15     A.   I'll have to see that.  I think H. Holland

16  is also on that list.

17     Q.   Okay.  The remainder of the individuals,

18  though, had at least as many hours, and in some cases

19  significantly more hours than you had for the time

20  period set forth in Exhibit 5, correct?

21     A.   The same or more, yes.

22     Q.   Okay.  And you never had any written

23  communication with any of these individuals on your

24  team?

25     A.   I -- I didn't produce any -- I didn't look

Page 34

1   for any written correspondence that I have with any

2   of them.

3       Q.   Okay.

4       A.   I didn't include those in my production.

5   I'm not -- I don't know whether I had any or not, but

6   I didn't look for those.

7       Q.   Okay.  Well, number 4 on the documents

8   requested from Bruce Strombom would include written

9   correspondence between you and other members of your

10  team; wouldn't you agree?

11      A.   I didn't take it to mean that, no.

12      Q.   Okay.

13      A.   I mean, I don't -- I don't think I've ever

14  produced e-mails between myself and my teammates, and

15  I didn't in this case.  I didn't look for them

16  either.

17      Q.   Okay.  So you read any and all

18  correspondence, documents, written materials,

19  e-mails, or other physical evidence exchanged between

20  you and anyone other than attorneys for Defendants

21  relating to your retention in this action as not

22  including e-mails between you and members of your

23  team?

24      A.   Yes.

25      Q.   For example -- okay.

```
 1       A.    That's how I interpreted that.

 2       Q.    Okay.  Okay.  Number --

 3             MR. LAZATIN:  Let me just clarify, I

 4    believe -- I mean, regardless of whether -- how he

 5    may have interpreted, I believe we interposed an

 6    objection -- on work-product grounds on -- on that

 7    particular request.

 8    BY MR. EDWARDS:

 9       Q.    What role did J. Wiles have in the

10    preparation of your report and opinions in this case?

11       A.    Joel was the manager on the case, so

12    essentially at the outset, I sort of set out the --

13    the work plan, I did that in conjunction with scroll,

14    about what we needed to do in this case to deliver

15    our work-product.

16             And then Joel's responsibility is among

17    other things coordinating the work of the analysts

18    who work on the case to basically execute the

19    analysis that -- that I've outlined, and he also

20    wrote drafts sections of the report --

21       Q.    Okay.

22       A.    -- at my direction.

23       Q.    So there are drafts of the report that

24    Mr. Wiles would have submitted to you and then you

25    would have done what, make redlines and changes,
```

1  things like that?

2      A.   Generally how it works is that we have one

3  copy of the report that we work on, so it's a living

4  document, and he, I think it started out in this case

5  as an outline that I put together, he added sections,

6  wrote sections to it.  I would review those and ask

7  questions, provide edits, change the content to -- to

8  turn it into my final report.

9      Q.   Okay.  And what -- what's his educational

10  background, if you know, Mr. Wiles?

11      A.   He has a Ph.D. in economics from Stanford.

12      Q.   Okay.  Is there anyone of the professionals

13  listed here that worked on this case in Exhibit 5

14  that is a conjoint analysis survey design expert?

15      A.   Not that I'm aware of.

16      Q.   Okay.  I mean, any -- is there anyone beyond

17  Exhibit 5, is there anyone on the team of individuals

18  that worked with you to prepare the report in this

19  case that holds him or herself out as a conjoint

20  analysis design expert?

21      A.   Not that I'm aware of.

22      Q.   Okay.  Number 5 on the document request you

23  have provided us with a current C.V., correct?

24      A.   That's correct.

25      Q.   Publications authored by you in the previous

1  ten years if different from the version attached to

2  your report.

3          Tell me about publications you've had in the

4  past ten years.

5      A.   Well, I think they're all listed on my C.V.

6  I think there's a book chapter that -- that came out

7  between the time of my issuance of my report and this

8  current updated C.V.  I think that's the only change

9  with respect to publications.

10      Q.   Okay.  And what's the name of that book that

11  came out subsequent to you issuing your report?

12      A.   The book is called:  Calculation of Lost

13  Profits Damages - Theory and Practice, First Edition.

14      Q.   And which chapter did you author?

15      A.   I wrote the chapter titled:  Using Cash

16  Flows Versus Accrual Net Income.  I was a co-author

17  on that with one of my colleagues.

18      Q.   Okay.  And is the list that you've provided

19  us of all other cases, which we asked about in

20  number 7 on the document request, a list of all other

21  cases in which during the previous four years you

22  testified as an expert at trial or by deposition, is

23  that current?

24      A.   Yes.  And that's contained within my C.V.

25      Q.   Okay.  Number 8 asks about (as read):

```
 1              All reports by you -- prepared by

 2         you for Defendants in any of the

 3         cases in which, during the previous

 4         four years, you testified as an

 5         expert at trial or by deposition.

 6         Do you see that?

 7    A.   Yes.

 8    Q.   Did you make a search for those documents?

 9    A.   I did.

10    Q.   Okay.  Did you provide them?

11    A.   There were none.

12    Q.   Okay.  You've never provided -- you've never

13  done any work for Kia before this case?

14    A.   I have worked for Kia before this case.

15    Q.   Okay.  In what capacity?

16    A.   As an expert.

17    Q.   Okay.  How many times?

18    A.   I believe it's four times.

19    Q.   Are each of those cases set forth in your

20  C.V.?

21    A.   Yes.

22    Q.   Okay.  Do you recall the names of those

23  cases?  And feel free to review your CV to refresh

24  your memory.

25    A.   One is captioned Johnette Alexander versus
```

 1   Kia Motors America.

 2        Q.   What page are you on?

 3        A.   I'm on page 15 of my C.V.  And then there

 4   were three other cases in different state courts

 5   dealing with the same alleged defect, the first one

 6   is --

 7        Q.   Hold on.  I'm sorry to interrupt you.  I'm

 8   looking at page 15, and I'm trying to find the first

 9   case that you mentioned.

10        A.   Second to the bottom.

11             MR. CUTTONE:  Johnette Alexander.

12             MR. EDWARDS:  Let me see what you're

13   pointing to there.

14        Q.   I see it.  Thank you.  That's Johnette

15   Alexander, et al., the Kia Motors America?

16        A.   Inc., et al., yes.

17        Q.   Okay.  And I want to ask you about, you've

18   told me there were four where you previously

19   represent -- or were retained by counsel on behalf of

20   Kia?

21        A.   Correct.

22        Q.   Okay.  This Alexander V. Kia case was

23   pending in the Superior Court of California?

24        A.   Yes.

25        Q.   When?  Is it ongoing?

1    A.   No.   This was seven or -- six or seven years

2  ago.

3    Q.   Okay.  And this was a class case where the

4  plaintiffs alleged that class members were injured by

5  defective rear seatbelt systems in the Kia Sephia?

6    A.   Yeah.  Economically injured, yes.

7    Q.   Okay.

8    A.   Not physically injured.

9    Q.   Okay.  Was there an allegation of a safety

10  defect?

11    A.   I don't recall.  I don't think it was a

12  safety defect.

13    Q.   Okay.  And in that case you testified at

14  deposition and at trial?

15    A.   Yes.

16    Q.   Okay.  And what was the scope of your

17  assignment in the Alexander V. Kia case?

18    A.   I was calculating damages in that case.

19    Q.   Okay.  Did you rebut the plaintiff's damages

20  model?

21    A.   I assume I did.  I don't actually have a

22  recollection of exactly what I did in that case.

23    Q.   Okay.  And how did you attempt to assess

24  damages suffered class wide in the Alexander V. Kia

25  case?

1      A.   I'd have to look at the report.  I don't

2   frankly recall, as I sit here.

3      Q.   Okay.  But you testified at deposition, at

4   trial on behalf of Kia?

5      A.   That's correct.

6      Q.   All right.  Did you ultimately determine

7   that the class members suffered for damages?

8      A.   I don't recall.

9      Q.   Okay.  We'd have to look at the deposition

10  or trial transcript?

11     A.   I think so.  I would have to.

12     Q.   Okay.  Was this a diminution in value case?

13  Do you recall?

14     A.   I think there were two theories of damage.

15  One was diminution of value and one was the cost of

16  repair and replacement, which I think the plaintiffs

17  were using sort of interchangeably.  They were using

18  repair costs as a measure of diminution in value.

19     Q.   Okay.  And you don't -- sitting here today,

20  you don't recall any of your opinions even generally

21  as far as your conclusions in that case about

22  damages?

23     A.   I really -- I don't.

24     Q.   Okay.  What was the second case where were

25  retained to represent Kia?

Page 42

1    A.   Well, I didn't represent Kia --

2    Q.   I'm sorry.  Retained on Kia's behalf.

3    A.   Yeah.  There was three of them.  There were

4  the following three listed on my C.V.  They all

5  involved the same underlying alleged defect, which

6  was a brake system defect in the Kia Sephia.

7    Q.   Okay.

8    A.   And they were Regina Little, et al., versus

9  Kia Motors America; Maria Santiago, et al., versus

10  Kia Motors America, and Samuel Bassett Kia -- versus

11  Kia Motors America.

12    Q.   Okay.  And those are the last four cases on

13  page 15 of your C.V.?

14    A.   Correct.

15    Q.   We'll identify that as KMA(Strombom)_00078.

16         Does that appear to be correct?

17    A.   Yes.

18    Q.   And you said braking system, but under the

19  Alexander case, it indicates that the alleged defect

20  involved a rear seatbelt system?

21    A.   Yeah.  The Alexander case dealt with a --

22  the seatbelt system and the other three cases that I

23  just named related to the braking system in the

24  Sephia.

25    Q.   Okay.  Was that a safety defect case, those

1    last three, Little and Santiago and Samuel Bassett?

2        A.   I don't recall a safety component.  I think

3    it was excessive wear of brake pads was the

4    allegation, and I don't recall a safety component to

5    that.

6        Q.   Okay.

7        A.   That's not to say there wasn't.  I don't

8    recall it, though, as I'm sitting here.

9        Q.   I mean, I think brake wear and I think

10   potential safety defect, but maybe that wasn't the

11   case.

12       A.   I don't recall a safety component.

13            MR. EDWARDS:  Okay.  We've been going about

14   an hour.  Let's take our first break.

15            VIDEO OPERATOR:  We're going off the record

16   now at 10:30 a.m.

17

18            (Recess taken.)

19

20            VIDEO OPERATOR:  We're on record.  Time,

21   10:42 a.m.

22            Counsel, you may proceed.

23   BY MR. EDWARDS:

24       Q.   All right.  I think when we took our break,

25   Dr. Strombom, we were talking about four occasions

1   prior to this occasion where you've been retained as

2   an expert on behalf of Kia in litigation, correct?

3      A.   Yes.

4      Q.   Okay.  Have you ever done any other work

5   whether it's in litigation or otherwise for Kia?

6      A.   No.

7      Q.   Okay.  Have you ever done any other work

8   whether it's litigation or otherwise for Hyundai?

9      A.   I've worked on the Glen case for Hyundai.

10     Q.   Right.

11     A.   I think that's the only case I've worked for

12   Hyundai on.

13     Q.   Okay.  Do you have any understanding as to

14   the kind of business relationship between Hyundai and

15   Kia?

16         MR. LAZATIN:  Objection, outside the scope,

17   foundation, speculation.

18         THE WITNESS:  Well, my understanding is that

19   they basically are competitors in the United States.

20   They compete against each other, often in similar

21   classes of vehicles.  But it really hasn't been the

22   focus of any -- any work that I've done, so that's --

23   that's just my general understanding.

24   BY MR. EDWARDS:

25     Q.   Okay.  You don't have any idea as to whether

```
1    there's ownership that overlaps between Hyundai and

2    Kia?

3        A.   I don't.

4             MR. LAZATIN:  Same objections.

5    BY MR. EDWARDS:

6        Q.   Okay.  All right.  Number 9 of the document

7    request (as read):

8             All documents pertaining to,

9             reflecting, or supporting any

10            assumption you relied on in forming

11            your opinions in this matter.

12            Did you make a search for documents

13   responsive to number 9?

14       A.   Yes.

15       Q.   Okay.  Did you find any documents that were

16   responsive?

17       A.   I mean, there were documents that I relied

18   upon that are listed in my report.  I'm not -- I'm

19   trying to think about whether they incorporate any

20   assumptions.  I don't think they actually incorporate

21   any assumptions, so there wouldn't be anything

22   outside the documents that I relied upon that are

23   listed in my report.

24       Q.   Okay.  Are you making certain assumptions as

25   part of your opinions in this case?
```

1    A.   Well, I mean, there are kind of economic

2  principles that I'm assuming, you know, price is

3  determined by the intersection of supply and demand,

4  you know, basic things like that.

5    Q.   Okay.

6    A.   The demand curve is downward sloping, those

7  types of things, but I don't think there's any -- I

8  can't think of any explicit assumptions that I made

9  that are, you know, specific to this case, the facts

10  of the case, or what have you.

11    Q.   Do you make any assumptions with regard to

12  liability?

13    A.   Well, as -- yes.  I guess as a damages

14  expert I'm assuming that liability is -- is found,

15  such that damages become a pertinent question, so --

16  so I guess that's true, I am assuming liability as a

17  damages expert.

18    Q.   Okay.  Number 10 (as read):

19         All backup data, schedules, and

20         notes pertaining to any calculations

21         you made in forming your opinions.

22    A.   Yes.

23    Q.   Did you make a search for documents

24  responsive to number 10?

25    A.   Yes.

1     Q.   Okay.  Did you find any?

2     A.   No.

3     Q.   You didn't make any notes pertaining to any

4  calculations?

5     A.   No.

6     Q.   Okay.  Do you know if anyone on your team

7  did?

8     A.   Not that I'm aware of.

9     Q.   Okay.  I mean, did you ask them?

10    A.   No, I didn't explicitly ask them.

11    Q.   Okay.  You and I can agree that -- well, let

12  me just ask you:  Were there at least other people

13  that -- on your team that worked on -- had various

14  roles in developing your report and the opinions set

15  forth in this case?

16    A.   I know that they worked on the opinions,

17  that they did work on the case at my direction.

18    Q.   Okay.

19    A.   And there were probably at least eight of

20  them.

21    Q.   And at least in the case of Mr. Wiles, had a

22  role in drafting the report itself, as you told me

23  earlier, right?

24    A.   That's correct.

25    Q.   Did you, with regard to any of these

Page 48

1  individuals, did you ask any of them if they had

2  documents responsive to the document request?

3      A.    No, I did not.

4      Q.    Okay.  Have any of these individuals on your

5  team seen the document request?

6      A.    Yes -- yes.

7      Q.    Okay.  Who?

8      A.    Joel Wiles and I believe Mark Gustafson as

9  well.

10      Q.    Okay.

11      A.    And perhaps others but those are the two

12  that I know of.

13      Q.    But do you know whether the individuals that

14  saw the document request made a search for the

15  documents?

16      A.    They in some cases helped me search for

17  those, yes, in our -- our case directory.

18      Q.    Okay.  But you don't know if any of these

19  individuals may have notes pertaining to

20  calculations, for example, responsive to number 10?

21      A.    I do not.

22           MR. EDWARDS:  Okay.  All right.  Let's go

23  ahead and make a copy of your report.  The next

24  numbered exhibit in this case?

25           THE REPORTER:  6.

Page 49

1          MR. EDWARDS:  Number Exhibit 6.

2          (Exhibit 6 was marked for identification by

3      the court reporter and is attached hereto.)

4          MR. EDWARDS:  You want a copy of the report.

5          MR. LAZATIN:  Thanks.

6   BY MR. EDWARDS:

7      Q.   Go ahead and take a moment or as much time

8   as you need to flip through that Exhibit 6 and make

9   sure that that is a complete and accurate copy of the

10  report that you submitted in this case.

11         Does it appear to be a complete and accurate

12  copy of the report?

13     A.   Well, it is to the body of my report and

14  Appendix A and B, I think there was a copy of the

15  Scott report that was attached, my understanding, was

16  attached to my expert report.

17     Q.   Right.

18     A.   That's not here, but with that exception,

19  right.

20     Q.   Yeah, okay.  I was trying to save a little

21  paper there.

22     A.   Fair enough.

23     Q.   In reviewing your report, we're going to

24  come back and ask about your opinions specifically,

25  but you brought up the Scott report.  The Scott

1    report is something that you do rely upon in setting

2    forth some of your opinions in this case, correct?

3         A.   Yes.  It's -- it's one of the bases for some

4    of my opinions.

5         Q.   Okay.  Let's talk first about the -- the

6    scope of your assignment in this case, and that I

7    believe that appears on page 2 of your report,

8    specifically paragraph 4.

9              Do you see that?

10        A.   Yes.

11        Q.   Okay.  States that you've (as read):

12             Been retained by counsel for Kia

13             Motors America, Inc., and Kia Motors

14             Corporation to provide expert

15             testimony in this matter.

16             Specifically, I've been asked to

17             review, and where appropriate,

18             respond to the opinions presented in

19             the declarations of Steve --

20             Steven P. Gaskin and Colin B. Weir,

21             submitted on behalf of the plaintiff

22             in this matter on July 10th, 2017.

23             Is that accurate?

24        A.   Yes.

25        Q.   Says that you've (as read):

```
 1            Not been asked to analyze whether
 2            the alleged defect exists or to
 3            opine on this subject.
 4            Correct?
 5     A.   Yes.
 6     Q.   So you offer no opinions as to liability
 7  regarding this alleged defect, correct?
 8            MR. LAZATIN:  Objection, form.
 9            THE WITNESS:  I don't think so.  I think
10  Gaskin and Weir are focused on -- on damages, and so
11  my analysis is not related to liability.
12  BY MR. EDWARDS:
13     Q.   Okay.  Do you -- have you reviewed the
14  complaint in this case?
15     A.   Yes.
16     Q.   Okay.  Do you understand that there's
17  allegations that this constitutes a safety defect?
18     A.   Yes.
19     Q.   Okay.  Do you have any opinion one way or
20  the other as to whether a spontaneously shattering
21  panoramic sunroof would amount to a safety defect?
22     A.   No.
23     Q.   Okay.  I notice in the Hyundai case where
24  you were also retained, the scope of your assignment
25  was broader.
```

1          Would you agree with that?

2     A.   Yes.

3     Q.   Okay.  In that case you also gave opinions

4  with regard to the -- the report of Neil Hanneman?

5     A.   Yes, I believe that's right.

6     Q.   Okay.  Is -- is there a reason why the scope

7  of your assignment in the Kia case is limited to

8  responding to the declarations of Mr. Gaskin and

9  Mr. Weir?

10         MR. LAZATIN:  Excuse me.  I'm going to

11  object and caution the witness not to reveal anything

12  he learned in conversations with counsel.

13         THE WITNESS:  Okay.  I imagine there is a

14  reason.  I don't know what that was, but I wasn't

15  asked to address that in this case.

16  BY MR. EDWARDS:

17     Q.   Okay.  And that's all I'm getting at.  I

18  don't want to get into conversations that you've had

19  with your lawyers.  If you made a conscious decision

20  not to set forth opinions with regard to

21  Mr. Hanneman, then I'd like to ask you about that,

22  but if you're telling me you just did what you were

23  asked to do in this case and limit it to that as far

24  as your assignment, which is what it sounds like,

25  then I -- I will accept that; is that correct?

1      A.    That is correct, yes.

2      Q.    Okay.  All right.  I believe I asked you

3  this as part of the Hyundai deposition, but I want to

4  make sure that you have the same opinion here.

5            Do you have any reason to think that a

6  spontaneously shattering sunroof would not startle or

7  distract a driver?

8            MR. LAZATIN:  Objection, form and outside

9  the scope.

10           THE WITNESS:  I -- I really don't have an

11  opinion about that.

12  BY MR. EDWARDS:

13     Q.    Okay.  All right.  Do you have an opinion

14  one way or the other as to whether the Kia vehicles

15  at issue have a reduced market value at the point of

16  sale as a result of this defect?

17     A.    That's -- that's not an opinion I'm

18  expressing in my expert report, so I -- I don't -- I

19  don't have an opinion about that.

20     Q.    Okay.  Would you agree that most people

21  purchasing a motor vehicle consider safety to be an

22  important factor?

23           MR. LAZATIN:  Objection, form, vague,

24  foundation.

25           THE WITNESS:  I mean --

1        MR. LAZATIN: Speculation.

2        THE WITNESS: -- I haven't done any sort of

3  investigation or expert inquiry about that topic. I

4  mean, I can think it's something that's at least

5  public sides by automotive companies, and it can be

6  something that people consider, but I don't have any

7  expert opinion about that.

8  BY MR. EDWARDS:

9     Q.  Well, you do -- you do opine somewhat in

10  your report about Kia purchase drives, do you not?

11     A.  Yes. I cite some surveys that talk about

12  what Kia service -- Kia purchase drives are.

13     Q.  Right. And you've seen the results of

14  Dr. Scott's survey and you rely upon the results of

15  her survey, don't you?

16     A.  Yes.

17     Q.  Okay. So when I asked you during the

18  Hyundai deposition, I asked you specifically can you

19  and I agree that most consumers want to buy a car

20  that they consider to be safe, your answer was I

21  would say just what I said before, I do, you know, I

22  understand that safety is an important consideration

23  for some consumers.

24        Do you hold that same opinion today?

25        MR. LAZATIN: Objection, assumes facts,

Page 55

1    vague, foundation, speculation.

2              THE WITNESS:  Well, I do -- I do think that

3    it can be an important consideration for some

4    consumers and the surveys that I cite identify, I

5    think, safety feature as something that's somewhere

6    on the list of factors considered by.

7              But my point is I haven't studied that.  I'm

8    not expressing, you know, a particular opinion apart

9    from the fact that I see these surveys that identify

10   that as one of the features.  It wasn't the primary

11   focus of my research, but --

12   BY MR. EDWARDS:

13       Q.   Right.

14       A.   -- my general awareness.

15       Q.   Okay.  Are you married?

16       A.   Yes.

17       Q.   Have kids?

18       A.   Yes.

19       Q.   Okay.  To your recollection, when you buy a

20   vehicle, do you want that vehicle to be safe?

21       A.   Yes.

22       Q.   Okay.  And I'm assuming the same for your

23   family, right, you want members of your family to

24   drive a safe vehicle?

25       A.   Yes.

1    Q.   And if there is an issue with one of the

2  components of that vehicle which could potentially

3  make it unsafe, you'd like to know about that before

4  you purchase the car, I'm assuming?

5         MR. LAZATIN:  Objection, beyond the scope,

6  incomplete hypothetical, assumes facts, speculation,

7  vague.

8         THE WITNESS:  I'm not sure -- I'm not sure

9  how to respond to that.  I -- I don't -- I'm not

10  certain what you mean by the question.

11  BY MR. EDWARDS:

12    Q.   Well, I'm -- I'm just asking you:  When you

13  go to purchase a car, if there is a latent defect

14  which could potentially make the vehicle unsafe,

15  would you like to know about that before you make the

16  purchase?

17         MR. LAZATIN:  Objection, same objections.

18         THE WITNESS:  It really depends.

19  BY MR. EDWARDS:

20    Q.   On what?

21    A.   On the probabilities associated with it.

22    Q.   Okay.

23    A.   I mean, every -- when I buy a vehicle, I

24  assume that there will be things that go wrong with

25  the vehicle and they may relate to safety.  There's

1  some chance of that.  I sort of recognize that as a

2  consumer.  So it really depends on the -- the -- the

3  particular factors associated with any particular

4  issue.

5      Q.   And I assume you're talking about whether or

6  not those factors would affect your purchase

7  decision, but wouldn't you want to at least know so

8  you could weigh those choices yourself?

9          MR. LAZATIN:  Objection, beyond the scope,

10  assumes facts, incomplete hypothetical.

11          THE WITNESS:  I mean, certainly with respect

12  to my expert work here, it's not anything that I've

13  investigated, nor really, you know, am I -- I'm not a

14  safety expert in vehicles.  I'm a pretty analytic

15  guy, and I -- I would prefer not to know about every

16  potential safety issue of which -- in an automobile

17  there could be, you know, there could be many of

18  them, so I just -- I'll stop my answer there.

19  BY MR. EDWARDS:

20      Q.   Okay.  So you're saying with regard to a

21  safety defect, you'd prefer not to know?

22      A.   No, that's not what I said.  What I said is

23  it would depend on the probabilities, the -- the

24  significance of the negative outcome.  There are, you

25  know, people who spend all their time studying

Page 58

1    vehicles and I -- it's not practical to know

2    everything there is to know about a vehicle or any

3    other product that you purchase.

4            So in general, I would just say it depends.

5        Q.    Okay.  Do you have any opinion one way or

6    the other as to whether an auto manufacturer should

7    disclose safety defects regarding its vehicle that it

8    knows about to consumers?

9            MR. LAZATIN:  Objection, outside the scope,

10   foundation, speculation, calls for a legal

11   conclusion.

12           THE WITNESS:  I mean, as an economist, you

13   know, should questions are not really the questions I

14   address, so I don't have an opinion about that.

15   BY MR. EDWARDS:

16       Q.    Okay.  No opinion one way or the other?

17       A.    No.

18       Q.    Do you consider yourself a marketing expert?

19       A.    Well, the disciplines of economics and

20   marketing are closely related.  I consider myself an

21   economist.  I certainly -- aspects of economics

22   overlap with aspects of marketing, so there's a lot

23   of common area between the two disciplines, but I

24   think if -- if I'm identifying myself as an expert in

25   either economics or marketing, it would be economics.

1           But that's not to say that there aren't

2    aspects of marketing, which I have opinions or that

3    fall within the purview of my area of expertise.

4           Q.    Okay.  When I took your deposition a few

5    months ago, I asked you the question:  Do you

6    consider yourself a marketing expert and your answer

7    was, no, I wouldn't consider myself a marketing

8    expert, per se.

9           Is that still your answer today?

10          A.    Yes.  I think that was what I was attempting

11   to communicate in my response.

12          Q.    Okay.  Okay.  Do you have an opinion as to

13   whether a conjoint survey can be properly used to

14   measure diminished value of a consumer product due to

15   a latent defect?

16          A.    Yeah.  I don't think that -- that conjoint

17   is incapable of measuring that singularly or in

18   combination with other models.

19          Q.    Have you seen examples in a product defect

20   class action litigation context where you believe

21   conjoint analysis has been appropriately used to

22   assist in the measurement of class-wide damages?

23          A.    I can't think -- I can't think of a case as

24   I sit here that I've -- that I've either read about

25   or studied where -- or that I know of, so I couldn't

Page 60

```
 1   identify such a case.

 2        Q.   Okay.

 3        A.   Not to say one doesn't exist.

 4        Q.   Right.  You've just never come across one

 5   that you, you've said, hey, that's -- that's a good

 6   use of conjoint in terms of a class action defect

 7   case?

 8        A.   Yeah.  I don't recall coming across one.

 9        Q.   Okay.  And I understand you're not a lawyer,

10   but are you familiar at all with the -- the body of

11   case law that exists which allows the results of

12   conjoint surveys to measure class-wide damages in the

13   class-action context?

14             MR. LAZATIN:  Objection, foundation,

15   speculation.

16             THE WITNESS:  Well, just from my general

17   awareness of this topic area, I know that courts in

18   some cases have accepted conjoint analysis, and in

19   other cases have not accepted conjoint analysis.

20             As to specifically what the conjoint was

21   used for in those cases, I have to say I don't

22   really -- I don't have any particular understanding.

23   BY MR. EDWARDS:

24        Q.   Right.  So you are familiar with some case

25   law with where the courts have accepted for measuring
```

Page 61

1    class-wide damages?

