## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

| | |
|---|---|
| **TOM KONDASH,** on behalf of himself and all others similarly situated,<br><br>         Plaintiff,<br><br>   v.<br><br>**KIA MOTORS AMERICA, INC.,** and<br>**KIA MOTORS CORPORATION,**<br><br>         Defendants. | Case No. 1:15-cv-506<br><br>Judge Susan J. Dlott |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.     Kia misstates the governing legal standard for class certification. ................. 2

II.    Plaintiff offers substantial common proof of the defect. ............................... 3

    A.    Kia fails to address its own records, which show a major problem............ 3

    B.    The alarming rate at which Class Vehicle sunroofs are shattering ............ 4

        1.    Kia estimates the rate of sunroof shattering using bad data........... 4

        2.    Third parties agree the Class Vehicle sunroof shatters far
             too often. ................................................................................. 6

    C.    The nature of the defect is well-understood and corroborated by
        testing. ................................................................................................ 6

        1.    Class Vehicle sunroof glass cannot withstand the bending
             stresses inflicted by Kia's all-glass roof design. ........................... 6

        2.    Kia, Hyundai, and the government all identified the
             same defect................................................................................. 7

        3.    Plaintiff's expert corroborates the science underlying
             the defect. ................................................................................. 9

III.   No design differences among the Class Vehicle models affect the defect...... 10

IV.   Plaintiff has advanced a sound model for proving classwide damages. ........ 13

    A.    Class members' injury is not individualized............................................ 13

    B.    Individualized damages issues do not preclude certification................... 14

    C.    Allocating damages between multiple owners does not impact
        certification. ....................................................................................... 16

V.    Individual reliance and knowledge issues do not exist. ............................... 17

VI.   Mr. Kondash is both typical and adequate as a class representative............. 18

VII.  Class certification is superior to individual actions. .................................... 20

VIII. Plaintiff does not seek to certify an express warranty claim......................... 20

CONCLUSION................................................................................................................... 20

## TABLE OF AUTHORITIES

<b>PAGE(S)</b>

**Cases**

*Cancino v. Yamaha Motor*,
2010 WL 2607251 (S.D. Ohio June 24, 2010).................................................................. 18

*Carriuolo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016) ...................................................................... 14

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005)........................................................................ 19

*Chapman v. Tristar Prods.*,
  2017 WL 1433259 (N.D. Ohio Apr. 24, 2017) ................................................. 4, 6, 8, 19

*Cope v. Metro. Life Ins. Co.*,
  82 Ohio St. 3d 426 (1998).......................................................................... 18

*Daffin v. Ford Motor Co.*,
  2004 WL 5705647 (S.D. Ohio July 15, 2004)......................................................19, 20

*Daffin v. Ford Motor Co.*,
  458 F.3d 549 (6th Cir. 2006) ......................................................................17, 19

*DeKeyser v. Thysenkrupp*,
  860 F.3d 918 (7th Cir. 2017)......................................................................10, 12

*In re Takata Airbag Litig.*,
  2015 WL 12641693 (S.D. Fla. Sept. 21, 2015)......................................................... 20

*Falco v. Nissan N. Am.*,
  2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) .............................................................. 19

*Faralli v. Hair Today, Gone Tomorrow*,
  2007 WL 120664 (N.D. Ohio Jan. 10, 2007).............................................................. 17

*Flynn v. FCA US LLC*,
  327 F.R.D. 206 (S.D. Ill. 2018)...................................................................... 17

*Gasperoni v. Metabolife, Int'l,*
  2000 WL 33365948 (E.D. Mich. Sept. 27, 2000) ........................................ 20

*Germain v. Teva Pharmaceuticals,*
  756 F.3d 917 (6th Cir. 2014) ...................................................................... 17

*In re Inter-Op Hip Prosthesis Liab. Litig.,*
  204 F.R.D. 330 (N.D. Ohio 2001) ............................................................... 18

*In re Mercedes-Benz Tele Aid Contract Litig.,*
  257 F.R.D. 46 (D.N.J. 2009) ....................................................................... 19

*In re Polyurethane Foam Antitrust Litig.,*
  314 F.R.D. 226 (N.D. Ohio 2014) ......................................................... 15, 16

*In re Sugar Litig.,*
  73 F.R.D. 322 (E.D. Pa. 1976) .................................................................... 17

*In re Terazosin Litig.,*
  220 F.R.D. 672 (S.D. Fla. 2004) ................................................................. 17

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,*
  722 F.3d 838 (6th Cir. 2013) ................................................................ passim

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,*
  302 F.R.D. 448 (N.D. Ohio 2014) ............................................................... 13

*In re: Lenovo Adware Litig.,*
  2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) .............................................. 14

*Jones v. H. & T. Enterprises,*
  88 Ohio App. 3d 384 (1993) ....................................................................... 18

*Kent v. DaimlerChrysler Corp.,*
  200 F. Supp. 2d 1208 (N.D. Cal. 2002) ...................................................... 20

*Khoday v. Symantec,*
  93 F. Supp. 3d 1067 (D. Minn. 2015) ......................................................... 14

*Kleen Pro. v. Int'l Paper Co.,*
  831 F.3d 919 (7th Cir. 2016) ...................................................................... 14

*Mullins v. Direct Digital, LLC,*
  795 F.3d 654 (7th Cir. 2015) ...................................................................... 17

*Rikos v. Procter & Gamble*,
  2014 WL 11370455 (S.D. Ohio June 19, 2014) .................................................. 15, 16, 17

*Rikos v. Procter & Gamble*,
  799 F.3d 497 (6th Cir. 2015) .......................................................................... 20

*Sanchez-Knutson v. Ford Motor Co.*,
  310 F.R.D. 529 (S.D. Fla. 2015) .................................................................... 14

*Stout v. J.D. Byrider*,
  228 F.3d 709 (6th Cir. 2000) .......................................................................... 17

*Wolin v. Jaguar Land Rover N. Am.*,
  617 F.3d 1168 (9th Cir. 2010) ...................................................................... 2, 19

**Other Authorities**

2 Newberg on Class Actions (3rd ed. 1992) ....................................................... 16

<u>INTRODUCTION</u>

In its opposition brief, Kia suggests there is no reason to believe that its panoramic sunroof is defective. Noticeably absent, though, is any explanation from Kia about why everyone else has reached the opposite conclusion. Federal regulators are now in their *sixth* year investigating the shattering. The Korean government has also spent years investigating, as has a United Nations working group. Even Kia engineers acknowledge the "very worrisome situation."

