IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| TOM KONDASH, on behalf of himself and all others similarly situated, | : : : | Case No. 1:15-cv-506 |
| Plaintiff, | : : | Judge Matthew W. McFarland |
| v. | : : | |
| KIA MOTORS AMERICA, INC., and KIA MOTORS CORPORATION, | : : | |
| Defendants. | : : | |

---

**ORDER DENYING CLASS CERTIFICATION (Doc. 80)**

---

In July 2015, while driving his 2012 Kia Optima on the highway with his wife, Plaintiff Tom Kondash suddenly heard a loud noise as his panoramic sunroof burst, causing glass to rain into his car. The wind whipped the sunshade awning around and dumped broken glass over Kondash and his wife, causing small cuts and glass splinters to their arms and legs. As it turns out, Mr. Kondash was not the only Kia owner who experienced their panoramic sunroof to spontaneously shatter.

Shortly thereafter, Kondash filed this prospective class action lawsuit against Kia. After years of litigation, this case is now finally before the Court on Kondash's Motion to Certify Class. (Doc. 80.)

While it may appear that Kia's spontaneously shattering sunroofs are a problem, the question presented to the Court is much narrower: whether a class-action lawsuit is the most judicially efficient avenue to resolving that problem?

# BACKGROUND

## I.    Procedural Background

Kondash seeks to certify this class action based on an alleged common design defect of certain Kia vehicles' panoramic sunroofs ("PSRs").  He alleges that this "systematic" design defect causes Kia PSRs to spontaneously shatter.  His proposed class would consist of all persons and entities who purchased or leased a "Class Vehicle" in Ohio.  "Class Vehicles" include the following Kia models equipped with PSRs: 2011-2015 Sorento, 2011-2015 Sportage, 2011-2015 Optima (including hybrid), and the 2014-2015 Cadenza.  Although Kondash initially brought a host of claims against Kia,[1] only two remain: (1) negligent design, and (2) breach of implied warranty.

Kondash contends that certifying this class action is appropriate because "[c]lasswide proof can speak to the main issues in this case: that there's a defect, that it's dangerous, and that Kia continued to manufacture and sell the vehicles while concealing the danger from drivers."  (Doc. 80-1.)

---

[1] Plaintiff initially brought fourteen causes of action: (1) violation of the Ohio Consumer Sales Practices Act ("OCSPA"); (2) unjust enrichment; (3) negligence; (4) breach of express warranty; (5) breach of implied warranty; (6) violation of the Delaware Deceptive Trade Practices Act; (7) violation of the Florida Deceptive & Unfair Trade Practices Act; (8) violation of the Louisiana Redhibition Law; (9) violation of the New Jersey Consumer Fraud Act; (10) violation of the New York General Business Law § 349; (11) violation of the New York General Business Law § 350; (12) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (13) violation of the Texas Deceptive Trade Practices-Consumer Protection Act; and (14) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. (Doc. 1.)

However, on June 24, 2016, Judge Susan J. Dlott dismissed the OCSPA claim (claim 1), the unjust enrichment claim (claim 2), and all claims of non-Ohio residents (claims 6-14).  (Doc. 49.)  She also dismissed the negligence claim (claim 3), in part, limiting it to just a negligent design claim.  (*Id.*)  And, on September 23, 2019, Plaintiff stated that he does not seek to certify the express warranty claim.  (Doc. 169.)

II.    **Kia Panoramic Sunroofs**

Starting in the late 2000s, Kia began selling PSRs, which are larger than traditional sunroofs and allow more light to enter the vehicle cabin. Kia offered PSRs as part of luxury upgrade packages, which cost thousands more than non-upgrade models. Kia uses tempered glass for its PSRs, which, according to Kia, "is the material of choice for about 90% of sunroofs industry-wide." (Doc. 155.) Tempered glass is favored because of its strength, low weight, and—most relevant here—its reduced risk of injury. This is because when tempered glass fails, usually due to a severe impact that breaks the glass, it is designed to fragment immediately into small pieces that are unlikely to cause serious injury. This fragmentation is consistent with the customer complaints proffered by Kondash.

Automotive glass—and the way it is used and designed to break—is highly regulated. *See Beaty v. Ford Motor Co.*, 2020 WL 639408, at *5 (W.D. Wash. Feb. 11, 2020) ("the manner in which automotive glass is used and is designed to break is a matter of well-considered governmental regulation"). As such, the glass used by Kia undergoes extensive evaluation, testing, and certification. Federal law requires that all auto glass conform to global engineering standards. *See* 49 C.F.R. § 571.205.S5.1. These standards require manufacturers to certify that their tempered glass passes stringent testing, including (1) a ball drop test, (2) a fragmentation test, and (3) a shot bag test. Kia conducts extensive internal testing as well, and has high standards and protocols that it requires its suppliers to abide by.