2        A.   Well, when you say "for measuring class-wide

3    damages," that's the part I'm not certain about

4    whether it's being used explicitly for that purpose

5    or whether it's part of a larger sort of structural

6    model and used only to estimate the demand side of

7    the -- of the market.

8            So that's my -- that's my -- that's what I'm

9    not sure about in answering your question.

10       Q.   Okay.  You're critical of Mr. Gaskin's

11   conjoint survey design in this case, the Kia case

12   we're here about today, and -- and also in the

13   Hyundai case, which involves a very similar

14   allegation as to the panoramic sunroof defect.

15           Would you agree with that?

16       A.   Yes.

17       Q.   Have you ever looked at any of Mr. Gaskin's

18   other conjoint survey designs?

19       A.   No.

20       Q.   Okay.  Are you aware of whether he's

21   conducted other conjoint survey designs?

22       A.   I think he describes some in his expert

23   report.

24       Q.   Okay.

25       A.   But I haven't investigated those.

1      Q.   Have you reviewed any legal opinions or case

2   law analyzing the -- a conjoint survey designed by

3   Mr. Gaskin?

4      A.   Not designed by Mr. Gaskin, no.

5      Q.   What case law have you reviewed which

6   analyzes the validity of other conjoint surveys?

7      A.   I'm thinking of a case involving John

8   Hauser, it may have been Samsung and Apple, where

9   conjoint was used as part of a bigger model.

10     Q.   Okay.

11     A.   That accounts for the demand side factors in

12  the market.  There are others that I've read, but as

13  I sit here, I -- that's the one that comes to mind.

14     Q.   So is it your opinion that conjoint itself

15  doesn't account for the demand side?

16     A.   I think the way that it's being used in this

17  case it doesn't account for the demand side of the

18  market.  It's a willingness to pay measure.  It

19  does -- excuse me, it does account for the demand

20  side of the market.

21     Q.   Okay.

22     A.   It doesn't account for the supply side of

23  the market.  It just -- it measures essentially

24  willingness to pay, but doesn't -- doesn't account

25  for the fact that the actual price that you would

1    observe is a function not only of demand, but also of

2    supply, and that's I think a major problem for

3    Mr. Gaskin's methodology.

4         Q.   Okay.  We'll come back to that.  Do you have

5    any understanding as to the best practices for

6    conjoint survey design?

7              MR. LAZATIN:  Objection, vague.

8              THE WITNESS:  With respect to what aspect?

9    You know, there --

10   BY MR. EDWARDS:

11        Q.   I'll rephrase the question.

12             Are you familiar with any of the best

13   practices for conjoint survey design?

14             MR. LAZATIN:  Objection, vague.

15             THE WITNESS:  Certainly -- certainly some.

16   BY MR. EDWARDS:

17        Q.   Okay.

18        A.   I mean, you know, surveying the appropriate

19   population would be I think one general observation.

20   That the sampling frame should correspond to the

21   population of interest.

22             I mean, there are fundamental aspects of --

23   of surveys, which is that if you're conducting a

24   survey about a consumer's choice in the marketplace,

25   construction of the choice set should as closely as

Page 64

1  possible, correspond to the choice set that a

2  consumer's actually going to face in the marketplace.

3        So there are -- those are two examples.

4  There are probably others, too.

5     Q.   You're familiar with the concept of

6  pretesting, and this goes beyond conjoint surveys,

7  I'm assuming, with regard to most marketing surveys,

8  are you familiar with the concept of pretesting?

9     A.   Yes.  I think most of, you know, pretesting

10  is a common practice and in surveys that I've

11  executed, we typically have done pretests.

12     Q.   Why is it important to pretest a marketing

13  survey?

14     A.   Because hopefully you'll uncover some of the

15  flaws of your survey before you roll it out to the

16  full population.

17     Q.   Okay.  Is that -- in your mind is that

18  considered a best practice for survey design in the

19  marketing consent to pretest, uncover those potential

20  flaws?

21        MR. LAZATIN:  Objection, form.

22        THE WITNESS:  I think the need for a pretest

23  can vary, depending on the setting, but in some

24  settings it is a preferred practice, I would think.

25

Page 65

1  BY MR. EDWARDS:

2      Q.   Okay.

3      A.   Otherwise you may have to re-execute your

4  survey again if you discover flaws in the -- in the

5  design.

6      Q.   Okay.  You told me in the Hyundai deposition

7  it's often advisable for a pretest and that it's done

8  frequently.  Do you agree -- is that still your

9  opinion today?

10     A.   Yes.

11     Q.   In the litigation context, have any of your

12 opinions ever been excluded by a court?

13     A.   There's one case in which a portion of my

14 opinions were excluded.  I was asked to perform some

15 probability calculations using survey data that was

16 collected by another expert, and the court ruled that

17 the results of that survey were unreliable.

18          So my calculations -- so that survey data

19 were excluded, and my opinions relied upon were also

20 excluded, though the rest of my testimony was

21 admitted.

22     Q.   What case was that?

23     A.   That was Helmer versus Goodyear.

24     Q.   Is that listed on your C.V.?

25     A.   Yes.

1     Q.    Where was that case pending?

2     A.    In Denver, federal court in Denver.

3     Q.    Okay.

4     A.    And that's the only instance, to my

5  knowledge, that my opinions have been -- an opinion

6  of mine has been excluded.

7     Q.    Who was the survey expert in that case?

8     A.    I forgot his name.

9     Q.    Okay.  Was it Mr. Gaskin?

10    A.    No.

11    Q.    It wasn't Carol Scott?

12    A.    No.

13    Q.    Do you remember where that survey expert was

14 from, city?

15    A.    He was from Ohio.

16    Q.    Okay.  Do you recall which law firm retained

17 you in that case?

18    A.    I believe it was Ballard Spahr.

19    Q.    All right.  What did you do to ensure that

20 the survey -- well, sorry, let's back up.

21          You rely upon results of a survey in this

22 case that Dr. Scott performed in the Hyundai matter,

23 correct?

24    A.    Yes.

25    Q.    Okay.

1    A.    Among -- among other things, but yes, I do

2  rely on that.

3    Q.    Okay.  Dr. Scott didn't do a separate survey

4  which involved Kia vehicles, right?

5    A.    That's correct, to my knowledge.

6    Q.    Okay.  And is -- is there a reason that you

7  believe it appropriate to rely on the results of a

8  survey involving only Hyundai vehicles, and

9  extrapolate those results over to Kia vehicles?

10    A.    Yes.  I think there are -- there are reasons

11  why that survey is informative to the question

12  related to Kia vehicles.

13    Q.    Okay.  And explain to me what those reasons

14  are.

15    A.    Well, primarily because the -- the alleged

16  defects in the two cases is very similar with respect

17  to shattering sunroofs, I think that's the primary

18  thing, so the survey is asking about the consequences

19  of knowledge or lack of knowledge about the alleged

20  defect, which is very similar between the two cases.

21        The Hyundai vehicles were, 95 percent of

22  them were in the same NADA category as the Kia

23  vehicles, so these are similar vehicles with respect

24  to their classification, so small surveys or -- or

25  midsized vehicles, many of the people that for whom

1   we have information in this case who ended up buying

2   a Kia, considered Hyundai's as part of their decision

3   set as possible vehicles.  And that includes the

4   named plaintiff in that -- in this case, Mr. Kondash.

5           So for all those reasons I think that the

6   outcomes of the -- the Scott survey are pertinent and

7   informative to the questions that -- for the reason

8   that I'm relying on them in this case.

9       Q.   So what did you do, if anything, to

10  determine whether purchasers of Hyundai vehicles

11  would have the same relevant preferences as

12  purchasers of Kia vehicles?

13      A.   Well, I looked at a survey of the -- the

14  purchase preferences of the two different groups of

15  vehicles, the Hyundai vehicles, and the Kia vehicles,

16  and I compared those across comparable models and

17  found that for those vehicles for which there's a

18  direct comparator between the Kia and the Hyundai

19  that is within the same vehicle category, classified

20  by NADA, that the top ten purchasing reasons were

21  anywhere between a match of eight or a match of all

22  ten criteria expressed by those two different groups.

23          So that is one of the elements that I looked

24  at to confirm that these consumers had similar

25  preferences and similar features that were important

1    to them in their purchase of vehicles.

2         Q.   So am I correct to assume or to extrapolate

3    from that that in your opinion Mr. Gaskin, when he

4    fields his survey, could appropriately survey both

5    Hyundai purchasers and Kia purchasers in his survey

6    for either the Hyundai or the Kia case?

7              MR. LAZATIN:  Objection, assumes facts,

8    misstates testimony.

9              THE WITNESS:  So -- so you're asking me --

10   well, to my knowledge Mr. Gaskin doesn't propose to

11   in this case -- in the Kia case, does not propose to

12   survey Hyundai owners in his conjoint analysis.

13   BY MR. EDWARDS:

14        Q.   Right.

15        A.   So was that a premise of your question

16   because I don't think that's the case.

17        Q.   It wasn't a premise of my question.  I just

18   want to make sure I understand your opinion.  I -- I

19   understand, at least I think I understand that you

20   feel like the relevant preferences between Kia

21   purchasers and Hyundai purchasers are the same --

22        A.   Well --

23        Q.   -- which is why you're comfortable using

24   Carol Scott's Hyundai survey results in your Kia

25   opinions, correct?

1        MR. LAZATIN:   Objection, vague, assumes

2    facts, misstates.

3        THE WITNESS:   Yeah.   I don't think I said

4    the same.   I think I said similar or I should say

5    similar.   If I said the same, I should have said

6    similar.

7    BY MR. EDWARDS:

8        Q.   Okay.

9        A.   And that's one reason why I think it's

10   appropriate for the use that I'm using these survey

11   results.   Mr. Gaskin does something that's quite

12   different from what I'm doing, and I think it's --

13   there's a different criteria that should apply in the

14   case of a conjoint analysis that's being used to

15   estimate a very specific damage number for a

16   particular group of vehicles versus the general sort

17   of qualitative conclusions that I'm drawing from the

18   Scott report.

19       Q.   Do you have any opinion as to whether

20   Mr. Gaskin is surveying the correct pool of people in

21   his proposed survey?

22       A.   I don't believe he is.   I think he's

23   proposing to survey both consumers who purchased and

24   did not purchase a panoramic sunroof.   The class only

25   includes those who purchased a panoramic sunroof so

1  to the extent that there are differences between

2  those two populations, which there presumably are,

3  because they came to different choices with respect

4  to the sunroof, which is the Kia, you think, feature

5  in this litigation, I think it's critical that his

6  sample be limited to those who actually are class

7  members for purposes of a conjoint analysis.

8      Q.   Would you agree that those individuals

9  purchasing a -- a Kia vehicle at the time of purchase

10 would have had the option between purchasing a

11 vehicle with a panoramic sunroof and one without, for

12 the most part?

13     A.   I don't know that to be the case.  I know

14 that -- I mean, the panoramic sunroof, it really

15 would depend on the individual, what they were

16 considering, what set of vehicles they were

17 considering, what trim levels, and what have you.

18     Q.   Okay.

19     A.   So any option, I wouldn't say as a general

20 proposition that I agree with that.

21     Q.   Right.  Are you saying that you disagree

22 with that or you just don't know?

23          MR. LAZATIN:  Objection, form.

24          THE WITNESS:  I'm saying you would have to

25 do an individualized inquiry to know if that's true

Page 72

1  for any particularized consumer and I haven't done

2  that, nor has Mr. Gaskin.

3  BY MR. EDWARDS:

4      Q.   So you don't know?

5      A.   So I don't know.

6      Q.   Okay.  What did you do to verify that

7  Dr. Scott designed a reliable survey before you

8  decided to rely on the results of that survey?

9      A.   Well, I reviewed her survey, both the

10  specific questions in her survey and her narrative

11  description of what she was doing and why she was

12  doing it with each of those questions, so I -- and

13  also I think observing the population that she was

14  surveying.  I think those are the main things that

15  come to mind, as I sit here, that I did.

16      Q.   Do you know what Dr. Scott was provided in

17  terms of documents from Hyundai to be able to --

18  which enabled her to reach out to the survey

19  population that she sampled?

20      A.   I think she described receiving a -- some

21  sort of list of consumers who had purchased the class

22  vehicles in the Hyundai case, and that she selected a

23  sample or the firm that executed the survey, selected

24  a sample from that group.

25      Q.   Right.  Do you know whether Mr. Gaskin has

1  been provided with that same list?

2      A.   I don't.

3      Q.   But your opinion is with regard to the

4  survey population if Mr. Gaskin surveyed the same

5  population as Dr. Scott, you would be okay with that

6  survey population for his survey?

7          MR. LAZATIN:  Objection, vague, misstates

8  testimony.

9          THE WITNESS:  No.  I -- that's not what I

10 said, I don't believe.  He has a very -- he has a

11 different purpose.  He's doing a conjoint analysis to

12 evaluate damages on a Kia proposed class members, so

13 I think that's the population he should be pulling

14 from for the purpose of a conjoint analysis, and

15 that's a different population than Dr. Scott injured.

16 BY MR. EDWARDS:

17     Q.   Because she only surveys Hyundai purchasers?

18     A.   That's correct.  Hyundai purchasers who

19 purchased a vehicle with a panoramic sunroof.

20     Q.   So you believe if Mr. Gaskin surveys -- in

21 this case surveys Kia purchasers who purchased a

22 vehicle with a panoramic sunroof that would be a

23 correct population to sample for his survey?

24     A.   I believe so, yeah, proposed class members.

25     Q.   Okay.  What is -- what is it that

1   Dr. Scott's survey seeks to measure?

2       A.   Well, she measures a few things in her

3   survey.  I don't have a report in front of me, but my

4   recollection is she attempts to measure the -- the --

5   well, one aspect of her survey are features that were

6   considered in the purchase decisions.  And she cuts

7   that a couple of different ways, is my recollection.

8           And then she also looks at how different

9   disclosures would affect the consumers' propensity to

10  purchase the vehicle.

11      Q.   And what's your understanding of her

12  conclusion?

13      A.   Well, as I sit here without her report in

14  front of me, she concludes essentially that there's

15  no statistically significant difference between -- in

16  the propensity to purchase between the three groups

17  that she tests, a group with no disclosure, a group

18  with disclosure that doesn't specify a percentage,

19  and a group that in which a disclosure does specify a

20  percentage.

21          I think the exception is that between the

22  second and third of those categories in one instance

23  there is a marginally statistically significant

24  difference that's between the percent for which a

25  percentage is shown, and the -- in the disclosure and

Page 75

1    the percent for which a percentage is not shown in

2    the disclosure.

3         Q.   Right.  Did you review the actual slides

4    from the survey which purportedly included the

5    disclosure about the panoramic sunroof defect?

6         A.   I don't believe so.  I reviewed a report

7    which has the text, but I don't think it has the

8    actual, or the version I got at least didn't have the

9    actual slides, screens.

10        Q.   Okay.  Well, let me ask you about that.

11             MR. EDWARDS:  Let's -- let's mark this as

12   the next numbered exhibit, please.

13             THE REPORTER:  7.

14             MR. EDWARDS:  7.

15             (Exhibit 7 was marked for identification by

16        the court reporter and is attached hereto.)

17             MR. EDWARDS:  I'm sorry.  Carlos you'll have

18   to share on this one.  I thought I had another copy.

19        Q.   So I'll give you a second to take a look at

20   that, and ask if you've seen Exhibit 7 before?

21        A.   I haven't seen this specific screenshot

22   before, to my recollection.

23        Q.   Okay.  I will represent to you that this

24   according to Dr. Scott is a image of the -- the

25   screen that includes marketing information about the

1   panoramic sunroof, and below that one of the two

2   disclosures related to the defect at issue for the

3   Hyundai vehicle.

4           But you've never seen the disclosure that

5   she listed here to provide any opinions as to whether

6   you would consider that to be an adequate disclosure,

7   correct?

8       A.   No.  I -- I saw the disclosure, the two

9   disclosures were -- were presented in her report.

10  So -- so I have seen these disclosures before.

11      Q.   Okay.  So you've seen the text of the

12  disclosure, but until today you hadn't seen the

13  manner in which it was presented on the slides to the

14  people that took the Dr. Scott survey?

15      A.   To my recollection, yes.

16      Q.   Okay.  Do you have any opinion as to whether

17  this is an accurate description of the -- the defect

18  at issue based on your review of the complaint and

19  the other materials in this case?

20      A.   Well, I think Dr. Scott said that she sort

21  of modeled the language after -- after language in

22  the complaint in the Hyundai case, and it comports

23  with my general understanding of -- of what the

24  allegations were, so I don't have any reason to

25  believe it's not accurate.  It certainly corresponds

Page 77

1    to my understanding of the alleged defect.

2        Q.   You see the sentence there in the defect

3    description where it says (as read):

4              The glass could shatter and break

5              into small round pieces which could

6              fall into the vehicle.

7        A.   Yes.

8        Q.   Have you seen any materials in this case

9    which support that description of small round pieces?

10       A.   I've seen purchases of -- of the tempered

11   glass that's shattered, and it -- by -- based on

12   those pictures, it breaks, and in my experience it

13   breaks into small -- small pebble-like pieces, so it

14   seems like a reasonable description to me as a --

15   sort of as a layman on that topic.

16       Q.   You've read the Tom -- the Tom Kondash

17   deposition, haven't you?

18       A.   Yes.

19       Q.   Do you recall the testimony about the

20   laceration that his wife received when their

21   panoramic sunroof exploded?

22       A.   Yes, generally.

23       Q.   In your experience, I think that's the word

24   you used earlier, are small round pieces consistent

25   with lacerations?

1        MR. LAZATIN:  Objection, foundation,
2   speculation, outside the scope.
3        THE WITNESS:  I really -- I really -- I
4   don't have an opinion about that.  I mean, one way or
5   the other.  It's not anything that I've investigated.
6   BY MR. EDWARDS:
7     Q.   Right.
8        Do you have any opinion as to whether this
9   description here that we've marked -- that Dr. Scott
10  set forth and we've marked as Exhibit 7 conveys to
11  Respondents the possibility of lacerations?
12    A.   I don't.
13    Q.   You just don't have an opinion one way or
14  the other?
15    A.   I don't.
16        MR. EDWARDS:  Go ahead and mark this as
17  Exhibit 8.
18        MR. LAZATIN:  Just a second let me see that
19  for a second.  So, Adam, we have a bit of a problem
20  here, which is that this is the version with the
21  percentage risk of sunroof failing percentage, which
22  is -- has been redacted in this case, in the material
23  that Dr. Strombom relied on because it's confidential
24  business information from the Hyundai case, so he
25  can't be seeing --

1      MR. EDWARDS:  From the --

2      MR. LAZATIN:  -- from the Hyundai case, the

3  Glen case, so he can't be seeing and this can't be

4  going into the record in the Kia cases that's going

5  to be available, you know, to Kia, to folks at Kia.

6      MR. EDWARDS:  All right.  That's fair

7  enough.  I'll withdraw Exhibit 8.

8      THE REPORTER:  Give it back to me for a sec.

9      MR. LAZATIN:  Sure.

10  BY MR. EDWARDS:

11    Q.   So you talked about two separate disclosures

12  that you reviewed in the Scott report earlier, in

13  your testimony earlier, correct?

14    A.   Yes.

15    Q.   Actually, three.  Well, one which talked

16  about the panoramic sunroof, one disclosure which you

17  just reviewed, and we've marked as Exhibit 7?

18    A.   Yes.

19    Q.   And a third disclosure that you -- that you

20  saw in her report, correct?

21    A.   Yeah.  You can call it a third disclosure or

22  I think of the first one as no disclosure, but --

23    Q.   Right.

24    A.   -- however you want to think about it, yes.

25    Q.   And what was the difference between the

1   second and third disclosures?

2       A.   The difference was that in one of those two,

3   there was a -- I understand there was a specific

4   percentage that indicated kind of the frequency of --

5   of this shattering of the glass.

6       Q.   Okay.

7       A.   In the version I reviewed, that percentage

8   was redacted, so I don't know exactly what that was.

9       Q.   Okay.

10      A.   But I understand there was a percentage in

11  the survey that she actually administered.

12      Q.   Fair enough.

13           And -- and the percentage is not what I was

14  going to ask you about, so we can avoid that, but so

15  I will -- I will represent to you that other than

16  that percentage, both of the two disclosures that

17  consumers would have seen regarding this defect

18  involve the description of small round pieces.

19           Do you have any reason to disagree with that

20  based on your recollection and reading of her report?

21      A.   No, not based on my recollection.

22      Q.   Do you know what Dr. Scott did, if anything,

23  to ensure that her survey respondents actually read

24  disclosure pertaining to the defect at issue?

25      A.   I know at least some things that she did

Page 81

1   with respect to that.  In particular at the end, she

2   asked a question that was designed to identify

3   participants who may not have read the detail on

4   the -- on the panoramic sunroof, and then I think she

5   excluded anyone that fell under that category.

6           She had two or three tests that she

7   performed that she described in her report to try

8   and, you know, make sure that there weren't any

9   people in that category.

10          So that is -- that's what I'm aware of, as I

11  sit here, about what she did to ensure that people

12  were aware of that, of the sunroof feature in that

13  disclosure.

14     Q.   Do you know what the results of Dr. Scott's

15  free test would have shown?

16          MR. LAZATIN:  Objection, assumes facts.

17  BY MR. EDWARDS:

18     Q.   Let me ask you:  Do you know whether

19  Dr. Scott conducted a pretest?

20     A.   I don't recall as I sit here.  I'd have to

21  look at her report.

22     Q.   A pretest is one of the ways that the

23  surveyor could determine whether the -- the key kind

24  of disclosure at issue here was featured prominently

25  enough so as to be seen by the survey pool.

1          Would you agree?

2          MR. LAZATIN:  Objection, vague.

3          THE WITNESS:  Well, the idea with the

4    pretest is that you can discover that before you roll

5    out the survey.

6    BY MR. EDWARDS:

7      Q.   Right.

8      A.   And so you either discover it in a pretest

9    or you discover it when you roll out the actual

10   survey, so you could discover it in either of those

11   contexts, but it's -- it's -- it may be more

12   economically efficient to discover it in a pretest

13   before you roll out the entire survey, and that's --

14   that's why a pretest is usually done.

15     Q.   Okay.  After the survey questions are asked

16   and you gather your result, it's certainly possible

17   to ask each of the survey respondents if they recall

18   seeing the disclosure about the panoramic sunroof

19   defect, isn't it?

20     A.   I'm not aware of any reason that you

21   couldn't do that.  I don't know whether that's a --

22   a -- I don't really -- I don't really know whether

23   that's something that you should do or not, to be

24   honest, in terms of survey design.

25     Q.   Well, if Dr. Scott would have done that,

1   we'd know what percentage of the survey pool that

2   took her survey actually saw the disclosure, wouldn't

3   we?

4           MR. LAZATIN:  Objection, assumes facts.

5           THE WITNESS:  I'm not sure that's the case.

6   I mean, there's issues with self-reporting and -- and

7   recollection, you know, when people are asked a

8   question about something they've read, did you see

9   this or did you not see it?

10          There may -- you know, there may be reasons

11  why people don't give their truthful answer or may

12  not recall, so I'm not certain that asking that

13  question is necessarily the final word on whether a

14  consumer actually observed it or not.  I think that

15  was -- I don't know, I haven't talked to Dr. Scott,

16  but I imagine that may be one reason why she

17  attempted to identify those people in the way that

18  she did.

19  BY MR. EDWARDS:

20      Q.   Sure.  There's always going to be a

21  possibility is that survey respondents don't recall,

22  but it would provide us data, wouldn't it, useful

23  data, about -- about the percentage of people that

24  actually saw the disclosure, if they were asked at

25  the end of the survey?

```
                                                Page 84

 1            MR. LAZATIN:  Objection, assumes facts.

 2            THE WITNESS:  Well, it would provide data.

 3   As to whether it would be useful or not, I'm not --

 4   BY MR. EDWARDS:

 5      Q.   Right.

 6      A.   That's the issue.  I think there are

 7   concerns about that kind of self-reporting being

 8   unreliable.

 9            MR. EDWARDS:  Okay.  Let's go off the record

10   for a second.

11            VIDEO OPERATOR:  Going off record.  Time

12   now, 11:41.  This ends Media Number 1.

13

14            (Recess taken.)

15

16            (Whereupon at the hour of

17            11:50 a.m., a luncheon recess was

18            taken.  The deposition was resumed

19            at 12:52 p.m., the same persons

20            being present.)

21

22            VIDEO OPERATOR:  We are on record.  Time now

23   12:52 p.m.

24            This begins Media Number 2.

25            Counsel, you may proceed.
```

Page 85

1    BY MR. EDWARDS:

2        Q.   All right.  All right.  Dr. Strombom, we're

3    back on the record, and I'd like for you to go back

4    to your report, Exhibit 6, I believe, and just as an

5    overview, I'd like to start with the -- the table of

6    contents where you start setting forth your -- your

7    opinions there at Roman numeral 4.

8            Do you see that?

9        A.   Yes.

10       Q.   Okay.  And then below that you have -- well,

11   let me ask you, first, about number 4.  It's your

12   opinion that determining the prices paid for class

13   vehicles would require individual inquiry, correct?

14       A.   Yes.

15       Q.   That is also an opinion that you provided in

16   the -- the Hyundai matter; is that correct?

17       A.   I believe so.

18       Q.   Okay.  Under Roman numeral 5, you list four

19   subsections, A, B, C, and D, and I'll ask you about

20   those individually, okay?

21       A.   Okay.

22       Q.   You state there that Mr. Gaskin ignores

23   differences in consumer preferences and valuations of

24   the alleged defect.

25           Is that your opinion?

1      A.   Yes.

2      Q.   Okay.  And you had that same criticism in

3  the Hyundai case, correct?

4      A.   I don't actually recall, but I know that

5  he's using the same methodology, so I believe I did.

6      Q.   Okay.  Under B, Mr. Gaskin does not consider

7  that automobiles are complex goods and that the

8  panoramic sunroof was bundled with other features.

9  That's also a criticism of Mr. Gaskin's survey that

10  you had in the Hyundai case, correct?

11      A.   It may be.  I think it was.  I don't

12  actually recall.

13      Q.   Well, I can -- I can probably pull out your

14  report here in the Hyundai case, so we can verify

15  that.

16           Go ahead and mark this as the next numbered

17  exhibit.

18           MR. LAZATIN:  Can we -- just one minute.  I

19  don't know if anything was redacted from that report

20  that runs into the same issue in terms of

21  confidentiality that's going to become part of the

22  record in this case, so check that, or if you want to

23  just read from it.

24           MR. EDWARDS:  Well, I mean, it's his report,

25  so I wouldn't be revealing anything --

1          MR. LAZATIN:  To him, but it's going to

2     become part of the record in the Kondash case that is

3     available to Kia to look at in the Kondash case,

4     that's all I have --

5          MR. EDWARDS:  Rather than making it an

6     exhibit, I'll be glad to just ask you about it.  Does

7     that satisfy your --

8          MR. LAZATIN:  Yeah.  All right.  We can

9     check, but it might take a little bit.