 With just about everyone else acknowledging the defect, Kia tries to explain it away using bad math. It claims that, despite all the internal investigating and outside inquiries, its sunroof actually shatters just a "remarkably low" 0.06% of the time. But Kia's investigation documents recognize there are two different ways to estimate shattering rates. One of those methods produces an inaccurately low estimate—which Kia uses in its brief. The second method—which both Kia engineers and Plaintiff use—is far more accurate. And it shows the truth: the Kia sunroof shatters at a rate *many times higher* than Kia's brief acknowledges.

Once it is understood that Kia's sunroof shatters so frequently, Kia's primary explanation for the shattering unravels. Kia claims the shattering is due to bad luck— "random impacts" from stones kicked up off the road. As the regulators realized, this explanation makes little sense. If it's just luck, that luck should even out across all automakers' vehicles. The truth, as Kia engineers acknowledged internally, is stones are *at best*, "a contributing factor." Instead, as Kia, regulators, and others have confirmed, the panoramic sunroof design is to blame: it causes the sunroof glass to bend during driving, whether from bumpy roads, head on winds, or temperature changes. This bending, worsened by Kia's application of a known adulterant to the glass, makes the glass prone to dangerous shattering.

Although Plaintiff has amassed considerable evidence of this defect, detailed further below, the question at the certification stage is not whether Plaintiff will prevail in proving the defect at trial. Instead, the question is whether Plaintiff's proof is common in nature— and it is. Rather than relying on individualized evidence (like his own shattered sunroof),

1

Plaintiff has marshalled generalized evidence, including records from both inside Kia and the governmental entities who have investigated. This evidence will either establish a systemic defect in Kia vehicles or it will not. Either way, the central issue can be answered once for everyone in the class. For that reason, and because Kia has pointed to no valid reason for denying certification, Plaintiff asks that the Court certify the class.

Argument

**I.      Kia misstates the governing legal standard for class certification.**

As a preliminary matter, Kia misses the mark—throughout its brief—by arguing that there is no evidence of a defect. Although this is wrong factually, as Plaintiff addresses below, it is also wrong under binding precedent. The Court need not make a finding that a defect exists in order to certify the class.

Tellingly, Kia relies on out-of-circuit authority, including *Butler v. Porsche*, to argue that Plaintiff has the burden to "*affirmatively demonstrate*, at class certification, that … a common defect exists." (Opp. at 8.) This statement of the law is inaccurate even in the Ninth Circuit (where *Butler* was decided). *Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168, 1173 (9th Cir. 2010) (the argument that class vehicles "do not suffer from a common defect" goes to "the merits," not certification). And it is wrong here. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013). As the Sixth Circuit's *Whirlpool* decision recognizes, any "alleged failure of proof as to an element of the plaintiffs' cause of action . . . is properly addressed at trial or in a ruling on a summary-judgment motion," not at class certification. *In re Whirlpool*, 722 F.3d at 859. Certification thus does not hinge on whether Plaintiff has *already* proved the defect. Certification is appropriate as long as Plaintiff proposes to prove the defect using "[c]ommon proof." *Id*. at 854-55.

As Plaintiff made clear throughout his opening brief, all his evidence of the defect is common in nature. Plaintiff never relies, for example, on the fact that his own, individual sunroof shattered. He marshals proof that any class member could use to show his or her vehicle is defective, ranging from Kia's corporate records to the sheer rate at which the Class

2

Vehicle sunroof shatters. This evidence is common—it points to a defect in each of the mass-produced vehicles—and thus justifies class certification.

## II. Plaintiff offers substantial common proof of the defect.

### A. Kia fails to address its own records, which show a major problem.

Plaintiff has advanced several categories of classwide proof of the defect. A chief example, which Kia all but ignores, is the collection of internal Kia records that Plaintiff cited throughout his opening brief. Those records reveal that Kia spent *years* investigating a problem that it now claims does not exist. (Pl.'s Br. at 5-7.)

The records show that Kia opened no fewer *six* inquiries into the shattering. Through those inquiries, employees repeatedly asked that Kia's Korean parent company design a countermeasure to eliminate the sunroof shattering. (Exs. 29-34; Exs. 30-33 ("C/M Part | YES").)[1] Yet Kia never introduced a countermeasure to solve the problem. (Suppl. Ex. 179 at 11440, Response 8.) All of the records underlying this activity constitute common proof.

The same is true for the Kia records that confirm how serious Kia acknowledged the defect to be: For years, Kia listed the shattering in its "Top Issues" report as well as on its lists of open safety issues. (Ex. 36 at 3621; Ex. 37 at 3662; Ex 38 at 3683; Ex. 39 at 3707-08; Ex. 131 at 4753; Exs. 40-41 at 3710, 3717-20, 3725-28; Exs. 42-43 at 3742, 3747-49; Exs. 44-45 at 3754, 3760, 3780.) Internal Kia emails also acknowledge the defect's severity. In one example, engineers acknowledge the "very worrisome situation" and urge "management [to realize] how serious the situation is." (Suppl. Ex. 180 at 11446; Suppl. Ex. 181 at 11454.) All of these records constitute common proof of the defect.

To the extent Kia suggests that these investigations concluded that flying road stones are the only reason the Class Vehicle sunroof shatters, common proof disproves that suggestion too. Kia wrote internally, for example, that "Rock Impact has been identified as … a *contributing factor*" only. (Ex. 49 at 3795 (emphasis added).) That's why even after

---

[1] All citations to (Ex. _) refer to exhibits attached to the Declaration of David Stein in support of Plaintiff's Motion for Class Certification, Doc. 80-7. Similarly, all citations to (Suppl. Ex. _) refer to exhibits attached to the Declaration of Steve Lopez in support of Plaintiff's Reply, Doc.166. Each pin citation to those exhibits refers to the CM/ECF PageID number, per the Court's standing order.

telling the National Highway Traffic Safety Administration (NHTSA) that the shattering was nothing more than bad luck from rocks kicked up off the road, Kia continued to list sunroof shattering on its "open critical issues/Help needed" lists—marked as a "priority request." (Ex. 52 at 3951-52; Perez Dep., Doc 78 at PageID 2049-50 (331:15-332:6).) Kia also continued to list the shattering among its "Significant Field Issues." (Exs. 53-54 at 3954, 3958-60.)