3

Kia introduced its first panoramic sunroof in the 2011 Sorento. By July 2011, however, Kia had already begun tracking PSR failures after an employee's PSR shattered while he was driving his 2011 Sorento on the highway. By May 2012, Kia had received 50 reports of sunroof fractures for the 2011-2013 Sorento. Kia quickly opened an internal investigation and ran numerous tests to determine the root cause. Kia also obtained the assistance of their PSR supplier, Webasto Products North America, and the Hyundai-Kia America Technical Center, Inc. They all concluded that "no design, manufacturing or assembly defect existed," and that "breakage typically was caused by external impacts." (Doc. 80-93.) [2]

Regardless, Kia contacted the National Highway Traffic Safety Administration (NHTSA), who opened their own investigation. At oral argument, counsel for Kia represented that, generally, when NHTSA determines that a car has a defect, it orders a recall within 48 hours. But after more than six years of investigating, the NHTSA investigation remains open.

Meanwhile, international efforts sprang up. The Korean auto Regulator KATRI released a study that suggested ceramic paint may reduce the impact resistance of PSR glass. (Doc. 80-3 at fn. 18.) The United Nations convened an Informal Working Group (IWG) which investigated and made the following relevant findings: (1) "bending loads may increase the propensity for failure to occur, specifically when vibratory loads are introduced during vehicle movement or flexion from traversing road hazards such as

_____

[2] At oral argument, counsel for Kia represented that, in sum, Kia has conducted at least six investigations, none of which have found a defect.

speed bumps," (2) "thickness of glass [did not] seem to affect exhibiting sudden

breakage," and (3) "impacts from small objects were likely the cause." (Doc. 106, Ex.

149; Doc. 107, Ex. 161.) However, the IWG "agreed . . . that no further data research for

glass breakage is necessary." (*Id.*)

      But Kia PSRs continued to shatter. So Class Members decided to seek relief from

the Court.

## III.    Motions to Exclude Expert Testimony

      To help explain the class-wide defect, Kondash retained two defect experts—Neil

Hannemann (Doc. 80-2) and Thomas Read (Doc. 80-3)—who prepared reports which

Kondash relies on in support of his Motion to Certify Class. In these reports,

Hannemann and Read purportedly uncovered what none of these other investigations

have been able to determine: a root cause. According to them, the reason PSRs

spontaneously shatter is due to a "systematic" design defect. Since PSRs effectively

replace traditional steel roofs with glass, the glass is forced to absorb stress typically

absorbed by steel. Kia then applies ceramic paint which further weakens the glass.

Again, according to Kondash and his experts, this combination of constantly bending

glass, weakened by ceramic paint, "cannot withstand the run-of-the-mill forces that

enter the roof during normal driving. Eventually, these forces bring the sunroof to its

breaking point." (Doc. 169.) Kia, however, has moved to exclude both expert reports.

(Docs. 156 and 157.)

      Kondash also retained two damages experts, Steven P. Gaskin (Doc. 80-4) and

Colin B. Weir (Doc. 80-5), whom Kia has also moved to exclude. (Docs. 158 and 159.)

Kondash, meanwhile, filed a Motion to Exclude the testimony of one of Kia's experts,

Dr. Bruce Strombom.  (Doc. 170.)  Each of the five motions to exclude are fully briefed

and ripe for the Court's review, as is the Motion to Certify Class.  (Doc. 80.)  In addition,

on September 24, 2020, the Court entertained oral arguments on the briefs.

LAW

## I.     Class Certification Under Fed. R. Civ. P. 23

Class certification is appropriate when the moving party satisfies all four

requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and

at least one of the three requirements listed in Rule 23(b).  *See Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338, 345 (2011).  Relevant here, Rule 23(b)(3) provides that a class action

may be maintained if "the court finds that the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that

a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard.  A party seeking class

certification must affirmatively demonstrate his compliance with the Rule—that is, he

must be prepared to prove that there are *in fact* sufficiently numerous parties, common

questions of law or fact, etc."  *Dukes*, 564 U.S. at 350 (emphasis in original).  Before

certifying a class, the Court must conduct a "rigorous analysis" into whether the

prerequisites of Rule 23 are met.  *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1078-

79 (6th Cir. 1996) (*citing General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)).  This

"rigorous analysis" may "overlap with the merits of the plaintiff's underlying claim . . .

6

because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (cleaned up). As such, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.

However, when conducting this "rigorous analysis," neither the Supreme Court nor the Sixth Circuit have decided whether a district court must undertake a *Daubert* analysis when an expert's report is critical to class certification. *See Comcast Corp. v Behrend*, 569 U.S. 27, 39-40 (2013) (Ginsburg, J., dissenting) (describing how the Court granted certiorari to resolve the *Daubert* question but did not ultimately reach its merits); *Hicks v. State Farm Fire & Cas. Co.*, 2020 WL 3888156, at *10 (6th Cir. July 10, 2020) ("We have yet to settle this matter . . . [and] [t]his case does not present an opportunity to do so" since the district court did not rely on the expert's opinion in ruling on class certification).

Other "courts of appeals have taken different approaches to this issue." *Id.*; *compare Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815−16 (7th Cir. 2010) (requiring a district court to rule on challenges to an expert's qualifications if the expert's report is "critical to class certification"); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020) ("District Court abused its discretion in failing to conduct rigorous analysis of competing expert reports that relied on competing evidence and assumed competing facts in determining whether purchasers met the predominance requirement for class certification."); *with In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612

(8th Cir. 2011) (approving a certification order without a full *Daubert* analysis and explaining the impracticalities of requiring a district court to consider the admissibility of evidence at the class certification stage).