10    BY MR. EDWARDS:

11       Q.   So I asked you about, "A," in your -- in

12    your report in the Kia case (as read):

13               Mr. Gaskin ignores differences in

14               consumer preferences and valuations

15               of the alleged defect.

16       I will show you your report from the Hyundai

17    case under Section 7(a) where you use the exact same

18    words.  Can you just verify that with me.

19       A.   Yes.

20       Q.   Okay.  So, in fact, your criticism of the

21    Gaskin report in the Hyundai case was -- you use

22    exact same words, actually (as read):

23               Mr. Gaskin ignores differences in

24               consumer preferences and valuations

25               of the alleged defect.

Page 88

1      A.    At least in this summary and heading, yes.

2      Q.    Okay.  And then feel free to take a look at

3   the Hyundai report as needed there, I'm now looking

4   at "B" (as read):

5            Mr. Gaskin does not consider that

6            automobiles are complex goods and

7            that panoramic -- and that the

8            panoramic sunroof was bundled with

9            other features.

10           That is also the same criticism that you had

11  in the Hyundai case, identical in terms of words,

12  right?

13     A.    Yes.

14     Q.    Okay.

15     A.    In the heading, that's correct.

16     Q.    Okay.  Look at the heading for "C"

17  (as read):

18           Mr. Gaskin's method cannot

19           allocate damages for purchasers of

20           used vehicles.

21           That is your -- that is one of your

22  criticisms in the Kia case, correct?

23     A.    Yes.  Used class vehicles, that's correct.

24     Q.    Okay.  And you have the same criticism in at

25  least in the table of contents, use the exact same

Page 89

1  words when you provided opinions in the Hyundai case,

2  correct?

3      A.   That's correct.

4      Q.   And number "D," I'm sorry, letter "D," in

5  the Kia case we're here about today, you set forth

6  your criticism (as read):

7              Mr. Gaskin's method is not

8          applicable to individuals who leased

9          class vehicles.

10          Do you see that?

11     A.   Yes.

12     Q.   Okay.  And you had the -- the same criticism

13  in the Hyundai case and used the same words in your

14  report, didn't you?

15     A.   Yes, for the heading, I did.

16     Q.   Okay.  I'm looking now in your Kia report

17  Roman numeral VI(a), you said there is that

18  (as read):

19              Mr. Gaskin's survey can only be

20          used to calculate damages if

21          consumers had no knowledge of the

22          alleged defect at the time of the

23          initial purchase.

24          Do you see that?

25     A.   Yes.

1     Q.   And you had the same criticism in the -- the

2   Hyundai case, didn't you?

3     A.   That's right.

4     Q.   Okay.  And also used the same words in the

5   index?

6     A.   Yes.

7     Q.   Okay.  And, finally, with regard to number

8   "B," under Roman numeral VI (as read):

9           Some putative class members may

10          have been aware of the alleged

11          defect.

12          That's, I believe, the last criticism that

13  you set forth in your table of contents for your

14  report in the Kia case, correct?

15    A.   Yes.

16    Q.   And, again, you had that same criticism in

17  the Hyundai matter and set forth the -- the same

18  language in the table of contents of your report in

19  that case?

20    A.   That's correct.

21    Q.   Okay.  And I think we already covered this,

22  but in the Hyundai case you also had some opinions

23  with regard to the Hanneman report, but you don't set

24  forth any of those criticisms in the -- in the Kia

25  case, right?

Page 91

1      A.    That's correct.

2      Q.    Because it wasn't part of your assignment?

3      A.    Correct.

4      Q.    And going through all of these opinions in

5   your index, understanding that you expound upon those

6   opinions in the body of the report itself, but does

7   that encompass all of your opinions that you set

8   forth in your report in the Hyundai case?  I'm sorry,

9   in the Kia case?

10     A.    Yeah.  I believe all my opinions would fall,

11  you know, into those categories.

12     Q.    Okay.  If you would, turn to page 9 of your

13  report, under Section A, there in bold on your Kia

14  report you state (as read):

15          Mr. Gaskin ignores differences in

16          consumer preferences and valuations

17          of the alleged defect.

18          Do you see that?

19     A.    Yes.

20     Q.    Then in paragraph 27 on the 11th line down

21  you state (as read):

22          Even lacking a formal test from

23          the conjoint analysis, it is

24          undoubtedly the case that individual

25          putative class members would place

Page 92

 1            different valuations on the alleged

 2            defect, just as they place different

 3            valuations on other attributes of

 4            class vehicles.

 5            Do you see that?

 6       A.   Yes.

 7       Q.   And why is this undoubtedly the case in your

 8  opinion?

 9       A.   Because different consumers perceive value

10  differently.  They have different assessments of --

11  of risk tolerance and risk preferences, and because

12  those vary across consumers, their valuation of the

13  alleged defect would also vary.

14       Q.   Okay.  And you believe that Gaskin's survey

15  ignores these differences in consumer preferences?

16       A.   Yes.  His methodology does ignore them.  He

17  calculates an average price decline diminution in

18  value, and he applies that equally across or he

19  purports that he'll be able to apply that equally

20  across all class members within the three categories

21  of surveys that he conducts.

22       Q.   Is it correct in your opinion to refer to

23  differences in valuations of the alleged defect or

24  attributes as heterogeneity?

25       A.   Yes.  I think that -- that's -- that's what

Page 93

1    heterogeneity can mean, that there's differences

2    across different individuals or different

3    observations.

4        Q.   Okay.  How should the Gaskin conjoint

5    survey, in your opinion, address the heterogeneity

6    that you've described?

7        A.   Well, I don't think I'm offering an

8    affirmative opinion about how he should do his

9    conjoint analysis.  I'm -- I'm observing that his

10   analysis doesn't account for differences across

11   consumers, which undoubtedly do exist, and therefore,

12   he's not accurately measuring the harm if any -- or

13   the injury if any suffered by any particular class

14   remember.

15       Q.   I know in your report you're not setting

16   forth how it -- how it should be done, but do you

17   know -- are you able to offer any opinion as to how

18   the conjoint survey should address this

19   heterogeneity?

20       A.   Well, the conjoint survey does provide

21   analysis at the individual consumer level, so the

22   implication of that is that you could make that

23   determination using a conjoint survey, but you would

24   need to survey all the class members, so it would be

25   an individualized inquiry across all class members is

Page 94

1    one way it could be addressed using a conjoint

2    approach.

3        Q.   And if this -- if the goal is to measure

4    damages for the class, class-wide damages, though,

5    how is that helpful?

6            MR. LAZATIN:  Objection, vague, ambiguous,

7    calls for a legal conclusion.

8            THE WITNESS:  Well, you would -- you would

9    be measuring it for each individual in the class.

10   That would be a way to do it.

11   BY MR. EDWARDS:

12       Q.   Right.  But if the goal is to measure

13   class-wide damages, in other words, measure damages

14   to an entire class of people, why in your opinion is

15   it necessary to calculate individualized damages as

16   you've stated?

17           MR. LAZATIN:  Objection, vague, assumes

18   facts, misleading.

19           THE WITNESS:  The -- the -- because you

20   would -- because each consumers has a different

21   valuation, or can have a different valuation of the

22   alleged defect.  To make that determination you would

23   need to survey every member of the purported class to

24   make that determination, and then you could sum those

25   across all class members and arrive at a class-wide

1    value.  And that is the only -- that is one way I

2    guess that you could answer the question about

3    whether all consumers in the class were harmed, and

4    if they were harmed, by what amount.

5            I mean, that's -- that's a way to use

6    conjoint to answer those questions.

7    BY MR. EDWARDS:

8        Q.   Okay.  So you could individually survey

9    everyone in the proposed class and then you would add

10   that number up and that would be your class-wide

11   damages?

12       A.   Well, I think there are other problems

13   with -- with Mr. Gaskin's survey and approach, so

14   I -- I don't think that would be -- that would be

15   sufficient to correct the problems that exist in the

16   Gaskin methodology.

17       Q.   Right.  So is it -- is it your opinion that

18   any time a product defect case involves or has a

19   degree of heterogeneity, it would require that the

20   survey expert individually survey each member of the

21   proposed class; is that fair?

22           MR. LAZATIN:  Objection, form.

23           THE WITNESS:  Well, first of all, I don't

24   think it's necessary that conjoint be -- be used.

25   There are other methods of calculating damages that

```
 1    don't involve a survey, and it would depend on the
 2    particular facts of the case as to whether a conjoint
 3    would be sufficient or whether the heterogeneity is
 4    such that it would require that.
 5          So I don't think there's a general answer to
 6    that question.  I think it depends on the facts of
 7    the case.
 8    BY MR. EDWARDS:
 9       Q.   Right.  When you say it's undoubtedly the
10    case that there is heterogeneity --
11       A.   Yes.
12       Q.   -- that consumers would place different
13    values on this defect.  What test -- what testing
14    have you done to verify that?
15       A.   Well, I think just as a general proposition,
16    in my experience, that would be true.  But in this
17    case, for example, Mr. Kondash's claim that the value
18    of the vehicle that he has, to him with the alleged
19    defect is zero, that it's basically worthless to him,
20    but yet we see positive values for these vehicles
21    changing hands in the -- in a used car market.
22          So that's -- that's a demonstration that
23    there is heterogeneity, just as you would expect, for
24    not only this defect but any kind of component of a
25    complex good, just based upon economic theory.
```

1    Q.   Well, and that's what I -- that's what I

2  want to ask you about.  Is it safe to assume that

3  there's always going to be heterogeneity when we're

4  talking about how consumers value various attributes

5  of a complex good?

6    A.   I think economic theory would indicate that

7  that's the case.  I think I wrote a similar article

8  from '77 from Professor Lancaster that kind of set

9  forward this idea about complex goods and the fact

10  that individual consumers place different values on

11  different attributes, and they put forward a whole

12  economic theory based upon that.

13        And it just -- it also just makes common

14  sense that, you know, when you buy a car, you might

15  focus on one aspect of it, and when I buy a car I

16  might focus on a different aspect, and have ascribed

17  different values to different components.

18    Q.   Right.  So in your opinion, conjoint surveys

19  shouldn't be appropriately used or aren't

20  appropriately used to measure class-wide damages

21  where you're dealing with a complex good in this

22  heterogeneity we've talked about?

23        MR. LAZATIN:  Objection, misstates, assumes

24  facts.

25        THE WITNESS:  I wouldn't say that.  I would

Page 98

1    say the way that Mr. Gaskin is proposing to use it is

2    inappropriate.  I wouldn't rule out that it could

3    appropriately be used in a class-wide damages study.

4    BY MR. EDWARDS:

5        Q.   Can you give me an example of a major

6    consumer good on the market today where there are not

7    differences in consumer preferences for various

8    attributes?

9        A.   I think as a general rule if it's a complex

10   good, there are -- there are different weights that

11   consumers place on or values that different consumers

12   place on different attributes and different negative

13   values that they might place upon an alleged defect

14   in a given product, so I think heterogeneity is

15   common.

16       Q.   So you're not able to give me an example of

17   a major consumer good on the market where there are

18   not differences in consumer presences for various

19   attributes?

20           MR. LAZATIN:  Objection, form.

21           THE WITNESS:  No, not as I sit here.

22   BY MR. EDWARDS:

23       Q.   Okay.

24       A.   It's an empirical question.  That's --

25   conjoint is sometimes used to quantify the

1  heterogeneity across consumers, so I could test it

2  for any particular product, but I'm not aware, as I

3  sit here, of anywhere I wouldn't expect that to be

4  the case.

5      Q.   Okay.  How would you would pose to measure

6  class-wide damages to a group of consumers that

7  overpaid for a product due to a latency safety defect

8  assuming that there is always going to be differences

9  in consumer preferences?

10          MR. LAZATIN:  Objection, assumes facts,

11  outside scope, incomplete hypothetical.

12          THE WITNESS:  Well, I haven't -- I haven't

13  attempted to put forward a determinative methodology,

14  you know, in general or in this case in particular,

15  with respect to how you should go about it.

16          So I don't -- as I sit here, I don't have an

17  answer to your question.

18  BY MR. EDWARDS:

19      Q.   Right.  As you sit here today, you're

20  critical of Mr. Gaskin's proposed methodology but you

21  can't offer any examples of how class-wide damages

22  could be appropriately measured in this case?

23      A.   I think that's fair to say.  That's --

24  that's not what I was retained to do and I haven't

25  attempted to affirmatively arrive at a methodology.

Page 100

1      Q.   Okay.  Turn to paragraph 29 of your report,

2    please.  I'm looking at the next to last sentence of

3    paragraph 29, where you state (as read):

4               When respondents were asked which

5               features of their vehicle were the

6               most important, the most frequently

7               mentioned features were the

8               technology or safety features,

9               color, design, or style.

10              You were referring to Dr. Scott's survey

11    there, weren't you?

12      A.   Yes.

13      Q.   Okay.  So according to the results of

14    Dr. Scott's survey, which you rely upon, safety

15    features is one of the most frequently mentioned

16    features mentioned in terms of purchase decisions for

17    the class vehicles?

18      A.   Yes, safety features.

19      Q.   Okay.  That was true for Hyundai and you

20    expect that would also be true for Kia, correct?

21      A.   I -- I would think it would be high on the

22    list for Kia --

23      Q.   Okay.

24      A.   -- consumers, based upon the Scott survey.

25      Q.   Can you extrapolate from this that

1  generally, purchasers of Hyundais and Kias, they do

2  care about safety, it is one of the primary

3  considerations in their vehicle purchase?

4         MR. LAZATIN:  Objection, vague, ambiguous,

5  assumes facts, speculation.

6         THE WITNESS:  Well, the question, the

7  survey -- the survey respondents responded to the

8  safety features, so there's a question about what

9  that means, is that airbags, side impact airbags,

10  there's specific features in vehicles that are

11  designed for safety.

12         So I think that's the conclusion that you

13  can draw from this -- from the survey.  I wouldn't

14  extrapolate beyond that.

15  BY MR. EDWARDS:

16     Q.  Oh, you don't make a connection between

17  safety features and safety?

18     A.  Well, I think the survey, strictly speaking,

19  is about safety features.  You know, I don't know.

20  You know, I assume safety features are the things

21  that I mentioned and that's what survey respondents

22  are -- are things like the things I mentioned and

23  those are the things the survey respondents are

24  responding to when they talk about safety features.

25     Q.  Right.  So you can't extrapolate that

Page 102

1    because consumers that are purchasing a Kia vehicle

2    place a high value on safety features, that they also

3    place a high value on safety?

4              MR. LAZATIN:  Objection, vague, ambiguous.

5    BY MR. EDWARDS:

6        Q.   You don't think the two go hand-in-hand?

7              MR. LAZATIN:  Objection, vague, speculation.

8              THE WITNESS:  You know, one could make that

9    jump if you wanted to, but that's not what the

10   survey, you know, specifically asked.

11   BY MR. EDWARDS:

12       Q.   Okay.  Can you and I agree that in general

13   safety features, the intended purpose of safety

14   features is to increase the safety of the vehicle?

15       A.   I would think that's the case, yeah.

16       Q.   Okay.

17       A.   I don't know, but ...

18       Q.   Turn to page 12 of your report, please.  I'm

19   looking at paragraph -- I'm sorry, heading "B"

20   (as read):

21              Mr. Gaskin does not consider that

22         automobiles are complex goods,

23         that -- and that the panoramic

24         sunroof was bundled with other

25         features.

Page 103

```
 1      A.   Yes.

 2      Q.   Do you see that?

 3           Okay.  And then in paragraph 33, in the

 4    second sentence, you state (as read):

 5                Some consumers value certain

 6           attributes of a -- of a product

 7           while others value different

 8           attributes of that product, and

 9           consumers do not necessarily value

10           the same attribute equally.

11           Do you see that?

12      A.   Yes.

13      Q.   Does this tie into what we -- what we talked

14    about earlier, that in your opinion, with regard to

15    complex goods, there is always going to be a certain

16    degree of heterogeneity?

17           MR. LAZATIN:  Objection, form, vague.

18           THE WITNESS:  Well, we did talk about this

19    topic earlier and, I think that -- I think I would

20    restate it a little differently than you did, which

21    is that in a complex good where there are many

22    attributes, different consumers are going to value

23    those different attributes differently, not all

24    consumers will value them equally.

25
```

Page 104

1    BY MR. EDWARDS:

2         Q.    Right.  And I guess what I'm asking is:  Is

3    there something unique about the Kia vehicle there or

4    does that apply to other consumer goods with multiple

5    attributes such as a washing machine, for example?

6         A.    Well, it applies at two levels in the Kia

7    vehicle.  It applies overall to the vehicle, but

8    there's also this -- that additional attribute that

9    in addition to buying the vehicle, the consumer is

10   making choices about option packages that themselves

11   are bundles of -- of features.

12             So it's -- it's sort of the -- it's bundling

13   times two in the case of automobiles, which I think

14   distinguishes automobiles from some other products.

15             But with respect to, in general, the

16   proposition that different consumers value different

17   attributes of complex products differently, it's --

18   it's similar to other products.

19        Q.    Would you agree that there are many

20   attributes on an automobile which are not sold as

21   stand-alone features?

22        A.    Yes.

23        Q.    Okay.  So this panoramic sunroof is not

24   unique in that it is sold as part of a bundle as

25   opposed to a stand-alone feature, when compared with

Page 105

1    other attributes on the vehicle, right?

2         A.   Yes.  It's not unique to this feature.

3         Q.   Okay.  So how would a conjoint survey be

4    appropriately used when we're talking about a defect

5    related to any individual component of a motor

6    vehicle which is not sold as a stand-alone feature?

7              MR. LAZATIN:  Objection, assumes facts,

8    beyond the scope.

9              THE WITNESS:  Well, again, I -- I'm not here

10   to advocate that conjoint analysis is an appropriate

11   method for calculating damages in this case.  I'm

12   pointing out that the way it's been proposed is not

13   appropriate, that using the -- the average affect,

14   ignoring all the issues with whether that average

15   effect is -- is measured reliably under Gaskin's

16   approach, or Mr. Gaskin's approach, setting those

17   issues aside, even if you had an average measure that

18   made sense, it wouldn't apply to all the consumers in

19   the class.

20             And so that's ignore -- in that sense, his

21   methodology ignores the heterogeneity of consumer

22   preferences across this complex product.

23   BY MR. EDWARDS:

24        Q.   Right.  I -- I understand your criticism is

25   that Mr. Gaskin does not consider that automobiles

1    are complex goods and that the panoramic sunroof was

2    bundled with other features.  What -- what's the

3    basis of your statement that he does not consider

4    that?

5         A.   Well, I guess there's two things

6    specifically that he does.  One is what I just

7    mentioned, that he uses an average that doesn't apply

8    to every, or even any class member.

9              And then secondly, the way he proposes to

10   present his choice sets to consumers, ignores the

11   fact that the sunroof is -- is often, most often,

12   purchased as part of a bundle of options, and it's

13   not purchased as a stand-alone product.

14             So his actual survey method is detached from

15   the reality of the facts in the case, and the way the

16   consumers in this class actually made their purchase

17   decision or would have made their purchase decision

18   had a disclosure been made.

19        Q.   I asked you earlier, and I think your answer

20   was you had no opinion on this, but I just want to

21   lay some foundation for the question I'm about to

22   ask, so I want to make sure, okay?

23        A.   Sure.

24        Q.   You have no opinion sitting here today as to

25   whether these class Kia vehicles would have a reduced

Page 107

 1  market value as a result of the alleged defect,

 2  correct?

 3      A.   Yeah.  I have -- as I said, I haven't

 4  expressed an opinion about that.  But we do have the

 5  Scott survey of the Hyundai vehicles which indicates

 6  that there would be no reduction in value as a

 7  consequence of disclosure.

 8          So there's that evidence.  But that's not an

 9  opinion that I'm expressing here, though, there

10  certainly is evidence to that effect.

11      Q.   Okay.  Assume hypothetically that purchasers

12  of the class vehicles did over pay at the point of

13  sale for these vehicles because they -- they bought a

14  vehicle with a latent defect.

15          Can you give me any example of how you would

16  measure that reduction in market value, assuming,

17  again, that it exists?

18          MR. LAZATIN:  Objection, vague and

19  ambiguous, assumes facts, incomplete hypothetical,

20  beyond the scope.

21          THE WITNESS:  Are you assuming that all

22  class members overpaid by the same amount?

23  BY MR. EDWARDS:

24      Q.   That -- that kind of wasn't part of my --

25  wasn't part of my hypothetical.

Page 108

1     A.   Yeah.

2     Q.   I'm asking you to -- I mean, you told me

3  that you don't have an opinion really one way or the

4  other.  Or you're not stating an opinion as to

5  whether there would be a reduction in the market

6  value of these class vehicles at the point of sale

7  due to the defect, correct?

8     A.   Correct.

9     Q.   I'm asking to you assume that there is a

10  diminished value, diminished market value at the

11  point of sale as a result of this defect.

12        Can you give me any example of how you might

13  go about measuring that diminished value?

14        MR. LAZATIN:  Same objections, vague,

15  assumes facts, incomplete hypothetical, beyond the

16  scope.

17        THE WITNESS:  Well, I talked about one,

18  which would be to survey all the class members to

19  perform an individualized inquiry about their --

20  about their preferences, and so I think that's

21  certainly a method that could be used to make that

22  determination.

23        It's not a class-wide method in the sense

24  that we usually use that term in class actions, it's

25  individualized inquiry.

1    BY MR. EDWARDS:

2        Q.   And that's the only example that you can

3    think of?

4        A.   Well, in a case like this with a complex

5    good where there's, you know, a strong presumption

6    that different consumers value it differently, I -- I

7    don't -- I'm not aware of a method other than

8    individualized inquiry.

9            And that's true in the all business, where

10   prices are negotiated, there's not a take it or leave

11   it list price, so it's an artifact of that condition,

12   too.

13   BY MR. EDWARDS:

14       Q.   All right.  So that -- that opinion would be

15   the same with regard to all auto defect cases?

16       A.   Well, you've asked me to just, you know, on

17   the fly see if I can come up with a method so that's

18   the method that comes to mind, the individualized

19   inquiry, given the conditions in the automobile

20   industry and the fact that prices vary, combined with

21   the fact that they're in a complex good, different

22   consumers are going to place different values on

23   features and different values on an alleged defect

24   due to differences in risk tolerance and references

25   and, you know, what have you.

```
 1          MR. EDWARDS:  All right.  Okay.  Let's go

 2   off the record, please.

 3          VIDEO OPERATOR:  Okay.  We're going off the

 4   record.  The time now is 1:28, and this ends Media

 5   Number 2.

 6

 7          (Recess taken.)

 8

 9          VIDEO OPERATOR:  We're back on record.

10   Time, 1:39 p.m.  This begins Media Number 3.

11          Counsel, you may proceed.

12   BY MR. EDWARDS:

13      Q.  All right.  So, Dr. Strombom, before the

14   break we were talking about an example that you came

15   up with for measuring a reduction in market value due

16   to a latent defect.

17          Do you recall that?

18      A.  Yes.

19          MR. LAZATIN:  I think you may have

20   misstated.

21          Go ahead.

22   BY MR. EDWARDS:

23      Q.  And -- and you talked about, you gave the

24   example of a survey which would ask each member of

25   the proposed class about his or her preferences,
```

1    correct?

2        A.   Yes.

3        Q.   And if you would, explain to me how you

4    would use the results of that kind of a survey to

5    arrive at a reduction in market value number.

6             MR. LAZATIN:  Well, objection, form and

7    outside the scope.

8             THE WITNESS:  I should say I haven't really

9    thought about how exactly you -- you would do that.

10   I do know that one thing you would have to consider

11   in that sort of analysis is what the supply side

12   effect would be to the extent that there is a change

13   in demand for the product as a consequence of any

14   disclosure.

15            You'd have to account for the supply side

16   effects in order to translate any change in

17   willingness to pay to a change in market price for

18   the -- the vehicle.  There are ways and ways which

19   you can potentially do that, but I don't have a

20   suggestion about specifically how to do it in this

21   case, I haven't thought about it.

22   BY MR. EDWARDS:

23       Q.   Okay.  So sitting here today, you don't have

24   an opinion about how you would take those -- those

25   survey responses from the class members and -- and

Page 112

1    come up with a reduction in market value as a result

2    of the alleged defect?

3         A.   I don't have a specific methodology that --

4    that I would propose for doing that.  There are a lot

5    of things you'd have to know, things you'd have to

6    spend thinking about in order to come up with a

7    specific methodology.

8         Q.   Okay.  And I apologize if I asked you about

9    this earlier.  Have you ever been asked to do that as

10   an expert before?  Have you ever been asked to

11   calculate a reduction in market value of a vehicle as

12   a result of an alleged safety defect at the point of

13   sale?

14             MR. LAZATIN:  This has been asked and

15   answered.

16             THE WITNESS:  I -- I've been asked to

17   evaluate whether there's any evidence of a diminution

18   in value in class vehicles, and I've done three or

19   four of those analyses based upon used car prices.

20             So I'm using actual transaction data for the

21   proposed class vehicles and examining those price

22   data using various techniques to determine if there's

23   any evidence of a diminution in value of class

24   vehicles.

25

Page 113

1    BY MR. EDWARDS:

2         Q.    Right.  And you determined in all of those

3    instances there was no diminution in value?

4         A.    That's correct, in the four or five cases

5    that I've done that.

6         Q.    Okay.  But I think my question was:  Have

7    you ever -- have you ever been asked to attempt to

8    calculate a reduction in market value of a product

9    due to an alleged defect?

10        A.    No.  Not if you don't count that analysis,

11   no.

12        Q.    Okay.  You talked about using, I think you

13   described it as real world data?

14        A.    I don't recall using that expression, but

15   maybe I did.

16        Q.    Okay.  Well, you talked about when you've

17   looked at analyzing whether there was, in fact, a

18   diminution in value --

19        A.    Yes.

20        Q.    -- as a result of a -- a defect in a

21   automobile case.

22        A.    Yes.

23        Q.    What data did you look at?

24        A.    I looked at actual transaction prices for --

25   for used cars and economists like to make the

1    distinction between revealed preferences, meaning

2    those preferences are displayed by actual market

3    participants based upon their -- what they end up

4    spending their money on in real transactions versus

5    stated preferences, which are things like responses

6    to surveys where their -- their money is actually not

7    at issue, and there's sometimes discrepancies between

8    those two approaches and that's why I think I and,

9    you know, others would tend to prefer to use actual

10   transaction data if it's available over survey or

11   hypothetical data that, you know, are constructed for

12   purposes of a particular litigation.

13       Q.   Have you looked at actual transaction data

14   in this case?

15       A.   No, I have not.

16       Q.   Why not?

17       A.   I -- it's outside the scope of what I've

18   been asked to do.

19       Q.   Okay.  For -- would you agree that for

20   actual transaction prices to be relevant to the

21   diminution in value analysis as data, the market

22   would have to have awareness of the alleged defect at

23   issue?

24       A.   It --

25            MR. LAZATIN:  Objection, vague.

Page 115

1          THE WITNESS:  I think in order for that

2    information to be imputed into actual market

3    transaction prices, at least some consumers would

4    need to be aware of the alleged defect, I think

5    that's true.