In addition to Kia's records, internal NHTSA documents also constitute common proof of a defect. For example, while Kia claims NHTSA "found no basis" for a recall, (Opp. at 1), years after it received Kia's rock-blaming response, NHTSA wrote that it "its investigation [remained] ongoing." (Suppl. Ex. 182 at 11462.) And internal NHTSA documents reveal that NHTSA believes there is a defect and that a safety recall is warranted. (Ex. 92 at 4435.) Accordingly, NHTSA documents, like Kia's, constitute common evidence of a defect, supporting class certification.

**B.    The alarming rate at which Class Vehicle sunroofs are shattering**

Kia argues that very few sunroofs have shattered. Kia is wrong on that point, but what's more important is that the frequency of the shattering is another question that can be addressed on a classwide basis. Both sides, after all, are pointing to common proof to assess the rate of shattering. *See Chapman v. Tristar Prods.*, 2017 WL 1433259, at *8 (N.D. Ohio Apr. 24, 2017) (defendant's argument that only a small number of its products were failing did not undermine certification and was to be addressed at trial).

**1.    Kia estimates the rate of sunroof shattering using bad data.**

Kia claims its sunroof has shattered in only 0.06% of Class Vehicles. (*See* Opp. at 10.) If it were truly so unusual, it would be hard to understand why Kia has spent so much time and energy investigating the problem. And the reality is the Class Vehicle sunroof shatters far more frequently than Kia suggests.

To generate its estimate of 0.06%, Kia relies on underinclusive data. Rather than counting all instances in which a sunroof shattered, Kia mostly just counted those instances in which a sunroof shattered, *and* Kia paid for the resulting repair. (*See* Padmanaban Decl.,

4

Doc. 102 at 6294-96.) It would be difficult, if one were trying, to devise a lower estimate, since Kia often refuses to pay for sunroof-shattering repairs. (Doc. 30, First Am. Compl. at ¶¶ 60, 73, 78, 83, 87, 91, 105, 122). As a Kia executive testified, "in most instances" Kia never learns about the repairs "for which the customer paid." (Cameron Dep., Doc. 118 at PageID 7083 (78:7-25); *accord id.* at PageID 7160 (155:12-20) (same); *see also* Padmanaban Dep., Doc. 165, at PageID 11215-16 (95:23-96:6) (same).)

In fact, while Kia asks the Court to rely on an estimate derived mostly from how many sunroofs Kia paid to replace, during in its own investigations Kia didn't do that. Kia engineers *repeatedly* cautioned against calculating shattering rates using that methodology, warning that "count[ ] may not fully represent this quality concern." (Ex. 32 at 3489; Ex. 30 at 3454; Ex. 31 at 3483.) So, Kia looked at "Sunroof Part Sales Data," which shows how many replacement sunroofs have been sold (regardless of whether Kia paid to replace them). (Ex. 30 at 3454.) This avoids relying on underinclusive data and works intuitively well: if a sunroof shatters it will need to be replaced, and all the replacement parts come from Kia. By counting the total number replaced, one has an accurate estimate of how many shattered. As this more-accurate method reflects, the true rate of shattering is dramatically higher than Kia suggests, as Kia discovered early in its investigation: At that time, Kia had paid to replace just 14 sunroofs; but Kia found there had already been over 250 replaced. (Ex. 30 at 3454 (warranty claims), 3476-81 (part sales).) Thus, the methodology advanced in Kia's brief counts about *one* sunroof for every *eighteen* that shatter.

It is for this reason that Plaintiff has estimated shattering rates by looking to the total number of replacement sunroofs sold. By early 2017 (when that data was provided), more than 2% of Class Vehicles sunroofs had already shattered—many times more than Kia's estimate of 0.06%. (Hannemann Decl., Doc. 80-2 at 2288 ¶ 28.) At the time, the average Class Vehicle had been on the road only a few years. (*Id.* at ¶ 29.) But by comparing the rate in newer versus older models, it becomes clear the percentage is quickly rising. The newer Class Vehicles (2014-15 model years) had experienced shattering at just over 1.5%. But the slightly older models (2011-13 model years) were already at 3%. (*Id.* at ¶ 28.) In just two

years' time, the shattering percentage had doubled. Given that two more years have now passed, and Class Vehicles will remain on the road for another decade, the final percentage is likely to be much higher still.

**2.      Third parties agree the Class Vehicle sunroof shatters far too often.**

Years ago, NHTSA reached much the same conclusion about the high rate of shattering. More recently, NHTSA has experienced "various changes and budgetary issues" that have slowed its activity. (Ex. 59 at 3996 ¶ 4; Suppl. Ex. 183 at 11465; Suppl. Ex. 184 at 11468.) But back when its investigation was active, NHTSA personnel discussed the need for a recall. (*See* Ex. 92 at 4435.) In particular, NHTSA personnel confirmed that they believed they had a "strong case on the frequency" of the shattering. (*Id.*)

Other independent assessments have reached the same conclusion. *Consumer Reports*, for example, found that while several automakers' sunroofs have shattered, "the problem is … more prevalent in some brands—notably Kia and Hyundai." (Suppl. Ex. 185 at 11474.) "The more data we see, the more widespread the problem looks, especially for Hyundai and Kia owners."[2] (Suppl. Ex. 186 at 11495.)

All of this evidence, again, is common in nature and supports certification.

**C.      The nature of the defect is well-understood and corroborated by testing.**

Kia also argues Plaintiff has not articulated the nature of the defect or conducted any testing. In truth, Plaintiff has detailed the technical aspects of the defect, (Pl.'s Br. at 2857-59), and his experts provided still more detail in their declarations, including about testing. (Read Decl., Doc 80-3 at ¶¶ 20-31, 39-51; Hannemann Decl., Doc. 80-2 at ¶¶ 24-26.)

**1.      Class Vehicle sunroof glass cannot withstand the bending stresses inflicted by Kia's all-glass roof design.**

All Class Vehicles feature a "unibody" construction. This means the whole frame— including the roof—is a stressed member of the vehicle body. (Ewing Dep., Doc. 160 at PageID 10385-86 (83:18-84:2); Hannemann Decl., Doc. 80-2 at ¶ 23.) As a result, every time a Class Vehicle drives over a railroad track or other bump, turns a corner, faces high-

---

[2] Hyundai and Kia jointly design vehicles. Hyundai resolved litigation over the shattering sunroof in its vehicles. *See generally Glenn v. Hyundai Motor Am.*, No. 15-2052, ECF No. 280 (C.D. Cal. Aug. 27, 2019).