**II.    Expert Testimony Under Fed. R. Evid. 702 and *Daubert***

Rule 702 of the Federal Rules of Evidence addresses the admissibility of expert witness testimony: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Experts are given wide latitude to explain the significance of scientific and technical evidence to juries. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). They are even permitted to testify to the ultimate issue the jury is tasked with deciding in the case. Fed. R. Evid. 704. However, jurors can be easily overwhelmed, confused, and misled by "hired-gun" experts peddling "junk science." *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."). As such, the district court must act as a "gatekeeper" in order to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597.

Although district courts have broad discretion to determine the admissibility of expert testimony, "its discretion is not unbridled." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 267 (6th Cir. 2001). In determining whether proffered expert testimony is admissible, district courts must make three inquires. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). First, the court must determine if the witness is qualified. Second, it must determine if the testimony is relevant. Third, and most relevant here, the court must determine if the testimony is reliable. *Id.*

An expert's testimony is reliable if it is grounded in "scientific knowledge." *Daubert*, 509 U.S. at 590. The court must consider whether the reasoning or methodology underlying the testimony is scientifically valid; subjective belief or unsupported speculation is not enough. *Id.*; *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014) ("The requirement that any and all scientific testimony or evidence admitted [be] not only relevant, but reliable, . . . entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.") (*citing Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir.2004)).

In *Daubert*, the Supreme Court identified several considerations that might bear on the trial court's determination of whether given testimony is scientifically valid and therefore "reliable": (1) whether the theory or technique had been tested; (2) whether the theory or technique can be or has been peer reviewed or published; (3) the known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) the general acceptance by the relevant scientific

9

community and the testimony's degree of acceptance therein. 509 U.S. at 593–94 (1993).

Furthermore, the Sixth Circuit has provided "red flags" that demonstrate a lack of reliability: (1) improper extrapolation, (2) reliance on anecdotal evidence, (3) reliance on temporal proximity, (4) insufficient information about the case, (5) failure to consider other possible causes, (6) lack of testing, and (7) subjectivity. *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 177 (6th Cir. 2009). In addition, "if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

## ANALYSIS

Since Kondash seeks class certification under Rule 23(b)(3), he must first demonstrate that the four prerequisites of Rule 23(a) are satisfied—numerosity, commonality, typicality, and adequacy. If he can, then he must also establish that: (1) common questions predominate, and (2) a class action is the superior method to adjudicating the case. Kia argues that class certification should be denied for many reasons. In fact, the only element of Rule 23 that Kia does not dispute is numerosity under Rule 23(a)(1). Although many of Kia's arguments have merit, the Court need only discuss one: predominance.

## I.   Do Common Questions Predominate?

### A. Common Questions

Rule 23(a)(2) requires plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Under this requirement, "all class members' 'claims must depend upon a common contention . . . that is capable of

10

classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Mays v. LaRose*, 951 F.3d 775, 793 (6th Cir. 2020) (*citing Dukes*, 564 U.S. at 350). In other words, the "common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (cleaned up). This standard is not demanding: "Rule 23(a) simply requires *a* common question of law or fact." *Bittinger v. Tecumseh Prod. Co.*, 123 F.3d 877, 884 (6th Cir. 1997) (emphasis in original).

Kondash identifies a single common question. He asserts that "both claims hinge—in large part—on the overlapping question: whether the Class Vehicles are defective such that their panoramic sunroofs are prone to shattering . . . Plaintiff's negligent design claim requires proof that Kia breached its duty to design against reasonably foreseeable hazards . . . And Plaintiff's implied warranty claim, similarly, requires proof that Kia manufactured and sold Class Vehicles with a defect." (Doc. 80-1.) Whether a common defect exists amongst all Class Vehicles is a question that is susceptible to generalized, class-wide proof. Accordingly, Kondash has satisfied the commonality requirement of Rule 23(a)(2). However, this does not end our inquiry.

Although similar to Rule 23(a)'s commonality requirement, the predominance requirement of Rule 23(b)(3) is "more demanding." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only

individualized proof." *Randleman v. Fidelity Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (citation omitted) (Scalia, J.). In other words, plaintiffs must produce enough evidence to show that the class "will prevail or fail in unison." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (Ginsburg, J.).

Kondash's whole theory of his case is embedded on the assertion that "[t]he panoramic sunroofs in Class Vehicles share a common design concept that makes them prone to abrupt shattering." (Doc. 80-1.) According to him, "[t]he flaw in Kia's design is thus well-understood." (Doc. 169.) But it is not well-understood. If it was, NHTSA's six-year investigation would have concluded by now and Kondash would not have needed two experts to testify as to what, exactly, the "design defect" is and how it is common amongst all 22 model-year Class Vehicles.