6    BY MR. EDWARDS:

7        Q.   Okay.

8        A.   Not -- not all consumers but some marginal

9    consumers would need to be aware of that.

10       Q.   Where's the line in terms of how many

11   individual consumers who need to be aware of the

12   alleged defect before you would conclude that the

13   market is generally knowledgeable about the alleged

14   defect?

15       A.   I don't -- I don't know that there's a

16   specific percentage or fraction of people that need

17   to be aware of it, so I don't -- I don't have a good

18   answer for that except to say, economists say the

19   marginal consumer who's on the border between

20   purchasing and not purchasing, is sort of indifferent

21   between purchasing and not purchasing, is generally

22   the consumer that's considered to set the market

23   price, but there's not a general rule about what

24   percentage of consumers that needs to be.

25       Q.   Right.  Well, for example, if we assume that

1   5 percent of the -- of consumers are aware of the

2   alleged defect, hypothetically, any alleged defect,

3   would that be a sufficient number in your mind to

4   yield reliable transaction price data?

5          MR. LAZATIN:  Objection, incomplete

6   hypothetical, assumes facts, vague.

7          THE WITNESS:  I couldn't say whether that's

8   sufficient or not.  I -- I don't have an opinion

9   about that.

10  BY MR. EDWARDS:

11     Q.   Okay.  Turn to page 17 of your report,

12  please.  Is it your opinion that conjoint surveys

13  such as the one designed by Mr. Gaskin can only be

14  appropriately used where none of the purchasers could

15  have possibly been aware of the alleged defect?

16     A.   Well, I don't know about in general, but I

17  do know that with respect to Gaskin's survey the

18  assumption is that none of the consumers had

19  awareness of the defect.  I don't know whether that

20  generalizes to all conjoint surveys.  I wouldn't

21  speculate about that.

22     Q.   And -- and why -- why do you feel that the

23  Gaskin survey assumes that consumers had no knowledge

24  of the alleged defect at the time of the initial

25  purchase?

Page 117

1      A.    Because that's the -- the difference in

2   price that he's setting up by the nature of the

3   questions that he's asking, is that if a consumer had

4   awareness of the alleged defect, then the actual

5   transaction price would be the but-for transaction

6   price.

7           And there would be no -- no contrast between

8   the two scenarios that he's attempting to measure the

9   difference in value between.

10     Q.    So you -- you do agree that Mr. Gaskin

11  hasn't run a survey yet, correct?

12     A.    That's -- that's my understanding, yes.

13     Q.    And -- and do you agree that Mr. Gaskin's

14  survey forces awareness of the defect at issue in

15  this case?

16     A.    Well, I guess to the extent that its

17  counterfactual is the disclosure of this alleged

18  defect to the extent that people are aware of that

19  when they take the survey I guess in that sense he

20  forces, forces it.

21     Q.    Right.  So if -- for those individuals that

22  take the survey that -- and I guess you and I sitting

23  here today have no idea whether -- well, strike that.

24          Sitting here today, do you have any evidence

25  that any of the survey participants in Mr. Gaskin's

Page 118

1   survey would, in fact, be aware of the alleged

2   defect?

3       A.   Well, he did exploratory interviews with --

4   with ten consumers, and out of that ten, one was

5   aware, at least one was aware of the propensity of --

6   of panoramic sunroofs to shatter, specifically with

7   respect to the Kia vehicles, so yes, I think -- I

8   think there's evidence that some consumers are and

9   were aware of this condition.

10      Q.   Well, that's not what I asked you, though.

11  I was asking you:  Do you -- do you have any evidence

12  that an individual that will be included in

13  Mr. Gaskin's survey pool did have knowledge of the

14  defect at issue in this case at the time of purchase?

15          MR. LAZATIN:  Objection -- objection,

16  argumentative, asked and answered.

17          THE WITNESS:  I think my question (sic) was

18  responsive to that.  I mean, this consumer who's a

19  class member presumably stated that he did a lot of

20  research before he buys a car, and he was aware of

21  sunroofs' glass breaking.

22  BY MR. EDWARDS:

23      Q.   And this is an individual that will be in

24  the survey pool that Mr. Gaskin will survey?

25      A.   I don't know if he's in the survey pool.

1   He's a class member.

2       Q.   Okay.  Yeah.  And that's what I was asking

3   you, though, is specifically about the survey pool.

4   Did Mr. --

5       A.   Well, the survey pool hasn't been identified

6   yet so we can't really know.

7       Q.   Exactly.

8       A.   But in a sample of ten, which is a small

9   sample if you uncover one of them it's -- it would be

10  very surprising if there weren't a lot more out

11  there.

12      Q.   Right.  But my question is, and it goes to

13  the fact that the survey pool has not been picked yet

14  because the survey hasn't been fielded, so we don't

15  know either one of us sitting here today whether a

16  individual in the survey pool would have had

17  knowledge of this defect at the time of purchase?

18          MR. LAZATIN:  Objection, asked and answered,

19  speculation.

20          THE WITNESS:  I think by the construction of

21  your hypothetical, we can't know that until the

22  survey pool has been identified.

23  BY MR. EDWARDS:

24      Q.   Right.  Okay.  If we assume -- well, let me

25  back up.  It sounds like you're assuming that some

1    percentage of Mr. Gaskin's survey pool would have had

2    knowledge of this defect at the time of purchase, or

3    will have had knowledge of the defect?

4        A.   Well, that's not really the -- the -- well,

5    I think that's true.  I think there is -- I think

6    it's likely that members of the -- people that are

7    getting surveyed by Mr. Gaskin given the numbers are

8    likely to have known about the defect, just given the

9    general broadcast of this issue and a lot of other

10   things that I talk about in the report, but that's

11   not really the problem with the survey.

12           The problem with the survey is that the

13   hypothetical that Gaskin -- Mr. Gaskin has

14   constructed is between a vehicle that as he says

15   where the sunroof will not shatter under normal

16   conditions, and then his counterfactual, which is

17   that it's -- that it will shatter in some, one to two

18   percent of cases.

19           So what he's measuring there is the

20   difference between someone who has no knowledge of

21   the defect or alternately knowledge that there is not

22   a defect versus knowledge of an alleged defect at a

23   particular rate, so what he's measuring in that

24   conjoint only applies if the person in the real world

25   actually was unaware of the defect at the time they

1   purchased the vehicle.

2           That's the problem, is that the hypothetical

3   or the assumption of his survey is not a condition

4   that's likely to be met by all consumers, since some

5   consumers at the time of purchase were likely aware

6   of the issues with panoramic sunroofs.

7       Q.   So what -- what would be the result in terms

8   of how that would affect the data, assuming there is

9   some small percentage out there of individuals in the

10  survey pool that may have been aware of this alleged

11  defect at the time of purchase?

12      A.   Well, again, it's -- it's not the survey

13  pool -- I mean, that's a different problem.  That the

14  survey pool participants may have been aware of the

15  alleged defect.  The issue is that you're

16  calculating, he's calculating a diminution in value,

17  assuming that no one knew about the defect compared

18  to then everyone knowing about the defect.

19          In the actual world, some fraction of people

20  were likely aware of the alleged defect at the time

21  they purchased the vehicle, so he's calculating his

22  diminution in value under a set of assumptions that

23  doesn't apply in the real world.

24          And the net effect is that he would be

25  overestimating the impact on the diminution of value.

                                                    Page 122

1          There are other problems, too, and that's

2    just -- just to be clear, with his survey, but

3    that's -- that's the one that we're focusing on

4    talking about this.

5       Q.   But do you have an opinion as to how it

6    would -- how knowledge of this defect within certain

7    members of the survey pool would affect the outcome

8    of the survey, the survey results or data?

9       A.   Well, again, the issue is that people in the

10   real world who purchased the vehicle with awareness

11   of the alleged defect were not harmed because they

12   were aware of the alleged defect, so they paid the

13   same price that they would have paid with a

14   disclosure because of their awareness.  That's the of

15   problem.

16          It's not per se that somebody in the survey

17   pool was aware of the defect.  To the extent that

18   somebody in the survey pool was aware of the defect,

19   just with respect to the survey results, that

20   introduces other issues because it may affect the way

21   they respond or evaluate the information in the

22   survey, which is contrary to what Mr. Gaskin is

23   attempting to measure.

24          But that's -- I don't think that's my

25   primary criticism that I'm trying to point out in

1    Section 6 of my report.

2         Q.   I think I understand.  Your primary

3    criticism in this section of the report is that there

4    may be individuals in your mind that saw a news

5    report about these panoramic sunroof or were somehow

6    made aware of this defect at the time they purchased

7    their vehicle and therefore wouldn't have been

8    harmed?

9         A.   Yes.  I would say it's likely there are

10   people like that.  We know of at least one.  There

11   are likely to be others.  We don't know how many.

12   But that's -- that's the nature of my criticism in

13   Section 6 of my report.

14        Q.   So you say you know of at least one because

15   of the pretest --

16        A.   That's correct.

17        Q.   -- questionnaire?

18        A.   That's right.

19        Q.   Or because of the exploratory research --

20        A.   Mr. -- calls it the exploratory interviews,

21   right.

22        Q.   Right.  And that's your only basis for --

23   actually your only direct basis for your assumption

24   that some members of the proposed class had knowledge

25   of this defect at the time of this purchase?

1          MR. LAZATIN:   Objection, misstates his

2     testimony.

3          THE WITNESS:  Well, I think there's a lot of

4     other evidence.  There's articles in the -- you know,

5     in the "New York Times," Good Morning America.  If

6     you Google panoramic sunroofs on the Internet, the

7     first article that comes up is -- talks about these

8     class actions that have been filed and the alleged

9     shattering, so there's lots of other ways, a lot of

10    other evidence that leads you to conclude that it's

11    likely that some group of consumers knew about this

12    product, and I think it's born out in this sample of

13    ten of which, you know, one was aware.

14    BY MR. EDWARDS:

15       Q.   In any of those news articles that -- that

16    you reviewed, or news programs that you just

17    mentioned, was there an indication that -- that Kia

18    admits this defect with the panoramic sunroofs?

19       A.   I don't believe that Kia believes there is a

20    defect, and I'm not aware of any sort of admission as

21    you say in those articles with respect to Kia.  Kia

22    was certainly mentioned in those, at least some of

23    those articles, along with other manufacturers, but I

24    don't think any of them stated whether or not Kia

25    believed there was actually an issue with the

Page 125

1   vehicle.

2       Q.   I mean, to this day, doesn't Kia still deny

3   that there is a defect in their panoramic sunroofs

4   which caused them to spontaneously shatter?

5           MR. LAZATIN:  Objection, foundation.

6           THE WITNESS:  It's my understanding that Kia

7   doesn't believe there's an -- there's an issue, that

8   there's a defect with these -- with these sunroofs.

9   BY MR. EDWARDS:

10      Q.   Right.  So are you aware of any instance

11  where a proposed class member would have been

12  informed that there is, in fact, a defect affecting

13  the safety of these vehicles due to shattering

14  panoramic sunroof which came from Kia?

15          MR. LAZATIN:  Objection, foundation.

16          THE WITNESS:  I have -- I don't see why it's

17  pertinent that it came from Kia, but to my knowledge,

18  there hasn't been any.  The awareness came from other

19  sources to the extent there was awareness.

20  BY MR. EDWARDS:

21      Q.   Well, do you agree that it's possible that

22  if a certain individual sees a news broadcast they

23  may not believe that there's an actual defect unless

24  the manufacturer admits it?

25          MR. LAZATIN:  Objection, foundation,

Page 126

1   speculation.

2           THE WITNESS:  I couldn't say what any

3   particular viewer of Good Morning America might take

4   away from an article -- from a story, but I do know

5   that it's -- there are lots of examples of

6   information about this alleged defect in the press,

7   so a number of people could be aware of it.

8           As to specifically what that means, you'd

9   have to -- you'd have to ask them individually, I'd

10  imagine.

11  BY MR. EDWARDS:

12      Q.  How many members of the class, the proposed

13  class in this case were, in fact, aware of this

14  panoramic sunroof defect when they purchased the Kia

15  vehicle at issue?

16      A.  We don't know that, as we sit here.

17  Presumably would have to perform individualized

18  inquiry to -- to know the answer to that.

19      Q.  Okay.  Turn to paragraph 36 of your report,

20  please.  And the fifth line down of paragraph 36, you

21  state (as read):

22              While Mr. Gaskin purports to

23              calculate a per vehicle damage

24              amount, neither he nor Mr. Weir

25              present any method to apportion the

Page 127

1          aggregate amount between multiple

2          owners of the same vehicle.

3          Do you see that?

4     A.   Yes.

5     Q.   Okay.  Have you read Mr. Weir's deposition?

6     A.   Yes.

7     Q.   Did you see in the deposition where he, when

8  asked, gives an example of how he would apportion the

9  aggregate amount between the different owners of

10 the -- of vehicles?

11    A.   Yes.

12    Q.   Okay.  So do you -- having -- having read

13 the Weir report, do you still -- is it still your

14 opinion that Mr. Weir does not present any method to

15 apportion the aggregate amount between multiple

16 owners of the same vehicle?

17    A.   Well, I think he's proposed a method.  I

18 don't think it's a method that he demonstrates can

19 actually be executed in practice, and I think it's a

20 method that introduces its own set of problems in

21 terms of allocating a per vehicle amount across

22 different consumers.

23    Q.   Well, that -- that's not quite what I asked

24 you, though.  Is it still your opinion sitting here

25 today that Mr. Weir has not presented any method to

Page 128

1   apportion the aggregate amount between multiple

2   owners of the same vehicle?

3           MR. LAZATIN:  Objection, asked and answered.

4   BY MR. EDWARDS:

5       Q.   Is that still your opinion?

6       A.   I guess with the modifier that it's -- it's

7   not an appropriate method.  He -- in one page of his

8   deposition or so, he describes a method or he

9   attempts to address that shortcoming in his analysis,

10  but it's -- it's inadequate and it's -- introduces

11  problems of its own, but he has responded to the

12  question, if that's your question.

13      Q.   Yeah.  I mean, you state here he hasn't --

14  Mr. Weir hasn't presented a method to apportion the

15  aggregate amount.  It would -- having now read his

16  deposition, would you modify that to say he has, in

17  fact, presented a method to apportion the aggregate

18  amount between multiple owners of the same vehicle,

19  but you disagree with how he would propose to

20  apportion that amount?

21          MR. LAZATIN:  Objection, misstates

22  testimony.

23  BY MR. EDWARDS:

24      Q.   Is that fair?

25          MR. LAZATIN:  Vague.

Page 129

1      THE WITNESS:  Well, my report is as of

2  September 8th, 2017, and as of that date he had not

3  described a method, so I would let me report stand.

4      As of his deposition, he's, I'd say he

5  responded to questions about that, and so I have

6  criticisms of the method that he's proposed that I

7  didn't have back when I issued my initial report

8  because he hadn't proposed a method at that time.

9  BY MR. EDWARDS:

10     Q.   Okay.  But now you -- you and I can agree

11  that he has proposed a method?

12          MR. LAZATIN:  Objection, misstates.

13          THE WITNESS:  It's vague and incomplete, but

14  he -- I think he has proposed a general -- a general

15  method.

16  BY MR. EDWARDS:

17     Q.   Okay.  It's just a method that you feel is

18  inappropriate?

19     A.   No.  I think there are problems with it,

20  yes.

21     Q.   Okay.

22     A.   And that it doesn't address the real issues.

23     Q.   Have you ever provided any opinions to

24  assist the court with claims administration in a

25  class action case?

Page 130

1      A.   I don't believe so, no.

2      Q.   You -- you've just never been asked to do

3  that?

4      A.   That's right.

5      Q.   On page 16 at the top, you set forth your

6  criticism (as read):

7               Mr. Gaskin's method is not

8          applicable to individuals who leased

9          class vehicles.

10          Do you see that?

11     A.   Yes.

12     Q.   Okay.  Again, assuming that there is some

13  reduction in market value of the class vehicles at

14  the point of sale as a result of the defects at issue

15  in this case, wouldn't an individual who leased a

16  class vehicle also have overpaid due to the -- due to

17  the reduced market value?

18     A.   Not necessarily.

19     Q.   Lease payments aren't set at least in part

20  by the purchase price of the vehicle at issue?

21     A.   In part is the key.  Part of your answer is

22  that there's lots of things that determine the lease

23  payments, and so you'd have to know about the context

24  of the particular lease to know whether the lease

25  payments, the present value of the lease payments was

Page 131

1   affected by any disclosure.

2       Q.   Lease payments, generally those payments are

3   set based on the purchase price of the vehicle on one

4   hand and the residual value of the vehicle at the end

5   of the lease term.

6            Will you agree to that?

7       A.   They're set on a lot of different

8   considerations.  Those are certainly two of them.

9   But they're also typically affected by maintenance

10  costs that the lessor pays for, the cost of capital

11  of the leasing company, the -- the sales, the

12  promotional incentives and other things that the

13  lessor may have either received or provide to a

14  consumer.

15           So it's not sufficient to know just those

16  two things, the residual value or the initial

17  purchase price, to determine the amount of a lease

18  payment.

19      Q.   Assume hypothetically that all of the -- all

20  of the other variables that you just mentioned other

21  than the purchase price are equal, okay?  On one

22  hand, someone purchases a vehicle via a lease for

23  $30,000 over a two-year lease term, and assume a

24  second individual purchases the same vehicle for

25  $25,000, again, all other variables being equal over

Page 132

1    the same term, wouldn't the consumer that paid $5,000

2    more hypothetically have a higher lease payment than

3    the individual that paid 25?

4              MR. LAZATIN:  Objection -- objection,

5    misleading, incomplete hypothetical, assumes facts

6    not in evidence.

7              THE WITNESS:  Well, if we're assuming a

8    different initial purchase price then it would be

9    sort of logical to assume a different residual value

10   as well.  If you're changing one, you're likely

11   affecting the other as well.

12   BY MR. EDWARDS:

13      Q.  Well, I'm asking to you hold all those

14   things constant, though, hypothetically?

15              MR. LAZATIN:  Same objections.

16              THE WITNESS:  Yeah.  Well, I think that's an

17   unrealistic set of assumptions, but given those

18   assumptions, I think mathematically there would be a

19   difference in the lease payments.  But again, I don't

20   think that that is an appropriate set of assumptions

21   in this, in the case of leasing of automobiles.

22   BY MR. EDWARDS:

23      Q.  I understand that.  But -- and just to

24   clarify that the individual that paid 30,000 would

25   have a higher monthly lease payment than the

1   individual that paid 25,000, again, assuming all the

2   other variables were the same.

3           MR. LAZATIN:  Objection, vague, incomplete

4   hypothetical, misleading, assumes facts.

5           THE WITNESS:  Well, I think by the

6   construction of your question, I think logically

7   that's the case, but again, I don't think that's a

8   reasonable set of assumptions in this circumstance.

9           MR. EDWARDS:  Okay.  I think I'm -- let's go

10  off the record.

11          VIDEO OPERATOR:  Okay.  We're going off

12  record.  Time now is 2:14.

13          This ends Media Number 3.

14

15          (Recess taken.)

16

17          VIDEO OPERATOR:  We're on record.  Time is

18  2:29.

19          This begins Media Number 4.

20          Counsel, you may proceed.

21  BY MR. EDWARDS:

22      Q.  Dr. Strombom, you are aware or have seen

23  those news articles or TV broadcasts that you

24  mentioned related to this panoramic sunroof defect at

25  issue, right?

Page 134

1      A.    Yes.

2      Q.    Okay.  And yet sitting here today you don't

3   have an opinion as to whether the sunroofs are, in

4   fact, defective, do you?

5      A.    No, I don't.

6            MR. EDWARDS:  Okay.  That's all I have.

7            MR. LAZATIN:  All right.  Cool.  Let's go

8   off the record.  Give me a couple minutes.

9            MR. EDWARDS:  Okay.

10            VIDEO OPERATOR:  Okay.  We're going off

11   record.  Time is 2:30 p.m.

12

13            (Recess taken.)

14

15            VIDEO OPERATOR:  We are back on record.

16   Time, 2:48.

17            This begins Media Number 4.

18            Counsel, you may proceed.

19            MR. LAZATIN:  Thank you.

20

21                      EXAMINATION

22   BY MR. LAZATIN:

23      Q.    Dr. Strombom, good afternoon.

24      A.    Good afternoon.

25      Q.    You recall that before we broke last,

                                                    Page 135

1   Mr. Edwards asked you if after having looked at some

2   news stories you had any opinion about the existence

3   of a defect as alleged in this case.

4              Do you recall that?

5        A.    I do.

6        Q.    And when you responded that you did not have

7   an opinion on that issue, can you explain to me what

8   you meant?

9        A.    Well, what I mean is that I'm not offering

10  an expert opinion on that topic in this litigation.

11  It's not the area of my expertise.

12       Q.    Okay.  One other thing Mr. Edwards covered

13  in his examination was your experience with working

14  with conjoint analysis.

15             Do you recall that?

16       A.    I do.

17       Q.    Can you describe for me your experience

18  working with conjoint analysis as part of your work

19  or as part of your academic training?

20       A.    Yes.  I have taken courses as part of my

21  graduate education in conjoint analysis, as well as

22  other marketing and survey techniques, so I -- that's

23  a topic that's been covered in my graduate education.

24             In addition to the Hyundai case and the Kia

25  case, I've worked on another case involving conjoint

Page 136

1  analysis where my role was to evaluate the conjoint

2  analysis that was proposed by a plaintiff's expert.

3          And I guess I've also taught a continuing

4  legal education course on conjoint analysis and

5  contrasting conjoint analysis with hedonic

6  regressions and comparing the advantages,

7  disadvantages, pros and cons of each of those two

8  methods.

9      Q.   One other thing that I think Mr. Edwards

10  touched on earlier was your experience with surveys.

11          Do you recall that?

12      A.   Yes.

13      Q.   Can you tell me about any experience you've

14  had actually fielding a survey as part of your work?

15      A.   Yes.  I have both designed and fielded

16  surveys as part of litigation assignments, as well as

17  non-litigation assignments, in both consumer products

18  related cases and in service and recreational related

19  case.

20          So that's something that I've done as part

21  of my professional experience.  And as I mentioned,

22  part of my academic training as well, courses on --

23  on marketing and survey design and execution.

24      Q.   Okay.  Let's talk about bayesian regression

25  for a second.

Page 137

1          Are you familiar with bayesian regression?

2     A.    I am familiar with hierarchical bayesian

3    statistics.  Bayesian statistics is an area of

4    statistics that I studied as part of my economics in

5    statistics training in my Ph.D. program, and I've

6    estimated many hierarchical models in the course of

7    my work and testimony as an expert.

8     Q.    And can you tell me what, if any, does

9    relation bayesian regression that you just described

10   have with conjoint analysis?

11    A.    Well, the method Mr. Gaskin proposed to use

12   to estimate part worth using the data that he's

13   generating through his survey is a hierarchical

14   bayesian regression method, so it's basically the

15   statistical procedure that's being applied, he

16   proposes to apply to the survey data in order to

17   extract the information that he needs to make his

18   proposed calculations.

19          And that's a procedure that I'm familiar

20   with and it's an area of statistics and economics

21   that I have experience in both from my academic

22   training and my professional experience.

23          MR. LAZATIN:  Thank you, Doctor.  That's all

24   I've got.

25

Page 138

1               FURTHER EXAMINATION

2   BY MR. EDWARDS:

3       Q.   Dr. Strombom, just to clarify, I asked you

4   if you'd seen the -- the news broadcasts and the

5   articles related to this panoramic sunroof defect and

6   you told me that you had, right?

7       A.   Yes.

8       Q.   Okay.  And I understand the attorney for Kia

9   has asked you about whether you have expert opinions

10  about whether there is, in fact, a defect in these

11  panoramic sunroofs, and your answer is you don't have

12  an expert opinion, right?

13      A.   Yes.

14      Q.   But sitting here today, as a lay person, do

15  you know whether the class vehicles at issue have a

16  defect in the panoramic sunroof?

17           MR. LAZATIN:  Objection, form, foundation,

18  vague, ambiguous.

19           THE WITNESS:  What I know is what I've read

20  and -- in this case and in the various news articles

21  we've talked about that panoramic sunroofs shatter

22  from time to time.  Whether that constitutes a defect

23  is not anything that I have an opinion on, either as

24  an expert or as a lay person.

25           Glass windows shatter, too, from time to

Page 139

1  time.  Does that mean there's a defect?  I don't

2  know.  That's not either my area of expertise as an

3  expert or something even as a lay person that I have

4  an opinion about with respect to the alleged defect

5  in this case.

6  BY MR. EDWARDS:

7      Q.   Right.  To know whether these class vehicles

8  are, in fact, sold with a defective panoramic

9  sunroof, you'd need Kia to admit that they are

10  defective and then you'd know, wouldn't you?

11          MR. LAZATIN:  Objection, misstates evidence,

12  assumes facts.

13          THE WITNESS:  Well, I don't -- I don't think

14  you'd need Kia to admit it to know it.  I mean, there

15  are -- it would be subject to some expert

16  determination or determination by a court based upon

17  expert testimony.

18  BY MR. EDWARDS:

19      Q.   Do you know, sitting here today as a lay

20  person, whether or not these panoramic sunroofs at

21  issue are defective?

22      A.   No.  I don't have an opinion about that, as

23  I said, either as an expert or as a lay person.

24          MR. EDWARDS:  All right.  No -- no more

25  questions.

Page 140

1          MR. LAZATIN:  Thanks, we're done.

2          Before we go off, I want to designate the

3    transcript of this deposition as confidential under

4    the terms of the protective order governing this

5    case.

6          VIDEO OPERATOR:  Okay.  That concludes

7    today's testimony from Bruce Strombom.  Total number

8    of media used was four, and will be retained by

9    Veritext Legal Solutions.

10          Time now is 2:55 p.m.

11

12          (TIME NOTED:  2:55 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 141

1          I declare under penalty of

2       perjury under the laws of the State

3       of California that the foregoing is

4       true and correct.

5          Executed on _____, 2018, at

6    _____, _____.

7

8

9

10       _____

11              SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 142

1    STATE OF CALIFORNIA        ) ss.

2    COUNTY OF LOS ANGELES      )

3

4            I, Lori M. Barkley, CSR No. 6426, do hereby

5    certify:

6            That the foregoing deposition testimony

7    taken before me at the time and place therein set

8    forth and at which time the witness was administered

9    the oath;

10           That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me, and

13   were thereafter transcribed under my direction and

14   supervision, and that the foregoing pages contain a

15   full, true and accurate record of all proceedings and

16   testimony to the best of my skill and ability.

17           I further certify that I am neither counsel

18   for any party to said action, nor am I related to any

19   party to said action, nor am I in any way interested

20   in the outcome thereof.

21           IN WITNESS WHEREOF, I have subscribed my

22   name this 5th day of March, 2018.

23

24

25           LORI M. BARKLEY, CSR No. 6426

Page 143

                         ERRATA SHEET

RE      : Kondash, Tom v. Kia Motors America, Inc.