speed wind, or experiences a change in temperature or pressure, all of those stresses enter the roof. While unibody designs are not uncommon, when Kia designed the Class Vehicle panoramic sunroof, it effectively replaced the traditional all-steel roof with an all-glass roof. So, rather than steel absorbing stress, the glass is forced to do so. Every bump, every driving maneuver, every slam of a car door, sends stress into the glass, bending and weakening it. Exacerbating the problem, the Class Vehicle sunroof is heavily coated in ceramic paint, a known adulterant. (Read Decl., Doc 80-3 at ¶ 28; Hannemann Decl., Doc. 80-2 at ¶ 20.)[3]

Weakened by bending stress and ceramic paint, the Class Vehicle sunroof cannot withstand the forces exerted on it during routine driving. (*See* Read Decl., Doc. 80-3 at ¶¶ 29, 31, 51.) Occasionally, this means the weakened glass will fail to withstand a relatively minor impact (like a pebble kicked up off the road) and the whole sunroof shatters, (*id.* at ¶¶ 42), though even in that type of instance, the impact of something kicked up off the road is fully anticipated at the design stage and a sunroof should not fail catastrophically when it happens. (Ewing Dep., Doc. 160 at PageID 10400 (98:2-12).) More often, however, are "progressive" failures, during which a small scratch on the sunroof glass deepens over time—every time stress causes the glass to bend. (Read Decl., Doc. 80-3 at ¶ 41.) Eventually the scratch will reach the tempered glass's core causing the glass to abruptly shatter. (Ewing Dep., Doc. 160 at PageID 10386 (84:10-25); Read Decl., Doc. 80-3 at ¶¶ 40-42.)

The flaw in Kia's design is thus well-understood. Constantly bending glass, weakened by ceramic paint, cannot withstand the run-of-the-mill forces that enter the roof during normal driving. Eventually, these forces bring the sunroof to its breaking point. (*See* Read Decl., Doc. 80-3 at ¶¶ 28-31, 41-42, 51; *see also* Hannemann Decl., Doc. 80-2 at ¶¶ 25-27.)

### 2. Kia, Hyundai, and the government all identified the same defect.

Kia claims the science behind the defect is not "coherent." (Opp. at 8.) But Kia, outside the litigation context, has acknowledge the same science. It told NHTSA, for

---

[3] Kia claims its ceramic paint is "within the range of other vehicles." (Opp. at 9 n. 5.) But Kia's expert looked only at single sunroof panels, not the whole roof. (Ewing Dep., Doc. 160 at PageID 10439-40 (137:3-12; 138:22-39:1).) When the whole roof is considered, Class Vehicle paint covers about 48% (Suppl. Padmanaban Decl., Ex. 1, Doc. 153-1; *see also* Ex. 26), nearly twice the industry average. (Ex. 27; Ewing Decl., Doc. 101 at 6275-76.)

instance, that scratches ("latent damage") lead to shattering "when later events occur, any one or more of which may *stress the glass to the point of breakage*." (Ex. 11 at 3222 (emphasis added).) These "later events" include "vibration caused by driving at high speeds, vibration from driving on rough roads or road disruptions such as railroad tracks, aerodynamic lift, changes in temperature . . . and weather conditions such as hail or high winds." (*Id*.) As Kia personnel wrote internally, the Class Vehicle sunroof frequently shatters "while being driven on a rough road, or even while the vehicle is parked in a hot location." (Ex. 66 at 4070; *see also* Exs. 32-33 at 3489, 3538 (finding the sunroofs shatter at "any speed," "while closing the door," and "while the vehicle is stopped or parked").)

Kia's sister company, Hyundai, reached the same conclusion. In 2012, Hyundai recalled one model after discovering that glass scratches inflicted during manufacturing later grew due to bending stresses and eventually caused shattering. (*See* Ex. 47 at 3789; Ex. 68 at 4093.) The minor difference between Hyundai's vehicles and Class Vehicles, is that Hyundai's vehicles came off the assembly line "pre-scratched," whereas Class Vehicles develop scratches over time—for example, due to objects placed on the roof, road debris, and even overzealous carwashes. (*See* Ex. 47 at 3789; Ex. 68 at 4093; Kim Dep., Doc. 75 at PageID 1049-50 (60:18-61:7); Ewing Dep., Doc. 160 at PageID 10407-08 (105:10-106:11).) No matter how a scratch first appears, the design entails that bending will cause the scratches to deepen until they eventually shatter the sunroof. (Verghese Dep., Doc. 162 at PageID 10937 (225:12-15); Ewing Dep., Doc. 160 at PageID 10449 (147:8-20); Read Decl., Doc. 80-3 at ¶¶ 41-42.)

The conclusion that Plaintiff, Kia, and Hyundai have all reached is consistent with findings by various governmental entities too. NHTSA, working with the UN group, found, for example, that "bending loads may increase the propensity for failures to occur, specifically when vibratory loads are introduced during vehicle movement or flexion from traversing road hazards such as speed bumps." (Ex. 67 at 4080.) The Korean government also found that when sunroof glass has substantial ceramic print on it—like in Class Vehicles—the glass is more prone to shattering after bending. (Ex. 28 at 3448.)

8

So, while Kia questions its "coherence," this science is known to Kia, Hyundai, and various governmental bodies. Any dispute over who better understands this science can be litigated for all Class Vehicles at once—there is nothing individualized about the debate.

### 3. Plaintiff's expert corroborates the science underlying the defect.

Kia accuses Plaintiff of having "not tested *any* sunroof glass." (Opp. at 1.) That is not true, as Plaintiff addresses below. But it's also a red herring. Even if Plaintiff's experts conducted no testing, testing by others has corroborated this understanding of the defect.

Kia, for example, conducted testing that confirms bending stresses (from vibrations, temperature changes, and the other conditions listed above) "stress the glass to the point of breakage." (Ex. 11 at 3222; Ex. 49 at 3902-03.) Kia's testing found, in particular, that the "highest strain" of bending "stress [is] concentrated at the edges" of the sunroof where the glass is bent when clamped down onto the metal vehicle body. (Ex. 49 at 3901-03.) Kia concluded the stress made the sunroof "vulnerable . . . for breakage." (*Id.* at 3902.)

The governmental records also reflect testing and analysis. (*See* Pl.'s Br. at 8.) That testing calculated the force generated by a "worst case" road stone. (Ex. 12 at 3235.) It then found that the force from such a worst-case stone *is substantially lower* than the force sunroof glass is supposed to withstand under standard pre-sale testing for all U.S. vehicles. (*Id.*) This again confirms what Kia has confirmed privately: flying road stones do not explain why the Class Vehicle sunroof shatters. That is why the NHTSA, with the UN group, and the Korean government have been testing "bending loads" in the glass, finding the bending makes the glass far more susceptible to shattering. (Ex. 67 at 4080; Ex. 8 at 3448.)