Kondash asserts that he "can and will address this predominating factual issue [the existence of a common defect] using common evidence . . . mostly from Kia's own documents, including formal inquiry-opening reports, submissions to the NHTSA, and warranty and other corporate records." (Doc. 80-1.) But Kia's own documents, which include extensive internal investigation reports, all reached the same conclusion: there was no evidence of a defect and the cause of sunroof fracture was likely due to external

impact from road debris. (Doc. 155.) The only other "common evidence" Kondash cites

is "[o]ther publicly available documents, including those relating to NHTSA and

international efforts [which] further help explain the existence and nature of the defect."

(Doc. 80-1.) The NHTSA investigation, however, is still ongoing and has yet to reach

any conclusions. And, the international efforts Kondash references either concluded

that ceramic paint could be a contributing factor or that "impacts from small objects

were likely the cause" and that "no further data research for glass breakage is

necessary." (Doc. 106, Ex. 149; Doc. 107, Ex. 161.)

        The only evidence Kondash has left that demonstrates a class-wide defect are the

expert reports of Hannemann and Read. Kia, however, has moved to exclude both

under Fed. R. Evid. 702 and *Daubert*. As such, the admissibility of this testimony is not

only "critical to class certification," *Am. Honda*, 600 F.3d at 815-6, it is likely dispositive.

   **B. Motions to Exclude Defect Experts**

        As discussed above, neither the Supreme Court nor the Sixth Circuit have

decided whether a district court must undertake a *Daubert* analysis when an expert's

report is critical to class certification. *Supra* p. 6-8. And circuits are split on how

extensive a district court's "rigorous analysis" must be at the class certification stage.

*Id*. Yet the degree of a district court's rigorous analysis is, perhaps, most significant

when determining if a proposed class satisfies predominance under Rule 23(b)(3).

        To answer this question, the Third Circuit recently adopted the following three-

step approach, which this Court finds practical:

13

> To determine whether the putative class has satisfied predominance (indeed, all
> applicable Rule 23 requirements), the District Court must conduct a "rigorous
> analysis" . . . that involves three key aspects. **First**, the court must find that the
> requirements of Rule 23 are met and any factual determinations supporting Rule
> 23 findings must be made by a preponderance of the evidence. **Second**, the court
> must resolve all factual or legal disputes relevant to class certification, even if
> they overlap with the merits. **Third**, the court must consider all relevant
> evidence and arguments, including expert testimony, whether offered by a party
> seeking class certification or by a party opposing it. If, after all that, the Court is
> convinced by a preponderance of the evidence that the plaintiffs' claims are
> capable of common proof at trial, then the predominance requirement is
> satisfied.

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190–91 (3d Cir. 2020) (cleaned

up; emphasis added) (*citing Falcon*, 457 U.S at 161; *Dukes*, 564 U.S. at 351; *Marcus v.*

*BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012); *In re Hydrogen Peroxide Antitrust*

*Litig.*, 552 F.3d 305, 310 (3d Cir. 2008)). As the Third Circuit makes clear, these three

steps need not be analyzed in any particular order. *Id.*

The Court finds that the Third Circuit's approach is consistent with Sixth Circuit

precedent. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838,

851 (6th Cir. 2013) ("'rigorous analysis' may involve some overlap between the proof

necessary for class certification and the proof required to establish the merits of the

plaintiffs' underlying claims . . . There is nothing unusual about 'touching aspects of the

merits in order to resolve preliminary matters ... [because doing so is] a familiar feature

of litigation.'"). At least one court in the Northern District of Ohio has held that

"[w]here this Court must probe merits questions, it must resolve any material

evidentiary disputes." *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 236 (N.D.

Ohio 2014) (*citing In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 324 (3d Cir.2008);

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.2011)).

Because the expert testimony of Hannemann and Read is critical to the question

of class certification, the Court will first resolve Kia's motions to exclude that testimony.

### 1. Neil Hannemann

In sum, Hannemann offers two broad opinions: (1) a common defect exists

amongst all Class Vehicles, and (2) this defect is dangerous. (Doc. 80-2.) Hannemann's

second opinion—that the defect is dangerous—is inadmissible since it is obvious and

capable of comprehension by a lay person. *See Churchwell v. Bluegrass Marine, Inc.*, 444

F.3d 898, 905 (6th Cir. 2006) ("[E]xpert testimony does not assist where the jury has no

need [ ] for an opinion because it easily can be derived from common sense, common

experience, the jury's own perceptions, or simple logic."). The admissibility of

Hannemann's first opinion, however, is more complicated.

Hannemann testifies that, "it is my opinion that the panoramic sunroofs in the

Kia vehicles at issue are defective." (Doc. 80-2.) He reaches this conclusion by

determining that the Class Vehicles have a 2.14% failure rate. Hannemann calculated

his failure rate by dividing the number of "original equipment replacement panoramic

sunroof panels" sold by the number of vehicles sold.

| Model | Parts Sold | Vehicles Manufactured for Sale | Percentage of Glass Part Sales per Vehicles Sold |
|---|---|---|---|
| 2011-2013 Sorento | 1,975 | 65,347 | 3.02% |
| 2014-2015 Sorento | 727 | 45,666 | 1.59% |
| 2011-2015 Optima (includes hybrids) | 4,914 | 238,352 | 2.06% |

15

| 2011-2015 Sportage | 848 | 38,995 | 2.17% |
|---|---|---|---|
| 2014-2015 Cadenza | 308 | 19,952 | 1.54% |
| **Overall** | 8,772 | 408,312 | **2.14%** |

Hannemann concludes by testifying that, "[t]he failure rates I have estimated are higher than I would expect to see in a non-defective sunroof and is higher than would be considered acceptable in the automotive industry." (*Id*.)