DEPO OF: Bruce Strombom

TAKEN  : 2/27/2018

 DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

Page #| Line #|  Change                    |  Reason

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

State of Florida     )

County of Dade       )


Under penalties of perjury, I declare that I have

read my deposition transcript, and it is true and

correct subject to any changes in form or

substance entered here.

_____            _____

Date                       WITNESS NAME

Page 144

```
 1                    VERITEXT LEGAL SOLUTIONS
                  One Biscayne Tower, Suite 2250
 2                  2 South Biscayne Boulevard
                      Miami, Florida 33131
 3                        305-376-8800
 4    March 9, 2018
      Bruce Strombom
 5    c/o Adam Edwards
      Greg Coleman Law, PC
 6    800 S Gay St, Ste 1100
      Knoxville, TN, 37929
 7    adam@gregcolemanlaw.com
 8    RE: Kondash, Tom -vs- Kia Motors America, Inc.
 9    Dear Mr. Edwards:
10    With reference to the deposition of Bruce Strombom
      taken on 2/27/18 in connection with the above-captioned
11    case, please be advised that the transcript of the
      deposition has been completed and is awaiting
12    signature.
13    Please have your client read the transcript and complete
      the errata page. Upon completion, please send the signed
14    errata to our office at Two South Biscayne Blvd., Ste. 2250,
      Miami, FL, 33131, or email it to litsup-fla@veritext.com.
15
      If this is not taken care of, however, within the
16    next 30 days, we shall conclude that the reading
      and signing of the deposition has been waived and
17    the original, which has already been forwarded to
      the ordering attorney, may be filed with the Clerk
18    of the Court without further notice.
19    Sincerely,
20
21    Production Department
      Veritext Florida
22
23
24
25
```

| & | | | |
|---|---|---|---|
| **&** 3:13 7:13,15 | | | |

**0**

**00002** 19:9
**00004** 20:5
**00005** 20:5
**00006** 20:21
**00007** 20:21
**00078** 42:15
**00506** 1:11 2:9

**1**

**1** 1:25 4:13 6:15
  14:21,25 15:7,9
  16:1 84:12
**10** 5:23 46:18,24
  48:20
**10:30** 43:16
**10:42** 43:21
**10th** 50:22
**1100** 3:7 144:6
**11:41** 84:12
**11:50** 84:17
**11th** 91:20
**12** 102:18
**12.9** 33:3
**122,198.25** 5:7
**122,198.25.** 20:15
**12:52** 84:19,23
**134** 4:7
**138** 4:8
**14** 4:13
**14,847.50** 4:22
**14,847.50.** 19:24
**142** 1:25
**15** 39:3,8 42:13
**15.7** 32:10
**16** 4:15 130:5
**17** 116:11
**18th** 2:17 3:18

**19** 4:19
**1:15** 1:11 2:9
**1:28** 110:4
**1:39** 110:10

**2**

**2** 4:15,15 16:13,24
  17:12 18:14 19:9
  50:7 84:24 110:5
  144:2
**2/27/18** 144:10
**2/27/2018** 143:3
**20** 5:4,9
**2017** 4:15,20 5:5,10
  5:15 17:6,10 19:19
  19:20 20:12 21:2
  31:14 50:22 129:2
**2018** 1:19 2:19 6:1
  6:5 141:5 142:22
  144:4
**21.2** 33:6
**2250** 144:1,14
**23,794.50** 31:21,24
**235,000** 21:14
**25** 23:1 132:3
**25,000** 131:25
  133:1
**27** 1:19 2:19 6:1
  91:20
**27th** 6:5
**2828457** 1:24
**29** 100:1,3
**2:14** 133:12
**2:29** 133:18
**2:30** 134:11
**2:48** 134:16
**2:55** 2:18 140:10,12
**2nd** 17:6,10

**3**

**3** 4:19 17:19 19:9
  19:12,13 21:6

**29**:13,16 110:10
  133:13
**30** 5:10 144:16
**30,000** 131:23
  132:24
**305-376-8800**
  144:3
**30th** 21:2 31:14
**31** 4:20 5:5
**31st** 19:19,20 20:12
**3213.430.6000** 3:20
**33** 103:3
**33131** 144:2,14
**36** 126:19,20
**37929** 3:8 144:6

**4**

**4** 5:4 20:1,6,17 21:6
  29:16,22 34:7 50:8
  85:7,11 133:19
  134:17
**400** 2:16 3:18 6:22
**41.4** 32:19
**45.5** 32:11
**47.35** 33:1
**49** 5:14

**5**

**5** 5:9 20:20,22 21:6
  29:17 30:18,21
  31:21 32:10 33:11
  33:20 36:13,17,22
  85:18 116:1
**5,000** 132:1
**54** 32:10
**54.7** 31:15
**5th** 142:22

**6**

**6** 5:14 48:25 49:1,2
  49:8 85:4 123:1,13
**6426** 1:23 2:20
  142:4,25

**7**

**7** 5:17 37:20 75:13
  75:14,15,20 78:10
  79:17 87:17
**7.2** 33:5
**70** 8:16
**720** 22:13
**75** 5:17 22:24
**77** 97:8

**8**

**8** 4:6 5:15,23 37:25
  78:17 79:7
**80** 8:16
**800** 3:7 144:6
**865.247.0080** 3:9
**8th** 129:2

**9**

**9** 45:6,13 91:12
  144:4
**90071** 3:19
**95** 67:21
**99,709.50** 5:12
**99,709.50.** 21:5
**9:04** 2:18 6:2
**9:34** 6:5

**a**

**a.m.** 2:18 6:2,5
  43:16,21 84:17
**ability** 142:16
**able** 11:11 72:17
  92:19 93:17 98:16
**academic** 28:2
  135:19 136:22
  137:21
**accept** 52:25
**accepted** 17:19
  60:18,19,25
**account** 62:15,17
  62:19,22,24 93:10
  111:15

**accounts** 62:11
**accrual** 37:16
**accurate** 49:9,11
  50:23 76:17,25
  142:15
**accurately** 20:16
  93:12
**action** 7:3 23:9
  24:22 30:5 34:21
  59:20 60:6,13
  129:25 142:18,19
**actions** 108:24
  124:8
**actual** 62:25 75:3,8
  75:9 82:9 106:14
  112:20 113:24
  114:2,9,13,20
  115:2 117:4 121:19
  125:23
**adam** 3:5,10 7:11
  78:19 144:5,7
**add** 95:9
**added** 36:5
**addition** 30:19
  104:9 135:24
**additional** 104:8
**address** 52:15
  58:14 93:5,18
  128:9 129:22
**addressed** 94:1
**adequate** 76:6
**administer** 7:2
**administered** 7:22
  80:11 142:8
**administration**
  129:24
**admission** 124:20
**admit** 139:9,14
**admits** 124:18
  125:24

**admitted** 65:21
**admonition** 13:11
**advance** 8:10
**advantages** 136:6
**advisable** 13:4 65:7
**advised** 144:11
**advocate** 105:10
**affect** 57:6 74:9
  105:13 121:8 122:7
  122:20
**affiliations** 7:7
**affirmative** 21:18
  93:8
**affirmatively** 21:22
  22:17 29:3,8 99:25
**afternoon** 134:23
  134:24
**aggregate** 127:1,9
  127:15 128:1,15,17
**ago** 8:5 40:2 59:5
**agree** 6:13 34:10
  47:11 52:1 53:20
  54:19 61:15 65:8
  71:8,20 82:1
  102:12 104:19
  114:19 117:10,13
  125:21 129:10
  131:6
**agreed** 17:20
**agreement** 16:19
  17:13,17 18:10,21
**agreements** 16:14
**ahead** 14:19 16:22
  19:25 20:19 48:23
  49:7 78:16 86:16
  110:21
**airbags** 101:9,9
**al** 6:18 39:15,16
  42:8,9
**alexander** 38:25
  39:11,15,22 40:17

40:24 42:19,21
**allegation** 40:9
  43:4 61:14
**allegations** 51:17
  76:24
**alleged** 25:4 39:5
  40:4 42:5,19 51:2,7
  67:15,19 77:1
  85:24 87:15,25
  89:22 90:10 91:17
  92:1,13,23 94:22
  96:18 98:13 107:1
  109:23 112:2,12
  113:9 114:22 115:4
  115:12,13 116:2,2
  116:15,24 117:4,17
  118:1 120:22
  121:10,15,20
  122:11,12 124:8
  126:6 135:3 139:4
**allocate** 88:19
**allocating** 127:21
**allow** 9:4 13:22
**allows** 60:11
**alternately** 120:21
**ambiguous** 94:6
  101:4 102:4 107:19
  138:18
**america** 1:11 2:10
  12:15 39:1,15 42:9
  42:10,11 50:13
  124:5 126:3 143:2
  144:8
**americas** 17:20
**amount** 21:3 23:19
  51:21 95:4 107:22
  126:24 127:1,9,15
  127:21 128:1,15,18
  128:20 131:17
**analyses** 112:19

**analysis** 22:7,14,16
  22:19 27:4,8,10,12
  28:24 29:9 35:19
  36:14,20 51:11
  59:21 60:18,19
  69:12 70:14 71:7
  73:11,14 91:23
  93:9,10,21 105:10
  111:11 113:10
  114:21 128:9
  135:14,18,21 136:1
  136:2,4,5 137:10
**analyst** 32:19,25
  33:2
**analysts** 35:17
**analytic** 57:14
**analyze** 51:1
**analyzes** 62:6
**analyzing** 62:2
  113:17
**angeles** 1:18 2:17
  3:19 6:1,23 22:19
  142:2
**answer** 5:21 9:3
  10:11 11:6 13:22
  23:13 54:20 57:18
  59:6,9 83:11 95:2,6
  96:5 99:17 106:19
  115:18 126:18
  130:21 138:11
**answered** 112:15
  118:16 119:18
  128:3
**answering** 61:9
**answers** 8:22
**apart** 55:8
**apologize** 8:9 112:8
**appear** 18:14 42:16
  49:11
**appearance** 7:10

**appearances** 3:1 7:6

**appeared** 12:5

**appears** 19:10,17 33:10 50:7

**appendix** 49:14

**apple** 62:8

**applicable** 89:8 130:8

**applied** 137:15

**applies** 92:18 104:6 104:7 120:24

**apply** 70:13 92:19 104:4 105:18 106:7 121:23 137:16

**apportion** 126:25 127:8,15 128:1,14 128:17,20

**approach** 94:2 95:13 105:16,16

**approaches** 114:8

**appropriate** 28:1 50:17 63:18 67:7 70:10 105:10,13 128:7 132:20

**appropriately** 59:21 69:4 97:19 97:20 98:3 99:22 105:4 116:14

**approximately** 8:15 22:24 23:3

**april** 4:15 17:6,10

**area** 58:23 59:3 60:17 135:11 137:3 137:20 139:2

**argumentative** 118:16

**arrive** 94:25 99:25 111:5

**article** 97:7 124:7 126:4

**articles** 12:5,11,13 12:14,18,23,25 13:2 14:6 124:4,15 124:21,23 133:23 138:5,20

**artifact** 109:11

**ascribed** 97:16

**aside** 10:15 105:17

**asked** 10:20 15:10 21:16,19,22,24 23:8,10 28:14 37:19 50:16 51:1 52:15,23 53:2 54:17,18 59:5 65:14 81:2 82:15 83:7,24 87:11 100:4 102:10 106:19 109:16 112:8,9,10,14,16 113:7 114:18 118:10,16 119:18 127:8,23 128:3 130:2 135:1 138:3 138:9

**asking** 8:18 10:13 10:15,19,23 56:12 67:18 69:9 83:12 104:2 108:2,9 117:3 118:11 119:2 132:13

**asks** 28:22 29:13,23 37:25

**aspect** 28:8 63:8 74:5 97:15,16

**aspects** 27:9,12,13 27:23 29:5 58:21 58:22 59:2 63:22

**assess** 25:3 40:23

**assessments** 92:10

**assignment** 22:2,6 40:17 50:6 51:24

52:7,24 91:2

**assignments** 23:2 136:16,17

**assist** 59:22 129:24

**associated** 25:4,21 56:21 57:3

**assume** 40:21 56:24 57:5 69:2 97:2 101:20 107:11 108:9 115:25 119:24 131:19,23 132:9

**assumes** 54:25 56:6 57:10 69:7 70:1 81:16 83:4 84:1 94:17 97:23 99:10 101:5 105:7 107:19 108:15 116:6,23 132:5 133:4 139:12

**assuming** 46:2,14 46:16 55:22 56:4 64:7 99:8 107:16 107:21 119:25 121:8,17 130:12 132:7 133:1

**assumption** 45:10 116:18 121:3 123:23

**assumptions** 15:20 45:20,21,24 46:8 46:11 121:22 132:17,18,20 133:8

**attached** 4:17 14:22 15:5 16:25 17:7,11 18:22 19:14 20:7,23 37:1 49:3,15,16 75:16

**attempt** 40:23 113:7

**attempted** 26:18,19 26:23 83:17 99:13

99:25

**attempting** 25:8 59:10 117:8 122:23

**attempts** 74:4 128:9

**attending** 7:6

**attorney** 3:6 7:10 138:8 144:17

**attorneys** 3:17 30:3 34:20

**attribute** 103:10 104:8

**attributes** 92:3,24 97:4,11 98:8,12,19 103:6,8,22,23 104:5,17,20 105:1

**audio** 6:11,12

**august** 5:5 19:19 20:12

**author** 37:14,16

**authored** 36:25

**authorized** 7:2

**auto** 58:6 109:15

**automobile** 26:15 26:18 57:16 104:20 109:19 113:21

**automobiles** 26:10 86:7 88:6 102:22 104:13,14 105:25 132:21

**automotive** 54:5

**available** 25:19 79:5 87:3 114:10

**average** 92:17 105:13,14,17 106:7

**avoid** 8:22 9:5 80:14

**awaiting** 144:11

**aware** 36:15,21 47:8 61:20 81:10 81:12 82:20 90:10

99:2 109:7 115:4,9
115:11,17 116:1,15
117:18 118:1,5,5,9
118:20 121:5,10,14
121:20 122:12,17
122:18 123:6
124:13,20 125:10
126:7,13 133:22
**awareness** 55:14
60:17 114:22
116:19 117:4,14
122:10,14 125:18
125:19

## b

**b** 49:14 50:20 85:19
86:6 88:4 90:8
102:19
**back** 29:11,13
49:24 63:4 66:20
79:8 85:3,3 110:9
119:25 129:7
134:15
**background** 36:10
**backup** 15:17
46:19
**ballard** 66:18
**barkley** 1:22 2:19
7:1 142:4,25
**based** 23:11 27:10
27:25 28:1 76:18
77:11 80:20,21
96:25 97:12 100:24
112:19 114:3 131:3
139:16
**bases** 50:3
**basic** 27:25 46:4
**basically** 16:2
24:18 25:24 35:18
44:19 96:19 137:14
**basis** 11:7 24:25
106:3 123:22,23

**bassett** 42:10 43:1
**bayesian** 136:24
137:1,2,3,9,14
**beginning** 2:18
7:10
**begins** 84:24
110:10 133:19
134:17
**behalf** 1:7 2:5,16
39:19 41:4 42:2
44:2 50:21
**believe** 17:18 20:18
28:14 29:18 35:4,5
38:18 48:8 50:7
52:5 53:2 59:20
66:18 67:7 70:22
73:10,20,24 75:6
76:25 85:4,17 86:5
90:12 91:10 92:14
124:19 125:7,23
130:1
**believed** 124:25
**believes** 124:19
**best** 8:21 19:1 63:5
63:12 64:18 142:16
**beyond** 36:16 56:5
57:9 64:6 101:14
105:8 107:20
108:15
**bigger** 62:9
**bill** 31:17,20
**billed** 21:12 31:15
32:8,17
**billing** 20:14,17
21:1,7 29:14,19
**billings** 21:11
**bills** 19:16 21:4
29:17 31:2
**biscayne** 144:1,2
144:14

**bit** 78:19 87:9
**blvd** 144:14
**body** 49:13 60:10
91:6
**bold** 91:13
**book** 37:6,10,12
**border** 115:19
**born** 124:12
**bottom** 39:10
**bought** 107:13
**boulevard** 144:2
**brake** 42:6 43:3,9
**braking** 42:18,23
**break** 43:14,24
77:4 110:14
**breaking** 118:21
**breaks** 77:12,13
**breslow** 33:6
**bring** 15:1
**broadcast** 120:9
125:22
**broadcasts** 12:6
133:23 138:4
**broader** 51:25
**broke** 134:25
**brought** 49:25
**bruce** 1:17 2:15 4:3
4:16 5:14 6:16 7:21
15:5 34:8 140:7
143:2 144:4,10
**bundle** 104:24
106:12
**bundled** 86:8 88:8
102:24 106:2
**bundles** 104:11
**bundling** 104:12
**business** 24:1 28:2
44:14 78:24 109:9
**buy** 54:19 55:19
56:23 97:14,15

**buying** 68:1 104:9
**buys** 118:20

## c

**c** 32:25 85:19 88:16
144:5
**c.v.** 17:7 18:14,18
18:22 36:23 37:5,8
37:24 38:20 39:3
42:4,13 65:24
**calculate** 21:20
22:8 24:11,19
26:19 89:20 94:15
112:11 113:8
126:23
**calculated** 24:24
26:12
**calculates** 92:17
**calculating** 40:18
95:25 105:11
121:16,16,21
**calculation** 37:12
**calculations** 23:11
24:15 46:20 47:4
48:20 65:15,18
137:18
**california** 1:18
2:17 3:19 6:1,23
22:20 39:23 141:3
142:1
**call** 79:21
**called** 37:12
**calls** 58:10 94:7
123:20
**capacity** 38:15
**capital** 131:10
**captioned** 38:25
144:10
**car** 25:2 54:19 56:4
56:13 96:21 97:14
97:15 112:19
118:20

**care** 101:2 144:15
**carlos** 3:14 7:13
  9:14 13:20 17:2
  75:17
**carol** 66:11 69:24
**cars** 113:25
**case** 1:10 2:9 8:6,11
  9:9 11:9,18,19 12:9
  12:10 14:14 16:20
  17:14,17 19:16
  21:9,12,14,17,25
  22:2,12 23:9,10,14
  23:15,16,17,20,22
  23:25 24:4,7,10,12
  24:18,23 26:17,18
  26:22 28:5,15 31:2
  31:10,11 32:7,8,16
  33:13 34:15 35:10
  35:11,14,18 36:4
  36:13,19 38:13,14
  39:9,22 40:3,13,17
  40:18,22,25 41:12
  41:21,24 42:19,21
  42:25 43:11 44:9
  44:11 45:25 46:9
  46:10 47:15,17,21
  48:17,24 49:10
  50:2,6 51:14,23
  52:3,7,15,23 59:23
  60:1,7,11,24 61:11
  61:11,13 62:1,5,7
  62:17 65:13,22
  66:1,7,17,22 68:1,4
  68:8 69:6,11,11,16
  70:14 71:13 72:22
  73:21 76:19,22
  77:8 78:22,24 79:2
  79:3 83:5 86:3,10
  86:14,22 87:2,3,12
  87:17,21 88:11,22
  89:1,5,13 90:2,14

90:19,22,25 91:8,9
  91:24 92:7 95:18
  96:2,7,10,17 97:7
  99:4,14,22 102:15
  104:13 105:11
  106:15 109:4
  111:21 113:21
  114:14 117:15
  118:14 126:13
  129:25 130:15
  132:21 133:7 135:3
  135:24,25,25
  136:19 138:20
  139:5 140:5 144:11
**cases** 15:15 23:3
  25:6,12 26:3,10,16
  33:18 37:19,21
  38:3,19,23 39:4
  42:12,22 48:16
  60:18,19,21 67:16
  67:20 79:4 109:15
  113:4 120:18
  136:18
**cash** 37:15
**categories** 74:22
  91:11 92:20
**category** 67:22
  68:19 81:5,9
**caused** 125:4
**caution** 52:11
**cell** 6:9
**cellular** 6:8
**certain** 11:10 45:24
  56:10 61:3 83:12
  103:5,15 122:6
  125:22
**certainly** 29:5
  57:11 58:21 63:15
  63:15 76:25 82:16
  107:10 108:21
  124:22 131:8

**certified** 2:20
**certify** 142:5,17
**chance** 57:1
**change** 36:7 37:8
  111:12,16,17 143:5
**changes** 35:25
  143:4,23
**changing** 96:21
  132:10
**chapter** 37:6,14,15
**characterize** 25:23
**check** 86:22 87:9
**choice** 63:24,25
  64:1 106:10
**choices** 57:8 71:3
  104:10
**circumstance**
  133:8
**cite** 54:11 55:4
**city** 6:22 66:14
**claim** 96:17
**claims** 25:13
  129:24
**clarify** 35:3 132:24
  138:3
**class** 7:12 23:9 24:2
  24:11,20,22,25
  25:7 26:10,15,25
  28:25 40:3,4,24
  41:7 59:20,22 60:6
  60:12,13 61:1,2
  70:24 71:6 72:21
  73:12,24 85:12
  88:23 89:9 90:9
  91:25 92:4,20
  93:13,24,25 94:4,4
  94:9,13,14,23,25
  94:25 95:3,9,10,21
  97:20 98:3 99:6,21
  100:17 105:19
  106:8,16,25 107:12

107:22 108:6,18,23
  108:24 110:25
  111:25 112:18,21
  112:23 118:19
  119:1 123:24 124:8
  125:11 126:12,13
  129:25 130:9,13,16
  138:15 139:7
**classes** 44:21
**classification** 67:24
**classified** 68:19
**clazatin** 3:21
**clear** 8:23 10:13,18
  122:2
**clerk** 144:17
**client** 144:13
**close** 21:15
**closely** 58:20 63:25
**coleman** 3:4 7:11
  144:5
**colin** 50:20
**colleagues** 37:17
**collected** 65:16
**color** 100:9
**combination** 59:18
**combined** 109:20
**come** 49:24 60:4
  63:4 72:15 109:17
  112:1,6
**comes** 28:21 62:13
  109:18 124:7
**comfortable** 69:23
**coming** 60:8
**comment** 27:13,25
  29:6
**commented** 22:9
**commenting** 22:7
**common** 58:23
  64:10 97:13 98:15
**communicate**
  28:20 59:11

communication 33:23

companies 23:2 54:5

company 20:14 24:1,14 131:11

comparable 68:16

comparator 68:18

compared 68:16 104:25 121:17

comparing 136:6

compensation 24:16,19

compete 44:20

competitors 44:19

complaint 51:14 76:18,22

complete 16:3 29:14,19 49:9,11 144:13

completed 144:11

completion 144:13

complex 86:7 88:6 96:25 97:5,9,21 98:9 102:22 103:15 103:21 104:17 105:22 106:1 109:4 109:21

component 43:2,4 43:12 96:24 105:5

components 56:2 97:17

comports 76:22

concept 64:5,8

concerns 84:7

conclude 115:12 124:10 144:16

concludes 74:14 140:6

conclusion 26:2 58:11 74:12 94:7

101:12

conclusions 41:21 70:17

condition 109:11 118:9 121:3

conditions 109:19 120:16

conduct 21:24

conducted 61:21 81:19

conducting 63:23

conducts 92:21

confidential 78:23 140:3

confidentiality 86:21

confirm 68:24

conjoint 22:14,16 27:4,8,10,12,16 28:7,16,24 29:4,5,9 36:14,19 59:13,16 59:21 60:6,12,18 60:19,20 61:11,18 61:21 62:2,6,9,14 63:6,13 64:6 69:12 70:14 71:7 73:11 73:14 91:23 93:4,9 93:18,20,23 94:1 95:6,24 96:2 97:18 98:25 105:3,10 116:12,20 120:24 135:14,18,21,25 136:1,4,5 137:10

conjunction 35:13

connection 101:16 144:10

cons 136:7

conscious 52:19

consent 64:19

consequence 107:7 111:13

consequences 67:18

consider 17:13 28:9 53:21 54:6,20 58:18,20 59:6,7 76:6 86:6 88:5 102:21 105:25 106:3 111:10

consideration 54:22 55:3

considerations 101:3 131:8

considered 15:12 16:4,6 23:12 55:6 64:18 68:2 74:6 115:22

considering 71:16 71:17

consistent 77:24

constant 132:14

constitutes 51:17 138:22

constructed 114:11 120:14

construction 63:25 119:20 133:6

consulting 23:2

consumer 57:2 59:14 72:1 83:14 85:23 87:14,24 91:16 92:15 93:21 98:6,7,17,18 99:9 104:4,9 105:21 115:19,22 117:3 118:18 131:14 132:1 136:17

consumer's 63:24 64:2

consumers 21:20 54:19,23 55:4 58:8 68:24 70:23 72:21

74:9 80:17 89:21 92:9,12 93:11 94:20 95:3 96:12 97:4,10 98:11,11 99:1,6 100:24 102:1 103:5,9,22 103:24 104:16 105:18 106:10,16 109:6,22 115:3,8,9 115:11,24 116:1,18 116:23 118:4,8 121:4,5 124:11 127:22

contain 142:14

contained 37:24

containing 15:19

content 36:7

contents 85:6 88:25 90:13,18

context 25:12 28:22 59:20 60:13 65:11 130:23

contexts 82:11

continue 6:12

continued 5:1

continuing 136:3

contrary 122:22

contrast 117:7

contrasting 136:5

control 27:2

conversation 6:7

conversations 10:16,22 52:12,18

conveys 78:10

cool 134:7

coordinating 35:17

copy 18:4,4,9 20:11 36:3 48:23 49:4,9 49:12,14 75:18

corporation 1:12 2:11 17:21 50:14

**correct** 8:19 10:6
13:7,14 14:2,8,9
18:8 20:2 21:25
22:1 23:6 26:11,22
27:5 31:21,24 32:7
32:11 33:14,20
36:23,24 39:21
41:5 42:14,16 44:2
47:24 50:2 51:4,7
52:25 53:1 66:23
67:5 69:2,25 70:20
73:18,23 76:7
79:13,20 85:13,16
86:3,10 88:15,22
88:23 89:2,3 90:14
90:20 91:1,3 92:22
95:15 100:20 107:2
108:7,8 111:1
113:4 117:11
123:16 141:4
143:23
**correctly** 31:2
**correspond** 63:20
64:1
**correspondence**
29:24 30:11 34:1,9
34:18
**corresponds** 76:25
**cost** 41:15 131:10
**costs** 41:18 131:10
**counsel** 6:17 7:5
9:10,11 10:14,16
11:5,16,23,24
13:12,13,16 16:11
16:20 23:22 30:13
39:19 43:22 50:12
52:12 84:25 110:11
133:20 134:18
142:11,17
**count** 113:10

**counterfactual**
117:17 120:16
**county** 142:2
143:21
**couple** 74:7 134:8
**course** 136:4 137:6
**courses** 135:20
136:22
**court** 1:1 2:1 6:19
6:25 14:22 16:25
19:14 20:7,23
39:23 49:3 65:12
65:16 66:2 75:16
129:24 139:16
144:18
**courts** 39:4 60:17
60:25
**covered** 11:5 90:21
135:12,23
**criteria** 68:22
70:13
**critical** 61:10 71:5
99:20
**criticism** 86:2,9
87:20 88:10,24
89:6,12 90:1,12,16
105:24 122:25
123:3,12 130:6
**criticisms** 88:22
90:24 129:6
**crunched** 24:18
**csr** 1:23 142:4,25
**current** 18:18
36:23 37:8,23
**currently** 22:18
**curriculum** 4:16
**curve** 46:6
**cut** 19:11
**cuts** 74:6
**cuttone** 3:16 7:15
7:15 9:14,20,21,21