In addition to ignoring its own testing and testing by the government, Kia ignores the testing performed by Plaintiff's expert. Tom Read has worked with tempered glass failures for 40 years, including developing glass finishing processes for NASA space shuttles. (Read Decl., Doc. 80-3 at ¶ 5.) Here, Read performed fractographic inspections of every sunroof origin that Kia preserved since it first began investigating the defect. Read's fractography reveals that, at most, just a single Class Vehicle sunroof failed immediately after an impact—all the others were progressive failures caused by bending stresses. (*Id.* ¶¶ 47-51.)

* * *

So, contrary to Kia's argument, there is a wide variety of testing that shows there is a defect. Even if the conclusions from that testing remain in dispute through trial, the evidence is common to the class and justifies certification. *DeKeyser v. Thysenkrupp*, 860 F.3d 918, 922 (7th Cir. 2017) ("Whether a jury will credit [the evidence] is a separate question" from whether plaintiff "produced common evidence"). And it is worth noting that the testing conducted to date is backed by the real-world experience of drivers, who describe shattering in contexts that indicate bending stresses—not flying rocks—are to blame:

- "[S]unroof shattered when cust[omer] shut the driver's door" (Ex. 121 at 4632.)

- "I was going over the railroad tracks, and it rained down on me." (Ex. 118 at 4578.)

- "[S]unroof shattered while in park." (Ex. 121 at 4639.)

- "Vehicle was sitting outside in a parking lot. When I came out, there was glass all over. There was a cop there and said it blew out from the heat." (Ex. 117 at 4566.)

- "While driving on the highway going over a bump, the sunroof shattered." (Ex. 121 at 4621.)

- "As soon as I closed the door, the sunroof shattered." (Ex. 113 at 4520.)

- "Sunroof glass has exploded upon shutting driver door." (Ex. 127 at 4700.)

- "[S]unroof glass blew out while sitting in a parking lot" (Ex. 121 at 4640.)

- "[T]he front glass part of the panoramic roof shattered while washing her car.) (Ex. 121 at 4628.)

Such examples abound for each Class Vehicle model. (*See* Exs. 121, 127; Read Decl., Doc.80-3 at ¶ 36.)

## III.    No design differences among the Class Vehicle models affect the defect.

Kia argues briefly that there are design differences among the four Class Vehicle models. (Opp. at 11.) None of these differences is meaningful.

As Kia concedes, it knows that "no design, materials, or manufacturing changes related to panoramic sunroofs shattering were ever implemented for any of the Class

Vehicles." (Suppl. Ex. 179 at 11440, Response 8.) Accordingly, Kia's investigations focused on all four Class Vehicle models—not just some of them. Kia's "Top Issues" reports also listed all four Class Vehicle models—not just some. And Kia's "Potential Safety Issues" listed all four Class Vehicle models—not just some. (Ex. 36 at 3621; Ex. 37 at 3662; Ex. 38 at 3683; Ex. 39 at 3707-08; Exs. 40-41 at 3710, 3717-20, 3725-28; Exs. 42-43 at 3742, 3747-49; Exs. 44-45 at 3754, 3760, 3780; Ex. 131 at 4753.)

The consistency of the defect across the four models can also be seen in the rate at which the sunroofs are shattering. While Kia argues that Plaintiff's estimated shattering rates vary widely—from 1.54% to 3.02%—that overlooks the different ages of the vehicles. The higher rate corresponds to older vehicles, which have been driven more years and more miles, and so have been exposed to far more bending stress. But when the Class Vehicle models are grouped by age, each model's sunroof replacement rate is remarkably similar:

|  | Model | Replacements Sold | Vehicles Manufactured | Replacement Rate |
|---|---|---|---|---|
| Newest | 2014-15 Sorento | 727 | 45,666 | 1.59% |
|  | 2014-15 Cadenza | 308 | 19,952 | 1.54% |
| Middle-Aged | 2011-15 Optima | 4,914 | 238,352 | 2.06% |
|  | 2011-15 Sportage | 848 | 38,995 | 2.17% |
| Oldest | 2011-13 Sorento | 1,975 | 65,347 | 3.02% |
|  | Overall (2011-15) | 8,772 | 408,321 | 2.14% |

(*See* Hannemann Decl., Doc. 80-2 at ¶ 28.) As the above table reflects, there is virtually zero difference in the rate at which the different models are experiencing shattering. This is compelling further proof of the common design principles already discussed.

These largely identical shattering rates help illustrate how the few differences among the models that Kia identifies don't actually affect shattering. Kia notes, for example, that the four models have sunroof panels of different shapes and sizes. The shape and size of a particular panel is unimportant, however. Naturally, smaller models have smaller roofs and larger models have larger roofs. But what holds constant in every Class Vehicle model is that the roof is all-glass. (Hannemann Decl., Doc. 80-2 at ¶¶ 20-21, 23; Read Decl., Doc. 80-

3 at ¶¶ 23-25; Exs.19, 21-23).) The fact that each model's sunroof spans across the whole roof means that glass (instead of steel) is forced to absorb all of the bending stresses sent into the roof. (Pl.'s Br. at 4; Hannemann Decl., Doc. 80-2 at ¶¶ 20-23; Read Decl., Doc. 80-3 at ¶¶ 25-31; Exs. 19, 21-23.) Similarly, while Kia notes the curvature of the sunroof glass can vary, the *degree* of curvature is not key; *any* curvature at all necessarily entails a stressed connection with the metal frame to which it is attached, and that creates bending stress. (Hannemann Decl., Doc. 80-2 at ¶ 21; Read Decl., Doc. 80-3 at ¶ 26.) And every Class Vehicle model has curved glass rigidly attached to a metal frame. (*Id.*) Finally, Kia suggests the amount of ceramic paint differs; but the amount does not differ much, and all four Class Vehicle models are coated with substantially more ceramic paint than industry average. (*Compare* Suppl. Padmanaban Decl., Ex. 1, Doc. 153-1 (Class Vehicle range of 43.7-53.7%) *with* Ex. 27 (typical industry range of 25-35%.)

Kia also suggests the amount of stress entering the sunroofs may vary. Each model is built with a unibody construction, however, and every sunroof is rigidly clamped on to the vehicle body. This make it inevitable that substantial stress will enter and bend the glass. (Hannemann Decl., Doc. 80-2 at ¶ 23; Ewing Dep., Doc. 160 at PageID 10385-86 (83:18-84:2).) The fact that this stress reaches levels sufficient to bend and weaken the glass can be seen in the driver reports for all four Class Vehicle models. Each model is the subject of the same type of driver reports, excerpted above, reporting that the sunroofs shatter on bumpy roads, when doors are slammed, and when temperatures change—all indicating bending stress entering the glass.