Kia attacks the reliability of Hannemann's testimony in various ways, most of which fail as they go to weight, not admissibility.  However, as discussed below, three of Kia's arguments have merit and warrant exclusion of the expert testimony.

### (i)  Hannemann's 2.14% Failure Rate is Not Reliable

Hannemann's opinion that a class-wide defect exists is based almost exclusively on his calculation of a 2.14% failure rate.  But as Kia points out, his calculations are not reliable: Hannemann's failure rate does not actually calculate or reflect "failures" because he counts *replacement parts sold*, not *incidents*.  This inflates his purported failure rate in two ways.

First, Hannemann's own report shows that multiple replacement parts may be used in any one sunroof repair, especially since the Class Vehicles "each have either two or three tempered glass panels." (Doc. 80-2.)  Yet under Hannemann's calculation, every replaced pane of glass would count as a separate "failure."  As such, if a Class Vehicle had to order two—or even three—panels for replacement as the result of one incident, Hannemann would count each panel that was order, thereby double or triple counting the number of sunroof failures.  (*See* Doc. 129 at 178:22-179-2, "what you're going to get at is there's a range of 2 percent to 4 percent error, possible error in that.

16

And I agree. And my numbers could be off by a little bit. I know there was some vehicles that had more than one piece of glass replaced.") (*see also id.* at p. 176-183).

Second, Hannemann counts every time a replacement part was sold, regardless of the reason why. (*See id.* at 187:15-22, "Q: Okay. That is the total number of each of these parts sold regardless of what the reason was for the replacement, correct? A: It's just the parts sold. Q: Period? A: **I don't even know if it was replaced. They might have just bought it and hung it on their living room wall**.") But Kia points out the obvious—replacement parts could be ordered for any number of reasons, not just for "spontaneous shattering" (e.g. car crash, leaking, wind, or the mechanism that opens the sunroof). (*See id.* at 170:2-6, "So it's—it is an estimate because every part sale doesn't necessarily mean a failed part . . . So, you know, it could be off by a little bit.") In fact, Hannemann admits that he did not look at any data that showed why parts were replaced. (*Id.* at 193:23-194:2, "Q: You don't have any hard data that you've seen that quantifies how many replacements occur because of these other reasons, you don't have that? A: No . . . .").

Kondash, meanwhile, fails to address these concerns. Instead, he counters by arguing that Hannemann's rate (replacement parts sold) is more accurate than the rate used by Kia (claims rate).[3] But this argument is unpersuasive since (1) Kondash fails to even acknowledge the potential errors in Hannemann's replacement parts calculation, and (2) saying "*that* method is bad" does not mean that "*this* method is good."

---

[3] Kia's failure rate divides the number of "claims" by the number of vehicles sold. (Doc. 102.) "Claims" data includes all of the following: warranty, goodwill, consumer affairs, technical assistance center, and filed product quality reports. (*Id.*)

Moreover, the "claims" rate used by Kia appears to be more generally accepted within the industry. When asked, Hannemann could not cite a single example of when anyone else had ever used "replacement parts sold" to determine a rate of failure, assess the existence of a defect, or order a recall. (*Id*. at 212:1-214:25.) Hannemann also admitted that the rate Kia uses is consistent with what NHTSA has used in the past (*id*. at 206:20-25), and that Kia's calculated failure rate takes into consideration even more data than what NHTSA uses. (*Id*. at 207:3-6.)

Accordingly, the third *Daubert* factor—known or potential error rate—weighs heavily against admissibility, as does the fifth *Daubert* factor—general acceptance by the relevant scientific community. The fifth Sixth Circuit "red flag"—failure to consider other possible causes—also appears to favor exclusion.

### (ii) Hannemann's Opinion that Failure Rates "Are Higher Than I Would Expect" Has No Factual Basis and is Purely Speculative

Hannemann ultimately concludes that there must be a defect because the failure rates he calculated are "higher than I would expect to see in a non-defective sunroof and [ ] higher than would be considered acceptable in the automotive industry." (Doc. 80-2, ¶ 30.) But Hannemann does not articulate what would be an acceptable rate. Nor does he compare his rate to any similar rates in peer vehicles or even compare his PSR failure rate with that of Kia's conventional sunroofs, even though he admitted that doing so could have been "useful." (Doc. 129 at 210:7-23.) As such, the sole basis for Hannemann's opinion that a class-wide defect exists is his failure rate, which, as already discussed, is unreliable.