9:22 39:11
**cv** 1:11 2:9 38:23

**d**

**d** 85:19 89:4,4
**dade** 143:21
**damage** 21:18
41:14 70:15 126:23
**damages** 21:17
22:3,8 23:9,12
24:12,17,22 25:7,8
28:25 37:13 40:18
40:19,24 41:7,22
46:13,15,17 51:10
59:22 60:12 61:1,3
73:12 88:19 89:20
94:4,4,13,13,15
95:11,25 97:20
98:3 99:6,21
105:11
**data** 15:18,19
23:12 24:18 25:19
28:25 46:19 65:15
65:18 83:22,23
84:2 112:20,22
113:13,23 114:10
114:11,13,21 116:4
121:8 122:8 137:12
137:16
**database** 24:14
**date** 21:7,11 129:2
143:25
**dated** 4:15 5:15
17:6 19:19
**day** 125:2 142:22
**days** 144:16
**dealing** 39:5 97:21
**dealt** 42:21
**dear** 144:9
**decided** 72:8
**decision** 24:17
52:19 57:7 68:2

106:17,17
**decisions** 74:6
100:16
**declarations** 50:19
52:8
**declare** 141:1
143:22
**decline** 92:17
**defect** 24:22 25:4
25:21 26:16 39:5
40:10,12 42:5,6,19
42:25 43:10 51:2,7
51:17,21 53:16
56:13 57:21 59:15
59:19 60:6 61:14
67:20 75:5 76:2,17
77:1,2 80:17,24
82:19 85:24 87:15
87:25 89:22 90:11
91:17 92:2,13,23
94:22 95:18 96:13
96:19,24 98:13
99:7 105:4 107:1
107:14 108:7,11
109:15,23 110:16
112:2,12 113:9,20
114:22 115:4,12,14
116:2,2,15,19,24
117:4,14,18 118:2
118:14 119:17
120:2,3,8,21,22,22
120:25 121:11,15
121:17,18,20 122:6
122:11,12,17,18
123:6,25 124:18,20
125:3,8,12,23
126:6,14 133:24
135:3 138:5,10,16
138:22 139:1,4
**defective** 40:5
134:4 139:8,10,21

**defects** 58:7 67:16
  130:14
**defendant** 3:12
  23:23
**defendants** 1:13
  2:12 7:14,16 16:15
  29:15,20 30:3,5
  34:20 38:2
**degree** 95:19
  103:16
**deliver** 35:14
**demand** 21:20 46:3
  46:6 61:6 62:11,15
  62:17,19 63:1
  111:13
**demonstrates**
  127:18
**demonstration**
  96:22
**denver** 66:2,2
**deny** 125:2
**department** 144:21
**depend** 57:23
  71:15 96:1
**depending** 64:23
**depends** 56:18 57:2
  58:4 96:6
**depo** 143:2
**deposition** 1:17
  2:15 4:13 6:11,16
  6:21 8:5 9:8 10:3,6
  10:17,25 11:13,22
  12:7 13:1,6,24 14:6
  14:7,11,13 15:2,6
  37:22 38:5 40:14
  41:3,9 53:3 54:18
  59:4 65:6 77:17
  84:18 127:5,7
  128:8,16 129:4
  140:3 142:6 143:23
  144:10,11,16

**depositions** 8:14,16
**describe** 135:17
**described** 72:20
  81:7 93:6 113:13
  129:3 137:9
**describes** 61:22
  128:8
**description** 4:12
  5:3 72:11 76:17
  77:3,9,14 78:9
  80:18
**design** 21:16,19,23
  24:21 25:6 27:7,15
  27:20,23 28:17,23
  29:8,9 36:14,20
  61:11 63:6,13
  64:18 65:5 82:24
  100:9 136:23
**designate** 140:2
**designated** 23:5
**designed** 22:15,16
  27:4 62:2,4 72:7
  81:2 101:11 116:13
  136:15
**designing** 29:3
**designs** 61:18,21
**detached** 106:14
**detail** 81:3
**determination**
  93:23 94:22,24
  108:22 139:16,16
**determinative**
  99:13
**determine** 15:25
  41:6 68:10 81:23
  112:22 130:22
  131:17
**determined** 46:3
  113:2
**determining** 85:12

**develop** 23:8
**developing** 47:14
**development** 15:13
  16:7
**difference** 74:15,24
  79:25 80:2 117:1,9
  120:20 132:19
**differences** 71:1
  85:23 87:13,23
  91:15 92:15,23
  93:1,10 98:7,18
  99:8 109:24
**different** 37:1 39:4
  68:14,22 70:12,13
  71:3 73:11,15 74:7
  74:8 92:1,2,9,10
  93:2,2 94:20,21
  96:12 97:10,11,16
  97:17,17 98:10,11
  98:12,12 103:7,22
  103:23 104:16,16
  109:6,21,22,23
  121:13 127:9,22
  131:7 132:8,9
**differently** 92:10
  103:20,23 104:17
  109:6
**dimensions** 28:7
**diminished** 59:14
  108:10,10,13
**diminution** 24:24
  25:3,14,17,21 26:4
  26:13,19,21 27:1
  41:12,15,18 92:17
  112:17,23 113:3,18
  114:21 121:16,22
  121:25
**direct** 68:18 123:23
**direction** 35:22
  47:17 142:13

**directory** 48:17
**disadvantages**
  136:7
**disagree** 71:21
  80:19 128:19
**disciplines** 58:19
  58:23
**disclose** 58:7
**disclosure** 74:17,18
  74:19,25 75:2,5
  76:4,6,8,12 79:16
  79:19,21,22 80:24
  81:13,24 82:18
  83:2,24 106:18
  107:7 111:14
  117:17 122:14
  131:1
**disclosures** 74:9
  76:2,9,10 79:11
  80:1,16
**discover** 65:4 82:4
  82:8,9,10,12
**discrepancies**
  114:7
**displayed** 114:2
**distinction** 114:1
**distinguishes**
  104:14
**distract** 53:7
**district** 1:1,2 2:1,2
  6:19,19
**division** 1:3 2:3
  6:20
**doctor** 137:23
**document** 14:24
  16:6 20:9 36:4,22
  37:20 45:6 48:2,5
  48:14
**documents** 9:9 10:5
  10:8,14,16,19,19
  10:24 11:2,4,10,12

11:21,22 12:1,4
13:6,12,13,17,21
13:23,25 14:4 15:1
15:4,11,18 16:1,3,4
16:10 29:11,25
30:11 34:7,18 38:8
45:8,12,15,17,22
46:23 48:2,15
72:17
**doing** 21:13 70:12
72:11,12 73:11
112:4
**downward** 46:6
**dr** 8:3 43:25 54:14
66:22 67:3 72:7,16
73:5,15 74:1 75:24
76:14,20 78:9,23
80:22 81:14,19
82:25 83:15 85:2
100:10,14 110:13
133:22 134:23
138:3
**drafting** 47:22
**drafts** 35:20,23
**draw** 101:13
**drawing** 70:17
**drive** 55:24
**driver** 53:7
**drives** 54:10,12
**due** 59:14 99:7
108:7 109:24
110:15 113:9
125:13 130:16,16

**e**

**e** 30:1,12 33:4,4
34:14,19,22
**earlier** 47:23 77:24
79:12,13 103:14,19
106:19 112:9
136:10

**economic** 27:10
46:1 96:25 97:6,12
**economically** 40:6
82:12
**economics** 27:18
36:11 58:19,21,25
58:25 137:4,20
**economist** 58:12,21
**economists** 113:25
115:18
**edition** 37:13
**edits** 36:7
**education** 135:21
135:23 136:4
**educational** 36:9
**edwards** 3:5 4:6,8
7:11,11 8:2 9:22
10:12,21 11:8,17
11:20 13:20 14:3
14:19,23 16:22
17:1,5,9 18:24 19:5
19:8,15,25 20:4,8
20:19,24 26:1
31:23 32:1 35:8
39:12 43:13,23
44:24 45:5 48:22
49:1,4,6 51:12
52:16 53:12 54:8
55:12 56:11,19
57:19 58:15 60:23
63:10,16 65:1
69:13 70:7 72:3
73:16 75:11,14,17
78:6,16 79:1,6,10
81:17 82:6 83:19
84:4,9 85:1 86:24
87:5,10 94:11 95:7
96:8 98:4,22 99:18
101:15 102:5,11
104:1 105:23
107:23 109:1,13

110:1,12,22 111:22
113:1 115:6 116:10
118:22 119:23
124:14 125:9,20
126:11 128:4,23
129:9,16 132:12,22
133:9,21 134:6,9
135:1,12 136:9
138:2 139:6,18,24
144:5,9
**effect** 105:15
107:10 111:12
121:24
**effects** 111:16
**efficient** 82:12
**eight** 47:19 68:21
**either** 18:10 34:16
58:25 59:24 69:6
82:8,10 119:15
131:13 138:23
139:2,23
**electronic** 24:14
**elements** 68:23
**email** 144:14
**empirical** 98:24
**employed** 22:18
**employees** 23:15
23:16 24:2
**enabled** 72:18
**encompass** 91:7
**ended** 19:20 21:2
23:17 68:1
**ends** 84:12 110:4
133:13
**ensure** 66:19 80:23
81:11
**enter** 143:4
**entered** 143:24
**entire** 8:25 9:3,4
82:13 94:14

**equal** 131:21,25
**equally** 92:18,19
103:10,24
**errata** 143:1
144:13,14
**essentially** 25:22
35:12 62:23 74:14
**estimate** 61:6 70:15
137:12
**estimated** 137:6
**et** 6:18 39:15,16
42:8,9
**evaluate** 73:12
112:17 122:21
136:1
**evidence** 25:3,20
30:1,12 34:19
107:8,10 112:17,23
117:24 118:8,11
124:4,10 132:6
139:11
**exact** 87:17,22
88:25
**exactly** 28:12 40:22
80:8 111:9 119:7
**examination** 4:2
7:19 8:1 134:21
135:13 138:1
142:12
**examined** 7:22
**examining** 112:21
**example** 28:5 34:25
48:20 96:17 98:5
98:16 104:5 107:15
108:12 109:2
110:14,24 115:25
127:8
**examples** 59:19
64:3 99:21 126:5
**exception** 33:11
49:18 74:21

**excessive** 43:3
**exchanged** 30:2,13
  34:19
**excluded** 65:12,14
  65:19,20 66:6 81:5
**excuse** 22:3 52:10
  62:19
**execute** 35:18 65:3
**executed** 64:11
  72:23 127:19 141:5
**execution** 27:15,24
  136:23
**exhibit** 4:13,15,19
  5:4,9,14,17 14:20
  14:21,25 15:7
  16:23,24 17:12
  18:14 19:12,13
  20:1,1,6,17,20,22
  30:18,21 31:21
  32:10 33:11,20
  36:13,17 48:24
  49:1,2,8 75:12,15
  75:20 78:10,17
  79:7,17 85:4 86:17
  87:6
**exhibits** 4:11 5:2
  21:6 29:16
**exist** 60:3 93:11
  95:15
**existence** 135:2
**exists** 51:2 60:11
  107:17
**expect** 96:23 99:3
  100:20
**experience** 28:2
  77:12,23 96:16
  135:13,17 136:10
  136:13,21 137:21
  137:22
**expert** 16:16 23:4,5
  23:17 27:14,16,17

28:5,7,8,10,17,23
  29:8 36:14,20
  37:22 38:5,16 44:2
  46:14,17 49:16
  50:14 53:18 54:3,7
  57:12,14 58:18,24
  59:6,8 61:22 65:16
  66:7,13 95:20
  112:10 135:10
  136:2 137:7 138:9
  138:12,24 139:3,15
  139:17,23
**expertise** 27:22
  59:3 135:11 139:2
**experts** 11:9,10
**explain** 67:13
  111:3 135:7
**explicit** 46:8
**explicitly** 47:10
  61:4
**exploded** 77:21
**exploratory** 118:3
  123:19,20
**export** 5:14
**expound** 91:5
**expressed** 68:22
  107:4
**expressing** 53:18
  55:8 107:9
**expression** 113:14
**extent** 71:1 111:12
  117:16,18 122:17
  125:19
**extract** 137:17
**extrapolate** 67:9
  69:2 100:25 101:14
  101:25

**f**

**f** 32:18
**face** 64:2

**fact** 31:13 55:9
  62:25 87:20 97:9
  106:11 109:20,21
  113:17 118:1
  119:13 125:12
  126:13 128:17
  134:4 138:10 139:8
**factor** 53:22
**factors** 55:6 57:3,6
  62:11
**facts** 15:19 46:9
  54:25 56:6 57:10
  69:7 70:2 81:16
  83:4 84:1 94:18
  96:2,6 97:24 99:10
  101:5 105:7 106:15
  107:19 108:15
  116:6 132:5 133:4
  139:12
**failing** 78:21
**fair** 22:5 26:20
  27:18 49:22 79:6
  80:12 95:21 99:23
  128:24
**fall** 59:3 77:6 91:10
**familiar** 60:10,24
  63:12 64:5,8 137:1
  137:2,19
**family** 55:23,23
**far** 10:14 21:12
  27:20 41:21 52:23
**farrukh** 32:18
**feature** 55:5 71:4
  81:12 104:25 105:2
  105:6
**featured** 81:24
**features** 55:10
  68:25 74:5 86:8
  88:9 100:5,7,8,15
  100:16,18 101:8,10
  101:17,19,20,24

102:2,13,14,25
  104:11,21 106:2
  109:23
**february** 1:19 2:19
  6:1,5
**federal** 66:2
**feel** 27:6,12,24 29:6
  29:12 38:23 69:20
  88:2 116:22 129:17
**fell** 81:5
**fielded** 119:14
  136:15
**fielding** 136:14
**fields** 69:4
**fifth** 126:20
**filed** 6:18 124:8
  144:17
**final** 36:8 83:13
**finally** 90:7
**financially** 7:4
**find** 30:16 39:8
  45:15 47:1
**finish** 8:25
**firm** 6:24 7:1 28:21
  66:16 72:23
**first** 9:12,25 14:16
  14:20 17:10 37:13
  39:5,8 43:14 50:5
  79:22 85:11 95:23
  124:7
**five** 26:7,9 113:4
**fl** 144:14
**fla** 144:14
**flaws** 64:15,20 65:4
**flip** 49:8
**floor** 2:17 3:18
**florida** 143:21
  144:2,21
**flows** 37:16
**fly** 109:17

**flying** 19:3
**focus** 44:22 55:11
  97:15,16
**focused** 51:10
**focusing** 122:3
**folks** 79:5
**following** 42:4
**follows** 7:23
**footnote** 12:14,16
**forces** 117:14,20,20
**foregoing** 141:3
  142:6,14
**forgot** 66:8
**form** 25:11 51:8
  53:8,23 64:21
  71:23 95:22 98:20
  103:17 111:6
  138:17 143:23
**formal** 91:22
**forming** 13:3 15:21
  16:4 45:10 46:21
**forth** 16:8 25:8
  31:21 32:9 33:20
  38:19 47:15 50:2
  52:20 78:10 85:6
  89:5 90:13,17,24
  91:8 93:16 130:5
  142:8
**forward** 25:15 97:9
  97:11 99:13
**forwarded** 144:17
**found** 26:20,25
  46:14 68:17
**foundation** 44:17
  53:24 55:1 58:10
  60:14 78:1 106:21
  125:5,15,25 138:17
**four** 26:3,7,9 37:21
  38:4,18 39:18
  42:12 43:25 85:18
  112:19 113:4 140:8

**fraction** 115:16
  121:19
**frame** 63:20
**frankly** 28:12 41:2
**free** 29:12 38:23
  81:15 88:2
**frequency** 80:4
**frequently** 65:8
  100:6,15
**front** 31:18 74:3,14
**full** 28:4 64:16
  142:15
**function** 63:1
**fundamental** 63:22
**further** 138:1
  142:17 144:18

**g**

**gaskin** 12:8 14:7
  22:4 28:9,12 50:20
  51:10 52:8 62:3,4
  66:9 69:3,10 70:11
  70:20 72:2,25 73:4
  73:20 85:22 86:6
  87:13,21,23 88:5
  91:15 93:4 95:16
  98:1 102:21 105:25
  116:13,23 117:10
  118:24 120:7,13,13
  122:22 126:22
  137:11
**gaskin's** 22:9 61:10
  61:17 63:3 86:9
  88:18 89:7,19
  92:14 95:13 99:20
  105:15,16 116:17
  117:13,25 118:13
  120:1 130:7
**gather** 82:16
**gay** 3:7 144:6
**general** 12:23
  44:23 55:14 58:4

  60:16 63:19 70:16
  71:19 76:23 96:5
  96:15 98:9 99:14
  102:12 104:15
  115:23 116:16
  120:9 129:14,14
**generalizes** 116:20
**generally** 36:2
  41:20 77:22 101:1
  115:13,21 131:2
**generated** 15:16
**generating** 137:13
**getting** 52:17 120:7
**give** 75:19 79:8
  83:11 98:5,16
  107:15 108:12
  134:8
**given** 8:14 98:14
  109:19 120:7,8
  132:17
**gives** 127:8
**glad** 87:6
**glass** 77:4,11 80:5
  118:21 138:25
**glen** 44:9 79:3
**go** 6:13 14:19 16:22
  19:25 20:19 29:12
  48:22 49:7 56:13
  56:24 78:16 84:9
  85:3 86:16 99:15
  102:6 108:13 110:1
  110:21 133:9 134:7
  140:2
**goal** 94:3,12
**goes** 64:6 119:12
**going** 8:8,8,10,17
  11:6 13:11,15,22
  19:8 22:7,7 29:11
  43:13,15 49:23
  52:10 64:2 79:4,4
  80:14 83:20 84:11

  86:21 87:1 91:4
  97:3 99:8 103:15
  103:22 109:22
  110:3 133:11
  134:10
**good** 6:4 8:3,4
  12:15 60:5 96:25
  97:5,21 98:6,10,17
  103:21 109:5,21
  115:17 124:5 126:3
  134:23,24
**goods** 86:7 88:6
  97:9 102:22 103:15
  104:4 106:1
**goodyear** 65:23
**google** 124:6
**governing** 140:4
**graduate** 135:21,23
**greg** 3:4 7:11 144:5
**gregcolemanlaw....**
  3:10 144:7
**grounds** 35:6
**group** 22:19 27:2
  70:16 72:24 74:17
  74:17,19 99:6
  124:11
**groups** 68:14,22
  74:16
**guess** 11:25 23:12
  46:13,16 95:2
  104:2 106:5 117:2
  117:19,22 128:6
  136:3
**gustafson** 30:24
  33:12 48:8
**guy** 57:15

**h**

**h** 32:18 33:2,4,15
**hand** 19:8 102:6,6
  131:4,22

**hands** 96:21
**hanneman** 52:4,21
  90:23
**harm** 93:12
**harmed** 95:3,4
  122:11 123:8
**hauser** 62:8
**he'll** 92:19
**head** 8:19 21:13
**heading** 88:1,15,16
  89:15 102:19
**hedonic** 136:5
**held** 6:21 29:7
**helmer** 65:23
**helped** 48:16
**helpful** 94:5
**hereto** 14:22 16:25
  19:14 20:7,23 49:3
  75:16
**heterogeneity**
  92:24 93:1,5,19
  95:19 96:3,10,23
  97:3,22 98:14 99:1
  103:16 105:21
**hey** 60:5
**hierarchical** 137:2
  137:6,13
**high** 100:21 102:2
  102:3
**higher** 132:2,25
**hold** 27:15,17 28:4
  28:16 39:7 54:24
  132:13
**holds** 36:19
**holland** 33:2,15
**honest** 82:24
**hope** 2:17 3:18 6:22
**hopefully** 64:14
**hour** 22:13 23:11
  23:16 24:4 43:14
  84:16

**hourly** 22:11
**hours** 9:18 24:16
  30:22 31:15 32:10
  32:10,16,19 33:1,3
  33:5,6,12,13,18,19
**huh** 8:22,22
**hundred** 23:7
**hypothetical** 56:6
  57:10 99:11 107:19
  107:25 108:15
  114:11 116:6
  119:21 120:13
  121:2 132:5 133:4
**hypothetically**
  107:11 116:2
  131:19 132:2,14
**hyundai** 8:6 17:17
  28:15 44:8,9,12,14
  45:1 51:23 53:3
  54:18 61:13 65:6
  66:22 67:8,21
  68:10,15,18 69:5,6
  69:12,21,24 72:17
  72:22 73:17,18
  76:3,22 78:24 79:2
  85:16 86:3,10,14
  87:16,21 88:3,11
  89:1,13 90:2,17,22
  91:8 100:19 107:5
  135:24
**hyundai's** 68:2
**hyundais** 101:1

**i**

**idea** 44:25 82:3
  97:9 117:23
**identical** 88:11
**identification**
  14:21 16:24 19:13
  20:6,22 49:2 75:15
**identified** 119:5,22

**identify** 20:9 24:16
  42:15 55:4,9 60:1
  81:2 83:17
**identifying** 58:24
**ignore** 92:16
  105:20
**ignores** 85:22
  87:13,23 91:15
  92:15 105:21
  106:10
**ignoring** 105:14
**image** 75:24
**imagine** 18:1 52:13
  83:16 126:10
**impact** 101:9
  121:25
**implement** 28:23
**implication** 93:22
**important** 12:25
  53:22 54:22 55:3
  64:12 68:25 100:6
**imputed** 115:2
**inadequate** 128:10
**inappropriate** 98:2
  129:18
**incapable** 59:17
**incentives** 131:12
**include** 34:4,8
**included** 75:4
  118:12
**includes** 22:6 68:3
  70:25 75:25
**including** 9:18
  12:14 15:14,17
  34:22
**income** 37:16
**incomplete** 56:6
  57:10 99:11 107:19
  108:15 116:5
  129:13 132:5 133:3

**incorporate** 45:19
  45:20
**incorporated** 6:18
**increase** 102:14
**incurred** 21:7 33:3
  33:4,6
**independently** 12:3
**index** 4:1 5:1 90:5
  91:5
**indicate** 97:6
**indicated** 20:17
  28:15 80:4
**indicates** 42:19
  107:5
**indication** 124:17
**indifferent** 115:20
**individual** 24:19
  30:13 71:15 85:13
  91:24 93:21 94:9
  97:10 105:5 115:11
  118:12,23 119:16
  125:22 130:15
  131:24 132:3,24
  133:1
**individualized**
  71:25 93:25 94:15
  108:19,25 109:8,18
  126:17
**individually** 85:20
  95:8,20 126:9
**individuals** 33:17
  33:23 36:17 48:1,4
  48:13,19 71:8 89:8
  93:2 117:21 121:9
  123:4 130:8
**industry** 109:20
**information** 68:1
  75:25 78:24 115:2
  122:21 126:6
  137:17

**informative** 67:11 68:7

**informed** 125:12

**initial** 89:23 116:24 129:7 131:16 132:8

**injured** 40:4,6,8 73:15

**injury** 93:13

**inquire** 11:3,11,19

**inquiry** 54:3 71:25 85:13 93:25 108:19 108:25 109:8,19 126:18

**instance** 66:4 74:22 125:10

**instances** 113:3

**instruct** 10:11 11:6

**instructed** 10:14

**instruction** 5:21 11:16 13:15 14:2

**intend** 24:11

**intended** 102:13

**interchangeably** 41:17

**interest** 63:21

**interested** 7:4 142:19

**interfere** 6:10

**interference** 6:8

**internet** 124:6

**interposed** 35:5

**interpretation** 33:10

**interpreted** 35:1,5

**interrupt** 39:7

**intersection** 46:3

**interviews** 118:3 123:20

**introduces** 122:20 127:20 128:10

**introductory** 8:9

**investigated** 57:13 61:25 78:5

**investigation** 54:3

**invoice** 4:19 5:4,9 19:22 20:11 31:13

**involve** 22:22 80:18 96:1

**involved** 23:16 42:5,20 67:4

**involves** 61:13 95:18

**involving** 23:15 26:10 62:7 67:8 135:25

**issuance** 37:7

**issue** 24:6 26:3 27:2 53:15 56:1 57:4,16 76:2,18 80:24 81:24 84:6 86:20 114:7,23 117:14 118:14 120:9 121:15 122:9 124:25 125:7 126:15 130:14,20 133:25 135:7 138:15 139:21

**issued** 129:7

**issues** 83:6 105:14 105:17 121:6 122:20 129:22

**issuing** 23:17 37:11

**j**

**j** 31:5,7 35:9

**jay** 33:6

**job** 1:24

**joel** 31:8,9 35:11 48:8

**joel's** 35:16

**john** 62:7

**johnette** 38:25 39:11,14

**july** 4:20 19:20 50:22

**jump** 102:9

**k**

**k** 32:2,4,11,18

**katie** 32:5

**key** 81:23 130:21

**kia** 1:11,12 2:10,10 6:18 12:9,10,21,22 17:20,21 18:11 20:14 21:4,9,14 31:2,11 32:7 38:13 38:14 39:1,15,20 39:22 40:5,17,24 41:4,25 42:1,6,9,10 42:10,11 44:2,5,15 45:2 50:12,13 52:7 53:14 54:10,12,12 61:11 67:4,9,12,22 68:2,12,15,18 69:5 69:6,11,20,24 71:4 71:9 73:12,21 79:4 79:5,5 87:3,12 88:22 89:5,16 90:14,24 91:9,13 100:20,22 102:1 104:3,6 106:25 118:7 124:17,19,21 124:21,24 125:2,6 125:14,17 126:14 135:24 138:8 139:9 139:14 143:2 144:8

**kia's** 42:2

**kias** 101:1

**kids** 55:17

**kind** 19:10 27:21 44:14 46:1 80:4 81:23 84:7 96:24 97:8 107:24 111:4

**kma** 19:9 20:5,21 42:15

**knew** 121:17 124:11

**know** 18:1,24 19:5 19:11 24:25 27:3 28:12 31:4,17 32:12 34:5 36:10 46:2,4,9 47:6,16 48:12,13,18 52:14 54:21 55:8 56:3,15 57:7,13,15,17,21 57:25 58:1,2,13 59:25 60:17 63:9 63:18 64:9 71:13 71:13,22,25 72:4,5 72:16,25 79:5 80:8 80:22,25 81:8,14 81:18 82:21,22 83:1,7,10,15 86:4 86:19 91:11 93:15 93:17 97:14 99:14 101:19,20 102:8 102:10,17 109:5,16 109:25 111:10 112:5 114:9,11 115:15 116:16,17 116:19 118:25 119:6,15,21 123:10 123:11,14 124:4,13 126:4,16,18 130:23 130:24 131:15 138:15,19 139:2,7 139:10,14,19