Finally, and perhaps most critically, even if there were any meaningful differences among the four Class Vehicle models, that would not warrant denying certification. At most, it would support employing model-by-model subclasses rather than one overarching class. *In re Whirlpool*, 722 F.3d at 854 ("The basic question in the litigation—were the machines defective … is common to the entire … class, although the answer may vary with the differences in design.") (citation omitted); *id.* at 860 (noting the "class may be divided into subclasses"); *see also In re Whirlpool*, 302 F.R.D. 448, 459 (N.D. Ohio 2014) (rather than

12

the "drastic step" of denying certification, "if possible, modification of the class definition, or use of subclasses, is generally preferred") (quoting H. Newberg & A. Conte, 2 Newberg on Class Actions § 7:37 at 190 (3rd ed. 1992)).

## IV.  Plaintiff has advanced a sound model for proving classwide damages.

Kia makes several arguments about damages. In each instance, however, Kia runs afoul of Sixth Circuit precedent or mischaracterizes Plaintiff's damages model.

### A.  Class members' injury is not individualized.

Kia argues that the issue of whether class members have been economically injured is individualized. But Kia offers no citation to for that point, and the Sixth Circuit has rejected it. As long as Plaintiff ultimately succeeds at trial in proving the defect, that will establish that everyone who bought the defective product suffered an injury: "If defective design is ultimately proved, *all* class members have experienced injury as a result of the decreased value of the product purchased." *In re Whirlpool*, 722 F.3d at 856 (emphasis added); *see also id*. at 857 ("all … owners were injured at the point of sale upon paying a premium").

Besides being flawed legally, Kia's injury argument misunderstands economics. Kia hypothesizes some class members would be indifferent to the defect and so would pay just as much for a defective vehicle as a non-defective vehicle. This is a factually dubious proposition—it's unlikely any driver would be indifferent to the risk of a sunroof shattering overhead. But even if true, it would not defeat certification. *In re Whirlpool*, 722 F.3d at 855 ("The existence of currently satisfied [product] owners in Ohio did not preclude the district court from certifying the Ohio class."). Instead, it is a bedrock economic principle that *all* consumers desire—everything else being equal—to pay a lower price for a given product. (Suppl. Weir Decl., Doc. 163, ¶ 7.) Accordingly, if the sunroof defect negatively impacted the market value of Class Vehicles, *all* class members suffered economic harm by paying a premium.

That is precisely what Plaintiff's damages model is designed to measure: the *market* value of Class Vehicles as impacted by the defect. If the defect negatively impacted market

value, *all* class members will have suffered economic harm, and damages can be awarded classwide. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016); *In re Whirlpool*, 722 F.3d at 856-57; (Weir Decl., Doc. 80-5 at ¶¶ 4, 11, 15, 17; *see also* Suppl. Weir Decl., Doc. 163, ¶¶ 7-8.) If, on the other hand, the damages model shows no decrease in market value, *no* class members will have overpaid. Either way, the question of injury will be answered classwide, with certification appropriate. As one court put it: "Even if an individual class member subjectively valued the vehicle equally with or without the [defect], she could have suffered a loss in negotiating leverage … on the open market [due to the defect] . . . . Obviously, prices are determined in substantial measure according to market demand." *Carriuolo*, 823 F.3d at 987.

Based on these economic principles, courts frequently approve damages models that measure a defect's impact on market value—including the conjoint-based model proposed here, designed by experts Gaskin and Weir. *E.g.*, *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015) (automotive defect suit; certified class with method from Gaskin and Weir); *Khoday v. Symantec*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015) ("Gaskin's conjoint analysis is a generally permissible method for calculating damages."); *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *2 (N.D. Cal. Oct. 27, 2016) (certifying class, relying on Gaskin conjoint); *see also In re Whirlpool*, 722 F.3d at 855-57 (approving price premium theory).

**B.      Individualized damages issues do not preclude certification.**

Kia also criticizes the damages model for failing to "measure individual class members' injuries." (Opp. at 17.) This again runs afoul of the law. At the "class certification stage, plaintiffs are not obliged to drill down and estimate each individual class member's damages." *Kleen Pro. v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016). "[R]ecognition that individual damages calculations do not preclude class certification … is well-nigh universal"; "it remains the black letter rule that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." *In re Whirlpool*, 722 F.3d at 861 (citations omitted).

With that being said, Plaintiff's damages model can calculate damages for each Class Vehicle without individual analysis. The model will measure the price premium attributable to the defect in the form of a percentage to be applied to either individual *or* aggregate vehicle prices. (Gaskin Decl., Doc 80-4 at ¶¶ 10, 21, 58; Weir Decl., Doc. 80-5 at ¶ 17; Weir Dep., Doc 99 at PageID 5812-13 (57:1-58:9).) For example, if the conjoint shows a 10% price premium, that 10% reduction can be assessed to the total revenue Kia derived from the Class Vehicles, or to each vehicle individually. (Weir Decl., Doc. 80-5 at ¶ 17; Weir Dep., Doc. 99 at PageID 5812-13, 5877 (57:1-58:9, 122:7-16), PageID 5878-80 (123:14-125:6).)

While it may sound—at first blush—like the latter method (applying the percentage reduction to particular vehicles) requires individualized inquiries, that's not true. Common evidence can provide the approximate price of each Class Vehicle—either the vehicle's MSRP or, more conservatively, its "dealer invoice price," which is the wholesale price dealers paid Kia. (Weir Decl., Doc. 80-5 at ¶ 18; Weir Dep., Doc. 99 at PageID 5871-72 (116:7-117:24).) Since dealers need to sell vehicles at a profit to stay in business, using this dealer invoice price to measure damages is both reasonable and highly conservative. *Rikos v. Procter & Gamble*, 2014 WL 11370455, at *13 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015) (approving "wholesale sales measure" as a "conservative" alternative to actual sales amounts, allowing for "a just and reasonable estimate of damage based on relevant data"); *accord In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 267–68 (N.D. Ohio 2014) ("damages need not be exact"). Kia has already produced the dealer invoice prices for every Class Vehicle model, (*see* Ex. 35; *see also* Exs. 6-10), so it will be a relatively straightforward task to take those prices and apply the conjoint-based percentage reduction to measure damages. (Weir Decl., Doc 80-5, at ¶¶ 17-18; Weir Depo., Doc. 99 at PageID 5870 (115:17-117:24).) This straightforward, classwide proof further supports a finding of predominance.