The reliability of Hannemann's testimony thus amounts to nothing more than his "say-so." For these same reasons, a judge in the Western District of Washington recently cast serious doubt on Hammemann's nearly identical testimony in a nearly identical case. *See Beaty v. Ford Motor Co.*, No. C17-5201RBL, 2020 WL 639408, at *5 (W.D. Wash. Feb. 11, 2020) ("Ford also points out that Beaty's experts have not 'laid a hand' on her car or any other Escape; expert Hannemann simply claims that 'the PSR replacement rate' he calculated is 'higher than he would have expected' and 'higher than what would be acceptable' in the industry. He does not articulate what would be an acceptable rate . . .).

Further, the Sixth Circuit has affirmed similar district court determinations to exclude such expert testimony. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). For example, in *Johnson*, the court excluded the testimony of an expert whose preparation, like Hannemann, "consisted primarily of document review," with no testing of the expert's theory, leaving the court to primarily rely on the expert's "say-so." *Id.* at 427, 430-432. Likewise, here, Hannemann only reviewed documents in order to calculate his replacement parts failure rate and did no further testing to prove his theory. *See also e.g., Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (methodology not sufficiently reliable to allow expert testimony when expert "merely counts accidents from accident reports . . . [w]ithout questioning or verifying the data and without conducting any tests of his own."); *Botnick v. Zimmer, Inc.*, 484 F. Supp. 2d 715, 720 (N.D. Ohio 2007) (methodology insufficiently reliable when it consisted of a review of "photographs, a visual inspection which included no testing, no

19

inquiry into failure rates, no knowledge of the Device's manufacturing process and no explanation for the alleged defect.").

### (iii) Hannemann's Testimony was Prepared "Solely for Litigation"

Another factor also weighs heavily on the Court's analysis. "[F]or some time," the Sixth Circuit has recognized that "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." *Johnson,* 484 F.3d at 434. Here, not only was Hannemann's testimony "prepared solely for purposes of litigation," but there is also evidence that some of it may have been prepared solely *by* the litigants. In his deposition, Hannemann admits that the chart in paragraph 28 of his declaration (which is referenced above) was created by someone at the Gibbs firm and that "by time I got working on this case, this chart had already been completed. And so what I did was just check the numbers." (Doc. 129, p. 42-43.) When asked if the chart was already populated with the numbers of parts sold, vehicles manufactured for sale, and percentages of glass part sales per vehicles sold, Hannemann stated, "I think it was, but I don't recall if I had to change or fill anything in or not. But when I -- I got the chart, I went, found the right documents, I verified those were the documents I would use and I think the numbers lined up, but I may have made a change here and there." (Doc. 129, p. 46-47.) This chart provides the basis for Hannemann's opinion that a class wide defect exists. The fact that he may not have even been responsible for creating it is greatly concerning.

In sum, none of the *Daubert* factors weigh in favor of admitting Hannemann's

20

testimony, at least two weigh in favor of exclusion (known/potential error rate and general acceptance), and several Sixth Circuit "red flags" demonstrate a lack of reliability, including: (1) improper extrapolation, (2) reliance on anecdotal evidence . . . (4) insufficient information about the case, (5) failure to consider other possible causes, (6) lack of testing, and (7) subjectivity. *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 177 (6th Cir. 2009). The Sixth Circuit has excluded expert testimony for less. *See e.g. Newell*, 676 F.3d at 528 ("the district court identified at least four red flags . . . these concerns have been deemed sufficient to warrant exclusion in prior cases."). These factors, along with the Court's concern about who actually calculated the failure rate, demonstrate that Hannemann's testimony is not reliable. As such, Kia's Motion to Exclude the Expert Testimony of Neil Hannemann (Doc. 156) is hereby **GRANTED**.

> **2. Thomas Read**

Thomas Read's testimony is also proffered to prove the existence of a class wide defect. (Doc. 80-3.) Read essentially offers two opinions: (1) Class Vehicles' PSRs have substantially common design features, and (2) these design features result in a defect that is common to all Class Vehicles.

In forming his opinions, Read did two things. First, he reviewed documents. Second, he utilized "fractographic analysis"—the "one known and proven technique used to determine the cause of failure of broken glass objects"—and inspected twelve failed Kia PSRs. Read concluded that one failure was the result of direct impact, one the result of "non-impact tensile stress," and the remaining ten were the result of progressive failures. Based on this, he concluded that "[g]iven the size, thinness,

21

curvature, ceramic print, and attachment to the unibody frame, the panoramic sunroof glass in Subject Vehicles is weakened and not capable of withstanding the tensile stresses one would reasonably anticipate, making the glass defective in that it is substantially likely to shatter and not reasonably fit for its intended use and environment." (*Id*. at ¶ 31.)