**knowing** 121:18

**knowledge** 66:5 67:5,19,19 69:10 89:21 116:23 118:13 119:17 120:2,3,20,21,22 122:6 123:24

125:17

**knowledgeable** 115:13

**known** 120:8

**knows** 58:8

**knoxville** 3:8 144:6

**kondash** 1:7 2:5 6:17 68:4 77:16 87:2,3 143:2 144:8

**kondash's** 96:17

**l**

**l** 3:16 33:4

**l.a.** 9:16

**laceration** 77:20

**lacerations** 77:25 78:11

**lack** 67:19

**lacking** 91:22

**lancaster** 97:8

**language** 76:21,21 90:18

**larger** 61:5

**latency** 99:7

**latent** 56:13 59:15 107:14 110:16

**law** 3:4,6,17 7:11 28:21 60:11,25 62:2,5 66:16 144:5

**laws** 141:2

**lawyer** 60:9

**lawyers** 52:19

**lax** 23:15,17

**lay** 106:21 138:14 138:24 139:3,19,23

**layman** 77:15

**lazatin** 3:14 4:7 7:13,13 9:14,20 10:9,18 11:2,15,18 13:25 17:3,8 18:21 19:4,7 25:11 31:22 35:3 44:16 45:4

49:5 51:8 52:10 53:8,23 54:1,25 56:5,17 57:9 58:9 60:14 63:7,14 64:21 69:7 70:1 71:23 73:7 78:1,18 79:2,9 81:16 82:2 83:4 84:1 86:18 87:1,8 94:6,17 95:22 97:23 98:20 99:10 101:4 102:4 102:7 103:17 105:7 107:18 108:14 110:19 111:6 112:14 114:25 116:5 118:15 119:18 124:1 125:5 125:15,25 128:3,21 128:25 129:12 132:4,15 133:3 134:7,19,22 137:23 138:17 139:11 140:1

**leads** 124:10

**learned** 52:12

**lease** 130:19,22,24 130:24,25 131:2,5 131:17,22,23 132:2 132:19,25

**leased** 89:8 130:8 130:15

**leasing** 131:11 132:21

**leave** 109:10

**legal** 15:14 58:10 62:1 94:7 136:4 140:9 144:1

**lessor** 131:10,13

**letter** 4:15 17:5,10 89:4

**level** 93:21

**levels** 71:17 104:6

**liability** 46:12,14 46:16 51:6,11

**limit** 52:23

**limited** 52:7 71:6

**line** 5:22 91:20 115:10 126:20 143:5

**list** 16:2,3 32:23 33:11,16 37:18,20 55:6 72:21 73:1 85:18 100:22 109:11

**listed** 12:13 13:25 36:13 37:5 42:4 45:18,23 65:24 76:5

**listen** 13:11

**lists** 30:22,23

**litigation** 22:23,25 22:25 28:22 44:2,5 44:8 59:20 65:11 71:5 114:12 135:10 136:16,17

**litsup** 144:14

**little** 21:13 42:8 43:1 49:20 87:9 103:20

**living** 36:3

**located** 6:22

**logical** 132:9

**logically** 133:6

**long** 9:17

**look** 29:22 30:18 33:25 34:6,15 41:1 41:9 75:19 81:21 87:3 88:2,16 113:23

**looked** 16:2 24:13 25:2,19 61:17

68:13,23 113:17,24 114:13 135:1

**looking** 30:21 39:8 88:3 89:16 100:2 102:19

**looks** 74:8

**lori** 1:22 2:19 7:1 142:4,25

**los** 1:18 2:17 3:19 6:1,23 22:19 142:2

**lost** 37:12

**lot** 58:22 112:4 118:19 119:10 120:9 124:3,9 131:7

**lots** 124:9 126:5 130:22

**lunch** 9:18

**luncheon** 84:17

**m**

**m** 1:22 2:19 3:14 142:4,25

**machine** 104:5

**mack** 3:25 6:24

**mails** 30:1,12 34:14 34:19,22

**main** 72:14

**maintained** 24:14

**maintenance** 131:9

**major** 63:2 98:5,17

**making** 45:24 87:5 104:10

**manager** 35:11

**managing** 22:19,21

**manner** 76:13

**manufacturer** 58:6 125:24

**manufacturers** 124:23

**march** 142:22 144:4

**marginal** 115:8,19
**marginally** 74:23
**maria** 42:9
**mario** 3:16 7:15
  9:14
**mark** 14:19 16:22
  19:11,25 20:19
  48:8 75:11 78:16
  86:16
**marked** 14:21,25
  15:6 16:24 17:12
  18:14 19:13 20:6
  20:22 29:16 49:2
  75:15 78:9,10
  79:17
**market** 53:15 61:7
  62:12,18,20,23
  96:21 98:6,17
  107:1,16 108:5,10
  110:15 111:5,17
  112:1,11 113:8
  114:2,21 115:2,13
  115:22 130:13,17
**marketing** 58:18
  58:20,22,25 59:2,6
  59:7 64:7,12,19
  75:25 135:22
  136:23
**marketplace** 63:24
  64:2
**married** 55:15
**match** 68:21,21
**material** 78:22
**materials** 15:15,16
  29:25 30:11 34:18
  76:19 77:8
**math** 21:13
**mathematically**
  132:18
**matter** 6:17 15:14
  15:22 16:7,16

**29**:15,20 30:14
  45:11 50:15,22
  66:22 85:16 90:17
**mcuttone** 3:22
**mean** 32:9 34:11,13
  35:4 36:16 43:9
  45:17 46:1 47:9
  53:25 54:4 56:10
  56:23 57:11 58:12
  63:18,22 71:14
  78:4 83:6 86:24
  93:1 95:5 108:2
  118:18 121:13
  125:2 128:13 135:9
  139:1,14
**meaning** 114:1
**means** 101:9 126:8
**meant** 135:8
**measure** 25:17
  41:18 59:14 60:12
  62:18 74:1,4 94:3
  94:12,13 97:20
  99:5 105:17 107:16
  117:8 122:23
**measured** 25:16
  99:22 105:15
**measurement**
  59:22
**measures** 62:23
  74:2
**measuring** 25:7
  59:17 60:25 61:2
  93:12 94:9 108:13
  110:15 120:19,23
**media** 6:15 84:12
  84:24 110:4,10
  133:13,19 134:17
  140:8
**meet** 9:13
**meeting** 9:11,15,17

**meetings** 10:1
**member** 94:23
  95:20 106:8 110:24
  118:19 119:1
  125:11
**members** 24:20
  34:9,22 40:4 41:7
  55:23 71:7 73:12
  73:24 90:9 91:25
  92:20 93:24,25
  94:25 107:22
  108:18 111:25
  120:6 122:7 123:24
  126:12
**memory** 38:24
**mentioned** 13:9
  39:9 100:7,15,16
  101:21,22 106:7
  124:17,22 131:20
  133:24 136:21
**met** 9:9 24:16
  121:4
**method** 27:25
  88:18 89:7 105:11
  106:14 108:21,23
  109:7,17,18 126:25
  127:14,17,18,20,25
  128:7,8,14,17
  129:3,6,8,11,15,17
  130:7 137:11,14
**methodology** 25:15
  63:3 86:5 92:16
  95:16 99:13,20,25
  105:21 112:3,7
**methods** 95:25
  136:8
**miami** 144:2,14
**microphones** 6:6
  6:10
**midsized** 67:25

**mind** 62:13 64:17
  72:15 109:18 116:3
  123:4
**mine** 66:6
**minute** 86:18
**minutes** 134:8
**misleading** 94:18
  132:5 133:4
**misstated** 110:20
**misstates** 69:8 70:2
  73:7 97:23 124:1
  128:21 129:12
  139:11
**model** 21:17,18
  22:3 23:9,13 24:22
  25:6,8 28:25 40:20
  61:6 62:9
**modeled** 76:21
**models** 59:18 68:16
  137:6
**modifier** 128:6
**modify** 128:16
**moment** 49:7
**money** 114:4,6
**monthly** 132:25
**months** 59:5
**morley** 32:25
**morning** 6:4 12:15
  124:5 126:3
**motor** 17:20 53:21
  105:5
**motors** 1:11,12
  2:10,10 6:18 17:21
  39:1,15 42:9,10,11
  50:13,13 143:2
  144:8
**multiple** 104:4
  127:1,15 128:1,18
**myers** 3:13 7:14,16

## n

**nada** 67:22 68:20
**name** 6:24 23:20
  37:10 66:8 142:22
  143:25
**named** 42:23 68:4
**names** 38:22
**narrative** 72:10
**nature** 117:2
  123:12
**necessarily** 83:13
  103:9 130:18
**necessary** 94:15
  95:24
**need** 8:11,18 49:8
  64:22 93:24 94:23
  115:4,9,11,16
  139:9,14
**needed** 35:14 88:3
**needs** 115:24
  137:17
**negative** 57:24
  98:12
**negotiated** 109:10
**neil** 52:4
**neither** 126:24
  142:17
**net** 37:16 121:24
**never** 23:17 27:3
  33:22 38:12,12
  60:4 76:4 130:2
**new** 12:15 124:5
**news** 12:6,17,19
  14:6 123:4 124:15
  124:16 125:22
  133:23 135:2 138:4
  138:20
**non** 136:17
**normal** 120:15
**northern** 1:2 2:2

**note** 6:6
**noted** 140:12
**notes** 15:18 46:20
  47:3 48:19
**notice** 4:13 14:13
  15:6 29:12,13
  51:23 144:18
**noticing** 7:10
**number** 4:12 5:3
  6:15 8:18 14:3 15:9
  16:1,13 29:13,22
  30:22 34:7 35:2
  36:22 37:20,25
  45:6,13 46:18,24
  48:20 49:1 70:15
  84:12,24 85:11
  89:4 90:7 95:10
  110:5,10 111:5
  116:3 126:7 133:13
  133:19 134:17
  140:7
**numbered** 20:1
  48:24 75:12 86:16
**numbers** 120:7
**numeral** 85:7,18
  89:17 90:8

## o

**o** 144:5
**o'melveny** 3:13
  6:21 7:13,15 17:14
  18:7,11
**o'melveny's** 9:16
**oath** 7:2,22 142:9
**object** 52:11
**objection** 10:9
  25:11 35:6 44:16
  51:8 53:8,23 54:25
  56:5,17 57:9 58:9
  60:14 63:7,14
  64:21 69:7 70:1
  71:23 73:7 78:1

81:16 82:2 83:4
  84:1 94:6,17 95:22
  97:23 98:20 99:10
  101:4 102:4,7
  103:17 105:7
  107:18 111:6
  114:25 116:5
  118:15,15 119:18
  124:1 125:5,15,25
  128:3,21 129:12
  132:4,4 133:3
  138:17 139:11
**objections** 7:8 45:4
  56:17 108:14
  132:15 142:11
**observation** 63:19
**observations** 29:7
  93:3
**observe** 63:1
**observed** 83:14
**observing** 72:13
  93:9
**occasion** 44:1
**occasions** 25:5
  43:25
**offer** 51:6 93:17
  99:21
**offering** 93:7 135:9
**office** 9:16 144:14
**oh** 101:16
**ohio** 1:2 2:2 6:20
  66:15
**okay** 8:8,12,17,21
  9:5,6,11,17,19,25
  10:8 11:2,17 12:2,4
  12:18,21,24 13:5
  13:11,17 14:3,16
  15:4,9,25 16:6,10
  16:13 17:8,16,24
  18:3,6,13,18,20
  19:4,7,18,21 20:13

20:19 21:3,12,16
  21:19,24 22:11,18
  22:22 23:25 24:3
  24:11,21 26:2,6,17
  26:24 27:3,17,20
  28:14,21,21 29:11
  29:22 30:8,10,16
  30:20 31:9,13,20
  32:2,6,13,22 33:8
  33:17,22 34:3,7,12
  34:17,25 35:2,2,21
  36:9,12,16,22
  37:10,18,25 38:10
  38:12,15,17,22
  39:17,22 40:3,7,9
  40:13,16,19,23
  41:3,9,12,19,24
  42:7,12,25 43:6,13
  44:4,7,13,25 45:6
  45:15,24 46:5,18
  47:1,6,9,11,18 48:4
  48:7,10,18,22
  49:20 50:5,11
  51:13,16,19,23
  52:3,6,13,17 53:2
  53:13,20 54:17
  55:15,19,22 56:22
  57:20 58:5,16 59:4
  59:12,12 60:2,9
  61:10,20,24 62:10
  62:21 63:4,17
  64:17 65:2,6 66:3,9
  66:16,25 67:3,6,13
  70:8 71:18 72:6
  73:5,25 75:10,23
  76:11,16 80:6,9
  82:15 84:9 85:10
  85:18,20,21 86:2,6
  87:20 88:2,14,16
  88:24 89:12,16
  90:4,7,21 91:12

92:14 93:4 95:8
98:23 99:5 100:1
100:13,19,23
102:12,16 103:3
104:23 105:3
106:22 107:11
110:1,3 111:23
112:8 113:6,12,16
114:19 115:7
116:11 119:2,24
126:19 127:5,12
129:10,17,21
130:12 131:21
133:9,11 134:2,6,9
134:10 135:12
136:24 138:8 140:6
**omm.com** 3:21,22
**ones** 10:20 13:9
**ongoing** 39:25
**operator** 6:4 7:17
43:15,20 84:11,22
110:3,9 133:11,17
134:10,15 140:6
**opine** 51:3 54:9
**opinion** 28:11
51:19 53:4,11,13
53:17,19 54:7,24
55:8 58:5,14,16
59:12 62:14 65:9
66:5 69:3,18 70:19
73:3 76:16 78:4,8
78:13 85:12,15,25
92:8,22 93:5,8,17
94:14 95:17 97:18
103:14 106:20,24
107:4,9 108:3,4
109:14 111:24
116:8,12 122:5
127:14,24 128:5
134:3 135:2,7,10
138:12,23 139:4,22

**opinions** 13:3
15:13,21 16:5,7
22:5 35:10 41:20
45:11,25 46:21
47:14,16 49:24
50:2,4,18 51:6 52:3
52:20 59:2 62:1
65:12,14,19 66:5
69:25 76:5 85:7
89:1 90:22 91:4,6,7
91:10 129:23 138:9
**opposed** 8:19
104:25
**option** 71:10,19
104:10
**options** 106:12
**order** 8:16 111:16
112:6 115:1 137:16
140:4
**ordering** 144:17
**original** 144:17
**outcome** 7:4 57:24
122:7 142:20
**outcomes** 68:6
**outline** 36:5
**outlined** 35:19
**outset** 35:12
**outside** 27:21 44:16
45:22 53:8 58:9
78:2 99:11 111:7
114:17
**overall** 104:7
**overestimating**
121:25
**overlap** 8:10 58:22
**overlaps** 45:1
**overpaid** 99:7
107:22 130:16
**overview** 85:5
**owners** 69:12 127:2
127:9,16 128:2,18

**ownership** 45:1

## p

**p** 50:20
**p.m.** 2:18 84:19,23
110:10 134:11
140:10,12
**packages** 104:10
**pads** 43:3
**page** 4:12 5:3,22
8:12 17:19,20 39:2
39:3,8 42:13 50:7
91:12 102:18
116:11 128:7 130:5
143:5 144:13
**pages** 1:25 17:11
17:11 18:13 19:3
142:14
**paid** 85:12 122:12
122:13 132:1,3,24
133:1
**panoramic** 5:17
51:21 61:14 70:24
70:25 71:11,14
73:19,22 75:5 76:1
77:21 79:16 81:4
82:18 86:8 88:7,8
102:23 104:23
106:1 118:6 121:6
123:5 124:6,18
125:3,14 126:14
133:24 138:5,11,16
138:21 139:8,20
**paper** 49:21
**paragraph** 50:8
91:20 100:1,3
102:19 103:3
126:19,20
**part** 29:12 45:25
53:3 61:3,5 62:9
68:2 71:12 86:21
87:2 91:2 104:24

106:12 107:24,25
130:19,21,21
135:18,19,20
136:14,16,20,22
137:4,12
**participants** 81:3
114:3 117:25
121:14
**particular** 12:25
35:7 55:8 57:3,3
60:22 70:16 81:1
93:13 96:2 99:2,14
114:12 120:23
126:3 130:24
**particularized** 72:1
**parties** 6:13
**party** 7:3 142:18,19
**pause** 9:2
**pay** 27:11 62:18,24
107:12 111:17
**payment** 131:18
132:2,25
**payments** 130:19
130:23,25,25 131:2
131:2 132:19
**pays** 131:10
**pc** 144:5
**pebble** 77:13
**pen** 19:10
**penalties** 143:22
**penalty** 141:1
**pending** 39:23 66:1
**people** 47:12 53:20
54:6 57:25 67:25
70:20 76:14 81:9
81:11 83:7,11,17
83:23 94:14 115:16
117:18 120:6
121:19 122:9
123:10 126:7

**perceive** 92:9
**percent** 22:24 23:1
  67:21 74:24 75:1
  116:1 120:18
**percentage** 74:18
  74:20,25 75:1
  78:21,21 80:4,7,10
  80:13,16 83:1,23
  115:16,24 120:1
  121:9
**perform** 23:11
  65:14 108:19
  126:17
**performed** 24:15
  66:22 81:7
**period** 4:19 5:4,9
  19:18,20 20:11,17
  20:25 21:2,4 31:14
  31:20 32:9,25 33:3
  33:7,14,20
**perjury** 141:2
  143:22
**person** 10:2 32:16
  120:24 138:14,24
  139:3,20,23
**persons** 84:19
**pertaining** 45:8
  46:20 47:3 48:19
  80:24
**pertinent** 46:15
  68:6 125:17
**ph.d.** 36:11 137:5
**phones** 6:9
**physical** 30:1,12
  34:19
**physically** 40:8
**pick** 6:7
**picked** 119:13
**pictures** 77:12
**pieces** 77:5,9,13,24
  80:18

**place** 6:9,13 91:25
  92:2 96:12 97:10
  98:11,12,13 102:2
  102:3 109:22 142:7
**plaintiff** 1:9 2:8,16
  3:3 6:17 7:12 23:25
  50:21 68:4
**plaintiff's** 24:17
  40:19 136:2
**plaintiffs** 23:23,24
  25:9,15 40:4 41:16
**plan** 35:13
**planning** 25:17
**please** 6:6,9 7:9
  8:25 14:20 16:23
  19:12 20:10 29:22
  32:24 75:12 100:2
  102:18 110:2
  116:12 126:20
  144:11,13,13
**point** 29:10 53:15
  55:7 107:12 108:6
  108:11 112:12
  122:25 130:14
**pointing** 39:13
  105:12
**policy** 23:1
**pool** 70:20 81:25
  83:1 118:13,24,25
  119:3,5,13,16,22
  120:1 121:10,13,14
  122:7,17,18
**population** 63:19
  63:21 64:16 72:13
  72:19 73:4,5,6,13
  73:15,23
**populations** 71:2
**portion** 65:13
**pose** 99:5
**position** 11:8,14

**positive** 96:20
**possibility** 78:11
  83:21
**possible** 64:1 68:3
  82:16 125:21
**possibly** 116:15
**potential** 22:25
  43:10 57:16 64:19
**potentially** 56:2,14
  111:19
**practical** 58:1
**practice** 37:13
  64:10,18,24 127:19
**practices** 63:5,13
**prefer** 57:15,21
  114:9
**preferences** 68:11
  68:14,25 69:20
  85:23 87:14,24
  91:16 92:11,15
  98:7 99:9 105:22
  108:20 110:25
  114:1,2,5
**preferred** 64:24
**premise** 69:15,17
**preparation** 10:2,6
  10:17,25 11:12,22
  13:6,23 14:5,11
  35:10
**prepare** 9:7 36:18
**prepared** 38:1
**presences** 98:18
**present** 7:5 9:19,23
  84:20 106:10
  126:25 127:14
  130:25
**presented** 50:18
  76:9,13 127:25
  128:14,17
**president** 31:1

**press** 126:6
**presumably** 71:2
  118:19 126:17
**presumption** 109:5
**pretest** 64:12,19,22
  65:7 81:19,22 82:4
  82:8,12,14 123:15
**pretesting** 64:6,8,9
**pretests** 64:11
**pretty** 10:23 57:14
**previous** 36:25
  37:21 38:3
**previously** 29:16
  39:18
**price** 46:2 62:25
  92:17 109:11
  111:17 112:21
  115:23 116:4 117:2
  117:5,6 122:13
  130:20 131:3,17,21
  132:8
**prices** 25:2 85:12
  109:10,20 112:19
  113:24 114:20
  115:3
**primarily** 22:2,22
  67:15
**primary** 55:10
  67:17 101:2 122:25
  123:2
**principal** 22:19,21
**principles** 27:11
  46:2
**prior** 44:1
**private** 6:7
**privilege** 10:9
**probabilities** 56:21
  57:23
**probability** 65:15
**probably** 29:4
  47:19 64:4 86:13

**problem** 63:2 78:19
  120:11,12 121:2,13
  122:15
**problems** 95:12,15
  122:1 127:20
  128:11 129:19
**procedure** 137:15
  137:19
**proceed** 43:22
  84:25 110:11
  133:20 134:18
**proceeding** 7:9
**proceedings** 142:15
**produce** 15:11
  33:25
**produced** 18:25
  19:5,9 20:4,20
  34:14
**product** 10:10 11:5
  24:22 35:6,15 58:3
  59:14,19 95:18
  98:14 99:2,7 103:6
  103:8 105:22
  106:13 111:13
  113:8 124:12
**production** 34:4
  144:21
**products** 104:14,17
  104:18 136:17
**professional** 4:21
  5:6,11 19:23,23
  20:15 21:1,5,8
  30:21 136:21
  137:22
**professionals** 30:22
  36:12
**professor** 28:5 97:8
**profits** 37:13
**program** 137:5
**programs** 124:16

**prominently** 81:24
**promotional**
  131:12
**propensity** 74:9,16
  118:5
**proper** 27:7
**properly** 59:13
**propose** 69:10,11
  112:4 128:19
**proposed** 7:12 22:3
  22:4 70:21 73:12
  73:24 95:9,21
  99:20 105:12
  110:25 112:21
  123:24 125:11
  126:12 127:17
  129:6,8,11,14
  136:2 137:11,18
**proposes** 106:9
  137:16
**proposing** 70:23
  98:1
**proposition** 71:20
  96:15 104:16
**pros** 136:7
**protective** 140:4
**provide** 11:10 14:1
  16:19 17:16 22:4
  36:7 38:10 50:14
  76:5 83:22 84:2
  93:20 131:13
**provided** 11:4,23
  11:24 13:13 16:11
  17:6,14 18:15
  29:17,18 36:23
  37:18 38:12 72:16
  73:1 85:15 89:1
  129:23
**providing** 28:25
**public** 23:1 54:5

**publications** 12:6
  36:25 37:3,9
**pull** 86:13
**pulling** 73:13
**purchase** 54:10,12
  56:4,13,16 57:6
  58:3 68:14 69:1
  70:24 71:9 74:6,10
  74:16 89:23 100:16
  101:3 106:16,17
  116:25 118:14
  119:17 120:2 121:5
  121:11 123:25
  130:20 131:3,17,21
  132:8
**purchased** 70:23
  70:25 72:21 73:19
  73:21 106:12,13
  121:1,21 122:10
  123:6 126:14
**purchasers** 68:10
  68:12 69:5,5,21,21
  73:17,18,21 88:19
  101:1 107:11
  116:14
**purchases** 77:10
  131:22,24
**purchasing** 53:21
  68:20 71:9,10
  102:1 115:20,20,21
  115:21
**purported** 94:23
**purportedly** 75:4
**purports** 92:19
  126:22
**purpose** 61:4 73:11
  73:14 102:13
**purposes** 28:24
  71:7 114:12
**purview** 59:3

**put** 25:15 33:12,12
  36:5 97:11 99:13
**putative** 90:9 91:25

**q**

**qualifications** 27:7
  28:13
**qualified** 27:12,24
  29:6
**qualifies** 25:1
**qualitative** 70:17
**quantify** 98:25
**question** 9:1,5
  10:24 25:2 28:14
  46:15 56:10 59:5
  61:9 63:11 67:11
  69:15,17 81:2 83:8
  83:13 95:2 96:6
  98:24 99:17 101:6
  101:8 106:21 113:6
  118:17 119:12
  128:12,12 133:6
**questionnaire**
  123:17
**questions** 8:11,18
  9:1 36:7 58:13,13
  68:7 72:10,12
  82:15 95:6 117:3
  129:5 139:25
**quite** 70:11 127:23

**r**

**r** 32:18,18
**rate** 22:11 120:23
**reach** 72:18
**read** 15:10 16:13
  29:23 32:15,23
  34:17 37:25 45:7
  46:18 50:11,25
  59:24 62:12 77:3
  77:16 80:23 81:3
  83:8 86:23 87:12

**[read - represent]**

87:22 88:4,17 89:6
89:18 90:8 91:14
91:21 100:3 102:20
103:4 126:21 127:5
127:12 128:15
130:6 138:19
143:23 144:13
**reading** 31:2 80:20
144:16
**real** 113:13 114:4
120:24 121:23
122:10 129:22
**reality** 106:15
**realize** 33:8
**really** 27:14 28:7
28:11 41:23 44:21
53:10 56:18 57:2
57:13 58:13 60:22
71:14 78:3,3 82:22
82:22 108:3 111:8
119:6 120:4,11
**rear** 40:5 42:20
**reason** 12:24 17:24
18:1 21:25 24:6,9
52:6,14 53:5 67:6
68:7 70:9 76:24
80:19 82:20 83:16
143:5
**reasonable** 77:14
133:8
**reasons** 67:10,13
68:5,20 83:10
**rebut** 25:8 40:19
**recall** 8:6 38:22
40:11 41:2,8,13,20
43:2,4,8,12 60:8
66:16 77:19 81:20
82:17 83:12,21
86:4,12 110:17
113:14 134:25
135:4,15 136:11

**receive** 14:13
**received** 77:20
131:13
**receiving** 72:20
**recess** 43:18 84:14
84:17 110:7 133:15
134:13
**recognize** 57:1
**recollection** 25:14
40:22 55:19 74:4,7
75:22 76:15 80:20
80:21 83:7
**record** 6:5,14 7:7
8:23 29:14 43:15
43:20 79:4 84:9,11
84:22 85:3 86:22
87:2 110:2,4,9
133:10,12,17 134:8
134:11,15 142:15
**recorded** 6:16
142:12
**recording** 6:12
**records** 24:13,15
29:19
**recreational**
136:18
**redacted** 78:22
80:8 86:19
**redlines** 35:25
**reduced** 53:15
106:25 130:17
**reduction** 107:6,16
108:5 110:15 111:5
112:1,11 113:8
130:13
**reepstein** 28:6
**refer** 29:1,4 92:22
**reference** 144:10
**referenced** 12:1
**references** 109:24

**referring** 100:10
**reflect** 20:16
**reflecting** 45:9
**refresh** 13:4 38:23
**regard** 11:9 12:21
46:11 47:25 52:4
52:20 57:20 64:7
73:3 90:7,23
103:14 109:15
**regarding** 16:15
51:7 58:7 80:17
**regardless** 35:4
**regina** 42:8
**regression** 136:24
137:1,9,14
**regressions** 136:6
**relate** 12:16 56:25
**related** 7:3 12:6
22:25 23:1 29:14
29:19 42:23 51:11
58:20 67:12 76:2
105:5 133:24
136:18,18 138:5
142:18
**relating** 30:4 34:21
**relation** 137:9
**relationship** 44:14
**relevant** 20:25
68:11 69:20 114:20
**reliable** 72:7 116:4
**reliably** 105:15
**relied** 13:2,18,21
14:4 15:20 16:3
45:10,17,22 65:19
78:23
**rely** 50:1 54:14
66:21 67:2,7 72:8
100:14
**relying** 68:8
**remainder** 33:17