Kia is also wrong to suggest this model only calculates damages for those who bought vehicles, rather than those who leased. The conjoint and economic analyses recognize that some Class Vehicles were leased. The conjoint-survey pool of respondents

will include both buyers and lessees. (Doc. 80-4 at ¶ 31.) In addition, the survey states drivers will not learn of the defect until after they "purchased *or leased* the vehicle." (*Id.* at PageID 2960 (emphasis added).) The survey also tells participants that "the decision to buy versus lease would be left to you and your dealer." (*Id.* at PageID 2962.) As Gaskin explains, the survey is designed this way because "there is considerable overlap" between those who buy and those who lease vehicles; many consumers first "identify the vehicle they wish to acquire and then only afterward decide whether to … purchase or lease" it. (Gaskin Suppl. Dec., ¶¶ 6-8.)

From an economic perspective, while lease transactions differ in some ways from purchase transactions, lease payments directly correlate to dealer invoice prices. (Suppl. Weir Decl., Doc. 163, ¶ 16.) This means that the revenue generated for each Class Vehicle is about the same, whether initially sold or initially leased and then sold. (*Id.*, ¶ 16 n.13, ¶¶ 14-17; Suppl. Gaskin Decl., Doc. 163, ¶¶ 4-9.) This allows the dealership invoice price to be used to measure damages for leased and sold vehicles alike. (Suppl. Weir Decl., Doc. 163, ¶¶ 9-10 n. 7.)

### C. Allocating damages between multiple owners does not impact certification.

Kia also suggests the damages model does not measure damages for used-vehicle purchasers. What Kia fails to acknowledge is the model measures damages on a per-*vehicle* basis, not a per-*owner* basis. (Weir Decl., Doc. 80-5 at ¶ 17; Weir Dep., Doc. 99 at PageID 5812-14 (57:5-59:9).) This allows for a more conservative measure, since it does not add a premium each time a vehicle is resold, and instead focuses only on the premium that benefited Kia at the original point of sale.

That means the question of how to divvy up price premium damages between original and subsequent owners is not a question of damages *measurement*; it's a question of damages *allocation*. And Kia lacks standing to challenge certification on grounds relating to allocation. *Rikos v. Procter & Gamble Co.*, 2014 WL 11370455, at *13 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015) ("Defendant's interest in not paying excess

damages" is not "implicated" unless "aggregate liability could not be reliably determined");
*Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669-71 (7th Cir. 2015) (collecting cases). How to
allocate "an aggregate judgment" among new and used purchasers "will become an intra-
class matter accomplished pursuant to a court-approved plan of allocation." *Rikos*, 2014 WL
11370455, at *14 n. 11 (citing *In re Terazosin Litig.*, 220 F.R.D. 672, 699 (S.D. Fla. 2004), *In
re Sugar Litig.*, 73 F.R.D. 322, 353-54 (E.D. Pa. 1976) ("Upon the establishment of such
aggregate damages as may be assessed against defendants, the problem of allocations …
largely becomes a plaintiff's problem."))

How to allocate damages is thus not an issue at certification. Even it were, as
Plaintiff's economist testified, there are straightforward ways of allocating damages in this
case that will not require undue time or complexity. (*See* Weir Dep., Doc 99 at PageID
5813-14 (58:15-59:9) (discussing potential allocation methods.)[4]

## V. Individual reliance and knowledge issues do not exist.

Kia argues that issues relating to its knowledge of the defect and class members'
reliance are individualized. (Opp. at 12, 15-16.) But neither Kia's knowledge nor class
members' reliance is an element of Plaintiff's claims.

The case Kia cites for knowledge being an element of Plaintiff's claims sets forth no
such requirement. *See Germain v. Teva Pharmaceuticals*, 756 F.3d 917, 927 (6th Cir. 2014).
Kia's authority for reliance is just as shaky: several of Kia's cases involve claims not at issue
here. *See Stout v. J.D. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000) (fraud); *Faralli v. Hair Today,
Gone Tomorrow*, 2007 WL 120664, at *14 (N.D. Ohio Jan. 10, 2007) (fraud). And *Cancino v.
Yamaha Motor*, discusses reliance in the context of a *written* warranty claim, not *implied*
warranty. 2010 WL 2607251, at *12 (S.D. Ohio June 24, 2010). As the Sixth Circuit

---

[4] Relatedly, Kia argues that any class member who bought a new Class Vehicle and later sold it, suffered no
damages. This argument too is unsound as a matter of economics. (Suppl. Weir Decl., Doc. 163, ¶¶ 11-12.)
Not surprisingly, Kia cites no legal authority to support it, and the Court should thus reject it. *See, e.g.*, *Flynn v.
FCA US LLC*, 327 F.R.D. 206, 223-24 (S.D. Ill. 2018) (rejecting defendant's suggestion, made "without
developed argument to support the contention, that the interests of a new purchaser are antagonistic to those
of a used purchaser because only one person in a chain of ownership can recover overpayment damages" and
noting courts certify certified classes involving claims of both purchasers and lessees) (citing *Daffin*, 458 F.3d at
552).

confirmed in *In re Whirlpool*, neither Plaintiff's implied warranty nor negligent design claim requires proof of knowledge or reliance. *See In re Whirlpool*, 722 F.3d at 853.

Even if the law were otherwise, proving what *Kia* knew, by definition, is not an issue individualized to class members. Courts consistently hold that when liability turns on a defendant's knowledge, "judicial efficiency will be improved through the class mechanism as opposed to relitigating these same issues in a series of individual cases." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 346 (N.D. Ohio 2001) (citation omitted); *see also Jones v. H. & T. Enterprises*, 88 Ohio App. 3d 384, 390 (1993) (under Ohio law, "a defendant is charged with knowledge of a situation he created"); *Cancino*, 2010 WL 2607251, at *7 (common questions included "whether Yamaha knew of the defect in [its] motorcycles"). Here, the potential hazard of glass shattering was apparent as soon as Kia introduced a design that called for an all-glass roof. If Kia did not realize the hazard then, it would have realized it soon after the vehicles went on sale: it began receiving claims for shattered sunroofs within the first year of each model going on sale. (See Ex. 187 at 11503, 11514, 11523, 11527.)