In this case, what is problematic is that the only thing that links Read's fractographic analysis to his proclamation that there is "common defect" amongst all Class Vehicles is his own speculation. Apart from his visual inspection of the twelve sunroofs, Read admits that he never inspected, tested, measured, even laid his hands on any Class Vehicles.[4] Nor did he ever conduct any comparative analyses, whatsoever: he never compared Kia's PSRs to other manufacturer's PSRs and never even compared Kia's PSRs to Kia's traditional sunroofs. (Doc. 131 at 253:1-22.) In fact, Read does not even know the model, year, or make of any of the twelve sunroofs he inspected.[5]

As for the characteristics that Read claims cause the common defect—size, thinness, curvature, ceramic print, and attachment to the unibody frame—Read never tested any of them. As for size and thinness, Read admits that: (1) he never measured or compared the differences in the size of a traditional sunroof and a PSR; (2) never compared the size of a Kia PSR to the size of other, non-Kia PSRs; (3) never measured or

_____

[4] Doc. 131 at 67:3-17, "Q: Did you take any notes related to the work you did on this case? A: No . . . Q: Did you make any calculations related to the work you did on this case? A: No. Q: **Did you do any testing related to the work you did on this case? A: No**. Q: Did you make any measurements related to the work you did on this case? A: No." (emphasis added). *Id*. at 39: 22-5, "Q: **Any sort of testing at all outside of what – your examination of those 12 sunroofs . . . A: No, I did not**." (emphasis added).

[5] *Id*. at 78:14-17, "Q: You do not know nor do you have records of what the model or model number is – model year is of any of those 12 sunroofs; is that correct? A: Correct."

compared the sizes of PSRs across the various class models; (4) did not know the

thickness for other sunroofs or what the industry standard was; and (5) never

conducted any tests to determine whether the glass' alleged thinness adversely affected

it strength.  (*Id*. at 136:4-7; 145:8-12; 145:15-23; 179:5-21; 188:25.)  As for curvature, Read

admits that all modern sunroofs (panoramic or not) are curved, but that he did not

measure the curvature of the glass in the Class Vehicles nor compare it to the curvature

of other sunroofs to determine if there was anything unique about Kia's PSRs.  (*Id*. at

162:8-166:1.)  As for ceramic paint, Read never performed any measurements, or

conducted any studies or tests, or even compared Kia's use to any of the many other

manufacturers who use ceramic paint on their sunroofs.  (*Id*. at 191:4-22; 195:10-196:25.)

And as for the attachment to the unibody frame, Read again conducted no tests and

took no measurements.

In fact, Read could not say which, if any, of the five alleged defects in design

were the cause of the failures he observed.  (*Id*. at 252:24-253:6, "Q:  Okay.  Did you

make a determination as to which characteristic you described earlier in your report,

you know, may have caused — or which combination of characteristics may have

caused the breakage in any of the 10 you observed?  A:  Specifically, no . . . .")

Read's failure to establish a definitive link between his fractographic analysis

and his opinion that a class-wide defect exists leaves his hypothesis as just that – a

hypothesis.  And, while an expert may be "distinguished," and "his conjecture about

causation . . . worthy of careful attention . . . the courtroom is not the place for scientific

guesswork, even of the inspired sort."  *Tamraz v. Lincol Elec. Co.*, 620 F.3d 665, 671 (6th

Cir. 2010) (citations omitted). Judge Sutton summarized this dilemma eloquently in *Tamraz*, stating the expert's opinion was "a plausible hypothesis. It may even be right. But it is no more than a hypothesis, and it thus is not 'knowledge,' nor is it 'based upon sufficient facts or data' or the product of reliable principles and methods . . . applied . . . reliably to the facts of the case." *Id*. at 670.

For these same reasons, the *Beaty* court, discussed above, also discredited Read's nearly identical testimony there. 2020 WL 639408 at *3 ("to the extent Beaty relies on her expert's opinion that the Escape PSRs are similar to PSRs in other model line or other manufacturers' vehicles, **it is flawed, because Dr. Read has not inspected the Escape**.") (emphasis added). The *Beaty* court's determination is consistent with Sixth Circuit precedent. *See, e.g., Johnson*, 484 F.3d 426; *Tamraz*, 620 F.3d at 671; *Newell Rubbermaid*, 676 F.3d at 527; *Botnick*, 484 F. Supp. 2d at 720.

Simply put, Read reviewed documents and inspected twelve failed Kia PSRs. Based on his cursory inspection, he speculated, without explanation, that a common design defect existed amongst all 22 model-year vehicles. He never inspected a single car or took any measurements to verify his findings. Nor did he ever conduct any tests or comparative analysis. As such, Read's testimony must be excluded under Fed. R. Evid. 702 and *Daubert* since it wholly lacks any reliability. Accordingly, Kia's Motion to Exclude the Expert Testimony of Thomas Read (Doc. 157) is hereby **GRANTED**.

### C. Predominance

As discussed above, Kondash is left with little—if any—evidence of class-wide common defect. On this basis, other courts around the country have denied class

24

certification.  *See, e.g., Kramer v. Toyota Motor Corp.*, 668 F. App'x 765, 766 (9th Cir. 2016)

("Without any evidence of a common defect, there are no "common questions of law or

fact" binding the proposed class together."); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813,

819 (7th Cir. 2010) ("Without [the expert] testimony, Plaintiffs are left with too little to

satisfy Rule 23(b)(3)'s predominance prong.").  Accordingly, Kia argues that class

certification should be denied because Kondash cannot meet his burden of

"affirmatively demonstrating . . . that such a common defect exists." (Doc. 155 at p. 8.)