**remember** 23:20
66:13 93:14
**remotely** 7:6
**rendered** 21:8
**repair** 41:16,18
**rephrase** 63:11
**replacement** 41:16
**report** 5:14 12:1,14
13:3,18,21 14:4
16:8 23:18 24:7
35:10,20,23 36:3,8
36:18 37:2,7,11
41:1 45:18,23
47:14,22 48:23
49:4,10,12,13,15
49:16,23,25 50:1,7
52:4 53:18 54:10
61:23 70:18 74:3
74:13 75:6 76:9
79:12,20 80:20
81:7,21 85:4 86:14
86:19,24 87:12,16
87:21 88:3 89:14
89:16 90:14,18,23
91:6,8,13,14 93:15
100:1 102:18
116:11 120:10
123:1,3,5,13
126:19 127:13
129:1,3,7
**reported** 1:22
**reporter** 2:20 7:1
14:22 16:25 19:14
20:3,7,23 48:25
49:3 75:13,16 79:8
**reporting** 83:6 84:7
**reports** 12:17,19
14:1 22:10 38:1
**represent** 21:6
39:19 41:25 42:1
75:23 80:15

**representative**
18:11
**request** 16:1,17
35:7 36:22 37:20
45:7 48:2,5,14
**requested** 15:5
29:12 34:8
**require** 85:13
95:19 96:4
**research** 15:14
28:1 55:11 118:20
123:19
**residual** 131:4,16
132:9
**respect** 13:16 23:19
37:9 57:11 63:8
67:16,23 71:3 81:1
99:15 104:15
116:17 118:7
122:19 124:21
139:4
**respond** 50:18 56:9
122:21
**responded** 101:7
128:11 129:5 135:6
**respondents** 78:11
80:23 82:17 83:21
100:4 101:7,21,23
**responding** 52:8
101:24
**response** 59:11
**responses** 8:19
111:25 114:5
**responsibility**
35:16
**responsive** 16:1
45:13,16 46:24
48:2,20 118:18
**rest** 65:20
**restate** 103:20

**result** 53:16 82:16
107:1 108:11 112:1
112:12 113:20
121:7 130:14
**results** 54:13,14
60:11 65:17 66:21
67:7,9 69:24 70:11
72:8 81:14 100:13
111:4 122:8,19
**resumed** 84:18
**retained** 23:18,22
24:21 39:19 41:25
42:2 44:1 50:12
51:24 66:16 99:24
140:8
**retainer** 16:19
17:13,17
**retention** 16:15
29:14,20 30:4
34:21
**reveal** 10:14 13:12
52:11
**revealed** 114:1
**revealing** 86:25
**review** 10:8,15,17
10:20,25 12:12,25
14:16,24 15:4,23
16:17 22:3 36:6
38:23 50:17 75:3
76:18
**reviewed** 9:9 10:5
10:19 11:3,4,12,15
11:21 12:3,7 13:5
13:23 14:5,10 15:8
22:9 30:8 51:13
62:1,5 72:9 75:6
79:12,17 80:7
124:16
**reviewing** 49:23
**right** 9:7 11:20
14:10 24:5 26:13

26:14 31:3,16 32:8
41:6 43:24 44:10
45:6 47:23 48:22
49:17,19 52:5 53:2
53:13 54:13 55:13
55:23 60:4,24
66:19 67:4 69:14
71:21 72:25 75:3
78:7 79:6,23 82:7
84:5 85:2,2 87:8
88:12 90:3,25
94:12 95:17 96:9
97:18 99:19 101:25
104:2 105:1,24
109:14 110:1,13
113:2 115:25
117:21 119:12,24
123:18,21,22
125:10 130:4
133:25 134:7 138:6
138:12 139:7,24
**risk** 78:21 92:11,11
109:24
**role** 35:9 47:22
136:1
**roles** 47:14
**roll** 64:15 82:4,9,13
**roman** 85:7,18
89:17 90:8
**room** 7:5
**round** 77:5,9,24
80:18
**rule** 24:17 98:2,9
115:23
**ruled** 65:16
**run** 117:11
**runs** 86:20

**s**

**s** 33:4 144:6
**safe** 54:20 55:20,24
97:2

**safety** 40:9,12
42:25 43:2,4,10,12
51:17,21 53:21
54:22 55:5 56:25
57:14,16,21 58:7
99:7 100:8,14,18
101:2,8,11,17,17
101:19,20,24 102:2
102:3,13,13,14
112:12 125:13
**sale** 53:16 107:13
108:6,11 112:13
130:14
**sales** 131:11
**sample** 71:6 72:23
72:24 73:23 119:8
119:9 124:12
**sampled** 72:19
**sampling** 63:20
**samsung** 62:8
**samuel** 42:10 43:1
**santiago** 42:9 43:1
**satisfy** 87:7
**save** 49:20
**saw** 48:14 76:8
79:20 83:2,24
123:4
**saying** 57:20 71:21
71:24
**says** 50:25 77:3
120:14
**scenarios** 117:8
**schedules** 46:19
**scientific** 27:25
**scope** 27:21 40:16
44:16 50:6 51:24
52:6 53:9 56:5 57:9
58:9 78:2 99:11
105:8 107:20
108:16 111:7
114:17

**scott** 49:15,25,25
66:11,22 67:3 68:6
70:18 72:7,16 73:5
73:15 75:24 76:14
76:20 78:9 79:12
80:22 81:19 82:25
83:15 100:24 107:5
**scott's** 54:14 69:24
74:1 81:14 100:10
100:14
**screen** 75:25
**screens** 75:9
**screenshot** 5:17
75:21
**scroll** 35:13
**se** 59:8 122:16
**search** 15:25 30:10
38:8 45:12 46:23
48:14,16
**seatbelt** 40:5 42:20
42:22
**sec** 79:8
**second** 39:10 41:24
74:22 75:19 78:18
78:19 80:1 84:10
103:4 131:24
136:25
**secondly** 106:9
**section** 87:17 91:13
123:1,3,13
**sections** 35:20 36:5
36:6
**see** 8:3,4 15:9 17:19
17:22 18:16 25:19
30:6,10 32:12
33:15 38:6 39:12
39:14 50:9 55:9
77:2 78:18 83:8,9
85:8 89:10,24
91:18 92:5 96:20
103:2,11 109:17

125:16 127:3,7
130:10
**seeing** 78:25 79:3
82:18
**seek** 17:16
**seeks** 74:1
**seen** 48:5 54:13
59:19 75:20,21
76:4,10,11,12 77:8
77:10 80:17 81:25
133:22 138:4
**sees** 125:22
**selected** 72:22,23
**self** 83:6 84:7
**send** 144:13
**sense** 97:14 105:18
105:20 108:23
117:19
**sensitive** 6:6
**sent** 18:5 21:10
**sentence** 77:2
100:2 103:4
**separate** 17:16
67:3 79:11
**sephia** 40:5 42:6,24
**september** 5:10,15
21:2 31:14 129:2
**serve** 28:23
**service** 28:4 54:12
136:18
**services** 4:21 5:6,11
19:23 20:15 21:1,5
21:8
**set** 16:8 25:8 31:20
32:9 33:20 35:12
38:19 47:14 52:20
63:25 64:1 68:3
71:16 78:10 89:5
90:13,17,23 91:7
97:8 115:22 121:22
127:20 130:5,19

131:3,7 132:17,20
133:8 142:7
**sets** 106:10
**setting** 50:1 64:23
85:6 93:15 105:16
117:2
**settings** 64:24
**settled** 24:10
**seven** 40:1,1
**shakes** 8:19
**share** 17:1 75:18
**shatter** 77:4 118:6
120:15,17 125:4
138:21,25
**shattered** 77:11
**shattering** 12:7,17
12:19 51:20 53:6
67:17 80:5 124:9
125:13
**sheet** 15:8 143:1
**shortcoming** 128:9
**shorthand** 2:20
**show** 26:4 87:16
**shown** 74:25 75:1
81:15
**sic** 118:17
**side** 61:6 62:11,15
62:17,20,22 101:9
111:11,15
**sides** 54:5
**sign** 18:7
**signature** 17:20
18:6,10 141:11
142:24 144:12
**signed** 17:25 18:5,9
144:13
**significance** 57:24
**significant** 26:4,21
32:6 33:9 74:15,23
**significantly** 33:19

**signing** 144:16
**similar** 44:20 61:13
67:16,20,23 68:24
68:25 70:4,5,6 97:7
104:18
**similarly** 1:8 2:6
**simple** 10:23
**sincerely** 144:19
**singularly** 59:17
**sit** 41:2 59:24 62:13
72:15 74:13 81:11
81:20 98:21 99:3
99:16,19 126:16
**sitting** 27:6 41:19
43:8 106:24 111:23
117:22,24 119:15
127:24 134:2
138:14 139:19
**situated** 1:8 2:7
**six** 9:18 40:1
**sjd** 1:11 2:9
**skill** 142:16
**slides** 75:3,9 76:13
**sloping** 46:6
**slowly** 9:1
**small** 67:24 77:5,9
77:13,13,24 80:18
119:8 121:9
**sold** 104:20,24
105:6 139:8
**solutions** 140:9
144:1
**somebody** 28:6
122:16,18
**somewhat** 54:9
**sorry** 9:22 16:23
39:7 42:2 66:20
75:17 89:4 91:8
102:19
**sort** 21:20 24:25
35:12 41:17 54:2

57:1 61:5 70:16
72:21 76:20 77:15
104:12 111:11
115:20 124:20
132:9
**sound** 31:16
**sounds** 21:15 52:24
119:25
**source** 15:17
**sources** 125:19
**south** 2:16 3:7,18
6:22 144:2,14
**southern** 6:19
**spahr** 66:18
**speaking** 101:18
**specific** 12:16 46:9
70:15 72:10 75:21
80:3 101:10 112:3
112:7 115:16
**specifically** 12:11
14:5 27:14 28:15
49:24 50:8,16
54:18 60:20 102:10
106:6 111:20 118:6
119:3 126:8
**specify** 74:18,19
**speculate** 116:21
**speculation** 44:17
54:1 55:1 56:6
58:10 60:15 78:2
101:5 102:7 119:19
126:1
**spend** 57:25 112:6
**spending** 114:4
**spent** 32:19
**spontaneously**
51:20 53:6 125:4
**ss** 142:1
**st** 144:6
**staeheli** 33:4,11

**stand** 31:7 32:4,20
104:21,25 105:6
106:13 129:3
**stanford** 36:11
**stapled** 18:22 19:1
19:2
**start** 85:5,6
**started** 36:4
**startle** 53:6
**state** 7:6,9 39:4
85:22 91:14,21
100:3 103:4 126:21
128:13 141:2 142:1
143:21
**stated** 94:16 114:5
118:19 124:24
**statement** 106:3
**states** 1:1 2:1 6:19
44:19 50:11
**stating** 108:4
**statistical** 137:15
**statistically** 26:4
74:15,23
**statistics** 137:3,3,4
137:5,20
**ste** 144:6,14
**stenographically**
142:12
**steve** 50:19
**steven** 50:20
**stop** 57:18
**stories** 135:2
**story** 126:4
**straightforward**
10:24
**street** 2:17 3:7,18
6:22
**strictly** 101:18
**strike** 117:23
**strombom** 1:17
2:15 4:3 5:14 6:16

7:21 8:3 15:5 19:9
20:5,21 34:8 42:15
43:25 78:23 85:2
110:13 133:22
134:23 138:3 140:7
143:2 144:4,10
**strombom's** 4:16
**strong** 109:5
**structural** 61:5
**studied** 55:7 59:25
137:4
**studies** 29:6
**study** 29:4 98:3
**studying** 57:25
**style** 100:9
**subject** 33:9 51:3
139:15 143:23
**submitted** 35:24
49:10 50:21
**subscribed** 142:21
**subsections** 85:19
**subsequent** 37:11
**substance** 10:22
143:24
**suffered** 40:24 41:7
93:13
**sufficient** 95:15
96:3 116:3,8
131:15
**suggestion** 111:20
**suite** 3:7 144:1
**sum** 94:24
**summary** 88:1
**sun** 12:17
**sunroof** 5:17 12:7
12:17 51:21 53:6
61:14 70:24,25
71:4,11,14 73:19
73:22 75:5 76:1
77:21 78:21 79:16
81:4,12 82:18 86:8

88:8 102:24 104:23
106:1,11 120:15
123:5 125:14
126:14 133:24
138:5,16 139:9
**sunroofs** 12:19
67:17 118:6,21
121:6 124:6,18
125:3,8 134:3
138:11,21 139:20
**superior** 39:23
**supervision** 142:14
**supply** 46:3 62:22
63:2 111:11,15
**support** 77:9
**supporting** 45:9
**sure** 8:12,13 32:21
49:9 53:4 56:8,8
61:9 69:18 79:9
81:8 83:5,20
106:22,23
**surprising** 119:10
**survey** 21:20,25
22:4,17 27:4,8,15
27:16,20,23 28:4,8
28:17,24 36:14
54:14,15 59:13
61:11,18,21 62:2
63:6,13,24 64:13
64:15,18 65:4,15
65:17,18 66:7,13
66:20,21 67:3,8,11
67:18 68:6,13 69:4
69:4,5,12,24 70:10
70:21,23 72:7,8,9
72:10,18,23 73:4,6
73:6,23 74:1,3,5
75:4 76:14 80:11
80:23 81:25 82:5
82:10,13,15,17,24
83:1,2,21,25 86:9

89:19 92:14 93:5
93:18,20,23,24
94:23 95:8,13,20
95:20 96:1 100:10
100:14,24 101:7,7
101:13,18,21,23
102:10 105:3
106:14 107:5
108:18 110:24
111:4,25 114:10
116:17,23 117:11
117:14,19,22,25
118:1,13,24,24,25
119:3,5,13,14,16
119:22 120:1,11,12
121:3,10,12,14
122:2,7,8,8,16,18
122:19,22 135:22
136:14,23 137:13
137:16
**surveyed** 73:4
120:7
**surveying** 63:18
70:20 72:14
**surveyor** 81:23
**surveys** 21:23
22:14 28:10 54:11
55:4,9 60:12 62:6
63:23 64:6,7,10
67:24 73:17,20,21
92:21 97:18 114:6
116:12,20 136:10
136:16
**sworn** 7:18
**system** 42:6,18,20
42:22,23
**systems** 40:5

**t**

**t** 33:4
**table** 85:5 88:25
90:13,18

**take** 6:13 13:15
29:22 34:11 43:14
49:7 75:19 87:9
88:2 109:10 111:24
117:19,22 126:3
**taken** 2:16 6:16
43:18 84:14,18
110:7 133:15
134:13 135:20
142:7 143:3 144:10
144:15
**talk** 9:11 50:5
54:11 101:24
103:18 120:10
136:24
**talked** 9:25 79:11
79:15 83:15 97:22
103:13 108:17
110:23 113:12,16
138:21
**talking** 9:5 26:9
43:25 57:5 97:4
105:4 110:14 122:4
**talks** 124:7
**taught** 136:3
**team** 33:24 34:10
34:23 36:17 47:6
47:13 48:5
**teammates** 34:14
**techniques** 28:1
112:22 135:22
**technology** 100:8
**telephone** 10:2
**tell** 37:3 136:13
137:8
**telling** 52:22
**tempered** 77:10
**ten** 12:13,18 37:1,4
68:20,22 118:4,4
119:8 124:13

**tend** 9:1,2 114:9
**tennessee** 3:8
**term** 33:8 108:24
131:5,23 132:1
**terms** 27:14 60:6
72:17 82:24 86:20
88:11 100:16
115:10 121:7
127:21 140:4
**test** 81:15 91:22
96:13 99:1
**testified** 7:23 37:22
38:4 40:13 41:3
**testifying** 23:18
**testimony** 50:15
65:20 69:8 73:8
77:19 79:13 124:2
128:22 137:7
139:17 140:7 142:6
142:10,16
**testing** 96:13
**tests** 74:17 81:6
**text** 75:7 76:11
**thank** 7:17 39:14
134:19 137:23
**thanks** 49:5 140:1
**theories** 41:14
**theory** 37:13 96:25
97:6,12
**thereof** 142:20
**thing** 67:18 111:10
135:12 136:9
**things** 8:9 35:17
36:1 46:4,7 56:24
67:1 72:14 74:2
80:25 101:20,22,22
101:23 106:5 112:5
112:5 114:5 120:10
130:22 131:12,16
132:14

**think** 10:24 12:5
18:14,24 20:1 22:6
23:10,13 25:13
26:8 27:9 28:6,20
29:7,17,21 33:15
34:13 36:4 37:5,6,8
40:11 41:11,14,16
43:2,9,9,24 44:11
45:19,20 46:7,8
49:14 51:9,9 53:5
54:4 55:2,5 58:24
59:10,16,23,23
61:22 62:16 63:2
63:19 64:9,22,24
67:10,17 68:5
69:16,19 70:3,4,9
70:12,22 71:4,5
72:13,14,20 73:13
74:21 75:7 76:20
77:23 79:22,24
81:4 83:14 84:6
86:11 90:21 92:25
93:7 95:12,14,24
96:5,6,15 97:6,7
98:9,14 99:23
100:21 101:12,18
102:6,15 103:19,19
104:13 106:19
108:20 109:3
110:19 113:6,12
114:8 115:1,4
118:7,8,17 119:20
120:5,5,5 122:24
123:2 124:3,12,24
127:17,18,19
129:14,19 132:16
132:18,20 133:5,6
133:7,9 136:9
139:13
**thinking** 62:7
112:6

**third** 74:22 79:19
79:21 80:1
**thought** 12:24 13:3
19:1 25:16 75:18
111:9,21
**three** 17:11 19:2
39:4 42:3,4,22 43:1
74:16 79:15 81:6
92:20 112:18
**tie** 103:13
**time** 7:9 14:17
19:18 20:17,25
21:4 24:13,14
31:20 32:8,9,25
33:2,7,13,19 37:7
43:20 49:7 57:25
71:9 84:11,22
89:22 95:18 110:4
110:10 116:24
118:14 119:17
120:2,25 121:5,11
121:20 123:6,25
129:8 133:12,17
134:11,16 138:22
138:22,25 139:1
140:10,12 142:7,8
142:11
**times** 12:15 38:17
38:18 104:13 124:5
**titled** 37:15
**tn** 144:6
**today** 8:18 9:8 10:3
10:6,17 11:1,13
13:1,7 14:11 15:2
15:23 27:6 28:18
28:19 30:8 41:19
54:24 59:9 61:12
65:9 76:12 89:5
98:6 99:19 106:24
111:23 117:23,24
119:15 127:25

**134:2** 138:14
139:19
**today's** 6:25 140:7
**told** 10:5 24:3 27:3
39:18 47:22 65:6
108:2 138:6
**tolerance** 92:11
109:24
**tom** 1:7 2:5 6:17
77:16,16 143:2
144:8
**top** 68:20 130:5
**topic** 54:3 60:17
77:15 103:19
135:10,23
**total** 4:20 5:5,10
19:21,23 20:13,15
21:3,5,6,11 26:9
140:7
**totalling** 4:21 5:6
5:11
**touched** 136:10
**tower** 144:1
**training** 27:7 28:2
135:19 136:22
137:5,22
**transaction** 112:20
113:24 114:10,13
114:20 115:3 116:4
117:5,5
**transactions** 114:4
**transcribed** 142:13
**transcript** 12:8,15
14:7 41:10 140:3
143:4,23 144:11,13
**translate** 111:16
**trial** 37:22 38:5
40:14 41:4,10
**tried** 28:20
**trim** 71:17

**true** 27:19 46:16
71:25 96:16 100:19
100:20 109:9 115:5
120:5 141:4 142:15
143:23
**truthful** 83:11
**try** 9:3 24:18 81:7
**trying** 10:21 39:8
45:19 49:20 122:25
**tuesday** 1:19 2:19
6:1
**turn** 6:9 36:8 91:12
100:1 102:18
116:11 126:19
**tv** 133:23
**two** 17:11 41:14
48:11 58:23 64:3
67:16,20 68:14,22
71:2 76:1,8 79:11
80:2,16 81:6 102:6
104:6,13 106:5
114:8 117:8 120:17
131:8,16,23 136:7
144:14
**types** 46:7
**typically** 64:11
131:9

**u**

**u** 32:18
**uh** 8:22,22
**ultimately** 41:6
**unaware** 120:25
**uncover** 64:14,19
119:9
**underlying** 42:5
**understand** 8:17
8:21 51:16 54:22
60:9 69:18,19,19
80:3,10 105:24
123:2 132:23 138:8

**understanding**
44:13,18,23 49:15
60:22 63:5 74:11
76:23 77:1 91:5
117:12 125:6
**undertake** 29:1
**undoubtedly** 91:24
92:7 93:11 96:9
**unique** 104:3,24
105:2
**unit** 6:15
**united** 1:1 2:1 6:19
44:19
**unrealistic** 132:17
**unreliable** 65:17
84:8
**unsafe** 56:3,14
**updated** 37:8
**use** 60:6 70:10
87:17,21 88:25
95:5 98:1 108:24
111:4 114:9 137:11
**useful** 83:22 84:3
**uses** 106:7
**usually** 82:14
108:24

**v**

**v** 39:22 40:17,24
143:2
**vague** 53:23 55:1
56:7 63:7,14 70:1
73:7 82:2 94:6,17
101:4 102:4,7
103:17 107:18
108:14 114:25
116:6 128:25
129:13 133:3
138:18
**validity** 62:6
**valuation** 92:12
94:21,21

**valuations** 85:23 87:14,24 91:16 92:1,3,23
**value** 24:24 25:4,14 25:18,21 26:5,13 26:19,21 27:1 41:12,15,18 53:15 59:14 92:9,18 95:1 96:17 97:4 102:2,3 103:5,7,9,22,24 104:16 107:1,6,16 108:6,10,10,13 109:6 110:15 111:5 112:1,11,18,23 113:3,8,18 114:21 117:9 121:16,22,25 130:13,17,25 131:4 131:16 132:9
**values** 96:13,20 97:10,17 98:11,13 109:22,23
**variables** 131:20 131:25 133:2
**various** 12:6,16 24:15 47:13 97:4 98:7,18 112:22 138:20
**vary** 64:23 92:12 92:13 109:20
**vehicle** 53:21 55:20 55:20,24 56:2,14 56:23,25 58:2,7 68:19 71:9,11 73:19,22 74:10 76:3 77:6 96:18 100:5 101:3 102:1 102:14 104:3,7,7,9 105:1,6 107:14 111:18 112:11 120:14 121:1,21 122:10 123:7 125:1

126:15,23 127:2,16 127:21 128:2,18 130:16,20 131:3,4 131:22,24
**vehicles** 12:21,22 24:25 25:14,20 26:3,25 27:1,2 44:21 53:14 57:14 58:1 67:4,8,9,12,21 67:23,23,25 68:3 68:10,12,15,15,15 68:17 69:1 70:16 71:16 72:22 85:13 88:20,23 89:9 92:4 96:20 100:17 101:10 106:25 107:5,12,13 108:6 112:18,21,24 118:7 125:13 127:10 130:9,13 138:15 139:7
**verbal** 8:19
**verify** 72:6 86:14 87:18 96:14
**veritext** 6:25 7:1 140:9 144:1,21
**veritext.com.** 144:14
**version** 37:1 75:8 78:20 80:7
**versus** 6:18 37:16 38:25 42:8,9,10 65:23 70:16 114:4 120:22
**vi** 89:17 90:8
**vice** 31:1
**video** 6:4,12,15 7:17 43:15,20 84:11,22 110:3,9 133:11,17 134:10 134:15 140:6

**videographer** 3:24 6:25
**videotaped** 1:17 2:15
**viewer** 126:3
**vitae** 4:16
**volume** 1:20 2:16 4:4
**vs** 1:10 2:9 144:8

**w**

**wage** 23:11,16 24:3
**wait** 18:21
**waived** 144:16
**want** 25:23 32:23 39:17 49:4 52:18 53:3 54:19 55:20 55:23 57:7 69:18 79:24 86:22 97:2 106:20,22 140:2
**wanted** 102:9
**washing** 104:5
**way** 18:25 51:19 53:14 58:5,16 62:16 78:4,13 83:17 94:1,10 95:1 95:5 98:1 105:12 106:9,15 108:3 122:20 142:19
**ways** 74:7 81:22 111:18,18 124:9
**we've** 14:24 15:6 17:12 18:13 43:13 78:9,10 79:17 97:22 138:21
**wear** 43:3,9
**week** 14:18
**weeks** 8:5
**weigh** 57:8
**weights** 98:10
**weir** 12:8 14:7 22:8 50:20 51:10 52:9

126:24 127:13,14 127:25 128:14
**weir's** 22:10 127:5
**wesley** 3:25 6:24
**western** 1:3 2:3 6:20
**whereof** 142:21
**whispering** 6:7
**wide** 24:25 25:7 28:25 40:24 59:22 60:12 61:1,2 94:4 94:13,25 95:10 97:20 98:3 99:6,21 108:23
**wife** 77:20
**wiles** 31:5,10,23 32:10 35:9,24 36:10 47:21 48:8
**williams** 32:2,11
**willingness** 27:11 62:18,24 111:17
**windows** 138:25
**withdraw** 79:7
**witness** 4:2 7:18 23:4 25:12 31:24 44:18 51:9 52:11 52:13 53:10,25 54:2 55:2 56:8,18 57:11 58:12 60:16 63:8,15 64:22 69:9 70:3 71:24 73:9 78:3 82:3 83:5 84:2 94:8,19 95:23 97:25 98:21 99:12 101:6 102:8 103:18 105:9 107:21 108:17 111:8 112:16 115:1 116:7 118:17 119:20 124:3 125:6,16 126:2 129:1,13

132:7,16 133:5
138:19 139:13
141:11 142:8,10,21
143:25
**word**   77:23 83:13
**words**   87:18,22
88:11 89:1,13 90:4
94:13
**work**   10:10 11:5
19:21 21:8 22:22
23:19 32:6 35:6,13
35:15,17,18 36:3
38:13 44:4,7,22
47:17 57:12 135:18
136:14 137:7
**worked**   23:3 26:10
26:16 31:1,10
32:16 36:13,18
38:14 44:9,11
47:13,16 135:25
**working**   135:13,18
**works**   36:2
**world**   113:13
120:24 121:19,23
122:10
**worth**   137:12
**worthless**   96:19
**write**   143:4
**written**   19:10,10
29:25 30:11 33:22
34:1,8,18
**wrong**   56:24
**wrote**   35:20 36:6
37:15 97:7

**y**

**yeah**   28:19 32:24
40:6 42:3,21 49:20
59:16 60:8 70:3
73:24 79:21 87:8
91:10 102:15 107:3
108:1 119:2 128:13
132:16
**year**   131:23
**years**   37:1,4,21
38:4 40:1
**yesterday**   9:10
**yield**   116:4
**york**   12:15 124:5

**z**

**zero**   96:19

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.