Likewise, even if Plaintiff's claims required proof of reliance, direct proof of reliance is not needed. When a defendant fails to disclose a material fact, courts permit classwide inferences of reliance and the cases are "generally certified as class actions." *Cope v. Metro. Life Ins. Co.*, 82 Ohio St. 3d 426, 436 (1998). While Kia argues some class members knew about the sunroof defect before buying, Kia's only evidence is one person who said he read about shattering in a model different from the one he bought. (Doc. 100 a 601 84:310.) Kia, for its part, concedes it *never* warned customers or allowed its dealerships to do so. (Suppl. Ex. 188 at 11534-39, Responses 2-12.) There is thus no basis for finding that class members knew of the defect before buying vehicles; to this day, Kia publicly denies its existence.

## VI.   Mr. Kondash is both typical and adequate as a class representative.

Kia argues against certification on the ground that Plaintiff owns just one of the four Class Vehicle models. But for the same reasons that commonality is satisfied, so are typicality and adequacy. *See In re Whirlpool*, 722 F.3d at 853 (discussing how commonality,

typicality, and adequacy all "tend to merge"). Where there is an overarching common question, such as a design defect, certification is appropriate. *Id.* at 853-54. And contrary to Kia's suggestion, it is common to certify a class spanning multiple models and model years. *E.g., Falco v. Nissan N. Am.*, 2016 WL 1327474, at *1 n.2 (C.D. Cal. Apr. 5, 2016) (23 model years); *In re Mercedes-Benz Tele Aid*, 257 F.R.D. 46, 48 (D.N.J. 2009) (5 model years); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 956 (9th Cir. 2005) (23 model years).

Kia also argues that since Plaintiff bought a new vehicle, he is atypical of those who leased or bought used. But various courts have certified classes with such mixed compositions. *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 551 (6th Cir. 2006) (class included "all Ohio residents who lease or own"); *Wolin*, 617 F.3d at 1171 (class encompassed both purchasers and lessees); *Falco*, 2016 WL 1327474, at *6 (purchaser was typical of lessees "[b]ecause Plaintiffs are not asking for vehicle buybacks, a recall, or other forms of relief perhaps not available for leased vehicles").

Next, Kia argues Plaintiff (whose sunroof already shattered) is not typical of those whose sunroof has not. Kia again runs afoul of precedent. *See In re Whirlpool*, 722 F.3d at 857–58 (holding plaintiffs would "fairly represent those . . . purchasers who have not yet experienced [the] problem" since all class members "suffered injury immediately upon purchase … due the design defect in, and the decreased value of, the product itself").

Kia also worries that a class seeking economic damages only may prejudice class members who suffer personal injuries. But as this Court has recognized, class members wishing to pursue such claims may opt out of the class. *Daffin v. Ford Motor Co.*, 2004 WL 5705647, at *4 (S.D. Ohio July 15, 2004), *aff'd*, 458 F.3d 549 (6th Cir. 2006); *accord Chapman*, 2017 WL 1433259, at *5 (rejecting argument that decision "to seek only economic damages" risked waiver of other class members' personal injury claims because "Sixth Circuit district courts … have … permitted individuals with personal injury claims to opt out"). Alternatively, the class can be defined to exclude persons who bring personal injury claims. *Gasperoni v. Metabolife, Int'l*, 2000 WL 33365948, at *4 (E.D. Mich. Sept. 27, 2000).

Finally, Kia argues Plaintiff is inadequate for not seeking a full refund of the price paid for his vehicle. It is far from obvious that full refunds would be available, however, and Kia cites no authority to suggest full otherwise. *See, e.g.*, *Rikos*, 799 F.3d at 523-24 (full-refund model appropriate where the entire product "is worthless").

## VII. Class certification is superior to individual actions.

Kia suggests class members are better served arbitrating individually. Kia has not identified a single class member who deemed this alternative palatable (let alone superior), however, which is not surprising given the extensive discovery and expert costs required to prosecute this type of case. *In re Whirlpool*, 722 F.3d at 861 ("class members are not likely to file individual actions—the cost of litigation would dwarf any eventual recovery.").

In the same vein, Kia suggests that because the NHTSA investigation technically remains open, the Court should wait for it to end. But Kia's only support for that suggestion comes from cases involving regulatory actions undertaken by different agencies. In the context of the NHTSA, on the other hand, courts routinely deny motions to stay. *E.g.*, *In re Takata Airbag Litig.*, 2015 WL 12641693, at *3 (S.D. Fla. Sept. 21, 2015) (it could "take years for NHTSA to reach a conclusion . . . or NHTSA may not reach any conclusion"); *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208, 1218 (N.D. Cal. 2002); *see also Daffin*, 2004 WL 5705647, at *8 ("the Motor Vehicle Safety Act and NHTSA itself do not in any way preempt a plaintiff's right to bring common law claims"). As noted above, the NHTSA investigation is already six years old, with no apparent end in sight, and the agency is facing budgetary constraints that suggest its activity will remain slowed.

## VIII. Plaintiff does not seek to certify an express warranty claim.

Finally, the Court need not decide any issues relating to an express warranty clam; Plaintiff has not sought to certify that claim.

## CONCLUSION

For these reasons, Plaintiff asks that the Court grant his motion for class certification.

DATED: September 23, 2019               Respectfully submitted,

**GIBBS LAW GROUP LLP**

*/s/ David Stein*

Eric H. Gibbs (*pro hac vice*)
David Stein (*pro hac vice*)
Steve Lopez (*pro hac vice*)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: 510-350-9700
Facsimile: 510-350-9701
ehg@classlawgroup.com
ds@classlawgroup.com
sal@classlawgroup.com

Gregory F. Coleman (*pro hac vice*)
Lisa A. White (*pro hac vice*)
Mark E. Silvey (*pro hac vice*)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: 865-247-0080
Facsimile: 865-533-0049
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
mark@gregcolemanlaw.com

Jason T. Dennett (*pro hac vice*)
**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
Telephone:     (206) 682-5600
Facsimile:     (206) 682-2992
jdennett@tousley.com

Paul C. Peel (*pro hac vice*)
**FARRIS BOBANGO BRANAN PLC**
999 S. Shady Grove Road, Suite 500
Memphis, Tennessee 38120
(901) 259-7100 Telephone
(901) 259-7150 Facsimile
ppeel@farris-law.com

Drew Legando (0084209)
**MERRIMAN LEGAL, LLC**
1360 West 9th Street, Ste. 200
Cleveland, Ohio 44113-1254
Telephone: 216-820-9799
Facsimile: 216-522-9007
drew@merrimanlegal.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ David Stein*