But Kia misstates the governing legal standard at this stage of litigation.  Kondash need

not affirmatively demonstrate that a common defect exists.  Rather, it is Kondash's

burden to "affirmatively demonstrate" that common issues predominate over

individual issues regarding a class-wide defect.  *See Dukes*, 564 U.S. at 350.

      Kondash cannot meet this standard either.  His whole theory of the case is that

there is a class-wide design defect that is common to all Class Vehicles.  But without the

existence of a defect, what is common amongst Class Members?  Yes, they all drive

Kia's with PSRs, except the Class Vehicles they drive vary drastically.  It is obviously

undisputed that the designs of the different models vary.  It is also undisputed that the

failure rates vary not only amongst models, but also amongst model-years as well.  (*See*

Docs. 80-2 and 153-1.)  Still, Kondash contends that the common defect is tied to the size

of the sunroof glass, its curvature, its ceramic print area, and the manner in which the

sunroof is fastened to the vehicle.  Yet, the Class Vehicles differ in almost all of these

regards.  The size of the glass used in each PSR varies amongst Class Vehicles.  (*See* Doc.

153-1.)  The curvature varies amongst Class Vehicles.  (*See* Doc. 154-1.)  Further, the

percentage area of sunroof glass that is coated in ceramic paint varies from 37-92%

amongst Class Vehicles.  (*See* Doc. 153-1.)  Although all Class Vehicles used tempered

glass, the glass type varies amongst Class Vehicles, as does the glass supplier, with

some PSRs being supplied by Guardian, some by Hankuk Sekurit, and some by KAC.

(*Id.*)  Moreover, the PSRs of each Class Vehicle model went through various engineering

changes that not only differ from model to model, but from model-year to model-year.

(*See* Doc. 80-8 at p. 56-71) (2011-2013 Sorento = 22 engineering changes; 2014-2015

Sorento = 9 engineering changes; 2011-2015 Optima = 31 engineering changes; 2011-

2016 Sportage = 27 engineering changes; 2014-2016 Cadenza = 24 engineering changes.)

And, even if Kondash could present evidence of a defect in one model-year vehicle—he

cannot—there is a significant amount of case law, in and out of the automotive context,

that stands for the proposition that knowledge of defect in one model line does not

establish knowledge of a defect in a different model line.  *See Beaty*, 2020 WL 639408 at

*3 (collecting cases).  Nor is this an issue that Kondash could efficiently resolve by

utilizing subclasses.

    In sum, the 22 model-year vehicles have different designs, resulting in 22

different PSRs with different sizes, shapes, curvatures, and different ways in which they

were fastened to the vehicle.  Without proof of a common defect, individual issues

predominate just amongst the Class Vehicles.

    But what about Class Members?  Individual issues predominate here as well.

Some Class Members, like Kondash, purchased new vehicles, while others purchased

used vehicles or leased.  Some Class Members drove their Class Vehicles every day,

while other Class Vehicles rarely ever left their owner's garage. Some Class Members, like Kondash, had their PSR replaced by Kia, while others did not . . . the list goes on. But most importantly, some Class Members (roughly 40-60 in Ohio by defense counsel's estimate) had their PSR spontaneously shatter, while the vast majority have not.

In sum, Kondash has failed to demonstrate that the most important factual question in this case—whether the Class Vehicles have a common defect—is capable of class-wide resolution. As courts across the country have routinely found when faced with similar circumstances, this Court finds that Kondash has failed to meet his burden of "affirmatively demonstrating" that common questions predominate over individual issues. *See, e.g., Kramer*, 668 F. App'x at 766; *Allen*, 600 F.3d at 819; *In re Bridgestone/ Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002); *Cates v. Whirlpool Corp.*, 2017 WL 1862640 (N.D. Ill. May 9, 2017); *Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316 (N.D. Cal., Apr. 19, 2017); *Burton v. Chrysler*, 2012 WL 7153877, at *1 (D.S.C. Dec. 21, 2012).

Accordingly, Kondash's Motion to Certify Class (Doc. 80) is **DENIED**.

## CONCLUSION

In sum, without the expert testimony of Hannemann and Read, there is no evidence of a class-wide defect. And without evidence of a class-wide defect, there is nothing that ties the class together in order to satisfy predominance. Accordingly, the Court hereby **ORDERS** that:

      1.    Kondash's Motion to Certify Class (Doc. 80) is **DENIED**;

      2.    Kia's Motion to Exclude the Testimony of Expert Hannemann (Doc. 156) is **GRANTED**;

27

3.      Kia's Motion to Exclude the Testimony of Expert Read (Doc. 157) is

**GRANTED**;

4.      Kia's Motion to Exclude the Testimony of Expert Gaskin (Doc. 158) is

**DENIED AS MOOT**;

5.      Kia's Motion to Exclude the Testimony of Expert Weir (Doc. 159) is

**DENIED AS MOOT**;

6.      Kondash's Motion to Exclude the Testimony of Expert Strombom (Doc.

170) is **DENIED AS MOOT**; and

7.      This case be closed on the docket of this Court.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND